No. 25-6813

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

EMALEE WAGONER,

*Plaintiff-Appellee,*

v.

JENNIFER WINKELMAN,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
District of Alaska, No. 3:18-cv-00211 (Scoble, J.)

## EXCERPTS OF RECORD
## VOLUME I

J. Michael Connolly
Jeffrey M. Harris
Rachael C.T. Wyrick
Ryan M. Proctor
Marie E. Sayer
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
jeff@consovoymccarthy.com
rachael@consovoymccarthy.com
ryan@consovoymccarthy.com
mari@consovoymccarthy.com

STEPHEN J. COX
  ATTORNEY GENERAL

Jenna Lorence
  *Solicitor General*
Jessica M. Alloway
  *Deputy Solicitor General*
ALASKA OFFICE OF THE
ATTORNEY GENERAL
DEPARTMENT OF LAW
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
(907) 269-7938
jenna.lorence@alaska.gov
jessie.alloway@alaska.gov

March 18, 2026

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

EMALEE R. WAGONER,

               Plaintiff,

        v.

JENNIFER WINKELMAN,
*Commissioner of Alaska Department of Corrections*,

               Defendant.

Case No. 3:18-cv-00211-MMS

## CORRECTED ORDER GRANTING DECLARATIVE AND INJUNCTIVE RELIEF TO PLAINTIFF

This Court, pursuant to Title 42, United States Code, Section 1983, having found that Plaintiff Emalee Wagoner has proven by a preponderance of evidence that the Defendant Jennifer Winkelman, in her official capacity as Commissioner of the Alaska Department of Corrections ("DOC"), has acted with deliberate indifference regarding Ms. Wagoner's gender dysphoria by denying gender-affirming genital surgery, and, in so doing, violated the Eighth Amendment to the United States Constitution's prohibition on cruel and unusual punishment, IT IS ORDERED that:

1. The Court hereby issues declaratory relief to Plaintiff Emalee Wagoner that Defendant Jennifer Winkelman, in her official capacity as Commissioner of Alaska Department of Corrections, has violated the prohibition against cruel and unusual punishment, arising from the Eighth Amendment to the United States Constitution,

by acting with deliberate indifference to Ms. Wagoner's serious medical need for gender-affirming genital surgery to treat her severe gender dysphoria.

2. Defendant Jennifer Winkelman, in her official capacity as Commissioner of Alaska Department of Corrections, is ordered and enjoined to provide Ms. Wagoner with adequate medical care, including prompt referral to a qualified surgeon for evaluation and consultation for gender-affirming genital surgery and no later than one month from the date of this order being operative. Defendant shall take all actions reasonably necessary to provide Ms. Wagoner gender-affirming genital surgery, including, but not limited to, all pre- and post-operative consultations, diagnostic studies, and procedures as deemed necessary by a qualified surgeon or other treatment provider, as promptly as possible.

3. The Court enjoins the enforcement of DOC July 2022 Policy #807.23 as to Section (V)(E) ("Surgical interventions for prisoners with gender dysphoria shall be for therapeutic purposes that meet the criteria for essential health care when symptoms of gender dysphoria have not responded to non-surgical interventions." Policy #807.23, Treatment and Management of Gender Dysphoria. Ex. 2021 at 5(V)(E)) insofar as it is, as applied, functions as a de facto prohibition on gender affirming surgery.

4. No later than 45 days from the date of this order being operative, the parties shall file a joint status report addressing whether a surgeon has been agreed upon and the anticipated approximate period during which Ms. Wagoner will be evaluated by a surgeon for gender affirming surgery and when surgery is expected to occur. If

needed, the parties are permitted to file under seal. *See* MGO 25-06 for newly updated procedures for filing under seal.

5. The Court has considered the mandates of the Prison Litigation Reform Act requiring that a court "shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the federal right," and "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." 18 U.S.C. § 3626(a)(1)(A). The Court concludes that this order for injunctive relief satisfies the PLRA requirements. It is narrowly drawn, extends no further than necessary, and is the least intrusive means of correcting the violations. Further, there is no evidence that granting this relief will have any adverse impact on public safety or the operation of the criminal justice system. 18 U.S.C. § 3626(a)(1)(B).

6. Upon Plaintiff's signed release, Defendant will promptly share with Plaintiff's counsel any medical records, charts, notes, or other information received from the surgeon(s) or other medical providers regarding Plaintiff's consultations and appointments associated with the surgery. Plaintiff's counsel may also directly contact the surgeon and other medical providers. This does not prohibit DOC from following its own safety protocols for outside medical appointments, such as not informing inmates of the exact date or certain sensitive details for safety concerns.

7. Defendant shall notify Plaintiff's counsel of any material updates.

8. Should the parties disagree as to the other's compliance with this order, they are ordered to meet and confer prior to notifying the Court.

9. This order's effect and operation is **STAYED** for 30 days or until receipt of a mandate from a higher court, whichever is later.

10. Plaintiff's claims pertaining to chronic regional pain syndrome are **DISMISSED with prejudice**.

11. The Clerk of Court shall prepare a Judgment for the Court's review and subsequently close this case.

12. The Court retains jurisdiction to enforce this order, though it would not exercise jurisdiction during the pendency of an appeal.

DATED this 8th day of January, 2026 at Anchorage, Alaska.

_____

MATTHEW M. SCOBLE
U.S. MAGISTRATE JUDGE

(Rev. 10/19) Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Alaska

| | | |
|---|---|---|
| EMALEE R. WAGONER | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   3:18-cv-00211-MMS |
| | ) | |
| JENNIFER WINKELMAN, *Commissioner of Alaska* | ) | |
| *Department of Corrections* | ) | |
| *Defendant* | | |

## JUDGMENT IN A CIVIL ACTION

☐ **JURY VERDICT.** This action came before the court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **DECISION BY COURT.** This action came to trial or decision before the Court. The issues have been tried or determined and a decision has been rendered.

   IT IS ORDERED AND ADJUDGED:

   THAT Plaintiff is awarded declaratory and injunctive relief as detailed in the Order at Docket 367. Plaintiff's claims pertaining to chronic regional pain syndrome are dismissed with prejudice.

APPROVED:

**s/Matthew M. Scoble**
Matthew M. Scoble
United States Magistrate Judge

Date: September 29, 2025

*Note: Award of prejudgment interest, costs and attorney's fees are governed by D.Ak. LR 54.1, 54.2, and 58.1.*

**Candice M. Duncan**
Candice M. Duncan
Clerk of Court

**1-ER-0006**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

EMALEE R. WAGONER,

               Plaintiff,

       v.

JENNIFER WINKELMAN,
*Commissioner of Alaska Department of Corrections*,

               Defendant.

Case No. 3:18-cv-00211-MMS

## ORDER GRANTING DECLARATIVE AND INJUNCTIVE RELIEF TO PLAINTIFF

This Court, pursuant to Title 42, United States Code, Section 1983, having found that Plaintiff Emalee Wagoner has proven by a preponderance of evidence that the Defendant Jennifer Winkelman, in her official capacity as Commissioner of the Alaska Department of Corrections ("DOC"), has acted with deliberate indifference regarding Ms. Wagoner's gender dysphoria by denying gender-affirming genital surgery, and, in so doing, violated the Eighth Amendment to the United States Constitution's prohibition on cruel and unusual punishment, IT IS ORDERED that:

1. The Court hereby issues declaratory relief to Plaintiff Emalee Wagoner that Defendant Jennifer Winkelman, in her official capacity as Commissioner of Alaska Department of Corrections, has violated the prohibition against cruel and unusual punishment, arising from the Eighth Amendment to the United States Constitution,

by acting with deliberate indifference to Ms. Wagoner's serious medical need for gender-affirming genital surgery to treat her severe gender dysphoria.

2. Defendant Jennifer Winkelman, in her official capacity as Commissioner of Alaska Department of Corrections, is ordered and enjoined to provide Ms. Wagoner with adequate medical care, including prompt referral to a qualified surgeon for evaluation and consultation for gender-affirming genital surgery and no later than one month from the date of this order being operative. Defendant shall take all actions reasonably necessary to provide Ms. Wagoner gender-affirming genital surgery, including, but not limited to, all pre- and post-operative consultations, diagnostic studies, and procedures as deemed necessary by a qualified surgeon or other treatment provider, as promptly as possible.

3. The Court enjoins the enforcement of DOC July 2022 Policy #807.23 as to Section (V)(E) ("Surgical interventions for prisoners with gender dysphoria shall be for therapeutic purposes that meet the criteria for essential health care when symptoms of gender dysphoria have not responded to non-surgical interventions." Policy #807.23, Treatment and Management of Gender Dysphoria. Ex. 2021 at 5(V)(E)) insofar as it is, as applied, functions as a de facto prohibition on gender affirming surgery.

4. No later than 45 days from the date of this order being operative, the parties shall file a joint status report addressing whether a surgeon has been agreed upon and the anticipated approximate period during which Ms. Wagoner will be evaluated by a surgeon for gender affirming surgery and when surgery is expected to occur. If

needed, the parties are permitted to file under seal. *See* MGO 25-06 for newly updated procedures for filing under seal.

5. The Court has considered the mandates of the Prison Litigation Reform Act requiring that a court "shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the federal right," and "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." 18 U.S.C. § 3626(a)(2). The Court concludes that this order for injunctive relief satisfies the PLRA requirements. It is narrowly drawn, extends no further than necessary, and is the least intrusive means of correcting the violations. Further, there is no evidence that granting this relief will have any adverse impact on public safety or the operation of the criminal justice system.

6. Upon Plaintiff's signed release, Defendant will promptly share with Plaintiff's counsel any medical records, charts, notes, or other information received from the surgeon(s) or other medical providers regarding Plaintiff's consultations and appointments associated with the surgery. Plaintiff's counsel may also directly contact the surgeon and other medical providers. This does not prohibit DOC from following its own safety protocols for outside medical appointments, such as not informing inmates of the exact date or certain sensitive details for safety concerns.

7. Defendant shall notify Plaintiff's counsel of any material updates.

8. Should the parties disagree as to the other's compliance with this order, they are ordered to meet and confer prior to notifying the Court.

9. This order's effect and operation is **STAYED** for 30 days or until receipt of a mandate from a higher court, whichever is later.

10. Plaintiff's claims pertaining to chronic regional pain syndrome are **DISMISSED with prejudice**.

11. The Clerk of Court shall prepare a Judgment for the Court's review and subsequently close this case.

12. The Court retains jurisdiction to enforce this order, though it would not exercise jurisdiction during the pendency of an appeal.

DATED this 26th day of September, 2025 at Anchorage, Alaska.

_____
MATTHEW M. SCOBLE
U.S. MAGISTRATE JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

EMALEE R. WAGONER,

     Plaintiff,

  v.

JENNIFER WINKELMAN,
*Commissioner of Alaska Department of Corrections*,

     Defendant.

Case No. 3:18-cv-00211-MMS

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case was tried before the Court without a jury on May 12–16, 2025. Having heard all testimony at trial, reviewed admitted trial exhibits, and received post-trial filings, the Court makes the following Findings of Fact and Conclusions of Law. A separate order will follow.

In summary, the Court agrees with Plaintiff as to whether Defendant acted with deliberate indifference as to her gender dysphoria, but it disagrees with Plaintiff as to whether Defendant acted with deliberate indifference as to her chronic regional pain syndrome. The Court also explained its hesitations with *Edmo* and the wisdom of considering WPATH as reflective of a consensus.

## I. FINDINGS OF FACT

### a. Background and Procedural History.

1) Plaintiff Emalee Wagoner is a transgender inmate housed at Goose Creek Correctional Center ("GCCC") under the supervision of the Alaska Department of

Corrections ("DOC"). She filed this litigation under 42 U.S.C. § 1983, alleging that DOC has acted with deliberate indifference in failing to adequately treat her gender dysphoria. Wagoner is approximately 44 years old. Wagoner was born with male anatomy and uses female pronouns. She was sentenced to serve 40 years and has been incarcerated within the DOC since 2011. Wagoner's current projected release date is 2038.

2)  The Defendant is Jennifer Winkelman, the Commissioner of Alaska Department of Corrections, who is sued in her official capacity.

3)  Wagoner first filed her Complaint in September 2018, followed by a June 2019 First Amended Complaint, and a Second Amended Complaint in March 2023, which is the operative complaint.

4)  The Second Amended Complaint sets forth three claims. First, Plaintiff alleges that DOC failed to implement "any policies with regard to the treatment of transgender inmates suffering from gender dysphoria." Second, Plaintiff alleges that DOC "failed to follow the referral [made by] Dr. Greg Lund to have her sent to a full spectrum transgender clinic." Third, Plaintiff alleges that DOC "failed to provide her with effective pain management medication in response to her chronic pain."

5)  The Second Amended Complaint requests three forms of injunctive relief. First, Plaintiff requests an injunction ordering DOC to "begin medical and mental health treatment for Wagoner which conforms with the WPATH standards of care," which she contends should include sex reassignment surgery. Second, Plaintiff requests an injunction to "schedule her to visit a full spectrum transgender clinic." Third, Plaintiff requests that DOC "provide [her] with effective pain management medication." Wagoner later

abandoned her request for an award of compensatory and punitive damages and therefore avoided a jury trial. At trial, Wagoner argued that she is seeking a vaginoplasty, specifically.

6) The Court held a five-day bench trial. Plaintiff presented four witnesses, including two experts, Dr. Randi Ettner and Dr. Nicholas Gorton, the plaintiff Emalee Wagoner, and her treating physician, Dr. Rachel Samuelson. Defendants presented seven witnesses, including two DOC security officers, a DOC mental health clinician, former DOC Chief Medical Officer Dr. Robert Lawrence, former DOC Chief Mental Health Officer and current DOC Deputy Director of Health and Rehabilitation Services Adam Rutherford, and two experts, Dr. Joseph Penn and Dr. Sara Boyd.

### b. Gender Dysphoria.

7) "Gender identity" is the term that refers to one's personal sense of their gender. A person who is "cisgender" has a gender identity that aligns with his or her birth-assigned sex, while a person who is "transgender" has a gender identity that does not. For some transgender people, the basic incongruence between their sex assigned at birth and their gender identity results in clinically significant distress. This clinically significant distress may result in "gender dysphoria", a psychiatric condition recognized by the fifth edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5").

8) Gender dysphoria is a mental health diagnosis for people experiencing a strong and persistent incongruity between their anatomy and their gender identity. Not all transgender people have gender dysphoria.

9) Gender dysphoria in adolescents and adults is defined by the DSM-5 as:

A. A marked incongruence between one's experienced/expressed gender and assigned gender, or at least 6 months' duration, as manifested by at least two of the following.

    i. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

    ii. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

    iii. A strong desire for the primary and/or secondary sex characteristics of the other gender.

    iv. A strong desire to be the other gender (or some alternative gender different from one's assigned gender).

    v. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

    vi. The strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

10) Left untreated, gender dysphoria can worsen with age due to hormone changes associated with aging. With normal aging, cortisol rises and destabilizes other hormones, potentially causing an intensification of gender dysphoria.

11) When people are not treated for gender dysphoria, they may suffer severe emotional symptoms, such as depression and anxiety, and may be at risk for substance abuse, self-surgery, or suicide.

12) Gender-affirming genital surgery is one treatment for gender dysphoria, but it is not a treatment for anxiety or depression.

13)     Some people have gender dysphoria without genital dysphoria.  For them, the presence of genitalia that does not match their gender identity is not itself a source of distress.  For other people, gender dysphoria generates genital dysphoria, which is focused on the presence of genitalia inconsistent with their gender identity.

### c.     WPATH.

14)     The World Professional Association for Transgender Health ("WPATH") publishes guidelines for the treatment of patients with gender dysphoria, most recently updated in late 2022.  The WPATH guidelines recommend a multidisciplinary approach to the treatment of gender dysphoria, with mental health staff and medical providers collectively deciding on the appropriate course of care.  WPATH's current Standards of Care, Version 8, was published in 2022.  Prior to Version 8, Standards of Care, Version 7 were in effect from 2016–2022.

15)     The most recent WPATH guidelines have a chapter applicable to institutionalized individuals, which Dr. Ettner testified she authored after years' worth of work.  However, these WPATH guidelines do not appear to have been developed based on extensive clinical experience with incarcerated persons, as Dr. Ettner also testified, she has never worked for or in a correctional institution, has never worked in a day-to-day correctional facility setting, did not have any specific training with prison operations, and could not provide any opinions relating to policies and procedures for keeping inmates safe.  It should be noted that the chapter found in WPATH dealing with incarcerated patients includes patients who are in long-term care facilities or residential treatment

centers, which calls into question the degree to which this chapter is applicable prisons and jails.

16) WPATH Standards of Care Version 8 sets forth the six criteria for gender affirming surgery:

    A. Gender incongruence that is marked and sustained.
    B. Meets diagnostic criteria for gender incongruence prior to gender affirming surgical intervention.
    C. Demonstrates capacity to consent for the specific gender affirming surgical intervention.
    D. Other possible causes of apparent gender incongruence have been identified and excluded.
    E. Mental health and physical conditions that could negatively impact the outcome of gender affirming surgical intervention have been assessed with risks and benefits discussed.
    F. Stable on their gender affirming hormonal treatment regime.

17) While there have been a number of studies designed to identify the long-term benefits of gender-affirming surgery, the relative scarcity of studies showing a reduction in morbidity and mortality in this evolving field of medicine casts doubt on the quality of evidence supporting the WPATH standards. There are no studies of the treatment of incarcerated individuals.

18) The unknown effectiveness of these surgeries is partially derived from the fact that there are studies that come to different conclusions. Some research has concluded that gender-affirming surgery is an effective treatment for mental health issues. Other studies suggest that gender-affirming surgeries do not improve the patient outcomes. For example, one study concluded that after sex reassignment surgery, people with gender dysphoria, "have considerably higher risks for mortality, suicidal behavior, and psychiatric morbidity than the general population. Our findings suggest that sex reassignment,

although alleviating gender dysphoria, may not suffice as treatment for transsexualism . . ."[1]

19)     In another recent study, the authors concluded that there are no short-term benefits from gender-affirming surgeries. Of 107,583 patients, matched cohorts demonstrated that those undergoing surgery were at significantly higher risk for depression, anxiety, suicidal ideation, and substance use disorders than those without surgery.[2]  Therefore, there remains uncertainty regarding the best modality to treat gender dysphoria, particularly in an incarcerated setting.

**d.     Expert Witnesses.**

Dr. Randi Ettner, PhD

20)     Dr. Randi Ettner is a PhD-level clinical and forensic psychologist who has been practicing for over thirty years and whose specialty is transgender healthcare.  Dr. Ettner has evaluated, diagnosed, or treated more than 3,000 people with gender dysphoria. She has referred approximately 325 people for gender-affirming surgery, most of them for genital surgery.  She is currently a member of the medical staff at Weiss Memorial Hospital, where she consults with the medical team regarding any issues that arise for them around gender affirming surgery.  Dr. Ettner has published 17 peer-reviewed journal articles on transgender healthcare, including several about gender-affirming surgery, and has authored a textbook.

---

[1] *See*, Ex. 2086.
[2] *See*, Ex. 2087.

21) Dr. Ettner has been a member of WPATH since around 1997 and was a board member for 12 years. Dr. Ettner co-authored the chapter on institutionalized people in Version 8, and is currently chair of the WPATH committee for the institutionalized.

22) Dr. Ettner consulted with the Connecticut state prison system and Cook County Jail in Chicago to help them develop policies on transgender healthcare. She has served as an expert in about 60–70 cases and has never been rejected as an expert witness by a court. This notably includes *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019).

23) Dr. Ettner is not a correctional practitioner, nor does she have any experience treating inmates with gender dysphoria who are currently incarcerated. Dr. Ettner is not board-certified, nor is she a medical doctor. Dr. Ettner has never been employed by a prison and has no formal training in prison operations or security.

24) The court recognized Dr. Randi Ettner, without objection, as an expert in clinical and forensic psychology generally, and specifically in the field of transgender health, including the diagnosis, evaluation, and treatment of gender dysphoria and assessment and referral for gender-affirming surgery. The Court found Dr. Ettner credible, though it notes below its concerns regarding her experience.

Dr. Ryan Nicholas Gorton, MD

25) Dr. Ryan Nicholas Gorton is a medical doctor and experienced primary care physician who works at a medical clinic in San Francisco that focuses on treating transgender patients. Dr. Gorton directly treats up to two hundred transgender patients per year. He has evaluated about 500 people for gender affirming surgery and has referred between one and two hundred people for a vaginoplasty. He has seen thousands more

patients post-gender-affirming surgery. Dr. Gorton has published about twenty articles, most of which are about gender affirming healthcare, and half of which have been peer reviewed. He's certified by WPATH in providing medical care to people with gender dysphoria.

26) Dr. Gorton has experience and training in complex regional pain syndrome.

27) Dr. Gorton was qualified as an expert in transgender healthcare in *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019).

28) Dr. Gorton has treated some incarcerated people who are brought to the emergency department of a hospital, but he has no other experience providing treatment to inmates, has never worked in a prison, has never been part of a treatment committee at a prison, and has never provided treatment to an inmate with gender dysphoria while incarcerated. He does not have training or a background in correctional safety or security. Dr. Gorton does not perform gender-affirming surgery.

29) The Court qualified Dr. Gorton, without objection, as an expert in transgender healthcare generally, emergency medicine, and the diagnosis, evaluation, and treatment of gender dysphoria, including referral and assessment for gender-affirming surgical treatment. Dr. Gorton was also qualified to render an opinion as to whether Ms. Wagoner suffers from complex regional pain syndrome. The Court found Dr. Gorton credible, though it notes below its concerns regarding his experience.

Dr. Sara Boyd, PhD

30) Dr. Sara Boyd is a licensed clinical psychologist who specializes in the assessment and treatment of psychological illness. She holds master's degrees in

counseling psychology and clinical psychology, and a PhD in clinical psychology. She is board-certified as a forensic psychologist with the American Board of Professional Psychology. She has specific training in gender minority and gender diverse individuals and has evaluated gender dysphoria in inmates relating to their care, sentencings, and for the purposes of providing expert testimony.

31) Dr. Boyd is the only expert in this case who is a forensic psychologist. Also, unlike Wagoner's experts, Dr. Boyd has experience evaluating patients in correctional settings, including experience with gender dysphoria treatment committees in prisons.

32) Dr. Boyd was critical of the screening measures Dr. Ettner undertook to evaluate Wagoner's gender dysphoria, describing them as inadequate. Specifically, Dr. Boyd described Dr. Ettner's use of the Beck Inventories, which are focused on depression and anxiety, as commonly given in a therapist's waiting room to track symptoms over time, given that they only cover a two-week period. They also do not have any validity indices, which renders them too narrow, not specific to gender dysphoria, and they fail to encompass Wagoner's co-occurring primary mental disorders.

33) Dr. Boyd took issue with the manner in which Drs. Ettner and Gorton relied on the studies upon which they supported their opinions. This is because the researchers evaluating the benefits of surgery utilize measurement tools such as the MMPI (Minnesota Multiphasic Personality Inventory) or personality assessment inventories that neither Drs. Ettner nor Gorton employed, which evaluate suicidality and life functioning. Suicidality testing would have been appropriate for Wagoner because of her demonstrated incidents of parasuicidal behavior, such as self-surgery, instances in which she engaged in self-harm,

but without the apparent intention to end her life. Per Dr. Boyd, there is thus an incongruence between the studies' measures and outcomes upon which Drs. Ettner and Gorton relied, and the methodologies they were using when they made predictions about the likelihood that Wagoner's gender dysphoria would resolve or significantly improve through a single surgery.

34) The Court qualified Dr. Boyd as an expert in the field of clinical and forensic psychology generally and specifically regarding transgender health, the diagnosis, evaluation, and treatment of gender dysphoria including informed consent for gender affirming surgical treatment in and out of a correctional setting. The Court found Dr. Boyd credible.

Dr. Joseph Penn, MD

35) Dr. Joseph Penn is a triple board-certified correctional and forensic psychiatrist and a clinical professor at the Department of Psychiatry and Behavioral Sciences, University of Texas Medical Branch ("UTMB"). Dr. Penn currently serves as the Director of Mental Health Services of the UTMB Correctional Managed Care, a university-based correctional health care system that provides direct health services to state inmates in the Texas Department of Criminal Justice. In his position, Dr. Penn is responsible for overseeing the psychiatric, psychological, and mental health services for approximately 120,000 inmates. Since 2004, Dr. Penn has maintained specialized certification as a Certified Correctional Health Professional-Mental Health. Dr. Penn serves as a physician surveyor for the National Commission on Correctional Health Care, is a member of its Board of Directors and its Accreditation and Standards Committee. As

with Dr. Boyd, and unlike Wagoner's experts, Dr. Penn has experience working and treating patients in correctional settings, including experience with gender dysphoria treatment committees in prisons.

36) The Court qualified Dr. Penn as an expert in general and forensic psychiatry with expertise concerning the diagnosis and treatment of mental health issues in correctional settings. The Court found Dr. Penn credible.

### e. DOC's Organization and Policies & Procedures.

37) DOC is responsible for the provision of essential medical and mental health care to its inmates. DOC utilizes a Medical Advisory Committee ("MAC"), an appointed group of DOC medical personnel, to consider complicated medical issues referred by attending mental health staff or medical providers to determine the extent to which requested care, procedure, testing, or treatment fits within the scope of essential healthcare. The composition of the MAC, which meets weekly, changes periodically, but typically consists of approximately ten members. The MAC also assists in reviewing policies and supervises the development of clinical care guides.

38) Dr. Robert Lawrence MD was the Chief Medical Officer of DOC from 2013 to 2024. He sat on the MAC, led the development of clinical care guides, and helped contact medical professionals outside of DOC to clarify recommendations made to DOC about what care to provide Wagoner and to ultimately oversee the process by which Wagoner received hormone therapy by an outside provider. The Court found Dr. Lawrence credible.

39)     Adam Rutherford is the Deputy Director of Health and Rehabilitation Services and was the Chief Mental Health Officer for DOC between 2013-2021.  He sat on the MAC, and in 2017, he helped DOC identify and adopt a counseling program for inmates suffering from gender dysphoria.  Rutherford also helped DOC identify an outside medical provider in the treatment of gender dysphoria to oversee Wagoner's receipt of hormone therapy.  The Court found Rutherford credible.

40)     DOC Policy and Procedure ("P&P") 807.23 is the DOC policy specifically applicable to the treatment and management of gender dysphoria.  Like the DOC guidelines, P&P 807.23 contemplates the treatment of gender dysphoria.  That policy also outlines DOC's multi-step evaluation process and potential treatment modalities.

41)     DOC first drafted a Gender Dysphoria Clinical Care Guide in July 2017. Those guidelines have been periodically updated since then, having been revised at least five times.  In developing the guidelines, DOC looked to other national guidelines, such as those of the WPATH, and available literature and studies.  The DOC guidelines, like the WPATH guidelines, recommend a multidisciplinary approach to the treatment of gender dysphoria, including assessments by mental health clinicians, psychiatric assessments, and medical provider assessments.

42)     DOC's policies and guidelines do not mandate a specific form of care for gender dysphoria, nor do they preclude an attending medical provider from recommending a particular form of treatment.  DOC allows its providers to consider any and all treatment options that are necessary for an inmate with gender dysphoria and specifically contemplates the provision of hormone therapy and surgical care.

43) DOC's multi-step treatment regimen for gender dysphoria includes referrals to the MAC. DOC's MAC may also designate a facility-specific Gender Dysphoria Management Committee ("GDMC") that meets in addition to the MAC to help ensure a treatment plan for a patient addresses the medical, mental health, and personal adjustment, as well as the housing needs of patients with gender dysphoria with the support of DOC officials who deal with security. The MAC has designated a GDMC for GCCC, which meets roughly every 90 days and includes a providing psychiatrist, a medical doctor, the sex offender treatment manager, a supervising mental health clinician, and a medical provider. Prior to the meeting of the GDMC, an inmate whose treatment is undergoing review is assessed by medical and mental health professionals, and the Committee evaluates the inmate's treatment and progress and collectively assesses the appropriateness of the treatment.

44) DOC has not adopted the WPATH guidelines as policy, though along with other professional guidelines, it consulted the WPATH guidelines to develop its own policies and guidelines.

45) Dr. Penn opined that the WPATH guidelines were difficult to apply in a correctional setting, as none of the authors had correctional experience and did not have experience with the Prison Rape Elimination Act or the safety risks that certain treatments may pose within an incarcerated setting.

46) Dr. Penn agreed with DOC's approach to evaluating Wagoner's needs and healthcare, particularly where inmates are seeking treatment based on self-reported harm,

which may be motivated by the issuance of pain medication or other types of secondary gain.

### f.    Emalee Wagoner.

47)    The Court heard testimony from Plaintiff Emalee Wagoner.    Plaintiff testified credibly and the Court, despite having knowledge of her prior manipulative behavior, does not find that an adverse credibility finding is appropriate for the testimony that it heard.

48)    Ms. Wagoner is transgender, but she had never attempted to live publicly as a woman prior to her incarceration.

49)    Plaintiff was formerly known as Emmanuel Cancel when the Alaska Superior Court entered a Judgment and Order of Commitment and remanded her to DOC custody after having pled guilty to three counts of first-degree sexual abuse of a minor to fulfill a sentence of 60 years' imprisonment with 20 years suspended.[3]   The conviction followed an indictment on fifty felony charges: forty-two counts of first-degree sexual abuse of a minor, five counts of second-degree sexual abuse of a minor, one count of third-degree sexual abuse of a minor, and two counts of first-degree controlled substance misconduct (distributing controlled substances to a minor).   These charges were based on allegations that Wagoner sexually abused several children — her stepchildren, her

---

[3] *Cancel v. State*, 2018 WL 3574712, at *1 (Alaska App. July 25, 2018).

biological daughter, and the daughter of a family friend — over a period of approximately ten years.[4]

50)     In 2016, Ms. Wagoner started to socially transition in prison.  She changed her external presentation by growing out her hair, changing her name, wearing improvised makeup, and otherwise presenting as female to the extent possible in prison.

51)     The parties stipulated that Ms. Wagoner experiences gender dysphoria.  The DOC also stipulated that it had confirmed Plaintiff's diagnosis of gender dysphoria.

**Self-Harm**

52)     On August 21, 2016, Ms. Wagoner tried to perform a penile inversion surgery to create a neo-vagina on herself.  Before her first attempt at self-surgery, Ms. Wagoner studied anatomy texts.  She used a razor blade to cut her penis down the shaft with the goal of tucking it in to create a vagina.

53)     Initially, Wagoner claimed that the incident was an accident, reporting that she injured her penis when she attempted to move a table.  Wagoner maintained for some time that the injury was accidental before later admitting that she intentionally harmed herself.  She reported to her then fiancé that she intended to give herself gender-affirming surgery, stating in a recording, "if things change – and I do [the self-surgery] and get moved over, will you come see me."  Wagoner also implied a surgery would allow her fiancé, a woman, and her to live together within DOC facilities: "[The self-surgery is] the only way

---

[4] Plaintiff's substantive crimes hold no weight in the Court's findings today.  This background is summarized for narrative purposes only.  Further, the Court will only use Plaintiff's former name in this paragraph.

I can see us being together. Otherwise, 22 more years will tear us apart. Six years [have] already destroyed us. It's the only way I see it happening." "Okay. So after I'm done, then you figure out how to come live with me. I'll make it happen if you promise to come live with me."

54)     DOC did not believe her account in 2016, and Plaintiff was later disciplined with 20 days in punitive segregation for her attempt at self-surgery.

55)     On another occasion, in June 2017, Wagoner re-injured her penis, requiring elevated medical attention at a local hospital. She attempted self-surgery by shoving her finger into her penis, splitting it down the shaft along the lines of the old laceration and causing considerable bleeding. Her goal was to further extend the incision she had made during the first self-surgery attempt. At the time, Wagoner reported she had accidentally slipped her finger inside of her penis and required care. At trial, Wagoner testified that this incident, along with another, was in actuality another attempt at self-surgery.

56)     Plaintiff's self-harm continues to this day. On a regular basis, she continues to crush her testicles, including as recently as the day before she testified. Her goal is to prevent Leydig cells from producing testosterone.

**Attempts to Receive Gender Affirming Care from DOC**

57)     In late 2016, Wagoner requested to be treated for gender dysphoria "in accordance with WPATH standards of care[.]" This request was granted in January 2017 through ongoing treatment by DOC's mental health professionals with an assessment by an outside provider.

58) Ms. Wagoner did not stop seeking healthcare to treat her gender dysphoria, as she began to file formal grievances. Ms. Wagoner's first grievances, in 2016, formally sought evaluation for gender dysphoria and care. The first grievance was GCC16-1272.

59) On November 12, 2016, Ms. Wagoner asked for mental health assistance, but DOC responded that GCCC was not a therapeutic environment. On November 23, 2016, Ms. Wagoner asked again and Rod Smith, mental health clinician, wrote back, stating that GCCC did not provide care for gender dysphoria and to telling her to "[p]lease let it go!" On November 26, 2016, Ms. Wagoner filed the first RFI addressed to "Primary Care Physician (Medical Provider)," asking, "Does medical offer treatment for Gender Dysphoria or Gender Identity Disorder (GID)?" The following day, a medical provider replied, "Alaska DOC does not offer medical treatment for this. Continue to follow up and meet with mental health."

60) Throughout 2018, Wagoner began or continued receiving care for these diagnoses, including gender dysphoria, thereafter. She requested, and received, where appropriately safe, women's deodorant and cosmetics, feminine hair accessories and styling instruments, and women's undergarments.

61) After Wagoner reported to have continued symptoms related to her injuries, such as urine leakage and reports of painful erections, DOC referred Wagoner once again to Alaska Urology.

62) DOC arranged for Ms. Wagoner to be seen by urologist Dr. Simerville at Alaska Urology LLC in early 2018. Ms. Wagoner told Simerville that her "[p]revious penile injury was self-inflicted while trying to do a self sex change procedure." She said

she experienced a "large amount of blood in urine one month ago," which had "since stopped," but she continued "experiencing pain and swelling in scrotum." Simerville offered no solution.

63) On March 13, 2019, Ms. Wagoner was seen by DOC's urologist Dr. Nemo requesting gender dysphoria treatment and help for injury to her penis because she had an open wound. She filed a grievance, GCC19-198, asking for a surgeon trained in gender dysphoria pursuant to DOC's medical policy of 807.02. She asked to be referred to a urologist "who is up to date" regarding treatment for gender dysphoria. The MAC denied this request on May 6, 2019, stating simply that the "Grievance request [is] denied. You are receiving essential health care per DOC policy."

64) The GDMC and the MAC continued to meet over the years to discuss Wagoner's gender dysphoria, her treatment and care, address her cooperation with mental health and medical professionals, recommend treatment, and assess her behavior. The MAC reviewed, and updated, the gender dysphoria treatment policy and guidelines throughout, revisiting the literature and studies regarding the treatment of gender dysphoria.

65) Additionally, Wagoner had ongoing appointments with mental health medical providers over the years regarding treatment of her other mental health issues, including her borderline personality disorder, anxiety, and depression.

66) In October 2021, a DOC psychiatric provider engaged in the oversight of Wagoner's mental health care, recommended she again undergo evaluation for hormone therapy, which Wagoner had requested in the past. Dr. Lawrence and Rutherford were

uncertain that DOC staff had the experience to monitor the provision of hormones to Wagoner in light of her cardiac issues, and so they began a search for an outside expert for advice. Dr. Lawrence and Rutherford met, and the MAC approved consultation with Anchorage provider Dr. Rachel Samuelson, who had experience supervising hormone therapy to patients with gender dysphoria.

67)     Dr. Samuelson agreed and became Ms. Wagoner's treating physician for gender affirming care, and Ms. Wagoner's first appointment took place on July 26, 2022. Dr. Samuelson has remained Ms. Wagoner's treating physician since then.

68)     On her first visit with Dr. Samuelson, Ms. Wagoner reported persistent gender dysphoria since she was a small child, explained how she had taken a razor to her penis, and confirmed that she had not been on hormones in the past.

69)     Dr. Samuelson recommended that Ms. Wagoner start receiving hormone therapy at the first visit.

70)     Gender-affirming hormone therapy involves the administration of hormones to individuals to align their physical characteristics with their gender identity. This causes a biological male to see physical results such as changes to body fat distribution, decreased muscle strength, softer skin, the creation of breasts and breast growth, and body hair thinning. The MAC approved Dr. Samuelson's recommendation in August 2022.

71)     Hormone therapy has led to changes in Wagoner's body so that, among other things, she has developed breast tissue, her skin has softened, and her body fat has redistributed in a manner more consistent with a female body. Wagoner testified she began to feel better after beginning hormone therapy and felt a "nice calm" and "rather peaceful."

72)     In April 2023, Dr. Samuelson recommended she be referred to a surgeon for evaluation for gender-affirming surgery as treatment for her gender dysphoria.

73)     On October 23, 2023, the MAC denied Ms. Wagoner an evaluation for surgery.  The MAC discussed concerns regarding several aspects of possible treatment for Wagoner, including the degree to which the surgery would be essential as "medically necessary" under DOC policy; the insufficient evidence of a long-term benefit of gender-affirming surgery for preventing suicide, substance abuse, sexually transmitted diseases, or cardiovascular disease; the potential for harm in mental and physical health if the recommended surgeries are expedited or approved; the lack of objective signs of deterioration in mental health since receiving hormone treatment; and patterns of behavior raising concern for the capacity for compliance with the anticipated long-term surgical care.  The MAC found there was "insufficient evidence to affirm that Ms. Wagoner's mental health and well-being will decline without surgery" and did not authorize the recommendation.

74)     Dr. Penn testified that he agreed with Drs. Ettner and Gorton that Wagoner meets the DSM-5 criteria for gender dysphoria.  He also agreed that Wagoner would benefit from gender-affirming healthcare.

75)     Dr. Penn disagreed with Dr. Ettner's opinion that the only immediate treatment for Wagoner was surgery and that it would be fully curative, given the consideration of other relevant social and mental factors such as Wagoner's remaining time left to serve and status as a sex offender.

76) Dr. Penn opined that DOC appropriately considered Wagoner's activities of daily living and participation and activities within the facility when evaluating Wagoner's need for surgery, and observed that her disciplinary history, leadership, and participation in activities was "remarkable."

77) The opinions of DOC's retained experts support the conclusions of the health care and medical professionals on the GDMC who also believe, based on their education, training, and experience, including experience providing treatment to Wagoner, their correctional experience treating inmates with complex and unique mental health concerns, and their review of Wagoner's correctional and mental health records, that surgery is not appropriate for Wagoner at this time, due to her co-existing mental health concerns and the fact that her gender dysphoria appears to be well-managed through hormone treatment.

**Plaintiff's Borderline Personality Disorder**

78) In 2017, Wagoner was diagnosed with borderline personality disorder by a DOC psychiatrist, and that diagnosis remains active.

79) The DSM-5 explains that borderline personality disorder affects interpersonal relationships and sense of self. The DSM-5 identifies nine diagnostic criteria, five of which must be met to diagnose the disorder, which include "frantic efforts to avoid real or imagined abandonment;" a "pattern of unstable and intense interpersonal relationships;" "identity disturbance: markedly and persistently unstable self-image or sense of self;" "impulsivity in at least two potentially self-damaging areas;" "recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior;" "affective instability due to a marked reactivity of mood;" "chronic feelings of emptiness;" "inappropriate,

intense anger or difficulty controlling anger;" and "transient, stress-related paranoid ideation or severe dissociative symptoms."

80)     Dr. Boyd opined that neither Drs. Ettner nor Gorton adequately accounted for other contributing factors in their assessment.  Specifically, that a person may have gender dysphoria and be unhappy with their genitals is not mutually exclusive to their borderline personality features causing them to self-injure when they are distressed.  What is required, instead, is an integrated approach that considers both gender-affirming interventions and treatment for borderline personality, clarifying the contribution of borderline personality to any reported incidents of self-injury.

81)     Dr. Boyd testified that based on her review of the records, the diagnosis of borderline personality disorder was "pretty well supported."  Individuals with borderline personality disorder may be triggered by emotionally distressing events that may cause a person to feel rejected or abandoned.  Thus, one of the things a professional should look for prior to any incidents of self-injury is whether there were emotionally distressing events that the person experienced just prior to that.  If a harmful behavior is consistent with borderline personality disorder, a proper analysis would evaluate the extent to which self-harm correlated with emotional stressors. In some people with borderline personality disorder, self-injurious behaviors reflect an effort to get something out of the harm, a secondary gain — rather than a cry for help, as a way to show others how distressed they are or how much they have caused hurt.

82)     DOC presented testimony from one of its supervising mental health clinicians, Raymond Mercer, who has a master's degree in guidance and counseling, and

32 years of experience treating mental health, the majority within the correctional setting. Mercer sits on the GDMC and has evaluated and monitored Wagoner's mental health since the inception of the GDMC.

83) The mental health professionals at GCCC include mental health clinicians and psychiatrists. These providers have been, and are, available to Wagoner for mental health support for her diagnoses, including individual counseling and psychiatric services.

84) Among other resources, DOC employs cognitive behavioral therapy through the use of a dialectical behavior therapy workbook, an intervention focused on assisting individuals diagnosed with borderline personality disorder. The workbooks are intended to facilitate the development of skills that help to regulate the symptoms associated with borderline personality disorder. The workbooks, which are interactive and provide education on techniques and strategies for managing behavior, have a broader utility in learning emotional regulation.

85) DOC also provides assessments, crisis intervention, medicated care, group therapy, psychoeducation, and release planning.

86) Dr. Penn echoed the testimony of Dr. Boyd and Mercer that the treatment of Wagoner's mental health through dialectical behavioral therapy workbooks is the "gold standard" for individuals who cut or self-harm or have borderline personality disorder. Treatment of an inmate who had gender dysphoria with co-occurring borderline personality disorder through workbooks would also be acceptable treatment.

87) Some of the positive coping mechanisms mental health staff encourage inmates to employ include attending rehabilitative programming, exercising, socializing,

pursuing spiritual beliefs, meditation, and creative arts and music endeavors. An inmate demonstrating positive coping skills is also demonstrating they are adapting to a mental illness and doing well.

**Plaintiff's Life in Custody**

88)     Wagoner testified that she has a support system of four inmates within her mod alone, acts as a mentor to between 15 and 20 inmates located in different mods, was the liaison and administrator of the Wicca club, was the liaison of the Buddhist club, and made efforts to create an LGBTQ club. At the time of trial, Wagoner testified she continues to be a mentor and runs a Christian Bible study group.

89)     DOC provided testimony from personnel trained in observing behavioral changes, such as suicidal ideation or self-harm. Security Sergeant Joshua Dinwiddie[5] testified that Wagoner has a relatively low number of disciplinary reports and infractions. Dinwiddie testified that he has not observed Wagoner being forced into anything she has not wanted to do by other inmates, and that he does not believe she faces any threats within the general population. Dinwiddie described Wagoner further as a so-called "heavy," with a wide network of people with whom she associates, who associates with other heavies, who gets along with many different types of inmates, and who is "more than capable of getting things done and has a lot of influence."

90)     Dinwiddie further described Wagoner as friendly with DOC staff, other inmates, with an "animated" and "bubbly" personality, and an active participant in the

---

[5] The Court found Dinwiddie's testimony credible.

GCCC community. He also testified that he had seen Wagoner attempt to use her good rapport with staff to gain certain privileges, such as employment and housing. He had not observed Wagoner to be in any extreme emotional or mental health distress. He also had not observed Wagoner wearing any incontinence undergarments, indicated there were many jobs allowing access to bathrooms or an inmate's own cell, and had never observed Wagoner being unable to walk or exhibiting signs of extreme pain.

91) DOC also presented the testimony of another sergeant, Neil Thomas,[6] who, until recently, had been responsible for supervising the GCCC yard for five years. In his capacity, he observed GCCC's inmates on a daily basis, as they commuted between housing and their programming, meal service, and the medical clinic. As with the security sergeant, he was trained in watching for changes in demeanor, socialness, and behavior as part of DOC's annual, mandatory suicide prevention training.

92) Thomas described Wagoner as "quite friendly," "very polite," "happy-go-lucky," and prone to joking. In his observations of Wagoner with the other general inmate population, he described her as "always with somebody," and that she would appear all the time for recreation, often to meet with others. Thomas denied that her social interactions were limited to two to three inmates, but "quite a few different ones" and that she was "pretty social" with a large number of inmates at GCCC.

93) Thomas' observations of Wagoner's robust social, religious, and curricular activities are further demonstrated by official requests she submitted for musical

---

[6] The Court found Thomas's testimony credible.

instruments, programming and scheduling, religious group organization and administration, cultural enrichment, vocational opportunities, and advocacy for leadership roles.

94)    Thomas further testified that he has observed Wagoner to organize and advocate for other LGBTQ inmates, and that she tries to take care of other LGBTQ inmates through advocacy and mentoring.  She also does not hesitate to register her complaints when she has been dissatisfied with aspects of correctional life.

95)    Consistent with Dinwiddie, Thomas described Wagoner's demeanor towards correctional officials to be respectful, outgoing, and friendlier than most.

96)    In summary, the testimony at trial also supported the general notion that Plaintiff has been doing relatively well while in custody, including taking pride in her employment and having a generally positive social life.

### Wagoner's Chronic Regional Pain Syndrome

97)    Plaintiff suffers from chronic pain due to her attempts at self-surgery. According to Wagoner's testimony, she has recurring daily pain caused by testicular self-harm.  This is caused, in part, through her intentional crushing of her testicles, which she also testified occurs daily.  This has also resulted in her genitals becoming "completely mangled" with her testicles being "three to four times the size of normal."  DOC is currently providing Wagoner 970 mg of Tylenol 3 times a day and Meloxicam for pain mitigation.

98)     Dr. Samuelson reported that Plaintiff's penis is "mutilated, is not functional for sexual purposes and makes urination and hygiene difficult" and she experiences urinary tract infections.

99)     The Court found Dr. Gorton qualified to render an opinion as to whether Ms. Wagoner has complex regional pain syndrome.  He explained that Ms. Wagoner has complex regional pain syndrome, which is a neuropathic pain that can result from trauma, is localized in a specific area of the body, and can cause severe pain.  It is in her genital area and he testified is a result of her self-surgery attempts.

100)    According to Dr. Gorton, the referral for treatment of her complex regional pain syndrome can happen immediately.  Dr. Gorton explained that Ms. Wagoner should be referred for surgery, and the surgeon should be informed about the complex regional pain syndrome and move forward from there, treating the pain with medication as an example.

101)    Per Dr. Gorton, aside from the complex regional pain syndrome, there's no indication surgery would be more complicated for Ms. Wagoner than for any similarly situated transgender woman.

102)    After Wagoner filed a request for surgical removal of her testicles or new medication to alleviate her chronic pain, the MAC made the following conclusion in November 2022 after having reviewed relevant records and consulted with DOC personnel: "Your medical case has been referred to and evaluated by the MAC.  A review of your records reveals that you have been prescribed Meloxicam and Acetaminophen daily. . . You have not come to the medication cart on any regular basis to take the prescribed medications [and therefore] we were unable to evaluate the effectiveness of these medications without appropriate dosing.  Observations in person and on camera have not

shown you to be in any obvious pain that would interfere with your activities of daily living."

103) Historically, Wagoner was as low as 38-, 53-, 70-, and 73-percent compliant with taking her prescribed medication. Wagoner also had been observed to have pocketed medication or merely pretended to take medication.

### g. Informed Consent.

104) Informed consent has three primary components: first, an individual must have the functional capacity to provide informed consent, such that they can process the information and communicate their consent. Second, the individual must have been provided with the relevant information they need for the intervention they are considering. Third, the consent must be voluntary. The more intrusive and riskier a procedure is, the more knowledge a person needs to have in order to develop informed consent.

105) Dr. Boyd agreed with both of Wagoner's experts that gender dysphoria has a significant impact on those who have it, that treatment is important and needs to be individualized, and that borderline personality disorder is not a bar to being able to provide informed consent for such treatment. However, to the extent both of Wagoner's experts opined that surgery was medically necessary for Wagoner to treat her gender dysphoria and that she had requisite information to provide informed consent, Dr. Boyd disagreed with both of their opinions.

106) Dr. Boyd was critical of Drs. Ettner and Gorton where they relied solely on Wagoner's self-reporting and made no efforts to engage in any additional inquiries in order to validate Wagoner's information.

107) Dr. Boyd was concerned about the representations from Drs. Ettner and Gorton that surgery would achieve any degree of resolution of Wagoner's gender dysphoria, despite the fact that the two did not appear to agree on the extent of the resolution.

108) Dr. Boyd disagreed that a mental health provider can appropriately opine that surgery is necessary, where a mental health professional's role is more appropriately to support and advise an individual so that they are individually able to develop their own reality-based individualized, reasonably comprehensive and balanced understanding of the risks, and likelihood of success, associated with treatment options, including the degree of relief, and conditions or concerns may or may not be alleviated and/or resolved with the intervention. Such factors properly taken into consideration in an informed consent analysis are not simply whether a person is in medically sufficient health to undergo surgery, but given a person's age, other injuries, expectations of functionality, appearance, term of incarceration, comprehensive objectives, and the likelihood that surgery will result in the way a person expected.

## II. CONCLUSIONS OF LAW

### a. Jurisdiction and Venue.

1) The Court has subject-matter jurisdiction over this mater pursuant to 28 U.S.C. § 1331 as it presents a federal question. This civil action arises "under the Constitution, laws, or treaties of the United States." *Id.* It does so because this case is for relief under 42 U.S.C. § 1983.

2) The District of Alaska is the proper venue pursuant to 28 U.S.C. § 1391(b).

3)      The undersigned has dispositive authority to preside over this case pursuant to 28 U.S.C. § 636(c)(1).

**b.      The Eighth Amendment Right to Medically Necessary Care While in Custody.**

4)      The Eighth Amendment to the United States Constitution proscribes "cruel and unusual punishments[.]"[7]

5)      Failure to provide adequate medical care to incarcerated people can violate the Eighth Amendment and constitute cruel and unusual punishment.[8]

6)      To establish that prison officials have violated the constitutional guarantee of adequate medical treatment, an incarcerated plaintiff must first demonstrate an objectively serious medical need.[9]  This is established upon a showing that "failure to treat [the] prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain."[10]

7)      The plaintiff must then demonstrate deliberate indifference.[11]  "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  *Id.* at 104 (internal citation omitted).  Such indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05.  This

---

[7] U.S. Const. Amend. VIII.
[8] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).
[9] *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.2006).
[10] *Id.* at 1096 (internal citations and quotation marks omitted).
[11] *Estelle*, 429 at 104.

second prong "is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."[12]  Mere negligence alone does not establish a valid Eighth Amendment claim.[13]  Rather, "the official [must] know[ ] of and disregard[ ] an excessive risk to inmate health or safety[.]"[14] "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

8)      In other words, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."[15]

### c.      *Edmo.*

9)      The Court is bound by the Ninth Circuit's ruling in *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) ("*Edmo*").

10)      Gender dysphoria is a serious medical condition for the purposes of the Eighth Amendment.  *Id.* at 785.

11)      Gender confirming surgery ("GCS"), for certain inmates, is a medically necessary treatment, denial of which could amount to an Eighth Amendment violation.  *Id.* at 803.

12)      "The weight of opinion in the medical and mental health communities agrees that GCS is safe, effective, and medically necessary in appropriate circumstances." *Id.* at 770.

---

[12] *Jett*, 439 F.3d at 1096.
[13] *Estelle*, 429 U.S. at 106.
[14] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).
[15] *Estelle*, 429 U.S. at 106.

13) The Ninth Circuit accepted the parties' position "that the appropriate benchmark regarding treatment for gender dysphoria is the [WPATH-VII]". *Id.* at 767.

14) The WPATH-VII Standards of Care identify the following treatment options for individuals with gender dysphoria:

    A. changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity);
    B. psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression[,] addressing the negative impact of gender dysphoria and stigma on mental health, alleviating internalized transphobia, enhancing social and peer support, improving body image, or promoting resilience";
    C. hormone therapy to feminize or masculinize the body; and
    D. surgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring).[16]

15) The WPATH-VII criteria for genital reconstruction surgery in male-to-female patients include the following:

    A. persistent, well documented gender dysphoria;
    B. capacity to make a fully informed decision and to consent for treatment;
    C. age of majority in a given country;
    D. if significant medical or mental health concerns are present, they must be well controlled;
    E. 12 continuous months of hormone therapy as appropriate to the patient's gender goals; and
    F. 12 continuous months of living in a gender role that is congruent with their gender identity.[17]

16) "[P]sychotherapy is not a precondition for surgery under the WPATH Standards of Care."[18]

---

[16] *Id.* at 770 (internal citations and quotations omitted).
[17] *Id.* at 771 (internal citations and quotations omitted).
[18] *Id.* at 789.

17) Drs. Gorton and Ettner were qualified as experts in gender dysphoria. *Id.* at 788. The Ninth Circuit considered, but rejected, the argument that these two individuals were less qualified than the state's due to their lack of experience in the custodial setting. *Id.* at 788. They had never treated any prisoners with gender dysphoria, let alone any who needed GCS. *Id.* at 788. "More to the point," for the Ninth Circuit, was their experience treating *any* individuals with gender dysphoria. *Id.* at 788.

18) The state's doctors' opinions were evaluated against the WPATH-VII standards. *Id.* at 789.

19) Edmo's failure to attend psychotherapy sessions for her concurrent medical condition was not a bar to proceeding with GCS. *Id.* at 789.

20) "In summary, the broad medical consensus in the area of transgender health care requires providers to individually diagnose, assess, and treat individuals' gender dysphoria, including for those individuals in institutionalized environments. Treatment can and should include GCS when medically necessary. Failure to follow an appropriate treatment plan can expose transgender individuals to a serious risk of psychological and physical harm."[19]

21) Edmo was an incarcerated transgender woman (male at birth) in the Idaho Department of Corrections' ("IDOC") custody, serving a 21-year sentence for sexual abuse of a minor. *Id.* at 771–72.

22) While in custody, Edmo changed her name and the sex on her birth certificate to reflect her gender identity. *Id.* at 772.

---

[19] *Id.* at 771.

23) Edmo was suffering from gender dysphoria, which was undisputed by the parties. *Id.* at 772.

24) Edmo was given hormone therapy beginning in 2012, followed the hormone therapy regiment, and had by then been hormonally transitioned, meaning that she had female secondary sex characteristics, such as breasts, and had reached the limit of physical changes that could result from such treatment. *Id.* at 772.

25) Edmo suffered from the concurrent medical condition of major depressive disorder. *Id.* at 772.

26) In 2015, Edmo attempted castration by self-surgery. *Id.* at 773.

27) Edmo was evaluated by a doctor, who opined that GCS was not necessary for Edmo. *Id.* at 773.

28) IDOC had an internal multi-disciplinary team evaluate the doctor's assessment, and it agreed that GCS was not medically necessary. *Id.* at 774.

29) In 2016, Edmo attempted self-surgery a second time. *Id.* at 774.

30) The Ninth Circuit found the evaluating doctor to have acted with deliberate indifference because they knew at the time of the evaluation that Edmo had attempted self-surgery, that Edmo suffered from gender dysphoria, and that Edmo experienced clinically significant distress, but they continued with the treatment plan that had been ineffective. *Id.* at 793. This was bolstered by the second attempted self-surgery not changing his recommendation. *Id.* at 793.

//

**d.      Plaintiff's Severe Gender Dysphoria, under *Edmo*, Renders Further Gender Affirming Care Medically Necessary.**

**1.      Wagoner Suffers from Severe and Persistent Gender Dysphoria.**

31)     The parties stipulated that Ms. Wagoner experiences gender dysphoria.  The DOC also stipulated that it had confirmed the plaintiff's diagnosis of gender dysphoria.

32)     The credible evidence shows that, despite almost three years of hormone therapy, Ms. Wagoner continues to experience severe emotional and psychological symptoms of gender dysphoria.

33)     The Court is unpersuaded by Defendant's argument that Plaintiff has done relatively well in custody, indicating that her gender dysphoria is not severe.  While Plaintiff appears to have an active social life and has more or less socially transitioned from male to female, gender dysphoria is a mental health disorder that makes a person unreasonably distressed due to their biological gender not aligning with their gender identity, irrespective of their environment.

34)     Observations from DOC staff of Ms. Wagoner are not sufficient to rebut her testimony that she continues to live in distress and the observations of Drs. Samuelson, Gorton, and Ettner.  This is evidenced further not only by her attempts at self-surgery, but also by her continued, nearly continuous, self-harm by the crushing of her testicles.

35)     The Defendant's arguments pertaining to the quality of the observations made by Drs. Ettner and Gorton are well-taken by the Court.  It accordingly gives their opinions on the severity of Plaintiff's gender dysphoria the appropriate weight, but finds their testimony competent and to weigh in favor of the Plaintiff.

36) In short, while the Court appreciates that Plaintiff is not GCCC's least adjusted inmate, it does not agree that the fact that Wagoner is able to survive as a transgender woman in a difficult environment is sufficient to rebut the other evidence of Plaintiff's gender dysphoria. In fact, the Court considers this to actually support her testimony that her distress is caused by her dysphoria and not by her environment.

**2. Under *Edmo*, DOC Acted with Deliberate Indifference to Plaintiff's Medical Condition of Gender Dysphoria.**

37) DOC's refusal to substantively consider Dr. Samuelson's recommendation that Ms. Wagoner be referred for surgery amounted to deliberate indifference under *Edmo*.

38) Ninth Circuit precedent is clear that the provision of partial treatment for a medical condition does not foreclose a finding of deliberate indifference where additional treatment is required to avoid further substantial risk of serious harm.

39) As applied in this case, DOC's decision to provide hormone therapy to Ms. Wagoner does not satisfy its obligations to her, when evidence shows that she continues to suffer from gender dysphoria, for which GCS is a medically indicated treatment that DOC has refused to approve.

40) The court concludes that DOC, through the MAC, failed to act on the recommendations of Dr. Samuelson, by applying criteria not supported by medical standards of care mandated by *Edmo*. The MAC determined that while "her symptoms of gender dysphoria subjectively persist," there was "insufficient evidence to affirm that Ms. Wagoner's mental health and well-being will decline without surgery."

41) The record reflects that while DOC's policies technically left room for CGS to occur, as a practical and functional matter, it was opposed to GCS in every circumstance. In addition to Plaintiff having to repeatedly request any sort of care, the ultimate MAC decision at issue today reflects DOC's ultimate *de facto* policy of not providing GCS. The MAC declined to implement Dr. Samuelson's recommendation, though acknowledging that Plaintiff continued to express feelings of gender dysphoria, after having

> discussed concerns regarding several aspects of the recommended surgeries for Ms. Wagoner including: the degree to which surgery is essential under DOC policy; insufficient evidence for long-term benefit of gender altering surgery for preventing suicide, substance abuse, sexually transmitted diseases, or cardiovascular disease; the potential for harms in mental and physical health if the recommended surgeries are expedited or approved; the lack of objective signs of deterioration in mental health over the last five years; and patterns of behavior raising concern for the capacity for compliance with the anticipated long-term post-surgical care.[20]

42) The only consideration pertaining to Plaintiff specifically was her likelihood of complying with follow-up care obligations. The remainder of the denial was a rejection of GCS as an effective treatment. The Court reads this denial as a categorical denial of GCS. For the reasons stated below, this Court would not have taken issue with that approach absent *Edmo*, but the Ninth Circuit precludes it.

43) The Defendant's experts spoke extensively to Ms. Wagoner's borderline personality disorder, specifically the difficulty of parsing symptoms or borderline personality disorder from gender identity disorder. While the Court agrees with the Defendant that Plaintiff's self-harm may be attributable in part to borderline personality disorder, the MAC did not contemplate this cooccurrence. Instead, the MAC focused only

---

[20] Ex. 2045.

on the severity of Ms. Wagoner's dysphoria and its view on the effectiveness of CGS generally. Accordingly, the fact that Wagoner's self-harm behavior may have been due to her borderline personality disorder is not relevant to whether DOC was deliberately indifferent *at that time*. Further, the Court will not order that Ms. Wagoner receive a vaginoplasty. It will only order that she be referred to medical professionals who will evaluate her for a vaginoplasty.

44) The Court is also unpersuaded by the Defendant's informed consent arguments, largely for similar reasons. The referral specialists, like any other medical provider, are required to obtain informed consent from Ms. Wagoner. Providing medical treatment without informed consent is a breach of medical ethics, creates a potential civil liability, and constitutes criminal battery. In other words, those professionals will be obligated to obtain informed consent before surgery. The Court will not order any doctor to perform any surgery on Plaintiff. It will only order that Defendant make such a doctor available to Plaintiff and that the Defendant not bar the option of a vaginoplasty.

### c. DOC Has Not Acted with Deliberate Indifference to Plaintiff's Chronic Regional Pain.

45) Plaintiff complains of chronic pain, and the Court accepts her representations. It also has considered the photographs of her penile injury, and it finds no reason to disagree with her that her penis often causes her severe pain.

46) However, DOC has not acted with deliberate indifference. Not only have they sent her to urology specialists, they have been providing Wagoner with Tylenol three times a day and Meloxicam for pain mitigation. To the extent that Dr. Gorton disagrees

with this treatment, his opinion can be seen at most as "a mere difference of opinion among medical providers," which does not rise to an Eighth Amendment violation.

47)     Additionally, Dr. Gorton's lack of experience with inmates is of great import here, and *Edmo* does not bind this Court to his expertise in transgender health to Plaintiff's chronic regional pain.

48)     Administering pain medications to inmates is an incredibly delicate and nuanced exercise. Many who are incarcerated struggle with substance abuse disorders, and even if Plaintiff does not (though there is a record of alcohol abuse with Plaintiff), the introduction of pain medications, especially controlled substances, creates a risk of distribution of those substances to the inmate population generally, which can fund organized crime, be detrimental to good order, and pose life-threatening risks to those taking medications without proper supervision and for unapproved purposes.

49)     Dr. Gorton does not have experience with inmates manipulating the prison medical system to obtain pain medications for improper secondary gain. While any provider must be concerned about improperly providing pain medications, these concerns are far greater when treating inmates.

50)     Plaintiff has also not been fully compliant with taking her medications, as noted by the MAC. It is reasonable for DOC to be hesitant to prescribe more potent medication to an individual already being noncompliant with their medications.

51)     Finally, Plaintiff's pain appears to relate to her penis and testicles. Should she receive a vaginoplasty, she would no longer have either, and should (presumably)

receive pain medication and follow-up care after that surgery.  Accordingly, a vaginoplasty would supersede this issue.

### III.    THE COURT'S HESITATIONS WITH *EDMO.*

The Eighth Amendment presents a distinctly American juxtaposition.  The Constitution provides that only one class of individuals is absolutely entitled to receive medically necessary care.  These people are, however, those with the least freedom: the incarcerated.  As a result, a law-abiding member of a community who suffers from gender dysphoria may not receive GCS at taxpayer expense.  On the other hand, a person who violated the social contract in perhaps the most egregious way — such as serial sexual abuse of children who they themselves were supposed to protect — might receive GCS at the expense of the taxpayers.  This dichotomy is of course not unique to GCS.  Many Americans suffer and die of chronic conditions, such as diabetes, hypertension, and cardiovascular disease, simply for lack of health insurance,[21] while prison inmates receive treatment for those same conditions, funded in some small part, by the taxes of those who cannot afford the treatment for themselves.

*Edmo* is binding precedent.  This Court is scrupulous to follow binding case law, and this case presents no exception.  This Court will not speculate as to what the outcome of this instant case would have been had the *Edmo* court had ruled differently.  The Court

---

[21]  *See, e.g.*, Wilper AP, Woolhandler S, Lasser KE, McCormick D, Bor DH, Himmelstein DU. *A national study of chronic disease prevalence and access to care in uninsured U.S. adults*. ANN INTERN MED. 2008 Aug 5;149(3):170-6. doi: 10.7326/0003-4819-149-3-200808050-00006. PMID: 18678844.

will observe that it would have placed much more weight on the inexperience of Drs. Ettner and Gorton had *Edmo* permitted such a consideration. In contrast to the state's medical experts, Wagoner's experts simply do not have meaningful experience treating incarcerated individuals. *Edmo* effectively forecloses this Court from considering that particular inexperience for any purpose. Without reaching the question of what, if any, impact Wagoner's experts' inexperience may have had on the Court's final decision, but for *Edmo*, their lack of experience would have been of greater moment.

Second, WPATH does not wrestle with the unfortunate and unavoidable realities of custodial care. WPATH-VIII has a chapter on "Institutional Environments." However, it is entirely devoid of any recommendations that address the DOC's concerns, and instead, focuses only on the welfare of the inmate/patient. These recommendations are generally for staff training and certain accommodations such as permitting transgender inmates to use restroom and shower facilities individually.[22]

Inmate healthcare is not strictly limited to the patient's wellbeing. Corrections staff must consider factors unique to incarceration. While doctors treating patients in the general public consider the risks and benefits of various procedures, corrections physicians must consider the medical necessity of procedures. Ms. Wagoner would almost certainly benefit emotionally from the surgery, and it is likely that she is a qualified candidate in that her

---

[22] *See*, Coleman, E., et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, INT'L J. TRANSGENDER HEALTH, "Institutional Environments" at 104–09.

health does not indicate a poor surgical outcome. That would be an outside physician's primary analysis.

In prison populations, physicians must consider factors such as secondary gain. It is entirely possible that an inmate may seek surgery simply to access (or possibly attempt to distribute) the pain medications given after the fact. One might also attempt to seek surgery in an attempt to build a case to change their housing conditions, such as reassignment to a dedicated medical facility, or relevant here, a female custodial setting. Neither Plaintiff's experts nor WPATH consider these factors. Instead, both concern themselves primarily with the self-actualization of the patient. The right of an individual to pursue their lives as they see fit is embedded in the Constitution, and for transgender persons GCS may be an important way to do so. By contrast, in the context of prison populations, the axiom that all are free to pursue happiness is no longer applicable. Such liberty is reserved for the law-abiding.

The Court also considers the advisability of WPATH being adopted by a court. Transgender and gender dysphoric health is, in addition to being deeply important for the individuals involved, also a salient topic of political controversy. While this is not the first (or the last) medical procedure to be the subject of national comment, courts should be mindful of giving judicial imprimatur to what is fundamentally a medical question.

WPATH takes several positions on difficult questions in transgender health, including the appropriate care to be given to children and adolescents. For adolescents, which range from the start of puberty to the age of majority, WPATH recommends the

exploration and ultimate administration of genital surgery.[23]    It bases such recommendations on supposed consensus of the medical communities.  But, as Justice Thomas concurred, "WPATH appears to rest this conclusion on self-referencing consensus rather than evidence-based research, which may help explain the group's confidence in the face of concededly inadequate evidence."[24]  Over the course of the trial, the Court was presented with several published studies on the medical outcomes of GCS.  While the experts debate the methods and takeaways of such literature, what remains are unavoidable limitations of such studies. The gender dysphoric population is small and those patients often have cooccurring medical or mental conditions that make broad study of this group difficult due to confounding variables.  The gold standard of any clinical research is the double-blind study, and for obvious reasons, this is impossible in the case of gender dysphoric patients seeking GCS.  This is not to discount the counterpoints of the Plaintiff's experts, however.  For instance, individuals with severe gender dysphoria are often at risk of more severe mental health conditions, either stemming from the disorder itself or difficulty socially transitioning.  As such, the Court is reluctant to find that this issue is definitively resolved.

The Court also considers out-of-circuit authority.  Contrary to the Ninth Circuit's position that *Edmo*'s "approach mirrors the First Circuit's[,]"[25] in *Kosilek*, the referenced case, the First Circuit relied on notably and irreconcilably different reasoning.  There, the

---

[23] *See*, *id.* at 43–66.
[24] *United States v. Skrmetti*, 145 S. Ct. 1816, 1848 (2025) (Thomas, J., concurring).
[25] *Edmo v. Corizon, Inc.*, 935 F.3d 757, 794 (9th Cir. 2019).

court found that reliance on WPATH alone was insufficient to establish an Eighth Amendment violation.[26] The First Circuit noted that gender identity disorder is a serious medical need that must be treated, but relying solely on WPATH "ignore[s] significant contrary evidence regarding the breadth and variety of acceptable treatments for GID [gender identity disorder] within the medical community."[27] Accordingly, the decision to not provide GCS did not amount to deliberate indifference, as the inmate was provided antidepressants, psychotherapy, hormone therapy, shaving razors, clothing/accessories, and the defendant's commitment to protecting the plaintiff from the risks of self-harm.[28] *Kosilek*'s approach was accurately summarized by the Fifth Circuit.[29] That court implored those reading *Kosilek* to take from it the proposition that "notwithstanding WPATH, sex reassignment surgery is medically controversial" and that choosing an alternative was not a constitutional violation.[30] Instead, the Fifth Circuit wrote that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate over sex reassignment surgery."[31]

Were the First Circuit's approach in fact the binding rule for this Court, the outcome may have been different. Here, Ms. Wagoner has been given the non-surgical tools to medically and socially transition. She has been given feminine clothing and accessories, has access to psychotherapy, is provided with razors, has successfully been receiving

---

[26] *Kosilek v. Spencer*, 774 F.3d 63, 89 (1st Cir. 2014).
[27] *Id.* at 89.
[28] *Id.* at 89–90.
[29] *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019).
[30] *Id.* at 221.
[31] *Id.* at 221.

hormone therapy, and she has generally been accepted as a woman at the facility, despite being housed with men. DOC's decision to not provide GCS under these circumstances, notwithstanding the attempted self-surgeries, may not require injunctive relief under *Kosilek*. Under *Edmo*, it does.

In summary, the field of transgender health is dynamic and unsettled; more study is required to find there is anything approaching consensus. WPATH's longstanding position that many such questions are settled indicates that in addition to its medical contributions, there exists an element of advocacy to the organization. Courts, by definition, benefit from passionate and diligent advocates. However, Courts should respond to such advocacy with cautious review, if not skepticism, rather than an unquestioned deference. In the Court's view, a correctional facility need not necessarily offer GCS if it believes, based upon reasoned review of the ongoing science, that other treatments or therapies for gender dysphoria are effective, or if based on the state of the literature there are good-faith questions as to the ultimate effectiveness of GCS in treating gender dysphoria.

## IV.    CONCLUSION

The Court commends the zealous and professional advocacy of all counsel of record. It also recognizes the efforts of all witnesses it heard, as the Court knows that the stress of testifying is a unique burden. The Court thanks corrections staff and law enforcement for their diligent and seamless supervision and transportation of Ms. Wagoner during the trial. While the Court expects that neither party will be fully happy with the resolution of this matter, the parties should know that the attorneys all made reasonable

arguments, represented their respective clients zealously and well, and presented a difficult case for the Court's consideration.

An order will follow.

DATED this 26th day of September, 2025, at Anchorage, Alaska.

_____
MATTHEW M. SCOBLE
U.S. MAGISTRATE JUDGE