No. 25-6813

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

EMALEE WAGONER,

*Plaintiff-Appellee*,

v.

JENNIFER WINKELMAN,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
District of Alaska, No. 3:18-cv-00211 (Scoble, J.)

## EXCERPTS OF RECORD
## VOLUME II

J. Michael Connolly
Jeffrey M. Harris
Rachael C.T. Wyrick
Ryan M. Proctor
Marie E. Sayer
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
jeff@consovoymccarthy.com
rachael@consovoymccarthy.com
ryan@consovoymccarthy.com
mari@consovoymccarthy.com

STEPHEN J. COX
  ATTORNEY GENERAL

Jenna Lorence
  *Solicitor General*
Jessica M. Alloway
  *Deputy Solicitor General*
ALASKA OFFICE OF THE
ATTORNEY GENERAL
DEPARTMENT OF LAW
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
(907) 269-7938
jenna.lorence@alaska.gov
jessie.alloway@alaska.gov

March 18, 2026

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

_____

| | |
|---|---|
| **Emalee Wagoner,** | ) |
| | ) No. 3:18-cv-00211-MMS |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Anchorage, Alaska |
| **Nancy Dahlstrom, et al.,** | ) May 12, 2025 |
| | ) 9:13 a.m. |
| Defendants. | ) |
| _____ | ) **(SECOND AMENDED)** |

**BEFORE:   THE HONORABLE MATTHEW M. SCOBLE, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**VIA HYBRID ZOOM VIDEOCONFERENCE**</u>

<u>**BENCH TRIAL - DAY 1**</u>

<u>**(A.M. SESSION)**</u>

<u>**(Pages 1-84)**</u>

Official Court Reporter:
**Cathy J. Taylor, RMR, CRR, CRC (By Zoom Videoconference)**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**2-ER-0059**

**A P P E A R A N C E S**

For the Plaintiff:
    LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
    By:  **Richard Saenz, Esq.**
         **Morgan Walker, Esq.**
    120 Wall Street, 19th Floor
    New York City, New York  10005

    LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
    By:  **Sasha Buchert, Esq.**
    815 16th Street NW, Suite 4140
    Washington, DC  20006

    LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
    By:  **Sonja D. Kerr, Esq.**
    3500 Oak Lawn Avenue, Suite 500
    Dallas, Texas  75219

For the Defendants:
    BIRCH HORTON BITTNER & CHEROT
    By:  **Mara Michaletz, Esq.**
         **David Karl Gross, Esq.**
    510 L. Street, Suite 700
    Anchorage, Alaska  99501

Also Present:
    Doron Levine, ACLU Alaska counsel

UNITED STATES DISTRICT COURT

**2-ER-0060**

# I N D E X

**SUMMARY OF COURT PROCEEDINGS:**                    **PAGE**
Plaintiff's Opening Statement                          16
Defendants' Opening Statement                          24


**WITNESSES:**                                       **PAGE**

Dr. Randi Ettner
        Direct Examination by Mr. Saenz               31

UNITED STATES DISTRICT COURT

**P R O C E E D I N G S**

(Court was called to order by the courtroom deputy.)

(Proceedings commence at 9:13 a.m.)

THE COURTROOM DEPUTY:  Your Honor, we're on record in Case Number 3:18-cv-211, Wagoner vs. Dahlstrom, et al.

Counsel, please identify yourself for the record.

MR. SAENZ:  Good morning, Your Honor.  Richard Saenz with Lambda Legal for the plaintiff, Emalee Wagoner.

Also joining today are my colleague Sonja Kerr, Sasha Buchert.  Morgan Walker, also with Lambda Legal.  In the audience is co-counsel Susan Orlansky and Doron Levine from here in Alaska.

Good morning.

THE COURT:  Good morning.

MS. MICHALETZ:  Good morning, Your Honor.  For the defendants, Mara Michaletz, David Gross, and Mackenzie Milliken.

THE COURT:  Good morning.

MS. MICHALETZ:  Thank you.

THE COURT:  All right.  Good morning, everyone.  Let's see.  A few things just before we begin.

Let me note that there are a number of members of the public in the audience.  And let me just say to you all good morning and welcome.  Of course, you're all more than welcome

UNITED STATES DISTRICT COURT

to be here. Open public trials are an incredibly important part of the American legal system. And not just a part of the Constitution, but embedded in the Constitution. I'm very glad everybody is here.

There is a rule in federal court that there is no recording of any kind. So I have to remind you that despite the fact that we all carry with us cell phones at all times that are very, very effective at making recordings, no -- no pictures, no video recording, no audio, nothing like that is permitted. So what I usually tell people is: Now is a great time to take out your cell phone, put it in airplane mode or power it off, and then just put it away.

We will be taking breaks about every 90 minutes, so you'll have an opportunity to check email, respond to text messages, whatever you need to do.

For the folks in the audience, if there is a -- a phone call or a text message that you absolutely cannot miss, just make sure your phone is in silent mode. And if there is something you have to respond to, please discretely leave the courtroom and deal with it outside of the courtroom. Okay?

That being said, just some housekeeping stuff. Our typical court hours will be 9:00 a.m. to 4:30-ish, subject to change, and actually subject to a couple of exceptions that I'm just about to mention. We'll take breaks roughly midmorning and roughly midafternoon. For lunch we'll take a one-hour

UNITED STATES DISTRICT COURT

6

break between noon and 1:00. If we had a jury, I would say we'd make it an hour and a half for lunch, but we can be more efficient without a jury.

Anybody have a problem just doing an hour for lunch?

Is that a problem for plaintiffs?

MR. SAENZ: No, Your Honor.

THE COURT: Defendants?

MS. MICHALETZ: No, Your Honor.

THE COURT: Very good. We'll take a lunch break roughly noon to 1:00.

And, let's see, having said what our schedule is, I'm now going to say what the exceptions are going to be.

I have a family obligation this afternoon, so we'll need to stop at about 4:00 o'clock today. And then Friday morning, I have some court business that I just cannot move. And I apologize for that. So we'll probably be dark Friday morning. If -- if it looks like we could finish -- if we came back Friday afternoon, then -- then that's what we'll do. If no matter what we're going into next week, then I would propose we just be dark altogether on Friday.

Does that make sense?

MR. SAENZ: Yes, Your Honor.

MS. MICHALETZ: Yes, Your Honor.

THE COURT: Okay. All right. And you know what? I apologize. I did not say good morning to Ms. Wagoner.

UNITED STATES DISTRICT COURT

Good morning, ma'am.  I'm glad you're here.

And let me also say thank you to the State of Alaska that has really facilitated Ms. Wagoner's presence in court this morning.  It's very helpful, and I do appreciate it.

All right.  And then final piece of housekeeping.  We are using a remote court reporter, as everyone can see on the screen.  I did this recently at a pretty lengthy evidentiary hearing, and it works really well.  The only thing that we need to bear in mind is if we're not speaking into the microphone, the court reporter cannot hear us.

So you're all more than welcome to remain seated when addressing the Court or -- or handling a witness.  That's totally fine.  If you want to move to the podium, that's fine, too.  Just while you are moving from your seat to the podium, don't speak, or else the court reporter won't hear you.

Also, please try to remember to speak slowly and clearly.  And I say this with -- with utter humility.  I'm sure there are several court reporters who have my face on a dartboard because no matter what, I always speak too quickly. So if I remind you to speak too -- to speak more slowly, just remember that it is said with humility and understanding, but we do need to be mindful of speaking slowly and not talking over each other, especially when we're working with a remote court reporter.

And, madam court reporter, thank you for your

UNITED STATES DISTRICT COURT

8

assistance in the course of this trial.

I think that is all that I have to say.

Are there any housekeeping matters we need to take up before we begin?

Mr. Saenz?

MR. SAENZ: Yes, Your Honor.

And good morning, everyone.

For the Court, we just wanted to confirm that Ms. Wagoner's lunch will be provided and also her medication.

THE COURT: Okay. I got an affirmative nod about the lunch.

THE OFFICER: Medication's not an issue.

THE COURT: It sounds like medication --

THE COURT REPORTER: I'm sorry. Who was that speaking?

THE COURT: Oh, yeah. Let me just repeat that for the record. The response from the -- from the State was that both lunch and medication issues have been resolved.

THE COURT REPORTER: Thank you.

MR. SAENZ: And the parties did discuss, and we're about to jointly move to admit the exhibits that have been stipulated both for authenticity and admissibility. I believe there are around 75 documents.

Okay. The documents -- those -- those exhibits are on Document 298-1 and Document 300.

UNITED STATES DISTRICT COURT

**2-ER-0066**

THE COURT: All right. I believe -- give me one second. I believe I have all that electronically.

MS. MICHALETZ: Your Honor, I have a copy if you don't.

THE COURT: That would be helpful. Yes. Please approach.

Thank you.

All right. So I have plaintiff's exhibits, it looks like -- it's not entirely inclusive, but it's Series 1001 through -- 1001 through 1128. And it looks like, just very rough guess here, maybe a third -- two-thirds roughly have been stipulated to as reflected in the plaintiff's exhibit list.

So from the defendants, do you stipulate to the exhibits that are reflected to being stipulated to in the plaintiff's exhibit list?

MS. MICHALETZ: That's fine, Your Honor.

THE COURT: All right. And then I also have -- as long as we're doing housekeeping about exhibits, I also have an exhibit list from the plaintiffs, and it looks like that's Series 2001 through 2105. And there are many stipulated exhibits in that list as well.

So, plaintiffs, do you stipulate to the exhibits indicated as stipulated in the defendants' exhibit list?

MR. SAENZ: We do --

THE COURT: All right.

UNITED STATES DISTRICT COURT

**2-ER-0067**

MR. SAENZ: -- Your Honor.

THE COURT: All right. And, sir, did have other housekeeping matters to take up?

MR. SAENZ: Yes, Your Honor.

THE COURT: Okay.

MR. SAENZ: Thank you.

We also discussed on stipulating to the admission of the -- the curriculum vitae of the four experts. I -- I believe those were submitted with our final witness lists, but if the Court prefers that we submit them and as separate exhibits, we can -- we can provide that. I believe the -- the CVs were included as appendix -- that appendixes or attachments to all of the expert reports. Both sides have them and both sides have put as evidence -- as exhibit the expert reports with the curriculum vitae.

How would the Court prefer that? If it's on the docket already, is that fine, or should we file those separately as exhibits as well?

THE COURT: I think just in an abundance of caution to make the record as clear as possible maybe just file them as separate exhibits.

MR. SAENZ: Thank you.

THE COURT: It is not anything super urgent. The Court already has that information, but just in an abundance of caution.

UNITED STATES DISTRICT COURT

11

MR. SAENZ:  As a new number, or is it fine to do 1080a?

THE COURT:  That should be fine.

MR. SAENZ:  Okay.

THE COURT:  Yeah, that should be fine.

All right.  Anything else?

MR. SAENZ:  Yes, Your Honor.

THE COURT:  Okay.

MR. SAENZ:  We have a question about how the Court would prefer to split the time, and understanding that we are scheduled for five days.  And with the changes, should we presume that each side gets two and a half, or will the Court be doing it by hour?

THE COURT:  I will let you continue until you are done presenting your case, and then I'll give the defendants the opportunity to present their case.

No, I wouldn't cut you off or put an artificial limit.  As soon as I say that, I realize I could be getting myself into trouble.

As long as you are presenting relevant, helpful evidence, I will let you keep doing that.  If we begin treading the same ground or if the rel- -- the relevance of the evidence you're presenting becomes more and more attenuated, then at some point I would cut you off.  As long as we are making progress, we will keep going.  I will say the same for the

UNITED STATES DISTRICT COURT

defendants.

MS. MICHALETZ: Your Honor, I do have one on Mr. Saenz's point. We were expecting a week-long trial based on the position that the plaintiffs -- plaintiff took I think just as early as last -- or as late as this past fall. So we planned for that. We have experts here in court who will be hearing the evidence. It would be a hardship for defendants if were we to go into that second week to the extent plaintiff isn't mindful of the time and to the extent that we've been very specific about how the evidence be presented.

So this is new information to us, that it could go into a new week. And so I don't know that we have a specific request right now, but just to put that in front of the Court.

THE COURT: Sure. And I appreciate that. And I will say that if we are running into a timing issue with some of your experts, or whomever, I would be more than happy to take a witness out of order or to accommodate the timing in whatever way we needed to, any way that the Court could.

And I will also, of course, pass to the parties to meet and confer and to continue to work together collegially. And if there's something that the parties can do to accommodate one another's schedules, of course, that would be my expectation. If, as we get to Wednesday -- you know, so roughly halfway through the week -- it appears to, in your estimation, that you're running into scheduling difficulties,

UNITED STATES DISTRICT COURT

let's talk about it. We'll figure it out.

MS. MICHALETZ: Thank you, Your Honor.

THE COURT: Okay.

MR. SAENZ: Your Honor --

THE COURT: Yes, sir.

MR. SAENZ: -- may I add?

THE COURT: Yes.

MR. SAENZ: Plaintiff, we submitted as -- amended witness lists, which we now have four witnesses that we've -- won't be calling. The defendants have listed nine or ten witnesses. That if there are any amendments to it that they could share now, that will help us with planning what this week will look like.

MS. MICHALETZ: We can -- we'll meet and confer maybe after -- at a break.

Does that sound good?

Yeah --

MR. SAENZ: Okay.

MS. MICHALETZ: -- we'll be mindful of that.

THE COURT: Very good.

MR. SAENZ: And, Your Honor, in terms of timing, again, with -- the Court tells us what to do. In terms of closing, plaintiff would -- would like to recommend that the -- that we do written closing and have an opportunity to submit written findings of fact and conclusions of law and instead of

UNITED STATES DISTRICT COURT

14

oral closing.

THE COURT:  Do defendants have a position on that?

MS. MICHALETZ:  Given the time constraint, that would be fine.  We -- we would agree to that, Your Honor.

THE COURT:  All right.  I'm definitely open to that. Let me give it some thought.  But if everybody's in agreement, that should be fine.

MR. SAENZ:  Thank you.

THE COURT:  All right.

MR. SAENZ:  And, Your Honor, thank you.

For Ms. Wagoner -- and -- and thank you for confirming that her food and medication are handled.  We did discuss with the State about the need for any additional bathroom breaks, as -- and I did want to bring to the Court's attention we -- Ms. Wagoner will be testifying on her own behalf.  She has been diagnosed with dyslexia and that if she needs additional time to review documents, that the Court is aware of that. Ms. Wagoner also has been tested twice recently for the need of hearing aids that have not been provided at this time.  So if there -- if she asks to repeat something or we see her move her head, it's -- it's because of the hearing impairment, to -- to better understand and to hear clear --

THE COURT:  Sir --

MR. SAENZ:  -- clearly.

THE COURT:  Sir, we have assisted -- assisted

UNITED STATES DISTRICT COURT

listening devices that she could try. It's not unusual for defendants to use -- for people in court to use them. They typically work pretty well.

MR. SAENZ: Yes, we would have -- thank you, Your Honor.

THE COURT: Of course.

MR. SAENZ: And that's it, Your Honor.

THE COURT: Okay. Ms. Wagoner, how is that for you? Is that better?

MS. WAGONER: Yes.

THE COURT: I'm so glad. So this is a really good example. I'm really glad Mr. Saenz spoke up. At no point do I want anybody to stuffer in silence. If you need a break, if you need something, if it's too hot in here, if it's too cold in here, if you need more water, please let me know, and we'll do everything we can to accommodate you. Okay?

Anything else, sir?

MR. SAENZ: No, Your Honor. Thank you.

THE COURT: Okay. From defendants, any housekeeping matters before we begin?

MS. MICHALETZ: No, Your Honor.

THE COURT: Are you sure?

MS. MICHALETZ: (No audible response.)

THE COURT: All right. In that case, from the plaintiffs. Opening statement.

UNITED STATES DISTRICT COURT

**2-ER-0073**

MR. SAENZ: Yes, Your Honor.

And can the court reporter hear me clearly?

(Discussion held off the record.)

MS. BUCHERT: Sasha Buchert on behalf of the plaintiffs.

Good morning, Your Honor. My name is Sasha Buchert, and I'm representing the plaintiff, Ms. Emalee Wagoner. Ms. Wagoner suffers from gender dysphoria, a serious medical condition that is characterized by clinically significant distress over the discordance between her gender identity and her sex assigned at birth.

Ms. Wagoner has been desperately seeking treatment for her medical condition for nine years now and counting, but at every turn, her requests for care have been stonewalled with denial after denial after denial, and a policy that provides no pathway to the surgical care that she needs.

There are at least three issues that are not in dispute in this case. First, there's no dispute that gender dysphoria is a serious medical condition that falls squarely within the Eighth Amendment's requirement that patients receive constitutionally adequate healthcare.

Second, there's no dispute that Ms. Wagoner has sustained self-inflicted injuries attempting to provide herself with the care that she is unable to obtain otherwise.

And, third, there's no dispute that the rights of

UNITED STATES DISTRICT COURT

**2-ER-0074**

transgender inmates to receive adequate medical care is well established in the Ninth Circuit.

During the course of this trial, the evidence will show that the defendants were deliberately indifferent to her medical need by depriving her of medically necessary care and that prison officials acted with deliberate indifference by consciously disregarding her ongoing distress and the substantial risk of serious harm to Ms. Wagoner if she is not provided treatment that has been recommended by medical specialists.

Instead of treating Ms. Wagoner's serious medical condition, the defendant and its officials have responded to her serious medical needs with continuous denials that continue to this day with the healthcare treatment that is the subject matter of this litigation, a vaginoplasty, which is a safe, effective, and widely accepted treatment for gender dysphoria.

The department and its officials have repeatedly denied this treatment for Ms. Wagoner despite the fact that Dr. Samuelson, Ms. Wagoner's treating physician, and the contracting physician with the Department of Corrections has repeatedly recommended that she be referred to a surgeon to evaluate her treatment.

You will hear directly from the plaintiff who will tell her story, but let me tell you a little bit about her now. Ms. Emalee Wagoner is a 44-year-old woman who is transgender.

UNITED STATES DISTRICT COURT

Ms. Wagoner has attempted to suppress her gender identity for much of her life, but as she got older, the stress of a persistent and severe gender dysphoria increased until it reached a boiling point where the pain and dysphoria was so immense that she could no longer suppress it, and she took the difficult step to live openly and effectively in a prison as a transgender woman.

Ms. Wagoner has taken every possible step to have the government recognize her for the woman that she is. She has legally changed her name, she's changed her name on her birth certificate, she's changed her Social Security record, and her Department of Corrections name is Emalee Wayne Wagoner.

Ms. Wagoner lives as a woman, as best she can, in a men's prison. The stakes in the case for Ms. Wagoner are enormous. There's no doubt that Ms. Wagoner will be placed at serious risk of substantial harm if she is continued to be denied treatment.

During her testimony, she will explain how, overwhelmed with emotional pain and desperate to alleviate her gender dysphoria, that she severely harmed herself when she performed a medical procedure on herself that she described as a penile inversion surgery, which was an attempt to comport her body with her gender identity. You'll hear how she took a Bic disposal razor blade and sliced through her phallus. Ms. Wagoner split the organ from the head down the middle to

the back of the urethra, leaving her with testicles four times the size of what they should be and with what she described as a phallus that looked like a butterfly.

The bleeding from the self-surgery was severe. She finally called for help. And, yes, afraid of being punished for her self-inflicted wounds, she initially did not tell the truth of how she was injured. The Alaska Department of Corrections sent Ms. Wagoner in an ambulance to receive medical care and has continued to treat her for her injuries but not for her underlying condition.

As a result of the surgery, and for the last nine years, she has lived in chronic physical pain, had ongoing urinary leakage, and risks of infections as a result of the injuries, and the constant reminder -- and the constant daily reminder of her detested genitals. In hindsight, Ms. Wagoner recognizes this was a bad idea, and she is now less likely to engage in self-surgery because she now has hope she will finally receive the medical care that she needs.

During the course of the trial, the evidence will show that the gatekeepers to her medical needs have a long history of deliberate indifference to Ms. Wagoner's condition. Indeed, for years Ms. Wagoner has been met with the troubling and dangerous pattern of denying any form of treatment for Ms. Wagoner's gender dysphoria.

For example, when Ms. Wagoner sought mental healthcare

20

counseling to treat her worsening dysphoria, she was informed in no uncertain terms by the department that -- that the department does not address gender dysphoria issues and that she should please let it go. But she could not let it go.

Ms. Wagoner continued to request talk therapy until the department finally relented and allowed her to speak with someone who formally diagnosed her with gender dysphoria and recommended that she attend further sessions. But, as we sit here today, the department still does not provide Ms. Wagoner with adequate mental healthcare services for her gender dysphoria, which is a part of necessary treatment for her.

Another example is that when she was seeking medical -- seeking a medical provider to provide her with hormone therapy, Ms. Wagoner was told that the department does not provide hormone therapy and that she should seek such medical services after she is released.

But, again, Ms. Wagoner could not let it go. She persistently challenged the denial of care. And, finally, in 2022, almost six years after she first requested treatment, Ms. Wagoner finally received hormone treatment for her gender dysphoria. And the troubling pattern continues to the present litigation.

Your Honor, you will hear from multiple witnesses that Ms. Wagoner satisfies all the criteria for this treatment by the World Professional Association of Transgender Healthcare

UNITED STATES DISTRICT COURT

standards of care and, if left untreated, that Ms. Wagoner is likely to suffer serious and substantial harm. Despite this fact, she has repeatedly been denied treatment. And, in the meantime, she continues to suffer from severe gender dysphoria, but she will not let it go.

During the trial, you will hear from Ms. Wagoner herself, who is in the courtroom, who will tell you -- tell the Court directly about her long history of gender dysphoria dating back to her childhood, her ongoing clinically significant distress, and why she has chosen to live openly as a transgender woman in the men's prison with all of the attendant risk that come along with that authenticity.

You will also hear from Ms. Wagoner's treating physician, Dr. Rachel Samuelson, who will testify to Ms. Wagoner's persistent and severe gender dysphoria and who will discuss the multiple recommendations she has made for Ms. Wagoner to be referred to a surgeon to evaluate her for surgical treatment over the last two years.

You will also hear from plaintiff's experts, Dr. Randi Ettner and Dr. Nicholas Gorton, both of whom have assessed Ms. Wagoner in person. Dr. Ettner is a renowned clinical and forensic psychologist with extensive experience concerning the diagnosis and treatment of gender dysphoria, who will testify that Ms. Wagoner has persistent and severe gender dysphoria and that surgery would help eliminate the ongoing risk of her

self-harm caused by inadequate treatment.

Plaintiff's other expert, Dr. Nicholas Gorton, a medical doctor who has extensive experience evaluating and referring transgender patients for surgical care, will testify that based on his assessment that Ms. Wagoner's current treatment is inadequate to address her significant clinical dysphoria that will only be remedied by surgical treatment.

Both experts have evaluated and treated hundreds of people with gender-affirming care, including assessments from gender-affirming surgeries.  They will testify that the ongoing distress she experiences is the direct result of untreated gender dysphoria.  Both will opine that Ms. Wagoner suffers from severe gender dysphoria and that she be -- she should be referred to a surgeon.

Even Dr. Gregory Lund, her urologist, and defendants' expert Dr. Sara Boyd all agree that Ms. Wagoner should be referred to a surgeon who provides gender-affirming surgery so that she could have the information necessary to have -- to provide informed consent on surgical care.

The defendants will raise a flurry of objections to justify denying her healthcare, many of which are untethered to Ms. Wagoner's actual medical needs.  And they will argue that despite her long history of gender dysphoria and self-surgery, that she is not suffering enough to warrant prompt -- proper treatment and that the treatment itself is not medically

UNITED STATES DISTRICT COURT

necessary.

But the evidence will show that Ms. Wagoner continuously suffers from clinically significant distress, and plaintiff's experts will explain the scientific basis addressing the clinical effectiveness of vaginoplasty, a proven treatment that has effectively been shown to alleviate gender dysphoria for decades.

In conclusion, Ms. Wagoner has waited for the defendants to do what the Constitution requires; provide her with adequate medical care for her severe gender dysphoria. She has exhausted grievance after grievance and has been forced to litigate a complicated lawsuit against the Alaska Department of Corrections on her own until present counsel joined the matter. Today she is in the courtroom once again facing down the same kinds of obstacles to healthcare that she has had to fight every step of the way for the last nine years in her struggle to be properly treated for what everyone in this courtroom acknowledges is a serious medical condition.

Your Honor, I thank you for allowing us the opportunity to provide this -- this case over the next week and for being open to our arguments. We will ask at the end of the trial for the Court to issue injunctive relief for Ms. Wagoner to be sent to a qualified surgeon, who will address her serious medical needs.

Thank you, Your Honor. I'm happy to answer any

questions.

THE COURT:  Thank you very much.

All right.  Defendants.  Opening statement.

MS. MICHALETZ:  Thank you, Your Honor.  I will keep my comments brief, further to our point about timing, but I would also like to provide the Court a short roadmap of where we think the evidence is going to go.  But I also want to flag several issues of law for the Court on the front end of evidence so it could be mindful of some salient points over the next few days of testimony.

Mara Michaletz, David Gross, and Mackenzie Milliken.  Our firm represents the defendants in this matter.  Nancy Dahlstrom, who is a former commissioner of the Department of Corrections; Laura Brooks, who is the former division director of the Health and Rehabilitative Services at the Department of Corrections; Dr. Robert Lawrence, the State of Alaska Chief Medical Officer; and Adam Rutherford, the deputy director of Health and  Rehabil- -- Health and Rehabilitative Services at the department.

I'm also joined in the courtroom by Sidney Wood at the door, the department representative, who is the divisions operations manager for the department.

The defendants are also joined by their experts, Dr. Joseph Penn and Dr. Sara Boyd.

Your Honor, seven years ago, in September of 2018,

Emalee Wagoner filed suit against four dedicated public servant employees of the Department of Corrections alleging they had acted with deliberate indifference to serious medical needs because the department had not implemented policies and procedures governing the treatment of transgender inmates.

That was simply not true. Since at least July of 2017, the Department of Corrections has been actively developing and revisiting policies governing medically necessary care and treatment for inmates with gender dysphoria. These policies and care have been consistent with the Ninth Circuit's decision in *Edmo vs. Corizon* in August of 2019, which includes the important points that not every transgender person has gender dysphoria, and not every gender dysphoric person has the same medical need.

Gender dysphoria is a serious and treatable condition. In certain circumstances, surgery can be medically necessary treatment for gender dysphoria. Co-occurring mental health concerns unrelated to the person's gender dysphoria do not necessarily preclude surgery, but those concerns need to be managed prior to or concurrent with treatment of a person's gender dysphoria. And it may be difficult to determine whether mental or medical health concerns result from the gender dysphoria or are unrelated.

Your Honor, the basic facts are as follows: Emalee Wagoner has been in state custody since 2011 when she was

26

charged with over 45 felonies related to her sexual abuse of three children; two of whom were in her care as her stepchildren. At the time of her arrest, she was 30 years old identifying as a man. She was divorced to the mother of her four children and dating another woman. At no time before this had she sought any treatment or counseling for gender dysphoria.

She was convicted in 2015. In 2016, she cut her penis, at the time claiming to all it was an accident. Phone calls with her romantic partner revealed her plan to get genital surgery and conspire to live with her lover at Highland Mountain women's facility.

In 2017, the department recognized a diagnosis of gender dysphoria for Wagoner, which is co-occurring with her diagnoses of borderline personality disorder and antisocial personality disorder. Under *Edmo*, the department correctly factored these diagnoses into its analysis of Wagoner's medically necessary needs and treatment. The department has provided Wagoner gender dysphoria resources medication to address depression, cosmetics and grooming devices, female undergarments, medication for hair loss, and hormone therapy under the supervision of a community family general practitioner, Dr. Rachel Samuelson. The department has also implemented a multidisciplinary committee specific to Goose Creek Correctional Center that meets regularly and focuses on

the treatment, monitoring, and care for each of the inmates with gender dysphoria housed there.

The Gender Dysphoria Review Committee incorporates quarterly check-ins with the inmates and reports medically to the Medical Advisory Committee known as the MAC, which is the department's reviewing clearinghouse for all significant questions of whether medical treatment under consideration is simply medically beneficial or actually medically necessary. Per the Eighth Amendment, the department will and does provide treatment that is deemed medically necessary.

The Court will hear that the MAC has considered Emalee Wagoner's treatments for gender dysphoria five times since 2015. The Court will hear from two of its former members considering the treatment and evergreen requests for surgery. Dr. Robert Lawrence was, until 2024, the chief medical officer for the Department of Corrections. He is now the chief medical officer for the State of Alaska.

Adam Rutherford is the deputy director of Health and Rehabilitative Services. In his former capacity as the chief mental health officer for DOC, he worked with Dr. Lawrence to develop the gender dysphoria policies and care guides which govern the department's current treatment of gender dysphoric inmates.

The Court will hear that Wagoner's community family practice doctor, Samuelson, has recommended surgery for Wagoner

and that Wagoner has been asking for surgery for several years. The Court will also hear the other information and factors that the MAC thoroughly considered when it evaluated Dr. Samuelson's recommendation. Ultimately, the MAC has found that surgery is not medically necessary for Wagoner despite the fact that she has long believed she would benefit from it.

Defendants anticipate Wagoner's experts will opine that after interviewing and meeting with Wagoner, based on the persistence and severity of her dysphoria, genital-affirming surgery is medically indicated and necessary for Wagoner, quote.

The Court will hear from Wagoner's experts that an analysis is based on standards developed by the World Professional Association for Transgender Health, of which they are both members. Wagoner is, in turn, likely to argue that the Court should adopt WPATH standards of care in evaluating the necessity of surgery in this case, as the Ninth Circuit did in *Edmo*. The Court should listen very carefully when the plaintiff, her counsel, and her experts discuss WPATH. *Edmo* was decided in 2019. And it violated and relied on WPATH so-called standards of care in WPATH 7. In 2022, the association adopted WPATH 8. Per the introduction to WPATH 8, it acknowledges that it, quote, "Represents a significant advancement from previous versions based in part on a fundamentally different methodology."

UNITED STATES DISTRICT COURT

**2-ER-0086**

The Court would like to flag for the Court -- sorry. The defendants would like to flag for the Court two other points to consider while the evidence is presented:

First, plaintiff has had the goal of surgery for over seven -- seven years seeking an outcome-specific treatment. In a prison setting, medical providers faced with inmates seeking specific treatment must also consider whether that is motivated by secondary gain incentives. This can include access to materials, housing, resources, or even other individuals to make confinement more comfortable. Defendants intend to present evidence that Wagoner has been motivated by such secondary gain incentives during the pursuit of specific surgical treatment.

Second, plaintiff has been very selective in the information she gives to her medical providers and her experts. In a prison setting, medical providers -- excuse me -- which has materially affected their ability to properly evaluate Wagoner's gender dysphoria. Neither her outside provider, nor experts have looked beyond Wagoner's self-reporting in any serious manner. This will, in turn, affect what they present to the Court, which is selective information that is contraindicated by the comprehensive records of Wagoner's life. We have already seen Wagoner's request to the Court disregard her history of violence and sexual crimes, which otherwise demonstrate the severity of her co-occurring mental disorders.

This information matters.

The defendants intend to present to the Court a comprehensive picture of plaintiff that when evaluated properly for the question of whether surgically is -- surgery is medical necessary for Wagoner will support the defendants' thorough and well-reasoned decision to deny surgery to Wagoner despite her long history of requesting that specific outcome.

The defendants look forward to the presentation of full information relating to Wagoner's medical and mental state in the coming days in defense of Wagoner's significant allegations that they have acted with deliberate indifference to her serious medical needs.

Because Wagoner and her team are focused on a specific outcome, what they will present will be an intentionally curated and choreographed production for the Court. What you will hear from the defendants will be the well-researched documentary.

Thank you, Your Honor.

THE COURT: Thank you.

All right. From the plaintiffs. Do you have a witness?

MR. SAENZ: Yes, Your Honor. Plaintiff would like to call expert witness Dr. Randi Ettner to the stand.

THE COURT: Dr. Ettner, if you could please come on up.

THE COURT REPORTER: Could I have counsel's name that was just speaking?

THE COURT: Yes, ma'am. One second.

Ma'am, just come on up, and you'll remain standing and be sworn.

And, Mr. Saenz, if you could please state your name for the record for the court reporter.

MR. SAENZ: Richard Saenz, S-A-E-N-Z.

THE COURT: All right. Good morning, Doctor. Could you please raise your right hand.

(DR. RANDI ETTNER, a witness herein, was duly sworn or affirmed.)

THE COURTROOM DEPUTY: Thank you. Be seated.

For the record, please state and spell your full name.

MS. WAGONER: Dr. Randi Ettner. R-A-N-D-I, E-T-T-E-N-R.

THE COURTROOM DEPUTY: Thank you.

THE COURT: All right. Mr. Saenz, you may go forward.

MR. SAENZ: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. SAENZ:

Q. Good morning, Dr. Ettner. How are you?

A. Good morning. I'm well. Thank you.

Q. Doctor, where do you live?

A. Evanston, Illinois.

UNITED STATES DISTRICT COURT

2-ER-0089

Q. And what is your profession?

A. I'm a clinical and forensic psychologist.

Q. How long have you been a clinical and forensic psychologist?

A. 30-plus years.

Q. And what is the difference between a clinical psychologist and a forensic psychologist?

A. A clinical psychologist delivers services to people, clinical services, whereas a forensic psychologist applies the principles of psychology and the methods to matters of law or criminal justice.

Q. Dr. Ettner, do you have an area of expertise or focus?

A. I do. It's transgender healthcare.

Q. And how do you describe transgender healthcare?

A. The provision of diagnosis, assessment, evaluation, treatment, and management of individuals who have some degree of gender incongruence.

Q. Doctor, what is gender incongruence?

A. It is misalignment of the sex assigned at birth and the individual's gender identity, their sense of belonging to a group typically male or female.

Q. Doctor, are you serving today as a retained expert on behalf of the plaintiff, Ms. Emalee Wagoner?

A. Yes.

Q. Are you being paid for your work?

UNITED STATES DISTRICT COURT

**2-ER-0090**

A.  Yes.

Q.  As part of your work as an expert, did you provide a copy of your curriculum vitae?

A.  I did.

Q.  Okay.  I want to show you what will be bookmarked as Plaintiff's Exhibit Number 1080.

MR. SAENZ:  If you could pull that up, please.  Okay. So it's -- Your Honor, if we could have a second to pull it up.

THE COURT:  Sure.

THE WITNESS:  I'm having a little trouble locating this.

BY MR. SAENZ:

Q.  Doctor, I believe it starts on page 62 or 63 of Exhibit 1080.  And --

A.  Okay.  Thank you.  I have it.

Q.  Okay.  If you can go to page 62.

MR. SAENZ:  Your Honor, may I ask, is the DEP system assigned to plaintiff at this point?

Page 62 of Exhibit 1080.  And this has been admitted per stipulation.

MR. GROSS:  Let's be clear that the exhibit that we're looking at has not been admitted, but we're going to have an exhibit prepared that's going to be submitted.

MR. SAENZ:  Correct.

THE COURT:  Understood.

UNITED STATES DISTRICT COURT

**2-ER-0091**

THE COURT REPORTER: Who was that speaking?

MR. GROSS: That was David Gross.

I'm not seeing it. Okay.

MR. SAENZ: It is not projecting, the content from counsel desk. It says --

THE COURT REPORTER: I'm not hearing. I'm sorry.

THE COURT: So, for the record, we were just sorting out some technical difficulties with the DEP system, but I believe that has now been resolved.

Does that correctly reflect what the court reporter missed, Counsel?

MR. SAENZ: Yes, Your Honor.

THE COURT: Counsel for the defendants?

MR. GROSS: Yes, that's correct.

THE COURT: All right. It looks like we now have Dr. Ettner's CV on the DEPS system.

MR. SAENZ: Yes. Thank you, Your Honor. We'll be starting on what's currently page 63 of Exhibit 1080.

BY MR. SAENZ:

Q. Doctor, did -- do you have it in front of you now?

A. Yes.

Q. Okay. Can you tell me what -- what is this document?

A. This is my CV.

Q. And did you create this?

A. I did.

Q. When -- when did you create this?

A. I'm constantly updating it, so I don't know when it was originally created.

Q. And if you can take a second to review it. Let me know when you've had a chance to review it.

A. I've reviewed it.

Q. Okay. Is it accurate?

A. I see one error on page 2 where it says "2017 to 2024" under my clinical and professional experience. That should be 2025 to make it current.

Q. Thank you.

Dr. Ettner, could you tell me, what is your educational background?

A. I received a bachelor's at my undergraduate university, Indiana University. I got a master's degree from Roosevelt University and a PhD at Northwestern.

Q. And what was your PhD in?

A. Psychology.

Q. Okay. And I want to look at page 64.

Do you see your clinical and professional experience? Is this what's up-to-date --

A. Yes.

Q. -- except for the change you mentioned?

A. Correct.

Q. You are currently a private practitioner in clinical and

forensic practice?

A. Yes.

Q. When did you begin your private practice?

A. 1980.

Q. And what kind of patients do you see?

A. I see adults currently who either have gender issues or adults who don't have gender issues.

Q. What do you mean by "gender issues"?

A. People who are struggling with some degree of gender incongruence.

Q. How many patients are you currently treating?

A. It varies from week to week, but approximately 14 or 15 patients a week.

Q. Are any of your current patients incarcerated?

A. No.

Q. Have you ever provided treatment to an incarcerated person?

A. Post-incarceration, yes.

Q. Okay. Have you ever provided consulting -- consultation to an incarcerated person?

A. On a crisis basis during a prolonged class action suit, I provided crisis counseling to several of the named plaintiffs.

Q. Okay. Could you tell me what -- what was that suit about?

A. That was a suit against the 40 state prisons in Illinois who were not providing adequate care to patients who had gender dysphoria.

UNITED STATES DISTRICT COURT

Q. Dr. Ettner, throughout your career, how many people have you evaluated or diagnosed with gender dysphoria?

A. I've evaluated, diagnosed, or treated 3,000 people.

Q. And is that an estimate?

A. I stopped taking patients at 3,000.

Q. And how many people have you assessed or referred for gender-affirming surgery?

A. For some form of gender-affirming surgery, I would say approximately 325.

Q. And of those 325, were any of those -- did you assess or refer any of those for gender-affirming genital surgery?

A. Yes. Most of them were for genital surgery.

Q. What is gender-affirming genital surgery?

A. It's the reconstruction of the genitals so that their primary sex characteristics appear typical of the sex that is the affirmed gender that the transgender person is living in.

Q. Okay. And, Dr. Ettner, are you currently on the medical team at Weiss Memorial Hospital Center for gender-confirmation surgery?

A. I'm a member of the medical staff at Weiss Memorial Hospital.

Q. As a member of the medical staff at Weiss Memorial Hospital, what -- what do you do?

A. I consult with the team regarding any issues that arise during perioperative period for individuals who are undergoing

UNITED STATES DISTRICT COURT

**2-ER-0095**

a gender-affirming surgery.

Q.  And what are examples of -- of the perioperative period? What are some issues that might come up?

A.  Well, for example, I had a patient that was born and raised in India, and she was taking hormones, and she was my patient. And she went to Bermuda where she received a job opportunity. Several years later, she returned to Chicago for a surgery. And after surgery, I received a phone call from the surgeon that the patient thought she could substitute meditation for medication.  So she was refusing anticoagulants, and she was refusing pain medication.  So, of course, the staff was very concerned that she would have an embolism.

And so that was a case where I was asked to intervene and help with that particular individual.

Q.  Can you estimate --

THE COURT REPORTER:  Excuse me.

(Discussion held off the record.)

BY MR. SAENZ:

Q.  Can you estimate how many patients have you consulted with post-gender-affirming genital surgery?

A.  I've consulted with approximately 7 or 8 percent of people. I have followed -- I have followed or heard from people post-surgery.

Q.  As a psychologist, are you a member of any professional associations?

A. Yes.

Q. Okay. If we could -- if you could turn to what's on page 73 of Exhibit 1080. And if you could scroll down to where it says "Professional Affiliations."

And, Dr. Ettner, if you could just let us know if that is a complete list of your affiliations.

A. Yes. I think there -- it continues on the next page.

Yeah, that would be a complete list.

Q. Thank you.

And, Dr. Ettner, if you can turn to page 70 of Exhibit 1080.

Do you see the section that says "Publications"?

A. I do.

Q. Okay. I have a few questions for you about that.

Have you published articles in professional journals related to transgender health?

A. Yes.

Q. Looking at page 70 through 80 of your curriculum vitae, how many of these publications are peer-reviewed articles?

A. 17.

Q. And are those 17 all related to the -- the broad topic of transgender health?

A. Yes.

Q. I want to look at -- do you see the one that's titled Gender affirmation surgery: A collaborative approach between

the surgeon and the mental health professional?

A. Yes.

Q. Where was that publshed?

A. In the American -- in the Journal of Plastic and Reconstructive Surgery.

Q. And what was that article about?

A. Basically about the collaborative impact on multidisciplinary team.

Q. Okay. Now, if you could look at the one titled Gender Confirmation Surgery: what surgeons need to know when providing care for transgender individuals.

A. Yes. I see that.

Q. Where was that published and when?

A. That was published in JAMA Surgery in 2017.

Q. And what -- what did that article discuss?

A. Basically discussing the role of the mental health professional and how that could inform care for surgeons, and particularly for surgeons who are new to the field, giving them information about the difference between, like, body dysmorphic disorder and gender dysphoria.

Q. Dr. Ettner, what is the process of getting an article accepted for publication in a professional journal?

A. Once a manuscript is submitted to a journal, it's centering viewers who have expertise in that particular subject matter. Those reviewers scrutinize the article and determine if it's

acceptable for publication as-is, if it requires revisions, or if it's simply not appropriate for publication, or publication in that particular journal.

Q. Dr. Ettner, have you ever served as a peer reviewer?

A. Yes. Several times.

Q. And what kind of standards are peer reviewers applying to determine if an article is acceptable for publication?

A. It's a high level of scrutiny. It's really a comprehensive review of the literature to see if there's anything missing and a -- attention to the methodology and statistical computations that are used in creating the results.

Q. Dr. Ettner, have you authored any textbooks?

A. I've authored two textbooks, Principles of Transgender Medicine and Surgery. And I'm currently under contract to produce a third revision of that textbook.

Q. And what -- what are some of the topics included in -- in this textbook version of the first and second edition and, as you just said, you are under contract for a third?

A. Well, there are different chapters on every aspect of transgender healthcare. So there's a chapter on endocrinology. Chapter on etiology of a condition. A chapter -- several chapters on surgery. Chapters on sexual health. So it's a comprehensive textbook that's used internationally.

Q. And in addition to co-authoring a complete textbook, have you submitted any chapters for other textbooks on this topic?

A. Yes. Vanderbilt asked me to write the chapter on surgery for the transgender population in the guidebook they were creating.

Q. Dr. Ettner, if you could turn to page 65 of the Exhibit 1080.

Do you see it where it says "Invited Presentations and Grand Rounds"?

A. Yes, I see that.

Q. What are grant -- grand rounds?

A. Grand rounds are when a healthcare provider goes to a hospital and the medical staff; interns, residents, the whole medical staff, is invited to hear a presentation about best practices or an unusual case.

Q. And, Dr. Ettner, do you see the -- at the top where it says, "The Evaluation of Transgender Prisoners' Access to Healthcare Behind Bars: 25 Years of Expert Witness Experience Using the WPATH SOC (Versions 5 to" -- "5 to 8)"?

A. Yes.

Q. Do you see that?

First, let me ask you, what is -- what does WPATH SOC Versions 5 to 8 refer to?

A. WPATH is the World Professional Association of Transgender Healthcare, an organization of some 2,000 individuals who specialize in this area from different disciplines, so endocrinologists, surgeons, mental health professionals. And

UNITED STATES DISTRICT COURT

**2-ER-0100**

WPATH has been promulgating standards of care since 1979. This is the eighth -- we're now on the eighth iteration of the standards.

Q. And could you tell us, what was -- what was this presentation about?

A. My colleague, Dr. Brown, Dr. George Brown, and I presented our experience over the past 25 years of working in incarcerated settings, and we looked at the evolution of healthcare over our experience.

Q. And if you could look -- if you could scroll down. It's the title Expectations of individuals undergoing gender-confirming surgeries.

A. I'm sorry. You said under Presentations?

Q. Yes, Doctor.

A. Is it on that same page?

Oh, I see it. Yes. Sexual Function?

Is that the presentation you're looking at?

Q. Yes.

A. Okay.

Q. Yes.

A. And what was your question?

Q. What -- what was that presentation about?

A. That was based on a survey of how patients determined -- we determined what their presurgical sexual practices, behaviors, attitudes were, how they expected that would change

post-surgery, and then evaluated them post-surgery to determine whether or not those expectations had, in fact, come to pass.

Q. And, Doctor, if you can turn to page 74 of Exhibit 1080.

Do you see the section Awards and Honors?

A. Yes.

Q. Okay. Is -- is this a complete list of awards and honors you have received for your work on transgender health?

A. Yes, it is.

Q. Can you tell us about any of these awards or honors you have received?

A. I'm the honoree of the externally funded Randi and Fred Ettner Fellowship in Transgender Health at the University of Minnesota. And during President Trump's first term in office, I was invited by the director of the Office of Civil Rights to discuss transgender healthcare. And I received a commendation from the United States House of Representatives for my work in gender dysphoria.

Q. Earlier you testified about -- defined the World Professional Association for Transgender Health, WPATH.

Do you -- do you recall that?

A. Would you repeat the question. I didn't hear the first part.

Q. Earlier you testified or you defined what the WPATH means?

A. Yes.

Q. Okay. Are you a member of the WPATH?

A.  I am.

Q.  Since when?

A.  Probably since 1997.

Q.  Okay.  And have you held positions with WPATH?

A.  I was a board member for, I think, 12 years.  And I served two terms as secretary of the organization.

Q.  Do you currently hold any positions with the WPATH?

A.  I chaired a committee for institutionalized persons.

Q.  And, Dr. Ettner, you are not here today as a representative of WPATH; is that correct?

A.  That's correct.

Q.  Okay.  Dr. Ettner, have you testified in court as an expert in the areas of evaluation, diagnosis, and treatment of gender dysphoria, including the assessment and referral for gender-affirming genital surgery?

A.  Yes.

Q.  Approximately how many times have you served as an expert?

A.  Including what?  Just writing a report without testifying, or are you asking just about testifying?

Q.  Including writing a report, depositions, testifying at a hearing or a trial.

A.  Probably 60 or 70 times.

Q.  Have you ever been rejected as an expert witness by any Court?

A.  No.

MR. SAENZ: Your Honor, I move the Court to recognize Dr. Randi Ettner as an expert in the field of clinical and forensic psychology generally and specifically regarding the -- regarding transgender health, the diagnosis, evaluation, and treatment of gender dysphoria, including referral and assessment for gender-affirming surgical treatments.

THE COURT: All right. Do the defendants wish to voir dire?

MR. GROSS: No. And then no objections.

THE COURT: All right. Very good.

All right. So Dr. Ettner will be recognized by the Court as an expert witness in the various fields that the plaintiff described.

MR. SAENZ: Thank you --

THE COURT: All right.

MR. SAENZ: -- Your Honor.

BY MR. SAENZ:

Q. All right.

THE COURT: And, Mr. Saenz, I'm sorry to interrupt you. We're sort of getting to our morning break. So if you want to begin your direct examination in substance now, you're welcome to do that, or we could just break now and come back in 15 minutes. Up to you.

MR. SAENZ: If I could first just offer. We do have a copy of the new exhibit, 1080a.

THE COURT: Do defendants have a copy of that?

MR. SAENZ: Yes, Your Honor.

THE COURT: All right.

MR. SAENZ: And if -- if we could take a break now, and then on return we could start?

THE COURT: Perfect. All right.

From the defense, anything to take up before we break?

MR. GROSS: No, Your Honor.

THE COURT: All right. We'll be on recess for 15 minutes.

Thank you very much.

MR. SAENZ: Thank you.

THE COURT: All rise. This matter's in recess for 15 minutes.

(Recess from 10:22 a.m. to 10:45 a.m.)

THE COURT: All right. We are back on the record. The parties are present. Ms. Wagoner is present. Dr. Ettner is still on the witness stand.

Ma'am, of course, you're still under oath.

Mr. Saenz, you may inquire.

BY MR. SAENZ:

Q. Doctor, can you explain what you were asked to do in this case.

A. I was retained to opine on the care that Ms. Wagoner was receiving for her gender dysphoria.

Q. Before today, have you met Ms. Wagoner in person?

A. Yes.

Q. Doctor, have you written a report in this case?

A. I did.

Q. And did you write a rebuttal report in this case?

A. Yes.

Q. And did you also write a responsive rebuttal report?

A. Yes.

Q. Okay.

MR. SAENZ: Your Honor, I'm not moving Dr. Ettner's reports as Exhibits 1080, 82 -- 1080, 1082, and 1084, but Dr. Ettner may need to refer to them during her testimony.

THE COURT: All right. I understand. So if she does need to refer to those to refresh her recollection, just please make the appropriate record.

THE COURT REPORTER: Mr. Saenz, please move the microphone close to you.

BY MR. SAENZ:

Q. Dr. Ettner, when you -- when you wrote your reports, did you believe that you had sufficient information about Ms. Wagoner in her treatment so that you could offer a valid and reliable expert opinion about Ms. Wagoner and her treatment?

A. Yes.

Q. What were your opinions about Ms. Wagoner and her treatment

49

for gender dysphoria?

A.  My opinions were that she was, indeed, a transgender woman who was suffering from gender dysphoria, that she was suffering from a severe form of gender dysphoria, and that the treatment she had received to date was inadequate for the dysphoria she was experiencing.

Q.  Could you explain?  What do you mean by that Ms. Wagoner suffered from severe gender dysphoria?

A.  Ms. Wagoner had made three attempts to perform a surgical procedure on herself.  Now, that is not an indication of mental illness.  That is an intention -- a desperate intention to access a -- a solution to a serious medical concern that was not being addressed.  So surgical self-treatment, as we call it, is a priority, evidence of severe gender dysphoria.  And we only see it in cases where treatment has not been adequate or appropriate.

In Ms. Wagoner's case, while I've seen many people who've attempted to remove their genitals while in prison, either penectomy or autocastration, Ms. Wagoner was the first person who I've ever seen who didn't really want to rid herself of her genitals.  She wanted to create congruent genitals.  She wanted to create a new vagina and a speculated urethra that she could urinate from.  And this was something I had never seen before.

And regarding the severity, her determination to do

this with the crudest instruments in the most unsterile environment, really without instruction, was a good barometer of how severe her gender dysphoria is and was.

Q. Dr. Ettner, when did you first meet Ms. Wagoner?

A. October 7th of 2024.

Q. Dr. Ettner -- Dr. Ettner, what -- what is gender identity?

A. Gender identity is something that all humans have. A deeply felt sense of belonging to one category or another, usually male or female.

Q. And what does it mean to be a transgender person?

A. It means an individual experiences a misalignment between the sex they're assigned at birth and their gender identity.

Q. What is gender dysphoria?

A. Gender dysphoria is a serious medical condition but fortunately a treatable one.

Q. And what is the etiology of gender dysphoria?

A. Well, there's been a huge assemblage of literature which now indicates that there's a biological basis for gender dysphoria.

So in 2000, Green noted that gender dysphoria ran in families. So a father and daughter or two siblings once shared a condition. Further examiners extended that. One found that if a family member had gender dysphoria, a sibling would be four and a half times as likely to have gender congruity than a member of the general population.

That wasn't enough to settle the science, however. The twin sets were very interesting, because Heylens discovered that identical twins had a 39.1 percent concordance for gender identity. Twins that were not identical had zero concordance. That led molecular geneticists to actually look for the genes that might be responsible for gender identity. And studies have found ARBRB and CYP19 and 17 to be polymorphisms associated with gender identity. Hormonally, women who took DES or phenobarbital during pregnancy had a higher prevalence of gender dysphoric offspring, indicating that prenatal hormonal influences were one contributing to gender congruity.

And, finally, functional magnetic resonance imaging studies, which only recently have become available, indicate differences in the white matter of the brain, subcortical structures, and the cortex, which is central to behavior. And then there are other indications, which I won't bore you with. DNA methylation, which is epigenetics. But there is certainly a biological foundation to the condition.

Q. Dr. Ettner, for someone with gender dysphoria, does the gender dysphoria improve or worsen as they get older?

A. Untreated, it will worsen.

Q. Why is that?

A. Because with aging, normal aging, cortisol raises, and it destabilizes some of the hormones and causes an intensification of gender dysphoria.

Q.  What do you base that conclusion on?

A.  Research I published with colleagues in the -- and opinions in endocrinology and also in the Journal of Maturitas where we talk about the specific pathophysiology of that.

Q.  How is gender dysphoria diagnose -- diagnosed?

A.  Well, there's criteria for diagnosing it in what we refer to as the DSM, the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association. And the International Classification of Diseases also has a descriptive diagnosis criteria.

Q.  I -- I want to first ask about the Diagnostic and Statistical Manual.

Is this also referred to as the DSM-V?

A.  Yes.  The current one is DSM-V, yes.

Q.  And does the "V" mean the fifth edition or volume or -- or what does the "V" mean in this?

A.  It's the most recent iteration.  It was published in 2013.

Q.  Okay.  And what are -- what are the criteria for diagnosis of gender dysphoria under the DSM-V?

A.  Can I just summarize them?

Q.  If you could provide the summary, yes.

A.  So one of the criteria is there has to be persistence of the gender dysphoria.  And the criteria would be the desire to rid one's self of primary and secondary sex characteristics, the wish to be of the other sex and to be perceived as a member

of the other sex, the feeling that one has the personal feelings and the mental feelings that are more typical of the other sex than the sex that they were assigned at birth, and the desire to appear through social signifiers as a member of the other sex.

And the -- this incongruence between the birth of same sex, the gender identity, has to be so significant that the distress it creates impairs some function.

Q. What types of function?

A. Well, in the community it would be -- it could impair occupational social functioning. Those kinds of important areas of functioning.

Q. Are these criteria different for diagnosing someone that is incarcerated?

A. I think the diagnostic criteria are foundational. They really define what the condition is. The B criteria may -- would have to be modified, because people who are institutionalized aren't working in occupations or functioning in the same areas and to the same extent that people who live in the free community would be.

Q. Who can diagnose someone with gender dysphoria?

A. Well, I think someone who's experienced with the condition can diagnose it.

Q. Is there any required training or specialization in order to be able to diagnose someone with -- with gender dysphoria?

A.   There's specialized training required in order to determine the treatment of the condition.  I mean, anyone who looks at the diagnostic criteria could sort of check them off.  But in order to create a treatment plan or a referral to medical or surgical providers, to determine if there are co-occurring conditions and if those co-occurring conditions are separate from the attendant emotional conditions, that occur with this gender dysphoria and the social violations that it creates.

So people who have gender dysphoria quite often have anxiety, depression, suicidality.  And an experienced person, as is required by the Standards of Care 7, has to be able to differentiate if it's a co-occurring condition or if it's caused by the gender dysphoria, per se.

Q.   And, Dr. Ettner, just to clarify, do all transgender people have gender dysphoria?

A.   No.

Q.   You have testified a little bit about the treatment and treatment plans of someone with gender dysphoria.  Are there professionally recognized guidelines to -- that set out the treatment for gender dysphoria?

A.   The WPATH guidelines set out the treatment, and the Endocrine Society also produce guidelines that set out treatment.

Q.   And under the WPATH and also the Endocrine Society, what is the treatment for gender dysphoria?  If you can summarize.

A.   Typically there are three treatment modalities:  The first is called social role transition, and that's when an individual actually lives in their affirmed and preferred gender.  And that can involve a change of name, changing one's appearance through hairstyle or clothing and, to the best of one's ability, living in and appearing in one's affirmed gender.

And this is such a significant part of the treatment because, if you remember, the sine qua non of the condition is to be recognized as the way I see myself.  And so this is actually considered medical treatment.

And with many medical conditions, there are more than one treatment that are sometimes necessary.  Core sex hormones or gender-affirming hormone treatment is most frequently required by people who have gender dysphoria.

Q.   And I -- I want to ask you about social transition.  In your opinion, has Ms. Wagoner received treatment for social transition?

A.   She's received some treatment for social transition, yes.

Q.   What has she received, if you can recall?

A.   Well, she's, yeah, had a legal name change.  And she has received female undergarments.  And I think she's received some cosmetic from commissary.

Q.   Is social trans- -- for Ms. Wagoner, is social transition treatment on its own sufficient to address her gender dysphoria?

A.  I would say it's necessary, but it is not sufficient.

Q.  Dr. Ettner, the -- the treatment standards that you have just testified about, do those same standards apply to prisons?

A.  Yes.  The standards of care for incarcerated people have been the same standards since 1998.

Q.  And you mentioned Standards of Care Version 7.  Is that the version currently in effect?

A.  No.  Standards of Care 8, which was published in 2022, is the newest iteration of the standards.

Q.  Okay.  So the Standards of Care Version 7 went -- weren't in effect until 2022; is that correct?

A.  That is correct.

Q.  And when did they first go into effect?

A.  I don't recall.  I'd have to look at it.

Q.  Okay.  What -- would it have been in effect in 2016?

A.  Oh, yes.

Q.  Okay.  Talking to -- looking at the Standards of Care Version 7, how were those standards developed?

A.  7?

Q.  The -- I would have -- first ask about Version 7, because these were in effect in 2016 to 2022; is that correct?

A.  Yes.

Q.  Okay.  I'll reask the question.

        How were the Standards of Care Version 7 developed?

A.  Experts in areas worldwide were invited to do literature

UNITED STATES DISTRICT COURT

**2-ER-0114**

reviews and to obtain expert consensus and to make any changes that were required from the previous iteration, which would have been 6.

Q. Okay. And the Standards of Care Version 8 had been in effect since 2022? Was that your testimony?

A. Yes.

Q. Okay. How -- how are the Standards of Care Version 8 developed?

A. 8 took a different process. It was an evidence-based review undertaken with Johns Hopkins. It was a multiyear transparent process that involved systematically-used public commentary, a Delphi process, and input from global experts.

Q. What is a Delphi process?

A. Delphi process is a methodology where, in this case I think it was 120 individuals, experts from, I think, 13 countries, go through round after round of surveys and ratings, and after that is ultimately formed, to acquire expert consensus.

Q. Have -- have other professional organizations or associations endorsed the WPATH standards of care?

A. Almost every major medical organization has endorsed the standards of care, including the World Health Organization, the American Medical Association, the American Psychiatric Association, the American Academy of Family Physicians, the American Association of Public Health, the National Association of Social Workers, the American College of Obstetrics and

Gynecology, the National Commission on Correctional Health, the National Association of Social Workers.

And I know I have left out some.

Q. Are you familiar with the claims that the WPATH standards of care were adopted for political purpose and not based -- and are not based on evidence?

A. Yes.

Q. What is your response, if any, to those criticisms?

A. I don't agree with those criticisms.

Q. Why not?

A. Well, there was a public commentary period, so people were able to give input. But the process was rigorously followed. I was the author -- a co-author, actually, of the chapter -- one chapter, the chapter of institutionalized persons. And we worked for years on our chapter, and there was never any political influence in our chapter.

Q. Dr. Ettner, you -- you testified to two treatment standards, the WPATH and the Endocrine Society. Is -- was that your testimony?

A. Yes.

Q. Are there any other treatment standards for gender dysphoria?

A. Well, I think that there -- I think UCLA may have standards which parallel the WPATH standards, more or less. I know at one time they did have --

Q. Okay.

A. -- published standards, but they were similar and endorsed the WPATH standards.

Q. The Endocrine Society standards, are they -- are they also similar to the WPATH standards, or are there differences between the two?

A. Well, they are compatible, but the Endocrine Society guidelines deal much more with the administration of cross-sex hormones specifically.

Q. And do you know if the Endocrine Society endorses -- I do -- was it your testimony that the Endocrine Society endorses the WPATH standards of care?

A. Yes. Did I leave them out? They definitely do endorse the standards of care.

Q. I think we got it.

Could you explain the term "evidence-based medicine."

A. Evidence-based medicine is a grading system that rates the certainty of an intervention.

Q. And are the WPATH standards of care supported by evidence-based medicine?

A. They are. Their support -- the quality of the evidence would be regarded as low. However, low evidence does not equate with poor evidence. So this has often been weaponized, this idea that there's no evidence. But in order to have high evidence, you have to have randomized controlled trials. And

it would be impossible to have that, for example, without the surgery, because it would mean you'd have two groups. One group would have surgery, and they wouldn't know if they had surgery or not. So you can see the absurdity of that.

Only one out of ten medical and surgical interventions have high levels of certainty. Tonsillectomy, rotator cuff surgery, arthroscopic knee surgery all have low quality of evidence, as do aspirin and Vitamin D.

Q. Dr. Ettner, do you have a response to some who suggest that gender-affirming surgical treatments should not be provided because there is insufficient high-quality evidence to support those surgery -- surgeries?

A. I think that's inaccurate. I think that there is abundant evidence going back into the 1970s indicating the efficacy of gender-affirming surgery for a certain group of individuals who require it.

Q. And just to expand on that, when you say "evidence," are you referring to -- what are you referring to?

A. Studies that document the efficacy of gender-affirming surgery.

So, for example, in May of 2014, the Health and Human Services, and for the purpose of Medicare, reviewed all of the literature available up until that time and found that surgery was not experimental and was an effective treatment for gender dysphoria in appropriately selected individuals.

Q. Dr. Ettner, you are not a surgeon; correct?

A. I am not.

Q. You are not a medical doctor; correct?

A. Correct.

Q. When you, as a psychologist, suggest that a person needs to be referred to a medical doctor or surgeon, are you making a medical decision?

A. No.

Q. In your earlier testimony about the treatment for gender dysphoria, you were talking -- you testified about social transition. And I asked you if -- if you were -- if you recalled if Ms. Wagoner has received social -- treatment related to social transition.

Do you remember that testimony?

A. Yes.

Q. As part of social transition -- strike that.

Is counseling a part of social transition?

A. Counseling can be important, but it's not a substitute for medical treatment if medical treatment is required.

Q. Do you know if Ms. Wagoner is receiving any counseling or mental health services from the Alaska Department of Corrections?

A. I know she has in the past. I don't know today if she is, as of now.

Q. What do you recall of her treatment for counseling or

UNITED STATES DISTRICT COURT

mental health services in the past?

A. To my knowledge, she received counseling largely focused on coping skills, the use of workbooks, and she received some psychotropic medication from time to time.

Q. Are coping skills, workbooks, psychotropic medicine, do those treat gender dysphoria?

A. No.

Q. If -- hypothetically, if a prison system only offered in terms of mental health services for the treatment of gender dysphoria counseling for coping skills, workbooks, or psychotropic medicines, would that address the gender dysphoria that someone is experiencing?

A. I'm sorry. Can I ask you to repeat that?

Q. I will. Hypothetically, if there was a prison system that as part of its mental health services only provided counseling for coping skills, workbooks, or psychotropic medicine as treatment for gender dysphoria, would that be adequate?

A. No.

Q. Why not?

A. Because counseling has never been shown to be a treatment that diminishes or cures someone of gender dysphoria. It can be helpful in reducing stigma or learning to come out to family or other related issues, but it can't address a medical condition. And gender dysphoria's a medical condition. It can't really attack that underlying issue.

UNITED STATES DISTRICT COURT

**2-ER-0120**

Q.  In terms of counseling, is there -- is there any difference for treating gender dysphoria in terms of the type of counseling that a person would need?

A.  Yes.  They would want to have access to specialized counseling that focused on gender dysphoria, what their individual needs were in regards to their dysphoria, and the phenomenology that they were experiencing.  So someone experienced with gender dysphoria who would be able to assist that person could be very helpful.

Q.  Hypothetically, if the only type of counseling was for coping skills and you have a patient with gender dysphoria who is seeking counseling but is told, we only provide counseling for coping skills, what -- what could you -- as -- what -- what do you think that patient's reaction could be, or how might they react to -- to that?

A.  Hypothetically, if that patient had gender dysphoria and required medical interventions and wasn't receiving them, coping skills and counseling would be insufficient, and I would imagine that patient would be despondent about not getting appropriate care.

Q.  Dr. Ettner, for a transgender women with gender dysphoria, what are the outcomes of hormone therapy?

A.  The outcomes are twofold:  Hormones work primarily on the brain, first and foremost.  So the transgender person who's never had hormones will experience a level of well-being.  It

will be a mood-elevating experience.

Secondly, they will develop the secondary sex characteristics consistent with a female habitus; breast development, cessation -- cessation of male pattern baldness, immunition of body hair, redistribution of body fat, and some other changes.

Q. What, if any, criteria determines whether hormone therapy is needed for someone who's treated for gender dysphoria?

Take your time.

A. Thank you.

Almost everyone who has gender dysphoria will require hormone treatment.

Q. Prescribes -- who prescribes it?

A. A family doctor can prescribe it. An endocrinologist can prescribe it. OB/GYN can prescribe it.

Q. Is specialized training required for someone in order to be able to prescribe hormone therapy?

A. It's -- the hormone therapy, I understand, is not that difficult a process to administer. And people have been trained or they have looked at, like, the Endocrine Society guidelines or other guidelines and have administered it using some -- some support from another source. So it can be administered by any physician that feels comfortable administering it.

Q. Are there any secondary benefits or gains of hormone

therapy for someone who is not receiving it for the treatment of gender dysphoria?

A. Interestingly, if someone took hormones who was not gender dysphoric and they took cross-sex hormones, they would be profoundly uncomfortable and possibly ill. It would be extremely unpleasant.

Q. Do you know -- you are aware that Ms. Wagoner is receiving hormone therapy; correct?

A. Yes.

Q. Do you know who is her provider?

A. Dr. Samuelson.

Q. What benefits has Ms. Wagoner received from hormone therapy?

A. I believe that she has received some mood-elevating benefits.

Q. Any other benefits?

A. I hear she's put on some weight, which can be an effect of estrogen treatment.

Q. In your opinion, is hormone therapy adequate to address Ms. Wagoner's gender dysphoria?

A. In the specific case of Ms. Wagoner, no, it is not.

Q. Why not?

A. Ms. Wagoner suffers from severe anatomical dysphoria. She has male genitalia and she's consolidated her female identity. And her constant inability to resolve this conflict, I'm a

woman but I have male genitals, is agonizing for her to the extent that she has, as I've said previously, attempted to do a complicated surgery on herself. And her dysphoria that's focused on these genitals is severe. It's extremely severe. And there are no secondary gains from having mangled genitals.

Q. Dr. Ettner, based on your experience and expertise in the treatment of gender dysphoria, what is your understanding about the ongoing use of hormone therapy? Is there a point where the benefits stop?

A. People who have gender dysphoria will have to remain on hormones for their -- for the remainder of their life.

Q. And will the benefits continue?

A. Well, the benefits will remain. The hormones will become institutionalized in the organ systems because hormones affect every organ of the body. And so all human beings require sex steroid hormones, so she will have to be on hormones for the rest of her life. And there's no benefit of giving larger doses if that's what you're asking.

Will this plateau? It -- it just remains sort of the new normal, but it doesn't address the physical need for genital reconstruction.

Q. Are gender-affirming genital surgeries effective treatment for gender dysphoria?

A. Yes. And for some people, they're the only effective treatment.

UNITED STATES DISTRICT COURT

**2-ER-0124**

Q. For Ms. Wagoner, are they the only effective treatment?

A. That is the only treatment that will resolve her gender dysphoria, yes.

Q. Are gender-affirming genital surgical treatments safe?

A. If you're asking about complications, our recent study indicates complications are slightly over 5 percent for vaginoplasty compared to, for example, breast reduction surgery in nontransgender women, which is a 43 percent complication rate. So, yes, they are safe.

The inversion technique, which is what Ms. Wagoner's familiar with, doesn't involve invasion of another system. So, yes, it is a safe procedure.

Q. And are gender-affirming genital surgeries widely accepted treatment for gender dysphoria?

A. Yes. Every major medical organization endorses surgery in accordance with the WPATH standards.

Q. What are the therapeutic purposes of a gender-affirming genital surgery for a transgender woman with gender dysphoria?

A. First, the surgery removes the testicles, which is the target organ that secretes androgens. And that -- those androgens are what kindle gender dysphoria.

Secondly, the patient has normal and functioning urogenital -- a urogenital perineum. And so the ability to sit while urinating is possible and the -- there's a urovagina that has depth and width. And so an individual can appear totally

congruent with their gender identity.

Q. Is gender-affirming genital surgery medically necessary for anyone with gender dysphoria?

A. No.

Q. What is your understanding of the term "medically necessary"?

A. The definition that the American Medical Association uses, which is what a prudent provider recommends for a patient for the purpose of treatment.

Q. Who should determine whether gender-affirming genital surgery is medically necessary treatment for someone with gender dysphoria?

A. Well, typically a multidisciplinary team with the mental health -- qualified mental health provider making the evaluation assessing whether surgery is necessary. Ultimately, the surgeon makes the decision.

Q. Dr. Ettner, you testified that you met with Ms. Wagoner in October 2024. Where -- where did you meet with Ms. Wagoner?

A. At Goose Creek correctional facility.

Q. How long did you meet with Ms. Wagoner?

A. Three hours.

Q. What was the purpose of this meeting?

A. To perform a clinical interview and to perform some testing to give information about her current status and to arrive at opinions about the care she was receiving and the future care

she might require.

Q. As part of the meeting, did that include an assessment of whether she -- if -- strike that.

As part of your meeting, did that include your assessment of Ms. Wagoner as to whether gender-affirming genital surgery is medically necessary for her?

A. I concluded that, yes.

Q. Before you met with Ms. Wagoner, what -- what did you do?

A. I reviewed a multitude of documents.

Q. Just to -- if you need to refresh your recollection, Dr. -- Dr. Ettner, if you can look at page 6 of Exhibit 1080.

MR. GROSS: I think the first appropriate question is whether she needs to refresh her recollection.

MR. SAENZ: I will rephrase.

BY MR. SAENZ:

Q. Ms. Ettner, do you need to refresh your recollection?

A. Dr. Ettner.

Q. Dr. Ettner. I apologize.

A. I do need to re- -- to refresh.

Q. Please take a moment.

A. And you said that was on page?

Q. 6 of Exhibit 1080.

A. Okay.

And is the question what documents I reviewed prior to meeting with Ms. Wagoner?

Q.   Or what -- what did you do before you met with Ms. Wagoner?

A.   I reviewed documents that were provided to me.

Q.   What type of documents?

A.   The documents -- I'm reading this now from this page.  The documents from Ms. Wagoner's personal files, including progress notes; mental health and medical records; disciplinary records and grievance filings; medical and mental health records of the Alaska Department of Corrections, including RFIs and grievance filings; medical records from Anchorage Neighborhood Clinic; documents filed with the federal court; deposition testimony of Ms. Wagoner; handwritten journal entries of Ms. Wagoner; audio recordings of Ms. Wagoner's phone calls; and documents provided by the Alaska Department of Corrections in discovery.

Q.   What did you do during your evaluation of Ms. Wagoner?

A.   Well, first I notified her of the purpose of my visit, the nature of what we would be doing during our time together, the limits of confidentiality.  She was aware of all of that.  She had met with her attorney the day before.

      And then we had a lengthy clinical interview, and then I administered four psychological tests.

Q.   What tests did you administer to Ms. Wagoner?

A.   The Beck Depression Inventory, the Beck Anxiety Inventory, the Beck Hopelessness Scale, and the Traumatic Symptom Inventory-2.

Q.   Why did you use those tests?

A.  Well, given that I had this one opportunity to spend with Ms. Wagoner, I wanted to have as much information as I could about her current functioning.  And those tests are a quick way of gathering information that would otherwise have taken repeated visits and a longer period of time to collect.

Q.  And what did the results of the testing show?

A.  That Ms. Wagoner was suffering from depression/anxiety, both severe/moderate levels of hopelessness.  And the Traumatic Symptom Inventory indicated that she was anxious.  She displayed elevated scores on anger, somatic preoccupation, and sexual disturbance, and that in general these -- her pattern of behavior could be characterized as what we call an externalizing pattern of behavior.

Q.  What does that mean?  What does "externalized" --

A.  Some individuals who will respond to adverse life conditions by internalizing their behaviors.  People who externalize are more likely to hurt themselves or to in other ways display emotional depression or anxiety.  It's a pattern of how an individual deals with internal tension.

So, for example, an externalizer would be more likely to hurt themself as a means of tension reduction.

Q.  For your assessment related to surgery, did you apply any criteria or -- scratch that.  Strike that.

For your assessment related to surgery, how did you conduct this assessment?

A. Well, I follow the standards of care in terms of eligibility in writing this criteria. In this case, it would have been both the SOC 7 criteria and the SOC 8 criteria. However, in Ms. Wagoner's case, given that she had attempted surgical self-treatment, it was a priority indication that she would likely require surgery if she met the criteria. She would, indeed, need to proceed to surgery.

Q. And based on your criteria -- based on your assessment, did she meet the criteria?

A. She meets the criteria both of SOC 7 and SOC 8.

Q. In your review of Ms. Wagoner's records, is there any indication prior to 2017 that Ms. Wagoner was diagnosed with borderline personality disorder?

A. Not from 2011 to 2017, she did not carry that diagnosis.

Q. And is there any indication prior to 2017 that Ms. Wagoner was diagnosed with antisocial personality disorder?

A. I know she has that diagnosis. I don't know when that was recorded.

Q. In your view of Ms. Wagoner's records, did you see any indications that Ms. Wagoner has uncontrolled borderline personality disorder?

A. No.

Q. In your view of her records, did you see any indication that Ms. Wagoner has uncontrolled antisocial personality disorder?

A.  No.

Q.  Would having a diagnosis of borderline personality disorder or antisocial personality disorder be a reason to not provide gender-affirming genital surgery for Ms. Wagoner?

A.  Not necessarily, no.  If those diagnoses are, in fact, accurate, if mental health issues are well controlled, if an individual is not psychotic, delusional, and able to participate in informed consent and understand the procedure that they're about to go through, then those conditions do not obviate the need for surgery or candidacy for surgery.

Q.  Dr. Ettner, you have used the terms "self-surgery" and "self-surgical treatment" in your testimony today.

Do you -- is -- has that been your testimony?

A.  Yes.

Q.  What does that mean?

A.  Surgical self-treatment means an individual attempts to remove their genitals, autocastration or autopenectomy, either by laceration to the organ or strangulation of the organ.  The term was first researched by Dr. Brown, who's documented it in two peer-reviewed articles.  It's seminal work in this area. And we know that in 2015, 12 percent of transgender inmates attempted surgical self-treatment.

Q.  What caused Ms. Wagoner to do this?

A.  Unbearable agony of having male organs in a female identity and a female-lived experience.

Q. Has Ms. Wagoner attempted other things to treat herself for gender dysphoria?

A. Yes. I believe in 2017, Ms. Wagoner crushed her testicles because she knew that by crushing the testicle she would destroy the Leydig cells that produce testosterone. And, in fact, she succeeded in that, and her testosterone levels were lowered.

Q. Has Ms. Wagoner suffered any consequences from this self-surgical treatment?

A. Absolutely. I mean, she has, from what I understand, constant pain, a propensity to urinary and kidney infections, urine leakage, scar tissue. All sorts of issues that are the sequelae of these really crude attempts to perform surgery. And that requires constant wound care on her part.

Q. At the time of the -- at the time you wrote your report, do you know if Ms. Wagoner had continued any type of self-treatment related to her genitals?

A. I'm not understanding the question.

Q. At the time you wrote your expert reports, do you know if Ms. Wagoner had continued any attempts to -- at self-surgery or self-treatment attempts related to her genitals?

A. I believe the last attempt was 2018, although she may continue to crush her testicles.

Q. Why would she do that?

A. My assumption is that it would be a tension-reducing

UNITED STATES DISTRICT COURT

behavior.

Q. And --

A. And it would also be the -- an -- a barometer of how much she detests these organs that she would reattempt to continue to damage them.

Q. And what are you basing this on?

A. I'm basing this on her severe gender dysphoria and her attempts to reconfigure her genitals.

Q. Dr. Ettner, in your experience, have you ever encountered someone who has attempted self-surgery for any reason other than inadequate or untreated gender dysphoria?

A. No. I think George Brown has documented one or two cases where a psychotic and delusional person may have cut on the genitals. But typically, even people who cut -- and we know that cutting is a behavior that people sometimes do -- they don't cut the genitals. So that is something that we really only see in this condition.

Q. Dr. Ettner, are you aware of any secondary gains for someone to perform self-surgery on their genitals?

A. Absolutely not.

Q. In your review of Ms. Wagoner's records, did you see whether any provider at the Alaska Department of Corrections had diagnosed Ms. Wagoner with gender dysphoria?

A. Yes, uh-huh.

Q. Did -- do you recall who that was?

A.  I recall -- I believe it was Mr. Rutherford that diagnosed her in 2017.  And then Michael Reed confirmed that diagnosis.

Q.  Who is Michael Reed?

A.  He was a counselor that the department hired, an outside expert, to confirm the diagnosis.

Q.  Do you know if Mr. Reed was hired for anything else?

A.  Mr. Reed was purportedly going to provide some specialized therapy for Ms. Wagoner, but that never occurred.

Q.  In your review of Ms. Wagoner's records, do you recall reviewing grievances filed by Ms. Wagoner between the time period 2017 until July of 2022?

A.  Yes.

Q.  Could you summarize what those grievances related to.

A.  To my eyes, she was pleading for help for her condition.

Q.  Did she get the help?

A.  She did not.

Q.  And what was the effect of not getting help on Ms. Wagoner?

A.  Surgical self-treatment.

Q.  Have you reviewed medical records from Dr. Rachel Samuelson?

A.  Yes.

Q.  Do you recall Dr. Samuelson's treatment recommendations for Ms. Wagoner's gender dysphoria?

A.  Yes.

Q.  And what was it?

UNITED STATES DISTRICT COURT

A. Feminizing hormones and genital surgery.

Q. Do you agree with Dr. Samuelson's treatment recommendations?

A. Yes.

Q. Is it standard practice for a treating doctor to have their recommendations denied or overturned by committees comprised of nontreating providers?

A. Not -- that wouldn't be standard, I don't think.

Q. Why not?

A. Because a specialist is the individual that really determines a treatment. And even if someone has a medical degree, that doesn't necessarily mean that they have the specialty knowledge.

So, for example, a family practice doctor could easily diagnose a retinal detachment, but you would refer to a retinologist for a specific treatment and a specific diagnosis.

Q. Let me show you what -- Defendants' Exhibit 2021.

MR. SAENZ: If we could have that pulled up. And this has been stipulated to.

BY MR. SAENZ:

Q. Do you see it, Dr. Ettner?

A. No.

MR. SAENZ: Madam Clerk, the DEPS is not switched over to --

///

UNITED STATES DISTRICT COURT

BY MR. SAENZ:

Q. Dr. Ettner, is it showing up on your screen?

A. Yes.

Q. Have you seen this document before?

A. Yes.

Q. What is it?

A. It is policies and procedures from the State of Alaska Department of Corrections.

Q. And what is the date of this document?

MR. SAENZ: Your Honor, I --

THE WITNESS: July of 2022.

MR. SAENZ: It's -- no. No.

MR. GROSS: What is that?

THE COURT: She just --

MR. SAENZ: She just said July of 2022.

MR. GROSS: Okay.

BY MR. SAENZ:

Q. Did you review this document in forming your opinion of Ms. Wagoner's treatment?

A. Yes.

Q. I'm going to look at page 5 of this exhibit.

MR. SAENZ: If you could go to Section V. Five. Thank you.

BY MR. SAENZ:

Q. Do you see -- do you see the highlighted section,

UNITED STATES DISTRICT COURT

**2-ER-0136**

Dr. Ettner?

A.  I do.

Q.  Okay.  What is -- what is the title of this section?

A.  Gender Dysphoria Treatment Modalities.

Q.  Do you see Subsection E?

A.  Yes.

Q.  Could you read that, please.

A.  "Surgical interventions for prisoners with gender dysphoria shall be for therapeutic purposes that meet the criteria for essential health care when symptoms of gender dysphoria have not responded to nonsurgical interventions."

MR. SAENZ:  And if you could go to page 3, please.  Go down.

BY MR. SAENZ:

Q.  Dr. Ettner, do you see on page 3 at the -- at the top of page 3 where it says -- at the top of page 3 where it says, "Surgical intervention for treatment of gender dysphoria"?

A.  Yes.

Q.  Could you read that, please.

A.  "A surgical procedure or procedures performed to modify primary or secondary sex characteristics, also called sex reassignment therapy, gender-affirming therapy, genital surgery, or sex reassignment surgery."

Q.  I think the last part said "sex realignment."

A.  Or sex realignment.  Excuse me.

UNITED STATES DISTRICT COURT

**2-ER-0137**

Q.   Okay.  Do you agree with that definition?

A.   Yes.

Q.   In your view of this policy, do you see what is the criteria for determining essential health?

A.   No.

Q.   Does the policy state a process for how to seek an evaluation for surgical intervention?

A.   No.

Q.   And, Dr. Ettner, in your experience, you have consulted with state agencies and corporations to develop policies concerning -- concerning gender-affirming care; is that right?

A.   Yes.

Q.   And did that include provision of gender-affirming surgical treatments?

A.   Yes.

Q.   What is your opinion of this Alaska Department of Corrections policy from July of 2022?

A.   I think it's inadequate in that it doesn't indicate a pathway for implementation of evaluation or surgical treatment, nor does it delineate what the criteria for essential health are.

Q.   I'd like to add -- go to page 5, please.

          THE COURT:  And, Mr. Saenz, we're going to break in about five minutes.  Whenever you reach a good stopping point.

          MR. SAENZ:  Okay.  After this question.

THE COURT: Sure. Whatever works for you.

BY MR. SAENZ:

Q. On page 5, again, Section V. V for five. And go to Subsection C.

Do you see that, Dr. Ettner?

A. Yes.

Q. Okay. Can you read that, please.

A. "Cosmetic or elective surgical procedures for the purpose of enhancement shall not be provided."

Q. Is gender-affirming genital surgery cosmetic?

A. No.

Q. Is it cosmetic for Ms. Wagoner?

A. No.

Q. Why not?

A. It's not cosmetic because it is not undertaken for the purpose of enhancement or beatification. It is addressing a serious medical condition.

Q. Is gender-affirming genital surgery elective?

A. Not in the sense that one chooses it if one wants it in -- in opposition to what a prudent physician would regard as medically necessary.

Q. Is it elec- -- is gender-affirming genital surgery elective for Ms. Wagoner?

A. No.

Q. Why not?

A.  She requires this surgery.  It is the only intervention that will eliminate her gender dysphoria.  It's not a cosmetic procedure.  There is a medical condition that will continue unabated and possibly exacerbated if she doesn't receive this treatment.

Q.  Dr. Ettner, in your review of the records, do you -- do you recall reviewing additional Alaska Department of Corrections policies related to the treatment of transgender people in its custody?

A.  I believe I did, yes.

Q.  In your professional opinion, are the Alaska Department of Corrections policies, including the July 2022 policy, and care guides consistent or inconsistent with the standards recommended by the medical guidelines?

A.  Which guidelines are you referring to that -- not -- not the --

Q.  By the WPATH standards of care.

A.  Okay.  Inconsistent with the standards of care with the guidelines that inform care.

Q.  Are they also inconsistent with the Endocrine Society's guidelines?

A.  Yes.

        MR. SAENZ:  We could close there.

        THE COURT:  Very good.  All right.  We'll be on a break.  Let's just call it 1:00 o'clock.

UNITED STATES DISTRICT COURT

**2-ER-0140**

Anything we need to put on the record before we break from the plaintiffs?

MR. SAENZ: Your Honor, we do have Dr. Samuelson, who's available at 1:00. I have probably around 30 more minutes of direct with Dr. Ettner and then defendants' cross.

THE COURT: Okay.

MR. SAENZ: Is -- can we -- I don't -- maybe we can confer and just let Dr. Samuelson's attorney know when we might expect her.

THE COURT: That's fine. I think that's reasonable. Yeah.

MR. SAENZ: Okay.

THE COURT: From the defendants, anything for the record?

MR. GROSS: No.

THE COURT: All right. Thank you very much. We're in recess until 1:00 o'clock.

Go ahead, Doctor. You can step down for a moment.

THE COURTROOM DEPUTY: All right. This matter's adjourned. Court's in recess until 1:00 p.m.

(Recess taken at 11:58 a.m.)

---oOo---

UNITED STATES DISTRICT COURT

**2-ER-0141**

# C E R T I F I C A T E

I, CATHY J. TAYLOR, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 12th day of May, 2025.

/s/ Cathy J. Taylor
Cathy J. Taylor, RMR, CRR, CRC

UNITED STATES DISTRICT COURT

**2-ER-0142**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

_____

| | |
|---|---|
| **Emalee Wagoner,** | ) |
| | ) No. 3:18-cv-00211-MMS |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Anchorage, Alaska |
| **Nancy Dahlstrom, et al.,** | ) May 12, 2025 |
| | ) 1:05 p.m. |
| Defendants. | ) |
| | ) **(AMENDED)** |

**BEFORE:  THE HONORABLE MATTHEW M. SCOBLE, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**VIA ZOOM VIDEOCONFERENCE**

**BENCH TRIAL-DAY 1**

**(P.M. SESSION)**

**(Pages 85-201)**

**Official Court Reporter:**
**Andrea K. Bluedorn, RMR, CRR (By Zoom Videoconference)**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona 85003-2151
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

**A P P E A R A N C E S**

For the Plaintiff:
    LAMBDA LEGAL DEFENSE AND EDUCATION FUND
    By:  **Richard Saenz, Esq.**
         **Morgan Walker, Esq.**
    120 Wall Street, 19th Floor
    New York, NY 10005-3919

For the Plaintiff:
    LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
    By:  **Sasha Buchert, Esq.**
    815 16th Street NW, Ste 4140
    Washington, DC 20006

For the Plaintiff:
    LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
    By:  **Sonja D. Kerr, Esq.**
    3500 Oak Lawn Avenue, Suite 500
    Dallas, Texas 75219


For the Defendants:
    BIRCH HORTON BITTNER & CHEROT
    By:  **Mara Michaletz, Esq.**
         **David Karl Gross, Esq.**
    510 L. Street, Suite 700
    Anchorage, Alaska 99501

**I N D E X**

**WITNESSES:**                                              **PAGE:**

UNITED STATES DISTRICT COURT

**2-ER-0144**

87

Dr. Randi Ettner.
        Direct Examination by Mr. Saenz            4
        Cross-Examination by Mr. Gross             97

Dr. Rachel Samuelson
        Direct Examination by Ms. Kerr           162
        Cross-Examination by Ms. Michaletz       179
        Redirect Examination by Ms. Kerr         198

UNITED STATES DISTRICT COURT

**2-ER-0145**

**P R O C E E D I N G S**

THE COURT: All right. Good afternoon, everyone. The attorneys are present. Ms. Wagoner is present. Just as a matter of housekeeping, my error when we spoke this morning about stipulated exhibits. I was provided with a list of plaintiff's exhibits and I had a list of defendant's exhibits that the parties have mutually stipulated to and I believe the parties moved to admit those stipulated exhibits and I believe I implied but didn't make it clear those stipulations are accepted. Any stipulated exhibits will be admitted as reflected in the parties' respective lists.

That said, any housekeeping matters before we begin, Mr. Saenz?

MR. SAENZ: Yes, Your Honor. The parties have spoken, and in terms of witness sequence, we would like to finish with the direct of Dr. Ettner and then to pause and have Dr. Rachel Samuelson who is appearing over Zoom to testify for direct and also cross, and if the afternoon permits, to then bring Dr. Ettner back for cross.

THE COURT: Okay. All right. From the defendants, that's your request as well?

MR. GROSS: Yes, Your Honor.

THE COURT: All right. That's what we'll do. All right.

UNITED STATES DISTRICT COURT

**2-ER-0146**

Mr. Saenz, so Dr. Ettner is still on the witness stand. Ma'am, of course you're still under oath. Mr. Saenz, you may continue.

MR. SAENZ: Thank you, Your Honor. Please pull up what is Defendant's Exhibit 2045. Zoom a little. The text is very small. Perfect. Thank you.

BY MR. SAENZ:

Q. Dr. Ettner, do you see what's labelled Defendant's Exhibit 2045?

A. Yes.

Q. Have you seen this document before?

A. Yes.

Q. What is it?

A. It is the MAC Review and Authorization of Gender Dysphoria Individual Treatment Plan.

Q. And what is the date of this document?

A. October 23, 2023.

Q. Have you had a chance to review this decision before?

A. Yes.

Q. And what is your assessment of the MAC denial of surgical procedures?

A. Well, respectfully, I understand that the people on this committee have advanced degrees -- medical degrees. But I think that this document undermines claims to their expertise.

Q. How so?

UNITED STATES DISTRICT COURT

2-ER-0147

A.  Well, they say they reviewed the current guidelines and evidence based literature regarding the treatment of gender dysphoria, but they don't specify what literature in refute of this body of literature.  They have a test to the efficacy of gender affirming surgery.  And they also say that there is insufficient evidence for the benefit of preventing suicide, which is not yet -- we know that, for example, Bauer has done a study showing 62 percent delineation of suicide and suicide attempts post surgery.

And there's no real citation about any of these claims that they've made.  And the recommended surgeries or lack of objective signs of deterioration in mental health over the last five years, patterns of behavior raising concern for capacity for compliance with the anticipated long-term postsurgical care.  The postsurgical care that Ms. Wagoner would require is far less intensive than the wound care she's currently doing.

And she's complied with her hormones.  There's no indication that she wouldn't be compliant with care post surgery, which consists of dilation for the first few weeks and postoperative consultation at two and six weeks and a follow up probably a year later.

Continuing, they suggest that because Ms. Wagoner has expressed no suicidal ideation and has displayed no active self harm, no action of self harm or self mutilation, that then denying surgery -- and I find it unconscionable that suicidal

UNITED STATES DISTRICT COURT

ideation or self harm would be the criteria required for surgery. So, overall, I disagree with this report in its entirety.

Q. Can we please pull up defendant's Exhibit Number 2052. Has this -- did this come up for you, Dr. Ettner?

A. Yes. Yes.

Q. Or do you have a copy?

A. Yeah, it's easier to read on here.

Q. Okay. Have you seen this document before?

A. Yes.

Q. What is it?

A. It's a progress note from -- excuse me -- MAC Review.

Q. What is the date of this progress note?

A. 1-22-24.

Q. Have you had a chance to review this document before?

A. Yes. I'd like another moment to review.

Q. Please take your time.

A. Thank you. I reviewed it.

Q. Dr. Ettner, I want to direct you to the -- the third line of the paragraph starting with the first full sentence, the GDCC Committee. Do you see that?

A. Yes.

Q. Okay. What -- what does that sentence say?

A. The GDCC Committee further stated that the patient does not meet the DSM-5 TR definition for gender dysphoria due to the

UNITED STATES DISTRICT COURT

2-ER-0149

92

patient not meeting diagnostic criteria number B. The conditions associated -- shall I continue?

Q. Please.

A. The condition is associated with clinically significant distress or impairment in social occupation or other important areas of functioning. GDCC Committee stated that the patient is well adjusted, working, and displaying appropriate interpersonal relationships.

Q. Do you agree with that conclusion?

A. I do not.

Q. Why not?

A. First of all, do you see where it says the condition that's associated with clinically significant distress or impairment.

Q. Could you explain that significance.

A. I would say that even if one were to make the argument that's being made here that Ms. Wagoner has no impairment in an area of functioning, she certainly has significant distress.

And, secondly, the idea that she's no longer transgender, she's no longer gender dysphoric because she didn't meet the B criteria I think is just a factious argument.

Q. Hypothetically, is it possible for someone to carry a diagnosis for gender dysphoria and then to later not have that diagnosis?

A. If they had had gone through complete transition and treatment including surgery, they may no longer experience

UNITED STATES DISTRICT COURT

**2-ER-0150**

gender dysphoria. But in untreated individuals or adequately treated individuals, the gender dysphoria is not going to just disappear.

Q. What is your assessment of this progress note?

A. I hate it. I mean --

Q. Why?

A. I think it's just -- it's just an indication that there is a lack of understanding how serious this condition is and the sequela for people who didn't get appropriate treatment. I mean, these people untreated with severe dysphoria are at great risk. And the risk is predictable and dire.

We know what the risk is. Ms. Wagoner has demonstrated to us what the risk is. The risk is bodily damage that could ultimately lead to death.

Q. Dr. Ettner, you previously testified as to reviewing the Alaska Department of Corrections policies. Was that your testimony?

A. Yes.

Q. And looking at this, the progress note is from the M-A-C, MAC Committee Review. Do you see that?

A. I do.

Q. Based -- is it your understanding that the MAC Committee determines -- strike that.

Dr. Ettner, is it your understanding, based on your review of the Alaska Department of Corrections policies that it

UNITED STATES DISTRICT COURT

**2-ER-0151**

is the MAC Committee review who determines whether Ms. Wagoner or anyone who is seeking treatment of gender dysphoria will get the treatment or not?

A. To my understanding, this committee makes the final decision regarding treatment.

Q. Dr. Ettner, based on your experience, your training, and your expertise with assessing and referring patients with gender dysphoria for gender-affirming genital surgery, in your opinion, does Ms. Wagoner understand the complications associated with gender-affirming genital surgery?

A. Yes.

Q. What is that based on?

A. Well, we spoke about that when I saw her. And based on her knowledge of the pelvis -- and she has extensive knowledge of the uro genital area and she's experienced infection. She understands the placement of the urethrae. She understands what the risks of surgery are.

Q. In your opinion, does Ms. Wagoner have realistic expectations of any benefits of gender-affirming genital surgery?

A. What's realistic and what's accurate is that it would resolve the gender dysphoria. Ms. Wagoner knows it. She'll still remain incarcerated, that this isn't going to solve life problems. But it is the essential treatment that will resolve her gender dysphoria.

UNITED STATES DISTRICT COURT

**2-ER-0152**

95

Q. Dr. Ettner, for Ms. Wagoner, is gender-affirming genital surgery simply beneficial?

A. Simply beneficial?

Q. Yes.

A. Is that the question? It's -- I believe it goes beyond beneficial. It's mandatory.

Q. Based on your clinical experience, what is the likelihood Ms. Wagoner's severe gender dysphoria will significantly improve without surgery?

A. I would say zero.

Q. Dr. Ettner, what is the medically necessary treatment that Ms. Wagoner needs right now for her severe gender dysphoria?

A. Vaginoplasty.

Q. What are the foreseeable consequences for Ms. Wagoner if she does not receive surgery?

A. I believe that Ms. Wagoner understands that she is not capable of performing an inverted procedure, an inverted penile procedure on herself. She now understands that is impossible. And so she would either remove her genitals with laceration or via strangulation of the genitals.

Q. And what would be the foreseeable consequences of if she were to do that?

A. With laceration, there's the risk of organ infection, sepsis, and excessive blood loss leading to death. With strangulation of the genitals, you would have a gangrenous

UNITED STATES DISTRICT COURT

**2-ER-0153**

organ that would have to be removed.

Q. Dr. Ettner, what could the defendants do to address these known risks to Ms. Wagoner's health?

A. Provide her with a consult with a surgeon who could examine her pelvis and determine if she is appropriate for surgery.

MR. SAENZ: No further questions at this time, Your Honor.

THE COURT: All right. Thank you very much, Mr. Saenz. So we're going to break and the defendants will take up cross examination after Dr. Samuelson. That's the plan?

MR. GROSS: Yes. Judge.

THE COURT: All right. Ma'am, thank you very much for your time. Go ahead and step down.

Do the parties want any kind of limiting order because she's still technically on the witness stand? Do you want me to order her not to confer with either party during the break?

MR. GROSS: Yes, please.

MR. SAENZ: We agree to that.

THE COURT: So, ma'am, just imagine you're still on the witness stand so you're not to substantively discuss your testimony with either side. If there are scheduling matters that need to be worked out, of course you can speak about those but nothing substantive.

THE WITNESS: I understand.

THE COURT: Thank you so much. You can step down.

MS. KERR: Your Honor, Sonja Kerr for the plaintiffs. Just an update, I just received word from counsel from Ms. Samuelson that now he's not available until 2:30.

THE COURT: Until 2:30. Oh, that's an hour.

MS. KERR: Yeah. And I apologize, you know, we've been trying to work with him and the clients so --

THE COURT: No need to apologize. It's not your fault. All right. So sounds like we have an hour before Dr. Samuelson. Any reason we can't take up cross examination with Dr. Ettner?

MR. SAENZ: No, Your Honor.

THE COURT: All right. Very good. So, ma'am, you're back in the hot seat. I apologize. Flexibility is the key, as we used to say.

All right. Mr. Gross, thank you so much. You may inquire.

CROSS-EXAMINATION BY MR. GROSS:

Q. First off, welcome to Alaska. I think the last time we talked you were in Chicago. The weather was very nice. I hope you're not responsible for bringing the rain but I do wish you -- I wish you welcome to Alaska.

And in that regard, can we agree that other than the occasion where you came up in October to meet with Ms. Wagoner and other than coming up for this trial, you've never been in Alaska before?

A. That's correct.

Q. And you are a licensed psychologist but you are not licensed in the State of Alaska?

A. Correct.

Q. You have never treated any patients in the State of Alaska?

A. I have not.

Q. And you have never actually spoken to anyone who is licensed to practice medicine in the State of Alaska about transgender care. Would that be fair to say?

A. Yes.

Q. So you've never spoke with anyone who is licensed in the State of Alaska about the standards of care in relationship to treating transgender patients. Correct?

A. Correct.

Q. Okay. And you did work as a consultant for Cook County Jail which is in the Chicago area. Right?

A. Yes.

Q. And you helped them prepare their policy related to transgender care. Correct?

A. Yes.

Q. And to date, despite that policy, there has been no transgender affirming surgeries done in the Cook County Jail. Correct?

A. The jail is only a holding facility. They're not able to do surgeries there. They would have to make other

UNITED STATES DISTRICT COURT

accommodations.

Q. So the answer to my question is no, there has not been surgery at the Cook County Jail?

A. Not to my knowledge.

Q. Okay. You also provided consultation with the Connecticut State Prison System with regard to their transgender policy. Correct?

A. Yes.

Q. And there was a challenge by a person by the name of Veronica-May Clark but despite that challenge, to date, no gender affirming surgery has happened in the Connecticut Correctional System. Is that correct?

A. I don't know.

Q. So you're unaware of whether there's been any gender affirming surgery taking place in the Connecticut State System?

A. Yes.

Q. And that's despite the policy you helped them create?

A. Correct.

Q. Okay. You do have -- I understand you have a practice where you provide psychotherapy to both transgender and non transgender people. Correct?

A. Yes.

Q. Despite that, you never treated anyone with psychotherapy while incarcerated. Correct?

A. Correct.

Q. So, for example, you've never gone into a correctional facility to provide psychotherapy to an inmate?

A. Only the brief crisis counseling I mentioned earlier.

Q. And those folks are not patients of yours. Right?

A. Correct.

Q. And you were not providing them with any type of psychotherapy. Right?

A. Correct.

Q. Now you don't have any board certifications. Right?

A. I'm sorry.

Q. You don't have any board certifications in psychiatry. Correct?

A. Not in psychiatry. Correct.

Q. And that same answer with regard to forensic psychiatry, no board certifications. Correct?

A. Correct.

Q. And you are not a medical doctor?

A. I am not.

Q. You're not a surgeon?

A. I am not.

Q. You're not trained as a surgeon?

A. Correct.

Q. You certainly haven't performed any surgeries?

A. No.

Q. And that would include no gender-affirming surgeries.

UNITED STATES DISTRICT COURT

Correct?

A. Correct.

Q. You're not an endocrinologist?

A. I am not.

Q. Okay. You don't have any type of training or you didn't go to medical school for -- for internal medicine?

A. I did not go to medical school.

Q. Okay. And you are a professional witness, however, and you have, I understand, about five or six cases you're a professional expert witness in?

A. Correct.

Q. And in all of those cases, you were paid by Lambda Legal and or the ACLU. Is that correct?

A. No.

Q. Okay. And in the vast majority of those cases, you were paid by ACLU or Lambda Legal. Correct?

A. Correct.

Q. And those are the same folks that are paying your tab in this particular case. Correct?

A. Yes.

Q. Now in the cases -- in the situations where you have testified as expert witness, you have, without question, always recommended the provision of gender-affirming surgery. Correct?

A. I'm sorry. Would you repeat that question.

UNITED STATES DISTRICT COURT

2-ER-0159

102

Q.  Let me try a different way.  In all of the cases where you testified as an expert witness, you have never once testified or offered the expert opinion that surgery was unnecessary.  Correct?

A.  Not entirely correct.

Q.  Okay.  In all of your testimony, you came to the conclusion or the opinion that the gender-affirming surgery should be provided.  Correct?

A.  For certain individuals in a class action suit, that would not be entirely correct.

Q.  Okay.  It looks like over the last three years you made about $165,000 from being an expert.  Is that about right?

A.  No.  That would be my total income.

Q.  Okay.  I think your testimony at the deposition was half of your income was derived from your services as an expert witness?

A.  During which year are you referring to?

Q.  The last three years.

A.  Okay.  Yes.

Q.  Is that fair to say?

A.  Yes.

Q.  So in 2024, would it be fair to say you made about $50,000 from being an expert witness?

A.  Yes.

Q.  And in '23, you made about $75,000 being an expert witness?

UNITED STATES DISTRICT COURT

**2-ER-0160**

103

A. It's possible. I'd have to check that but it could be. Yes.

Q. All right. And you've never worked for -- you had never worked for a correctional institution or DOC. Is that fair to say?

A. Correct.

Q. And you never worked in a prison as a mental health clinician or mental health practitioner. Correct?

A. Correct.

Q. And you've never worked in a day-to-day setting where you're involved with the correctional facility and you're seeing the patients day-to-day. Correct?

A. That is correct.

Q. And you certainly have never worked for the department of corrections in Alaska. Correct?

A. I have not.

Q. And you never provided any type of consultation or work for the Alaska DOC. Correct?

A. Correct.

Q. And you don't have any specific training when it comes to prison operations. Right?

A. I do not.

Q. Okay. For example, you wouldn't be able to -- able to provide any type of opinions regarding the policies and procedures for keeping inmates safe in the prison facility.

UNITED STATES DISTRICT COURT

**2-ER-0161**

Correct?

A. Correct.

Q. And you don't have the background or training to offer opinions regarding how to run a prison to make the -- to make the prisoners safe and to avoid conflicts. Correct?

A. Correct.

Q. Okay. Now you did coauthor the section of the Eighth Edition of WPATH dealing with institutions, and I believe you said you were the co-chair on the applicability of the standards of care to people living in institutional environments. Is that -- is that correct?

A. Yes.

Q. Okay. Let's take a look -- let's take a look at that. There's a couple portions of that specific document. It's going to be Exhibit 2103, and I'll go ahead and throw it up on the screen for your convenience.

And this is going to be the section of -- this is going to be WPATH 8. We're going to turn to the section of WPATH 8 that you helped to drafted. If you could turn to page 8 of that exhibit.

(A discussion was held off the record.)

MR. GROSS: There we go. We're in business. Success.

BY MR. GROSS:

Q. If you could turn to page eight of this document. Specifically, I'm looking under statement 11.1. And, okay,

UNITED STATES DISTRICT COURT

**2-ER-0162**

105

page 8, it looks like under statement 11.1 about the third sentence. Okay. And this -- I understand this is a document that you helped to draft. Correct? Yes?

A. I was one of the contributors.

Q. And this is a -- in this particular chapter, there's a reference to Koselik versus Massachusetts. Do you see that?

A. Yes.

Q. And let's take a second to talk about that case. That case is a circuit court decision that determined that a gender-affirming surgery was not necessary. Correct?

A. Yes.

Q. Because -- and that's a situation where the circuit court actually overruled the district court, had determined that DOC did not have to provide gender-affirming surgery. Correct?

A. Yes.

Q. And in this instance, you're referring to as if the case that we're looking at did provide gender affirming care. Isn't that the perception that's left with this particular paragraph?

A. It's there because Judge Wolf was the first judge to grant that Michelle Koselik should have gender-affirming surgery and the department of corrections had violated the 8th Amendment --

Q. Right. But --

A. -- was later overturned.

Q. Right. And you understand how that works. Right? The district court makes a decision, and if it goes to the circuit

UNITED STATES DISTRICT COURT

**2-ER-0163**

court, they can overrule that decision, and, in this case, they did. Correct?

A. Yes.

MR. SAENZ: Objection, Your Honor. The final question asking the question for legal conclusions or legal opinions --

MR. GROSS: This is just -- this is her language. It's her chapter she helped author. I've got a point that I'm going to raise in a second.

THE COURT: Insofar as she's opining about the procedural posture of the case, I agree that's outside of her area of expertise. If you're setting up a point that would go directly to an area of her expertise, go ahead and get there.

BY MR. GROSS:

Q. And ultimately what this is doing is leading a misimpression as to what that decision actually ultimately held. Correct?

A. I'm uncertain about that.

Q. Okay. Now in reaching your opinions, you did rely on a number of different research studies and articles. Correct?

A. Correct.

Q. And your report outlines and cites to a number of these different studies. Correct?

A. Yes.

Q. In fact, I think your report had a bibliography that listed numerous different articles you relied on?

A.  Yes.

Q.  And of those studies you relied on, you're trying to make the point that these different articles and studies support your opinions that you're expressing in this case.  Correct?

A.  They support perhaps some aspect of my opinion.  Yes.

Q.  And one study that you do not cite to -- that I don't think exists -- would be a study that tracks the outcomes of gender-affirming surgery in a correctional setting.  Correct?

A.  Surgeries performed in a hospital on incarcerated persons, yes, there is no study.

Q.  And the reason for that could be the group of people may be too small, but one way or the other, there is no study that you're aware of that would say one way or the other whether there's that benefit of receiving gender affirming care in a correctional setting.  Correct?

A.  There's no study that evaluates --

Q.  Okay.

A.  -- surgery on people who have been incarcerated or are currently incarcerated.

Q.  And when you look -- when you look at your report, one study that you did not include was a study that was done in Sweden back in about 2011.  Correct?

A.  Is that the Dhejne study?

Q.  Yes.

A.  Yes.

UNITED STATES DISTRICT COURT

**2-ER-0165**

Q.  Okay.  That's a study you omitted from your expert report.  Correct?

A.  Correct.  Yes.

Q.  Let's take a look at that and see maybe why that was.  If we could turn to Exhibit 2086.  And this is a -- this is an article or a study that's entitled Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden.  Do you see that?

A.  Yes.

Q.  And if we look at the first page under abstract, if we look at the eighth paragraph under the conclusion part it says this it says "persons with transsexualism after sex reassignment have considerably higher risks of mortality, suicidal behavior, and psychiatric morbidity than the general population.  Our findings suggest that sex reassignment, although alleviating gender dysphoria, may not suffice as treatment for transsexualism and should inspire improved psychiatric and somatic care after sex reassignment for this patient group."

So those particular -- that particular portion I just read is suggesting that perhaps gender-affirming surgery does not provide the results that one would hope for, and, in fact, it could harm the particular patient that's receiving that care.  Isn't that what that says?

A.  Not exactly.

Q.  Okay.  And I understand that after the fact this particular

UNITED STATES DISTRICT COURT

**2-ER-0166**

author wanted to try to take that back, but that language says what it says. Right? That language is basically saying that there may not be --

MR. SAENZ: Objection. Counsel is testifying based on his opinion of what the author did or did not do or what the author did or did not mean.

MR. GROSS: It's a leading question. I'm simply asking if the author said these -- if the words that she's using expresses this particular opinion.

THE COURT: Well, I think you've asked this witness what this particular abstract means. This witness has disagreed with your assessment of it. I agree with you there are words on this page and this page is an exhibit. I don't know you need this witness to agree that there are words on this page.

So the Court will have this exhibit. I can certainly review what it actually says. So unless there's a further basis for this question, I would sustain the objection.

BY MR. GROSS:

Q. And one of the reasons you did not include this study in your report and didn't rely on it is because it's contrary to the opinions you're expressing in this case. Isn't that correct?

A. No.

Q. Okay. Now there's another study, it's a recent study that

came out in January of 2025, and it's going to be Exhibit 2087 and let's take a look at that. This is an article that's entitled Examining Gender Specific Mental Health Risks After Gender-Affirming Surgery, a National Database Study. Now, as I indicated, this was published in January 2025. In your deposition, we talked about this particular study. Didn't we?

A. Yes.

Q. And if we look at the second full paragraph under the introduction, this says despite increasing support for gender affirming medical interventions to alleviate distress in transgender individuals experiencing gender incongruence, the long-term mental health outcomes associated with these interventions remain largely unclear. Do you see that?

A. Yes.

Q. And in our -- the deposition we sort of talked about the conclusions of this particular article and the fact that these authors believed if you look at the research, the conclusions about whether gender affirming care is successful or not is largely unclear. That's what this author is explaining. Correct?

A. I'm sorry. Would you repeat that for me.

Q. Sure. Well it says what it says. Right. The authors of this particular study are suggesting that it's unclear what type of mental health outcomes result from gender affirming care. That's what they're saying?

111

A.  Correct.

Q.  And this is a study that you sort of immediately rejected when I brought it to your attention.  Correct?

A.  I wasn't aware of it when you brought it to my attention in the deposition.

Q.  Okay.  If you go to page 4 of this particular study.  And if we look at the sections discussions.  The second sentence under discussion.  It says our analysis reveals that significantly elevated risk of mental health disorders including depression, anxiety, suicidal ideation, and substance use disorder post surgery among individuals with a prior diagnosis of gender dysphoria.  Do you see that?

A.  Yes.

Q.  So this particular study is reaching a conclusion that, in fact, gender-affirming care may result in negative mental health outcomes.  Isn't that what that is saying?

A.  That's what this particular sentence is saying.  Yes.

Q.  Okay.  And at the time of the deposition, when we were talking about this particular study, you rejected it out of hand.  Do you remember that?

A.  Yes.

Q.  And one of reasons that you did that is because you don't want to recognize any study that would be contrary to your opinions.  Would that be fair to say?

A.  No.

UNITED STATES DISTRICT COURT

**2-ER-0169**

112

Q. Would it be fair to say that you have and when you were preparing these reports in these various cases you're working on, you have a habit of cherry picking the studies that support your opinion and rejecting studies that don't support your opinion?

A. No. That wouldn't be true to say.

Q. And would it be fair to say that if you had done that, that would not be an objective way of approaching an expert opinion?

A. Had I done that, that would not be an objective approach.

Q. All right. Let's go ahead and look at one more section of this study. The same paragraph, about fourth sentence down. It says, notably, the heightened risk of mental health issues post surgery was particularly pronounced among individuals undergoing feminizing transition compared to masculinizing transition. Emphasizing the necessary for gender sensitive approaches even after gender affirming procedure. Do you see that?

A. Yes.

Q. So these particular authors are warning that bad mental health outcomes are more profound in folks that transition from a man to a woman. Would that be fair to say?

A. Compared to a group of individuals who did not undergo surgery.

Q. And, again, during our deposition, you took this study and rejected it out of hand without really reading it. Correct?

A.  I still reject large portions of this study.

Q.  Now, during your testimony, it seemed like you were offering a lot of opinions about what Ms. Wagoner was thinking, what she was thinking, what she was feeling.  You were offering opinions about as if you went into her mind and you were offering opinions about how she was perceiving the world, and I want to ask you some questions about your knowledge of Ms. Wagoner.

Now, first off, Ms. Wagoner is not a long-term patient of yours.  Correct?

A.  Correct.

Q.  You're not her treating provider?

A.  I am not.

Q.  You are hired as an expert to work on this case.  Correct?

A.  Yes.

Q.  And when this case is over, you're not assigned with providing her with a treatment plan or following up with her care?

A.  Right.

Q.  You're simply here as an expert to provide testimony in this case.  Would that be fair?

A.  Yes.

Q.  Okay.  Now, one of the things that you did to try to get to know Ms. Wagoner is you interviewed her.  Correct?

A.  Yes.

114

Q. And you interviewed her, I understand, for about three hours. Right?

A. Correct.

Q. And 40 minutes of that was dedicated to providing the different tests you talked about in your examination so far. Right?

A. Yes.

Q. And that would leave about two hours and 20 minutes to ask her questions about herself. Right?

A. Well, we talked during the testing as well.

Q. Okay. And after the interview was done, you didn't do anything to verify that the things that Ms. Wagoner had told you were true. Did you?

A. No.

Q. Okay. You didn't talk to her family members?

A. No.

Q. You didn't talk to her mother?

A. No.

Q. You didn't talk to her ex-wife?

A. No.

Q. You didn't talk to her children?

A. No.

Q. You didn't talk to her ex-fiance?

A. No.

Q. Didn't speak with her siblings?

UNITED STATES DISTRICT COURT

**2-ER-0172**

A.  No.

Q.  You did nothing to try to verify that what she told you was true.  Correct?

A.  Correct.

Q.  You simply accepted it at face value that whatever she told you was accurate?

A.  Correct.

Q.  Now, one of the things you assumed in that regard is you assumed she was not being deceptive with you.  Correct?

A.  Correct.

Q.  And you basically assumed, again, everything she told you was true in that she was being completely 100 percent accurate with you but you didn't speak to any of her medical care providers pre-incarceration.  Did you?

A.  No.

Q.  In fact, you didn't look at a single medical record before she was incarcerated.  Is that true?

A.  I saw some records from the urology clinic that occurred before her incarceration.

Q.  Okay.  Is that for her circumcision?

A.  No. It was for her vasectomy.

Q.  Okay.  Now prior to being incarcerated, you understood that Ms. Wagoner was in psychotherapy.  Correct?

A.  You mean in the prison?

Q.  No.  Prior to incarceration, she was seeing a therapist to

UNITED STATES DISTRICT COURT

116

talk about her issues.  Did you know that?

A.  I know that she saw a therapist prior to incarceration.

Q.  Okay.  And you didn't speak to that therapist about this case.  Did you?

A.  No.

Q.  You don't know who that therapist is.  Right?

A.  Correct.

Q.  And you didn't look at any medical records from that particular psychotherapist.  Correct?

A.  Correct.

Q.  Had you looked at those records, it would have revealed to you the struggles she was having prior to incarceration. Correct?

A.  If those records documented what her presenting problem was, then I would be able to determine at that point she was seeking help for that given problem.

Q.  Okay.  And in your psychotherapy practice, you take notes as to what the different issues are that your patients are suffering with.  Correct?

A.  Yes.

Q.  So if this psychotherapist did that exact same thing, you would be able to look at these records and determine what she was struggling with pre-incarceration.  Correct?

A.  I don't know what the therapist had documented.

Q.  Okay.  And because you didn't look at those records, you

UNITED STATES DISTRICT COURT

117

don't know if she was struggling about issues having to do with her childhood.  Right?

A.  I don't know what her issues were.

Q.  And you don't know if issues were related to her children and the fact they were taken away from her?

MR. SAENZ:  Objection, Your Honor.  Counsel is not questioning.  Assumes facts not in evidence.  These records were not produced -- if they do exist -- were not produced during discovery, and there is no foundation for these questions.

THE COURT:  I think what is -- I think she said she didn't review these records.  So there are a number of sort of predicates to all of this.  So, first of all, yes, the records would have to exist.  Yes, they would have to say what counsel represents they say.  They would have to be truthful.  They would have to have been accurate on the part of the record maker.  So there are any number of ways that even if Dr. Ettner were to review the records, they might not be illuminating to her testimony or to her opinion.

Yet, nonetheless, I think -- I think the defendant is entitled to ask these questions for whatever they're worth.  But I think you've made your point.

MR. GROSS:  Yes.  I'll move on.

BY MR. GROSS:

Q.  Were you able to talk to any of the CO's or correctional

Q. officers that see Ms. Wagoner on a day-to-day basis?

A. No.

Q. And you yourself are not in the jail to witness her on a day-to-day basis. Right?

A. I am not.

Q. Okay. You basically saw her for a period of three hours and that is the entire extent of you observing her in her situation?

A. Yes.

Q. And, in fact, that particular interview wasn't even in her normal setting because it was in a room you were interviewing her in. Right?

A. Correct.

Q. You never saw her interacting with people. Right?

A. Other than the people that were present at the time of the interview.

Q. Okay. And a correctional officer who is on the MOD day in and day out would have a better idea of how Ms. Wagoner was functioning on a day in and day out basis. Would you agree with that?

A. I don't know.

Q. Do you have an idea of what groups Ms. Wagoner is currently participating in?

A. I believe one is a -- some sort of Christian religious group.

UNITED STATES DISTRICT COURT

119

Q. Okay. So one group she belongs to currently is a Christian religious group?

A. That's my belief. That's my understanding.

Q. Is that what she told you?

A. No. That's my understanding.

Q. Okay.

A. Is that she belongs to some Christian group.

Q. Any recollection of her belonging to a Wicca group?

A. At one point, yes.

Q. Okay. Do you know if she currently belongs to that group?

A. I don't know that.

Q. What about Buddhist group. Do you know if she belonged to a Buddhist group?

A. I believe at one point in time she was interested in Buddhism.

Q. Okay. What about right now?

A. I don't know.

Q. Do you know what she currently does for work?

A. Currently, no, I don't.

Q. Do you know what she's done for work over the last six months?

A. No, I don't.

Q. Do you know what she was doing for work when you interviewed her?

A. I know that there was some job instability over the periods

of her incarceration.

Q. Okay. But no idea what she's been doing for a job over the last six months?

A. No. Correct.

Q. Same with the groups, you have really no idea what groups she belongs to over the last six months?

A. Correct.

Q. And as far as her physical activity each day, you wouldn't have any idea what she does for exercise. Would you?

A. No, I would not.

Q. And what kinds of things she does in terms of working out, you have no idea what she does?

A. I don't.

Q. And it would be the correctional officers that are in the MOD day in and day out that would have a better understanding of those kinds of things she's doing. Correct?

A. Of her activities? Yes.

Q. Yes. Now would you consider Ms. Wagoner to be a manipulative person?

A. A what person?

Q. Manipulative person.

A. Overall, no.

Q. She certainly manipulated the victims of her crimes. Correct?

A. That I don't know.

Q. Okay. Do you remember doing anything to look at her criminal past?

A. I'm aware of her criminal past.

Q. Did you ask her about her criminal past?

A. No.

Q. Did you look at any record in the court system having to do with her criminal past?

A. There were records regarding her criminal past.

Q. What kinds of records did you look at?

A. Whatever was provided to me.

Q. Did you look at presentence reports?

A. No.

Q. Did you look at the presentence report?

A. I don't know if I did or not. I may have.

Q. Okay. You look at any court filings?

A. Just the court filings that she provided in this case.

Q. Okay. Can you tell us what those are as you sit here today?

A. Her pro se filings to the Court.

Q. Her sentence? Her appeal to her conviction?

A. No, for this case.

Q. Oh. I'm talking about her criminal case?

A. No.

Q. So you don't have any information or documents you looked at dealing with the criminal case?

UNITED STATES DISTRICT COURT

A.   Correct.

Q.   Did you have an understanding that she threatened her victims with death if they told about the abuse.  Did you know that that happened?

A.   You mentioned that in my --

MR. SAENZ:  Objection, Your Honor.

THE COURT:  What's the objection?

MR. SAENZ:  Again, counsel is assuming facts not in evidence.  There is no foundation for this question.

THE COURT:  Well, he's testing the witness' knowledge of this -- I think before you challenge the witness' opinion based on this set of facts, I think you need to lay the foundation that these facts exist, unless you want to pose it as a hypothetical question.

MR. GROSS:  They do exist in the presentence report.

THE COURT:  Okay.  But --

MR. GROSS:  I'm going to offer that when it's my case in chief.  I offer these questions with a foundation which is the presentence report.  I just haven't entered that into evidence yet.

THE COURT:  So you're representing that such a presentence report exists?

MR. GROSS:  Correct.

THE COURT:  Insofar as counsel is representing that the factual predicate does exist, I'll allow the question but

it will be subject to revisiting the objection. Unless there is a factual foundation laid, I would strike the testimony. Okay.

All right. Sir, go ahead.

BY MR. GROSS:

Q. And the presentence report also suggests that Ms. Wagoner gave her victims drugs like meth, cocaine, and crank to keep them quiet. Were you aware that that allegation was out there?

A. You mentioned that during my deposition.

Q. Okay. Since your deposition, have you done anything to research that and verify that that was true or not true?

A. No.

Q. If that was true, if those two things were true that she threatened her victims with death if they said anything and that she used cocaine and meth and marijuana as sort of a tool to keep the victims quiet, would that be indicia of manipulative behavior?

MR. SAENZ: Objection, Your Honor. Under Rule 404, this is going to -- this is all character evidence.

THE COURT: Well --

MR. GROSS: It's not character -- I'm not using it for character evidence. What this case is going to be about, symptoms -- Ms. Wagoner's symptoms -- and if I could link them to other things that are happening that could cause her anxiety or depression. I'm also simply testing this witness'

UNITED STATES DISTRICT COURT

**2-ER-0181**

124

understanding of these different predicate facts.

THE COURT: Yeah. I mean, insofar as it's relevant, I think it goes to more to -- for our purposes, I think it goes more to weight than admissibility. And, again -- and I think this is going to be maybe a theme throughout the next few days, because this is a bench trial, there is a lower risk of evidence inflaming a jury. So I think I can accept the evidence for what it's worth.

So I will overrule the objection. But -- I'll overrule the objection.

Go ahead, sir.

BY MR. GROSS:

Q. There's also in the records that you reviewed, there's evidence of manipulation in her health care. Would you agree with that?

A. I don't know that I would consider it manipulation of health care.

Q. Have you ever seen any records where Ms. Wagoner was caught hiding pills under her tongue?

A. I remember one incident of her putting pills under her tongue and concealing that. Yes.

Q. Do you remember another instance where she threw away the pills she was supposed to take?

A. Yes.

Q. And do you remember records indicating that at one point in

UNITED STATES DISTRICT COURT

**2-ER-0182**

2021 she was at about 38 percent compliance rate for taking medications?

A. I don't recall that.

Q. When you met with Ms. Wagoner back in October of 2024, she understood that you were an expert in this case. Correct?

A. Yes.

Q. And she understood that you were going to be offering an opinion as to whether gender-affirming surgery was required or not. Correct?

A. Yes. She recognized that.

Q. And she recognized that if you offered an opinion that suggested that gender-affirming surgery was necessary, that might help her cause. Correct?

A. Correct.

Q. And so in that particular setting, isn't there a fear that Ms. Wagoner is going to tell you whatever you want to hear in offering your opinions as opposed to giving you the honest answers to your questions?

A. I don't have that fear.

Q. And, of course, as we already established after that particular interview, you did nothing to verify that any of her responses were accurate or true?

A. Correct.

Q. I heard your testimony about a few tests that were performed on Ms. Wagoner, the Beck test with the Beck Anxiety

126

Inventory.  Do you recall doing that test with her?

A.  Yes.

Q.  And this is a subjective test.  Correct?

A.  Yes.

Q.  And the test is going to be only as good as the answers that are being provided.  Correct?

A.  I'm not clear what you mean by only as good as.

Q.  Well, if someone wants to manipulate the test, for example, they could read the answers or read the questions and they could provide an answer that -- that weighs in the outcome they want to achieve.  Correct?

A.  They could endorse most of your symptoms in every category. Yes.

Q.  Right.  For example, one of the questions I think is I am nervous.  And you're supposed to say either not at all or bothers me a lot.  If someone wants the outcome indicating that they're extremely anxious, they would understand you just said it bothers me a lot to all of the different questions. Correct?

A.  There's a stipulation that they respond the way they felt in the past week including that day.

Q.  Okay.  I think it's two weeks but the point being is that if they wanted to manipulate the test to make it look like they were really anxious, they could certainly do that.  Correct?

A.  All of the -- in terms of the Beck Anxiety Inventory --

UNITED STATES DISTRICT COURT

**2-ER-0184**

Q. Yes.

A. All of the questions have to do with some aspect of anxiety.

Q. Right. And if --

A. -- could endorse every question in the most severe manner if they wanted to present themselves as having the most severe amount of anxiety one could achieve on that test. Yes.

Q. And this particular test, Beck Anxiety Test, it doesn't spit out answers to the cause of the anxiety, it's just a measure of the amount of anxiety, that day to two weeks prior to that date?

A. The severity and the type of anxiety. Correct.

Q. And it's not the type of test where every -- I'm sort of thinking like 23andme that gives you the graph and points out every part of your ancestry. It's not the type of test where it spits out a graph that says, okay, this percent of their anxiety is related to being incarcerated, this percent of anxiety is related to gender dysphoria, this percent is related to having their freedom taken away. It's not that kind of test. Right?

A. It doesn't indicate what the cause of an individual's anxiety is.

Q. And it also only -- as we indicated -- it tests the person's anxiety for that particular day and the two weeks prior to that day. Correct?

UNITED STATES DISTRICT COURT

**2-ER-0185**

128

A. Correct.

Q. So those test results have a shelf-life. Right?

A. Those test results give information for one point in time.

Q. Right. And that point in time would be going on seven months ago. Correct?

A. Correct.

Q. And you don't have any test results or any information, any personal information indicating whether her anxiety level has gone up or whether it's gone down or whether it's been up or down over the last several months. Right?

A. I don't have personal knowledge of that. No.

Q. You also performed the Beck Depression Inventory. Same questions there. It looks like there's 21 questions scored from a zero to three. And it's a subjective test, right, it's got questions like I feel like a total failure. I do not feel like a failure. You simply pick the answer that best suits the way you're feeling that day and the two weeks prior. Correct?

A. Correct.

Q. And, again, if someone wanted to make that test look like they were severely depressed, they could skew the answers in a certain way to make it look like they're significantly depressed. Correct?

A. Correct.

Q. And that test also does not provide any type of bar graph or chart indicating the cause of the depression, it simply is

an indication of depression?

A. Correct.

Q. So it would not establish if Ms. Wagoner's depression was related to her childhood. Right?

A. Correct.

Q. It wouldn't provide an indication if her depression was related to being incarcerated. Correct?

A. Correct. It talks about the symptoms of depression.

Q. And it won't give us any type of indication as to whether the depression was related to, for example, remorse for her crimes. Correct?

A. Correct.

Q. Same questions there, again, it's talking about depression that she felt or feelings that she felt on October 7th, 2024 and the two weeks prior to that date. Correct?

A. Symptoms of depression that she felt at that time. Correct.

Q. And so that particular test would not give us any indication as to whether her depression increased or whether it lessened or it went up and down over the last seven months. Correct?

A. I don't have a comparison today with that -- with those test results. Correct.

Q. So those test results only indicate whether she was depressed on that particular day and the two weeks prior?

130

A. Correct.

Q. And you also gave her the Beck Hopelessness Scale and that's sort of to test whether a person has a positive outlook or negative outlook. Correct?

A. It's not about outlook as much as feelings of hopelessness.

Q. Okay. And feelings of hopeless on October 7, 2024 or the two weeks prior. Correct?

A. Correct.

Q. And, again, subjective test. Right?

A. Correct.

Q. And she scored a seven. What does a seven score indicate?

A. It's moderate amount of hopelessness. Similar to what people who have chronic cardiac disease would score.

Q. Now, the interview you did in October of 2024, that will give us an idea of your perception of how she was doing on that particular day, but it's not going to give us any information or you any information about how she was doing prior to that interview date. Correct?

A. I obtained that information from the medical records and her journals and the other documents I reviewed.

Q. Okay. Did you have any ability to watch her or to -- to see how she's doing personally prior to that interview?

A. No.

Q. Okay. So, for example, if there's a progress note that we talked about, I think when you were showing it during your

UNITED STATES DISTRICT COURT

**2-ER-0188**

direct exam, in January 2024, you don't have any personal first-hand knowledge as to how Ms. Wagoner was doing on that particular date. Do you?

A. No.

Q. And it's going to be the correctional officers and the people in the MOD day in and day out that would have a better understanding how she was doing in January of 2024, for example?

A. I'm not clear what you mean by how she was doing. I don't know that they would be able to detect how she was feeling. They might be able to have an understanding of her activities and to observe her.

Q. Okay. So they certainly would -- they would be in a better position to provide information about her activities, her enthusiasm, whether she was participating in things, not participating in things, whether she was active, or all of the information they could provide but you don't have first-hand knowledge of that information. Do you?

A. Correct. I don't have that information.

Q. Now one of the -- if I understand your testimony, one of the reasons you believe that a vaginoplasty is necessary is because of what you portray is three separate instances where she attempted self surgery. One was in August of 2016. Correct?

A. Yes.

Q. And when were the other two?

A. 2017 and 2018.

Q. Okay. Now 2017, do you remember what month of that year that this happened?

A. I don't.

Q. Okay. So sometime in the calendar year of 2017 the second event happened?

A. 2017, yes.

Q. Yes. And, in that event, could you explain to me your understanding of what happened?

A. In terms of what are you asking?

Q. Well, my understanding is your testimony that this was the second effort at self surgery and I'm interested to understand what you know about that incident. Could you explain to me what happened during that instance?

A. She cut further down the penile shaft.

Q. Okay. Using what?

A. I think it was a BIC razor.

Q. Okay. So in 2017, your understanding is that she used a BIC razor to cut further down the shaft of her penis?

A. She cut further down the shaft of her penis. Yes.

Q. And who told you that?

A. She told me that.

Q. Did you do anything to verify whether what she told you was true?

UNITED STATES DISTRICT COURT

**2-ER-0190**

A. I saw medical records that she had cut her penis.

Q. Okay. And, again, you think it was with a BIC razor?

A. I know at one point she used a BIC razor.

Q. Okay. If that happened in 2016, do you think it also happened in 2017 where she used a BIC razor?

A. I'm not 100 percent certain she used a BIC razor in 2017.

Q. Okay. What did she use?

A. She used something that allowed her to lacerate her phallus.

Q. What was it?

A. I don't know.

Q. Okay, 2018. Tell me your understanding of what happened in 2018?

A. She cut even further down to the level of the urethra, the skin on the penile shaft.

Q. Okay. Did she use a BIC razor again?

A. I don't know.

Q. Okay. So no idea how she actually performed this event?

A. You mean the instrument that she used?

Q. Yes.

A. I don't know the instrument.

Q. And this information is coming directly from what Ms. Wagoner told you?

A. And from the medical records.

Q. The medical records, are you talking about the ER records?

UNITED STATES DISTRICT COURT

**2-ER-0191**

134

A. Yes.

Q. Okay. Did you talk -- you looked at the ER records and you're coming to the conclusion that she used a BIC razor to cut herself in 2017 and 2018?

A. The medical records indicate that she cut her penis in an attempt to, quote, change his sex, unquote.

Q. Okay. Wasn't that referring back to 2016?

A. I believe it was.

Q. Okay. So they weren't talking about the event in 2017, were they?

A. I don't recall.

Q. Okay. Did you talk to the ER doctors in reaching your opinions?

A. No.

Q. You would agree with me that WPATH requires that you have a working relationship with your patients when you're going to recommend a gender-affirming treatment. Correct?

A. No.

Q. Let's take a look at that, trial Exhibit 2102. This is WPATH 7. Exhibit 102.

Madam Clerk, do we need to push a button or something? There we go.

If you could turn to page 8 of 27. And under section 4 -- under section 4, second paragraph. It would be the third sentence.

UNITED STATES DISTRICT COURT

**2-ER-0192**

135

A. That's for the primary evaluator. But individuals, according to SOC-7, needed a second, independent, one time evaluation.

Q. Okay. But you're not going to disagree with me with the notion that anybody who is a medical care provider, is evaluating someone for gender-affirming surgery, should know the patient before they make those type of representations. Are you?

A. They should know the patients' medical needs. And they should know if the patient has uncontrolled mental health issues or medical issues before referring them to a surgeon.

Q. Okay. Do you feel like you had a sufficient amount of information about Ms. Wagoner to offer the opinion to operate in this case?

A. Yes.

Q. That's based on a three hour interview with the documents?

A. Correct.

Q. And during that time, again, you did not look at any pre-incarceration medical records correct?

A. Correct.

Q. Okay. Now I think we established that a person can be transgender and not have gender dysphoria. Correct?

A. Yes.

Q. A transgender person can exhibit no exhibits of gender dysphoria and, therefore, there obviously would be no need for

UNITED STATES DISTRICT COURT

**2-ER-0193**

136

treatment.  Correct?

A.  I'm sorry.  Would you repeat that.  I didn't hear you.

Q.  Sure.  A person who is transgender can exhibit no symptoms of gender dysphoria, therefore, under those circumstances, no treatment would be required.  Correct?

A.  A transgender person may not require and may not desire medical or surgical treatment.  Correct.

Q.  Okay.  And a person with gender dysphoria, the type of treatment that they're going to need is going to vary from person to person.  Correct?

A.  Correct.

Q.  And it's largely going to depend on that person's mental health needs.  Correct?

A.  It's going to depend on the severity of the medical condition of gender dysphoria.

Q.  And I think during our deposition we both agreed that gender dysphoria can come in a continuum.  Right?

A.  Yes.

Q.  It can occur in a continuum.  There can be a gender dysphoria where not a lot of treatment is needed, there can be a gender dysphoria where a whole bunch of treatment is needed?

A.  Correct.

Q.  It's going to be a case by case, patient by patient basis?

A.  Yes.

Q.  Now, there's going to be -- there's going to be some

UNITED STATES DISTRICT COURT

**2-ER-0194**

137

situations where a transgender person with gender dysphoria is going to be able to engage in mental health counseling, provide coping skills, and the symptoms they're experiencing are not so severe that that's enough for them, they're going to be okay with just the coping skills, and they'll move forward.  That happens.  Right?  If that's their choice, that's their choice.

A.  If they have gender dysphoria or if they're transgender?

Q.  If they have gender dysphoria.

A.  Typically, no.

Q.  There's no situation where someone could get coping skills with gender dysphoria and decide they don't want to go any further with any treatment?

A.  They could decide that at that point in time they can't access treatment or they don't want to access treatment, but that doesn't change the fact that they have a medical condition and that at a future time, they may require treatment.

Q.  Okay.  But they can make the decision they don't need treatment at that particular point in time.  Correct?

A.  Correct.

Q.  And another gender dysphoria person who has gender dysphoria could undergo hormone therapy and it sufficiently alleviates their symptoms where they say, okay, that's good enough, I'm okay with the hormones and move on with their life.  Correct?

A.  That can happen yes.

UNITED STATES DISTRICT COURT

Q. And that happens quite regularly yes?

A. It happens often. Yes.

Q. And, finally, there's going to be those people who are transgender that need additional relief beyond the hormone therapy. That's where the surgery comes into play. Correct?

A. Correct.

Q. And, again, case-by-case basis?

A. Correct.

Q. Now, let's talk a little bit about Ms. Wagoner's current situation. First off, you don't have any information about -- let me say it this way. You don't have any medical records pre-incarceration that would shed light on how she was doing with her gender dysphoria prior to incarceration. Fair to say?

A. I don't have those medical records. Correct.

Q. And you haven't done any research or talked to health care providers or tried to get those medical records to determine what her symptoms were prior to her incarceration in 2007. Correct?

A. Correct.

Q. And from 2011 to August 2016, Ms. Wagoner made no complaints about gender dysphoria. Correct?

A. Correct.

Q. In fact, during that time frame, she didn't even suggest she was transgender. Correct?

A. Correct.

UNITED STATES DISTRICT COURT

**2-ER-0196**

139

Q. She basically just went about her business without asking for any type of treatment during that time frame. Correct?

A. She may have asked for treatment but not for gender dysphoria.

Q. Okay. Is there any record, any RFI, any document, any note where she reached out to DOC and asked for any type of gender affirming care?

A. Prior to 2016?

Q. Prior to August of 2016.

A. No.

Q. Okay. Since that time, she has decided to live overtly as a woman as she's done some things to sort of help alleviate some symptoms on her own. For example, she changed her name. Correct?

A. Correct.

Q. And, for some folks, that can be an important step. Right? It's the outward public recognition that they're now identifying as a woman. Correct?

A. Yes.

Q. And in this instance, she filled out the forms, she went to court, and she got her named changed officially?

A. Correct.

Q. And DOC actually helped facilitate that by providing the forms, filling out the forms, and doing that type of thing. Were you aware of that?

UNITED STATES DISTRICT COURT

A. Is that a question?

Q. Were you aware the DOC did that?

A. Yes. Yes.

Q. And after the change of the name, Ms. Wagoner saw improvement. She -- that was a step in the right direction for her. She saw some progress in her gender dysphoria by changing her name?

A. She changed her name, yes.

Q. And she saw progress. She saw alleviations of her symptoms because she took that important step. Correct?

A. It would have been beneficial for her. Yes.

Q. And she also was able to wear undergarments. Correct?

A. Yes.

Q. And DOC has facilitated that. Correct?

A. Correct.

Q. And that was an important step as well and that helped to alleviate some of her symptoms. Correct?

A. Yes.

Q. Same question with regard to -- DOC facilitated the use of (inaudible) for Ms. Wagoner. Correct?

A. Yes.

Q. And that too helped to alleviate some of her symptoms. It's progress. Correct?

A. Correct.

Q. Okay. Now in August of 2022, DOC authorized hormone

UNITED STATES DISTRICT COURT

**2-ER-0198**

141

therapy for Ms. Wagoner.  Correct?

A.  Yes.

Q.  And we talked about that a bit.  You stated it has an impact on the brain, the way that a person perceives themselves.  Correct?

A.  Hormones have an effect on the brain.  Yes.

Q.  Okay.  It also has an outwardly appearance.  It helps with the growth of fat breasts, softens skin, relocates body fat to make you look more like a female, those are all things you benefit from in hormone therapy?

A.  Yes.

Q.  And those things were provided to Ms. Wagoner starting in August of 2022?

A.  Correct.

Q.  And that's helped?

A.  Yes.

Q.  Yes.  That's helped alleviate some of her symptoms. Correct?

A.  I think it's helped elevate her mood.

Q.  Since the hormone therapy has started, she has not attempted to harm her penis.  Correct?

A.  Correct.

Q.  She certainly hasn't had to go to the doctor or the ER for any kind of treatment related to that?

A.  That's my understanding.  Correct.

UNITED STATES DISTRICT COURT

**2-ER-0199**

Q.  And there's been no outwardly expression of wanting to commit suicide.  Correct?

A.  Correct.

Q.  No suicidal ideation?

A.  I don't know about ideation.  There's been no attempts.

Q.  Okay.  Did you ask her about suicidal ideation when you interviewed her in October of 2024?

A.  In October of 2024, she was not suicidal and did not have suicidal ideation.

Q.  Okay.  One thing she told you was she thought that type of thing was selfish.  Do you remember her saying that to you?

A.  I don't recall that specifically.

Q.  Now I understand that you -- from your testimony -- that you believe gender dysphoria gets worse over time, and you base that on elevated cortisol levels in a person's body.  Correct?

A.  And my experience.

Q.  Okay.  And with regard to cortisol levels, there's been no testing done on Ms. Wagoner to determine what her cortisol levels are.  Correct?

A.  Cortisol levels fluctuate during the day.  So in order to test her cortisol, we would have to test it periodically throughout the day, day in and day out, until we have a long and aggregate of cortisol.

Q.  It's a simple test.  Right?  It could be blood, it could be urine, it could be saliva?

UNITED STATES DISTRICT COURT

**2-ER-0200**

A. Correct.

Q. -- to test someone's cortisol levels?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And there's been no testing of Ms. Wagoner so there's no way to test whether her cortisol levels are going up or down?

A. Does the department of corrections perform that test?

Q. My question for you is do you know of any testing that's been done to see what her cortisol levels have been historically?

A. I know that it has not been recorded that that's been done for Ms. Wagoner.

Q. Okay. So you don't have any information to indicate whether her cortisol levels are going up or whether they're going down?

A. No. Everyone's goes up and down during the day. However, with aging, over time, they go up.

Q. Right. But in this particular instance, you can't say how much because you don't have any idea what her cortisol levels have been currently, what they were in 2024, 2015, 2011, you don't have enough information so you can't say one way or the other?

A. That's correct.

Q. Now, I think we both can agree Ms. Wagoner -- at least in

UNITED STATES DISTRICT COURT

her communications to you -- have expressed a very difficult childhood?

A. I'm sorry. I can't -- I didn't hear you, the first part.

Q. Sure. The information you were provided by Ms. Wagoner indicated she had a difficult childhood?

A. Yes.

Q. I think you wrote in your report that Ms. Wagoner's childhood can be best described as one of severe neglect, abhorrent abuse and disadvantage. Is that --

A. Yes.

Q. And can we agree that oftentimes childhood trauma can lead to adult depression?

A. It's possible.

Q. All right. In fact, it's one of the main causes of depression is a difficult childhood. Would that be fair to say?

A. I can't make that statement. No.

Q. And as we sit here today, do you have any idea or understanding as to whether her difficult childhood is causing her any symptoms of depression?

A. I don't know.

Q. And there's certainly no test that you could have run in October of 2024 to determine whether her difficult childhood was causing symptoms of depression?

A. Only if she shared with me that her depression was due to

UNITED STATES DISTRICT COURT

rumination about her unhappy childhood.

Q. All right. That's another thing she shared with you. She shared with you the difficulties she had during her childhood?

A. Yes. But she didn't anchor that to her current depression.

Q. And you understand Ms. Wagoner attempted to commit suicide in 2008. Right?

A. I thought it was 2006, but, yes, there was a suicide attempt.

Q. Okay. Sometime in the middle of the 2000s there was a suicide attempt?

A. Yes.

Q. Yes. And she goes to the ER. Correct?

A. Correct.

Q. And you have not seen those ER records to determine what she may have told the doctors at the ER as to what the cause of the suicide was?

A. I have not seen those records.

Q. Okay. You haven't done any research to try to find out by looking at medical records or any other record to determine the cause of the suicide attempt in either 2006 or 2008. Correct?

A. I'm sorry. Was it -- that was a question?

Q. That was.

A. I haven't seen any records from that suicide attempt.

Q. Okay. You haven't got anything to try to locate those --

A. I have not. No. I have not.

UNITED STATES DISTRICT COURT

Q.  Okay.  We can agree if you look at those records, certainly they would give you some type of insight as to that suicide attempt in 2006 or 2008?

A.  If they -- if it was noted in the medical records.

Q.  Okay.  And typically if you go to the ER and you indicate you attempted suicide, they're going to ask you some question about why that was and that's going to be memorialized in the records.  Correct?

A.  It may be very vague and just say suicide attempt, what medication was used, and familial discontent or problems at home.  It might not be very specific.

Q.  Okay.  And of course we haven't seen them so there's no way of knowing.  Correct?

A.  Correct.

Q.  All right.  And would you agree with me that mental health issues are more prominent among inmates?

A.  Yes.

Q.  In fact, I think the World Health Organization indicated that inmates suffer ten times the mental health issues that you see in the general public.  Does that sound about right?

A.  I agree with that.

Q.  And that could be that they came to the facility with mental health issues, but it also could be a product of mental health issues that would -- are caused by being incarcerated.  Would you agree with that?

UNITED STATES DISTRICT COURT

2-ER-0204

147

A. It's possible.

Q. Okay. And would you agree with me that depression and symptoms of depression can be caused by a loss of freedom and loss of your -- sort of your social structure, your social support system?

A. I'm sorry. I'm going to ask you to repeat that. I'm sorry.

Q. Sure. Do you think that depression or symptoms of depression can be caused when someone loses their freedom and their social support system?

A. Typically, we called it demoralization of being in prison. But for some individuals, it could rise to the level of depression.

Q. Okay. And did you do anything to test whether Ms. Wagoner was suffering from symptoms of depression because of the fact she had been incarcerated?

A. No.

Q. Okay. But it certainly is a possibility that some of her symptoms is just by virtue of the fact that she is now behind bars?

A. Some of what symptoms are you --

Q. Symptoms of depression.

A. I'm attributing her depression to her medical condition. But she may also have feelings of dysthymia and depression about being incarcerated. But that would be an ongoing

UNITED STATES DISTRICT COURT

depression.

Q. Sure. But it would certainly -- it could potentially explain some of the symptoms that she's having regarding depression?

A. Not gender dysphoria.

Q. I'm just talking about symptoms of depression. Is it possible Ms. Wagoner is experiencing symptoms of depression because she's incarcerated?

A. I can't determine what percentage of her distress is related to her being incarcerated. But her being incarcerated certainly exacerbates the depression that she has from having an untreated medical condition and not having agency to get treatment.

Q. But my question is much more simple. And I understand that you're talking about gender dysphoria. And during redirect, they can ask you all kind of questions about that if they want. But my question is much simpler. My question is if we're seeing Ms. Wagoner exhibit symptoms of depression, some of the cause -- I'm not saying all of it -- but some of the cause could be by virtue of the fact she's now incarcerated. Right?

A. It's possible.

Q. Okay. And the same is true with regard to regret that she may have for her crimes?

A. She likely has regret about her crimes.

Q. Okay. And, oftentimes, regret can lead to symptoms of

depression?

A. Possibly for some individuals.

Q. So in this particular case, it's possible that some of Ms. Wagoner's symptoms of depression could be related to the fact she has regret for the awful crimes she committed in this case?

A. That's not my opinion.

Q. Is it possible?

A. It's possible for some hypothetical person. It's not my opinion regarding Ms. Wagoner.

Q. Okay. Would you agree with me that people who are convicted of crimes against children, especially sexual crimes against children, have greater anxiety while incarcerated?

A. I think it depends on the person. If a person is a sociopath, then they may not.

Q. What about this person?

A. I think she regrets her crimes.

Q. I'm talking about anxiety related to someone convicted of a crime against children in a jail or a prison. Does that cause anxiety?

A. I don't know if that's presently causing anxiety. Perhaps it caused anxiety in the past. I don't have knowledge of how she experiences that now.

Q. Okay. So it's certainly a cause for anxiety at the beginning of her sentence and you're not sure whether it causes her anxiety now?

UNITED STATES DISTRICT COURT

150

A. That's fair. Correct.

Q. But she could. She could still have anxiety but for the fact that she is a convicted -- she has a crime that she -- where she abused children in a sexual fashion. She could still have anxiety which would be at the cause of this inherent threat that she feels?

A. We would have to ask her to find out.

Q. Did you ask her? You didn't ask her?

A. I didn't ask her specifically that question, no.

Q. Okay. Do you know if Ms. Wagoner currently has a relationship with her children?

A. She does not, I believe.

Q. Okay. And how many children does she have?

A. Four.

Q. And could the possibility that she has -- no longer has a relationship with her children, could that cause her both depression and anxiety?

A. Not -- that is not my opinion that that's the source of her depression and anxiety.

Q. Okay. Did she talk to you about her feelings about losing her children?

A. Yes.

Q. And did that cause her distress?

A. She regrets that. Yes.

Q. Not only does she regret it, but it causes her distress, it

151

causes her emotional distress that she doesn't have a

relationship with her kids.  Right?

A.  She's unhappy about it.  I don't think it rises to the

level of a generalized anxiety disorder or depression.

Q.  Could the lack of relationship with her children, could

that cause the current symptoms of either depression and

anxiety, could it be one cause among many?

A.  If you are conceptualizing depression and anxiety as

separate co-occurring conditions, then anything could sustain,

exacerbate or trigger those conditions.

Q.  Okay.

A.  My opinion is the depression and the anxiety are attendant

to gender dysphoria which is common, almost ubiquitous with

people who have gender dysphoria.  They also have attendant

depression and anxiety.

Q.  All right.  And, in this case, you can't rule out the fact

that some of her symptoms of depression or anxiety is related

to the fact that she doesn't have a relationship with her kids?

A.  I think she regrets that.  I think if that -- if it rose to

the level of the depression, then psychotropic medications and

psychotherapy around that issue would be helpful.  But I didn't

see any indication that she received any therapy regarding that

issue.

Q.  Was she on medication?

A.  Pardon me?

UNITED STATES DISTRICT COURT

Q. Was she on medication, psychotropic medication?

A. Periodically yes.

Q. Okay. Is she currently on psychotropic medication?

A. I think she's on Wellbutrin.

Q. Currently?

A. I'm not certain, but I read a record from a -- a fairly recent record that indicated Wellbutrin.

Q. If I told she was off psychotropic medications since June of 2024, would that seem to ring true with you?

A. I think that would be great.

Q. Okay. You understand that Ms. Wagoner's fiance left her at the end of 2016?

A. Yes.

Q. Did that cause her grief and distress?

A. Yes.

Q. In fact, I think during one of her phone calls, she told her fiance if you abandon me here, I won't be able to mentally handle it. Do you remember that?

A. Yes.

Q. And that particular breakup did cause her emotional distress?

A. At the time, yes.

Q. And that emotional distress can exhibit itself in symptoms of depression?

A. Not ongoing depression.

UNITED STATES DISTRICT COURT

Q. You're not a surgeon, but I understand that you advise your patients about the risks of surgery. Do I have that straight?

A. If I refer people to surgery, to a surgeon, and they have questions or they need to understand the process, then, yes, I will give them the information.

Q. Okay. And when you're doing that, you talk about the risks of surgery, what would you tell them?

A. I would explain the risks of surgery.

Q. What would you say? Let's say I'm one of your patients, I'm thinking about surgery. What would you ask them?

A. I would ask you if you've ever undergone surgery before. And if you had, then you would understand that there's a risk of general anesthesia, that you'll experience pain post-operatively. I would explain the process of the inversion technique if that was the surgery that the person was having.

I would tell them the major problem they might experience would be dehiscence. But there are also more complicated risks that they might -- although they're not common -- they might occur.

Q. Did you have --

A. Infection. Excuse me.

Q. I'm sorry. I didn't mean to cut you off. Please finish.

A. Infection. Dehiscence. There could be a loss of tissue. There could be stenosis if they don't regularly practice dilation. Perhaps the most serious, but fortunately infrequent

UNITED STATES DISTRICT COURT

risk, would be fistula.

Q. Did you have that conversation with Ms. Wagoner?

A. No.

Q. Now, we -- we mentioned or you mentioned in your direct examination that Ms. Wagoner has been diagnosed with both borderline personality disorder and antisocial disorder. Correct?

A. I saw those diagnose in the medical records. Yes.

Q. You didn't do anything yourself to try to confirm those diagnose or understand the symptoms that they would be causing in Ms. Wagoner?

A. I'm aware of the symptoms of borderline personality disorder.

Q. Okay. Would one of the symptoms be a chronic feeling of emptiness?

A. Yes.

Q. What about a fear of abandonment?

A. Yes.

Q. Distorted self image and sense of identity?

A. That could be a symptom for some people, yes.

Q. Okay. All three of those symptoms would be exhibited by Ms. Wagoner. Would you agree?

A. It's possible that one could say she exhibits those symptoms. Yes.

Q. And people with borderline personality disorder are also

UNITED STATES DISTRICT COURT

**2-ER-0212**

155

known for self harm.  Correct?

A.  Occasionally they self harm.  Yes.

Q.  And that could include cutting.  Right?

A.  Yes.

Q.  And the point of that is it sort of releases emotion.  It's a feeling they're releasing?

A.  It's a tension reducing behavior.

Q.  Okay.  It sort of distracts a person maybe from the emotional pain they've been suffering?

A.  From internal, yes.

Q.  Okay.  Now, here, Ms. Wagoner's efforts at smashing her testicles, those could be indicia of borderline personality disorder.  Correct?

A.  No.

Q.  And, again, you haven't done anything to evaluate or to try to test Ms. Wagoner for the extent of her borderline personality disorder.  Correct?

A.  Correct.

Q.  Nor with regard to her antisocial behavior disorder?

A.  Correct.

Q.  Now, you and I in your deposition talked a little about some different scenarios.  I believe your testimony was that if Ms. Wagoner was asking for breast augmentation surgery that that would not be medically necessary in this case at this point.  Correct?

UNITED STATES DISTRICT COURT

**2-ER-0213**

A. Yes.

Q. So in that instance, you would agree with DOC denying Ms. Wagoner's request for breast augmentation?

A. It's not medically necessary at this point.

Q. Okay. So you also -- I think we also agreed that the surgery to alter one's vocal cords to allow for a more feminine sounding voice, that also would not be medically necessary at this point?

A. Correct. Not for Ms. Wagoner.

Q. Not for Ms. Wagoner. Okay. So in that instance, you would agree with DOC that denying Ms. Wagoner's request for the feminization surgery to her vocal words?

A. I would agree with that.

Q. Same with regard to the facial reconstruction surgery. You thought that that would not be medically necessary with regard to Ms. Wagoner?

A. Correct.

Q. So if that's something that she wanted, you would say, no, that's a bridge too far. That's not medically necessary?

A. I don't believe it's medically necessary for Ms. Wagoner at this time.

Q. Okay. Also, in your deposition, I proposed sort of a hypothetical example. What I said is -- I said for you to assume that there is a girl who has an objectively large nose, and she is in high school and she's just bullied constantly.

157

As a result of that, she's given a diagnosis of PTSD because of this exceedingly large nose. She wants to go get a rhinoplasty. Would you consider that to be medically necessary?

A. No.

Q. And the reason for that is because that type of surgery is elective surgery?

A. Having a large nose is not a medical problem. It's a cosmetic problem.

Q. Did you listen to the deposition of Dr. Lund?

A. I'm not certain if I did or not.

Q. Did you look at the records from Alaska Urology?

A. Yes.

Q. Okay. Did you see where Dr. Lund is offering the opinion that he believes the vaginoplasty is elective from a medical standpoint?

A. Yes.

Q. Do you agree with him?

A. No.

Q. You don't agree with him it's not necessary from a medical standpoint?

A. I thought you asked me if he said it was an elective surgery.

Q. Well, he did say that.

A. Yes.

Q. You disagree with that. But he also went on to say he didn't think it was medically necessary from a physical medical standpoint. Do you recall that?

A. Yes. I recall him saying that bottom surgery was elective and the department of corrections did not provide elective surgeries.

Q. Now, in looking at a lot of the studies that you relied on in reaching your opinions, would you agree with me that none of those studies involve people who are incarcerated. Correct?

A. Correct.

Q. Okay. And most of these studies were trying to track whether gender-affirming surgeries would be helpful or not. Correct?

A. I don't think I agree with that characterization.

Q. Well, it's certainly trying to track whether mental health improves after gender-affirming surgery, would that be fair to say?

A. Some of the studies track certain aspects of mental health. Others determine quality of life in general and some were having to do with complications, some have to do with the selection process. Some of the studies I cited had to do with other -- other issues. So I'm not sure which studies you're referring to precisely.

Q. But you would agree with me --

MR. SAENZ: Your Honor, if I may. It's already 2:37.

UNITED STATES DISTRICT COURT

**2-ER-0216**

We discussed earlier about Dr. Samuelson's availability.

THE COURT: Is Dr. Samuelson now available?

MR. SAENZ: Yes.

THE COURT: Yes. So Mr. Gross, I'm sorry, you were literally mid question. Do you want to ask that one question?

MR. GROSS: That's okay. I'll call that -- I'll come back later.

THE COURT: All right. I appreciate your flexibility. All right. So this time you can go ahead and step down. This time I mean it. And we'll get back with you as soon as we can. As before, you're not to discuss your testimony substantively with any of the parties. Okay. Thank you, ma'am.

Pardon me.

What's the ballpark on how long Dr. Samuelson will testify for?

MS. KERR: I think my direct would be about 45 minutes, Your Honor.

THE COURT: Okay. All right. And then we'll assume about 45 minutes. That will get us to the end of the day. All right.

MS. KERR: Okay. Are we good technology wise? Can the court reporter hear me? Just waiting for the witness.

THE COURT: Counsel for defendants, can you go ahead and disconnect from whatever the magic connection is that allows us to see everything. We're good. All right.

UNITED STATES DISTRICT COURT

MS. KERR: I just need to step out one minute and call.

THE COURT: Okay.

MS. MICHALETZ: Your Honor, while we're waiting, a couple housekeeping items.

COURTROOM DEPUTY: They're joining right now. Okay. Yes. There it is. Okay.

MS. KERR: Your Honor, Sonja Kerr for the plaintiffs. Just for the record, we are going to be discussing with Dr. Samuelson Plaintiff's Exhibit 1057, Defendant's Exhibit 2085, which was also Plaintiff's Exhibit 1058 and 1059, and Plaintiff's Exhibit 1061 and Defendant's Exhibit 2045.

I believe all of those have been stipulated. They might not have the X boxes on the chart we gave you earlier, but we have reached agreement is my understanding.

MS. MICHALETZ: Counsel, can you slow down. I thought you were only going to talk about three exhibits. What were the other ones.

MS. KERR: 1057 and 2085 which are the letters from Ms. Wagoner to Ms. Samuelson. Plaintiff's 1061, which is the August 8th, 2022 MAC decision. And Defendant's 2045 which is the October 23 denial for surgery.

Okay. All right. Thank you, counsel.

THE COURT: All right. And so do we have Dr. Samuelson available?

UNITED STATES DISTRICT COURT

**2-ER-0218**

MR. GERLACH: Pardon me. This is Dr. Samuelson's counsel. I think I'm in a waiting room with the Zoom right now.

THE COURT: Let's bring Dr. Samuelson's counsel in as well. All right. And counsel for Dr. Samuelson, go ahead and identify yourself.

MR. GERLACH: Yes, Your Honor. Scott Gerlach from Jermain Dunnagan Owens.

THE COURT: All right. Let's go ahead and swear Dr. Samuelson in then.

COURTROOM DEPUTY: Ma'am, can you please raise your right hand and let me know when you do so.

THE WITNESS: Yes.

RACHEL SAMUELSON, after being first duly sworn, testified as follows:

THE WITNESS: Yes.

COURTROOM DEPUTY: For the record, please state and spell your full name.

THE WITNESS: Rachel Alice Samuelson. R-A-C-H-E-L, Alice, A-L-I-C-E. Samuelson, S-A-M-U-E-L-S-O-N.

COURTROOM DEPUTY: Thank you.

THE COURT: All right. Thank you, Dr. Samuelson. And Dr. Samuelson, just for your awareness, you're testifying remotely and we're actually using a remote court reporter so it's going to be very, very important that we not talk over

each other. So it's absolutely fine once you hear a question just to take a beat and then respond and we'll try to do the same thing on our end just to make sure the court reporter catches everything. Okay.

THE WITNESS: I understand.

THE COURT: All right. Thank you.

All right. Ms. Kerr, go ahead, please.

MS. KERR: Thank you.

DIRECT EXAMINATION BY MS. KERR:

Q. Good afternoon, Dr. Samuelson. How are you?

A. I'm doing well. Thank you.

Q. I'm Sonja Kerr. We haven't met. I'm representing Emalee Wagoner. Nice to see you.

Dr. Samuelson, would you please state what your occupation is.

A. I'm a family medicine physician.

Q. And by whom are you employed?

A. The Anchorage Neighborhood Health Center.

Q. Can you tell us about your educational background, please.

A. Yes. I went to undergraduate in Williams College in Massachusetts. And then medical school at the University of Washington through the WWAMI Program. And then residency at the Oska(ph) County Medicine Residency.

Q. Okay. And how long have you been a doctor?

A. For 13 years.

UNITED STATES DISTRICT COURT

**2-ER-0220**

Q. And would you describe yourself as a general practitioner, family practitioner?

A. Yes.

Q. Okay. And as a general practitioner, what kind of medical problems do you address? What kinds of patients do you have?

A. I see patients from birth until death -- basically to the elderly. So I see mostly chronic problems and well child checks and well adult visits as well as acute visits as well so kind of a large breadth of medicine.

Q. Okay. And as a doctor, when you treat someone for a medical problem, do you follow particular guidelines for care for different types of medical conditions?

A. Yes.

Q. Okay. Now do you know the plaintiff, Emalee Wagoner?

A. Yes.

Q. How do you know her?

A. She is my patient.

Q. Okay. And what kind of medical care do you provide to Ms. Wagoner?

A. I provide gender-affirming care.

Q. And what is gender-affirming care?

A. That is a medical treatment of gender dysphoria.

Q. Okay. And what do you understand gender dysphoria to be?

A. My understanding is that it is a patient's identity that differs from their sex assigned at birth that is persistent and

UNITED STATES DISTRICT COURT

**2-ER-0221**

164

causes distress.

Q. Okay. Now you should have available to you -- we provided to your counsel -- your office records which are for our record here Plaintiff's Exhibits 1057. So if I refer you to a page within 1057, they'll bring it up on the screen. You'll be able to see it and I think your counsel also has a copy of those records. Okay.

A. Yes.

Q. Now when did you start working with Ms. Wagoner? Do you recall?

A. I believe it was in July of 2022.

Q. Okay. Let's look at Plaintiff's Exhibit 1057, page 150. Okay. Was this the first visit you had with Ms. Wagoner?

A. Yes.

Q. And what did you learn from Ms. Wagoner at this first visit?

A. Well, as I wrote in the note, she was presenting for gender-affirming care, transgender care. And that she had persistent gender dysphoria since she was a small child. And that she had taken a razor to her penis at one point and she had not been on hormones in the past.

Q. Okay. Now when you talk about hormones, can you explain to the Court what you mean when you say hormones?

A. Yes. So typically for trans feminine care, we're talking about estrogen primarily and then sometimes, additionally, an

UNITED STATES DISTRICT COURT

**2-ER-0222**

androgen blocker. So kind of a testosterone blocker and also sometimes progesterone.

Q. And what is the purpose of providing a person with this type of hormone therapy? What are they supposed to get out of it?

A. The hope is that they will get physical changes and that more aligned with their gender identity including redistribution of body fat, breast growth, softer skin, body hair thinning, and -- yeah.

Q. Okay. And when you saw Ms. Wagoner on July 26th, 2022, did you discuss with her hormone therapy and the risks and benefits of that?

A. I did.

Q. Was Ms. Wagoner able to give informed consent about that?

A. She was.

Q. Okay. And did you have a discussion even on that first visit about surgery?

A. Not that I recollect.

Q. Okay. So when you first saw Ms. Wagoner, you started her on hormone therapy at the first visit?

A. That's correct.

Q. And is that consistent with current guidelines on how to assist a person with gender dysphoria?

A. Yes.

Q. Okay. Now when Ms. Wagoner came to see you, how was it she

came to you?  Did she call you, did someone from the prison call you?  Do you know how she came to be your patient?

A.  Yes.  I was contacted by, I believe it was the medical director of the department of corrections at the time, Dr. Robert Lawrence, I believe, and he asked if I would see Emalee for gender-affirming care.

Q.  Okay.  All right.  Now would you -- let's turn to page 140 from Plaintiff's Exhibit 1057.  If I could have 140, please. Can that be brought up for me a little bit.

Okay.  Looking at page 140, do you recognize what this document reflects?  It's some type of order from -- or to J. Cronin.  What is that about?

A.  I -- I don't know.  I did not -- I don't know what this document is.  I didn't see it as part of my regular care of her.

Q.  After you -- when you started working with Ms. Wagoner, she was incarcerated.  Right?

A.  Correct.

Q.  So you gave her her first dose of hormone therapy.  Right?

A.  I recommended it and then --

Q.  Okay.

A.  Yeah.

Q.  And then did -- were there arrangements made so that folks at the Goose Creek facility could administer the hormone therapy?

UNITED STATES DISTRICT COURT

**2-ER-0224**

A.  Orders were faxed over.

Q.  Okay.  All right.  So let's look now at Plaintiff's Exhibit 1057.  Page 128 and there's a reference to Quest and Quest Diagnostics.  Why are there references to Quest diagnostics and lipid panels and things like that, Doctor?

A.  I've sent over the labs that I requested be done, and then after that, it was up to the department of corrections for how they were collected and where they were sent.

Q.  Okay.  And why is it important to have lab work if you're receiving hormone therapy?

A.  Well, you want to make sure you're monitoring hormone levels and then watching for any potential adverse effects.

Q.  Okay.  Now I'd like to turn to Plaintiff's Exhibit 1061 briefly.

        Dr. Samuelson, when you started working with Ms. Wagoner, did anyone from the Goose Creek facility tell you that -- the request about hormone therapy was going to go through something called a MAC Committee.  Did you hear anything about that?

A.  No.

Q.  Okay.  Have you ever seen this document before?

        MR. GERLACH:  Counsel, just to be clear on this one, that was not part of her chart.  She does not have that exhibit in front of her.  If you want to share your screen --

        MS. KERR:  That's fine.  If she has not seen it, if

she could verify she's not seen it, that's fine.

THE WITNESS: I have not seen it.

BY MS. KERR:

Q. Okay. Thank you.

Would you please turn to defendant's -- well, lost my note. Defendant's Exhibit 2085.

Dr. Samuelson, do you recognize this as a letter from Ms. Wagoner to you?

A. Yes.

Q. Okay. And in this letter, she talks about some of her care and she notes in, I believe, it is the third paragraph if you can go down to the third paragraph. No. Next one. There you go. Okay.

So did you read this paragraph about what she was trying to do with the razor in 2016?

A. Yes.

Q. Okay. And did you have any reason to believe that was incorrect what Ms. Wagoner was telling you?

A. No.

Q. Okay. Now let's also look at Plaintiff's Exhibit again, 1057. Page 123. Okay.

Dr. Samuelson, do you recognize this as a date of service with Ms. Wagoner on January 5th, 2023?

A. Sorry. I'm getting to the page. What page number again?

Q. It should be page 123?

169

A. Okay. Sorry. What was the question?

Q. The question is just did you recognize this as another date of service you had with Ms. Wagoner?

A. Yes.

Q. Okay. I wanted to focus on the second paragraph where it says she reports -- okay, Ms. Wagoner, according to this note -- this is a note you made, right, these are notes from your visit with her?

A. Correct.

Q. So Ms. Wagoner reported to you her testicles were swollen constantly with pain up to the abdomen. Do you see that?

A. Yes.

Q. Now, as the doctor who is providing HRT, did you do anything to assist with regard to the pain, that type of thing?

A. No, I didn't.

Q. Okay. And further down, I think it's like the second or third paragraph from the bottom. Okay. There we go. Ms. Wagoner is reporting at this time in January of '23 that she is having trouble with the injections. Are these injections for the hormone therapy?

A. Yes.

Q. Okay. And what was she explaining?

A. She was explaining that -- from what I'm reading here in my notes -- was that she preferred to have her injections done with an 18 gauge needle because she felt the smaller ones made

her bleed more.

Q. Okay. And did you suggest that to the prison then?

A. I don't recall.

Q. Okay. No worries.

THE COURT: Ms. Kerr, sorry to interrupt you. We've been going for two hours. My inclination would be to press for 4:00, but if anybody is in need of a comfort break, that's not a problem. Plaintiffs, do we need a break? We're okay.

Defendants, we're good? We're good. How about our custody officers? We're both okay. We're good. So we'll press.

Thank you, all. Appreciate it. We got another hour.

MS. KERR: Thank you, Judge.

BY MS. KERR:

Q. Would you go onto the next page 124 and keep going further down. It's a section called assessment and plan. Must be the next page. Sorry. There you go?

Assessment and plan. So there's a reference under this section called assessment and plan. And there's a reference to level of estradiol. Can you explain why it's important to have that information. Why do you check the levels?

A. Well, the -- we check the levels to make sure that the levels are not too high or too low, and, in this case, they were way too high.

UNITED STATES DISTRICT COURT

Q. So then what did you do?

A. So let's see. I wanted to recheck and then the plan was to lower the estradiol level and then recheck again in three months.

Q. Okay. Very good. Excuse me.

Under the next section which says overview, there's a reference to following with urology. It says follows with urology. Was that Alaska Urology?

A. I'm not certain.

Q. Okay. Did you ever -- do you recall trying to get notes or information from Alaska urology?

A. I believe that a release of information and a request for records was sent, and I -- I am not sure. I don't believe I've ever seen any records from a urologist.

Q. Okay. Fair enough. Now would you turn to an office visit at page 114 of Plaintiff's Exhibit 1047. Appears to be a date of service of 4-11-2023. If you could look at the page 116. Okay. Under the assessment and plan would you take a moment and look at this, Dr. Samuelson, then I have a question about it. Just let me know when you're ready.

A. Okay.

Q. Okay. So this was another visit you had with Ms. Wagoner in April of 2023. Right?

A. Correct.

Q. Okay. And the second paragraph you state the patient has

UNITED STATES DISTRICT COURT

**2-ER-0229**

clear, persistent, and severe genital dysphoria. Can you help explain to the Court when you say severe genital dysphoria. What does that mean?

A. That means when a patient has -- that they're -- their genitals are not matching up with their gender identity and that is causing a lot of distress.

Q. Okay. When you say that's causing her a lot of distress, what do you mean?

A. So she -- so psychologically she I think felt distressed by this. And then, physically, I think she felt uncomfortable.

Q. Okay. Now there's a reference that says third line down on that second paragraph. It says penis continues to be mutilated, is not functional. Do you see that part?

A. Yes.

Q. Can you just read for the Court where it starts with her penis.

A. Her penis continues to be mutilated, is not functional for sexual purposes and makes urination and hygiene.

Q. Okay.

A. That's where it ended. Clearly I think I meant to put something else in there.

Q. Okay. And then you make a recommendation in this statement. Can you just find the part that says due to the severe dysphoria and read for the Court what you were recommending on April 11th, 2023?

UNITED STATES DISTRICT COURT

**2-ER-0230**

A.  Due to the severe dysphoria, I am recommending that the patient undergo a gender-affirming bottom surgery that includes orchiectomy and creation of a neovagina and may include other procedures as indicated.  Do you want me to keep going?

Q.  Sure.

A.  I do not specialize in gender-affirming surgery.  I am unable to recommend a specific surgery.  I know the logistics for surgery would be significant and I am making this recommendation based on the best interest of the patient knowing that logistically it may not be possible for the surgery to be completed while institutionalized.

It is likely that gender-affirming bottom surgery will greatly decrease the -- likely not eliminate -- her genital dysphoria.  It is likely with the decrease in genital dysphoria she will have great improvement in her ability to function in her current environment and society.  It is unclear what the repercussions would be without a gender-affirming surgery.  It is possible that her mental health in general will significantly decline without surgery.

Q.  Now this was in April of 2023.  Correct?

A.  Correct.

Q.  And did you continue to see Ms. Wagoner on a regular basis from April of 2023 until currently?

A.  Yes.

Q.  And so you've been her treating physician this whole time

UNITED STATES DISTRICT COURT

from July, 2022 until today?

A. Correct.

Q. And I want to direct you to an office visit at Plaintiff's 1057 page 20. And this should be a visit for February 13th, 2025. Is that correct?

A. Yes.

Q. Okay. And so it's May. Was February of this year the last time you saw Ms. Wagoner?

A. Yes. That's correct.

Q. And if you would turn to page 23 of Plaintiff's 1057. And looking under assessment and plan, keep going down. Keep going down. Okay. Assessment and plan. There you go. Would you take a moment and look at the section under assessment and plan and then I have a question for you.

A. All right.

Q. Okay. Would you read for the Court what you indicated in your latest note regarding Ms. Wagoner's needs under assessment and plan?

A. I continue to recommend a gender-affirming genital surgery for the patient as noted in the 10-28-24, 6-18-24, 1-25-24, and 4-11-23 chart notes. Patient continues to have significant genital dysphoria. Her genital disfigurement needs to be corrected due to pain, current UTI -- urinary tract infections -- and dysphoria. It really would be -- it really would be counter productive to repair the penis and I continue

to advocate for her to have gender-affirming bottom surgery that remedies her genital injury and affirms her female gender. Her physical and mental health would significantly benefit from not having disfigured genitals and have genitals that align with her gender.

Q. Then you go on to say you sent a note to DOC. Can you read about that?

A. I sent a note to the DOC noting that, quote, due to chronic healing genital mutilation, patient is at risk for urinary tract infections. She requires a way to clean her genitals. She needs either disposable wipes or a supply of five wash cloths that can be laundered, and an irrigation bottle so she can irrigate the genitals with tap water, end quote.

She notes that she has told her DOC medical provider about this need and has not been provided with a way to clean her genitals.

Q. Okay. So you continue to recommend a gender-affirming surgery for Ms. Wagoner. Right?

A. Correct.

Q. And then, in addition, she was having difficulty with urinary tract infections?

A. Correct.

Q. How important is it for someone to have a way to keep themselves clean when they're in Ms. Wagoner's situation?

A. It is important.

UNITED STATES DISTRICT COURT

**2-ER-0233**

THE COURT: I'm sorry. Hang on one second. Everybody talks to me.

MR. SAENZ: I have an --

THE COURT: Go ahead. So state your name and then restate your objection.

MS. MICHALETZ: Hi, Dr. Samuelson. My name is Mara Michaletz. I represent the defendants. All I asked was I stated an objection to form so that Ms. Kerr can provide more detail for us.

THE COURT: And Ms. Kerr is going to rephrase her question.

MR. SAENZ: Yes. Thank you, Judge

BY MS. KERR:

Q. Dr. Samuelson, what importance was it for Ms. Wagoner to have a way to clean her genitals?

A. It was -- it is important for her to have a way to clean her genitals.

Q. And why so?

A. Well, I think it's important for anyone but particularly for her because she has the disfigurement of her genitals that makes it -- her more susceptible for infections and irritation.

Q. And is it consistent with adequate medical care to have a way for Ms. Wagoner to clean her genitals?

A. Yes.

Q. Now, you've recommended this surgery. Did you ever hear

UNITED STATES DISTRICT COURT

**2-ER-0234**

from Ms. Wagoner as to whether the DOC had approved or not approved surgery?

A. I don't know exactly about what the process was. All I know is that the surgery, it -- there was no plan to proceed down the path towards surgery.

Q. Okay. And now if -- if Ms. Wagoner has surgery, would she still need to continue to receive hormone care?

A. Yes.

Q. And why so?

A. The surgery is a change to the -- to the genitals but -- and -- and would remove, possibly if the testes were removed, the production of testosterone. But she would still need estrogen medicine -- therapy.

Q. Okay. Do you have any concern that Ms. Wagoner cannot understand the pluses and minuses of gender-affirming surgery?

A. I think she can understand.

Q. Okay. And in your nearly three years of working with Ms. Wagoner, have you found her a reliable reporter about her medical care?

A. Yes, I have.

Q. Okay. And if she -- if you ask her questions about her medical care, is she able to answer them?

A. Yes.

Q. Okay. And as a doctor, in your experience -- let me back up. So you made these recommendations about surgery. As a

178

doctor, is it common for you to make referrals for surgery or surgical consult?

A. Yes.

Q. Is that something that doctors traditionally do?

A. Yes.

Q. And as a doctor, based on your experience, when you make a recommendation for a referral, typically, do -- does the entity responsible, you know, pick up on that and get the referral done?

A. I'm not sure I understand the question.

Q. Let me restate it. Do you think it's unusual for -- do you think that it's adequate medical care for the prison to ignore your recommendation?

A. Well, I -- you know, it's my job to make the recommendation and then that's really what I can do in my position is make the recommendation to the best of my medical ability, and then it -- it goes from -- it goes -- it's out of my hands from there.

Q. Okay. Has anyone from the prison or the department of corrections contacted you and told you why they won't follow your recommendation?

A. No.

Q. Okay. All right. I don't think I have any other questions but don't run off yet because opposing counsel may have some questions. Okay.

THE COURT: All right. Defendant's cross examination.

UNITED STATES DISTRICT COURT

**2-ER-0236**

MS. MICHALETZ: Thank you, Your Honor. I do have questions for cross. I want to -- logistically, I can stand up there, I can stay here. What's best for Dr. Samuelson?

THE COURT: Dr. Samuelson, are you able to see counsel if she remains at counsel table there?

THE WITNESS: I don't believe I can see her.

THE COURT: If you don't mind to step up to the podium. Or you can fix the camera. We'll adjust the camera. Would you rather stay --

MS. MICHALETZ: I don't have a preference.

THE COURT: If it's all the same to you, step up to the podium. We have something that works. Let's stick with it. All right.

CROSS-EXAMINATION BY MS. MICHALETZ:

Q. All right. Good afternoon, Dr. Samuelson?

A. Good afternoon.

Q. As I stated, my name is Mara Michaletz. I represent the defendants who are four employees of the department of corrections. And just before I start going through some of these appointments with you, how did you come to work with Ms. Wagoner?

A. I received a call from Dr. Robert Lawrence asking if I would see Emalee for gender-affirming care.

Q. All right. And what did you understand was the scope of the services and the consultation?

A.   It was my understanding it was care just pertaining to gender-affirming care.

Q.   Thank you.  I just want to go back to the first appointment that you had with Ms. Wagoner.  And, Dr. Samuelson, when you were looking at the records, were you looking at a physical copy, or would it be helpful if we throw them on the screen again?

A.   I have a physical copy.

Q.   Okay.  That's probably the most efficient way.

     But for a couple references, I think I heard you say that you don't recall discussing surgical options at that first meeting.  Is that -- is that correct?

A.   That's correct.

Q.   Okay.  Did Ms. Wagoner say anything to you in terms of that request?

A.   I don't recall.

Q.   I noticed that -- I don't see any mention of testicular pain in this first record.  Would you have noticed that if Ms. Wagoner would have mentioned that?

A.   I -- I -- typically, if a patient notes something, I put it in the notes.  So -- but I can't say for certain.

Q.   There's a note here that said when asked about Bupropion -- that's Wellbutrin; am I correct -- she denies any depression or anxiety and said she was put on this for -- as a treatment for gender dysphoria.  Are these two things mutually exclusive?

181

A. I don't totally understand the question. But Wellbutrin is not a treatment for gender dysphoria.

Q. Let's go to page 152 of that exhibit. This was an actual physical visit. Am I correct, Dr. Samuelson? All right. I note here it says genital, penis is splayed open from near the base to the glans. There is no discharge or exudate, well healed. Did you physically see Ms. Wagoner's penis in this visit?

A. I did.

Q. Now I look down here at a assessment and plan under the next section and it said went over the consent for feminizing hormones in detail. I think that's consistent with your previous testimony. She has risk factors of obesity, hyperlipidemia. But then I go to the last sentence right here and it says will discuss bottoms and tops surgery more in the future.

So did you or did you not discuss surgery or the option of surgery at that first meeting?

A. Well it sounds like she mentioned that she was interested in bottom surgery because, from the overview I write, desires hormones as well as bottom surgery, but I don't believe I discussed that with her.

Q. So then after this initial visit, I assume you did screening for the indicators that you just discussed at that assessment, did some lab work. Is that correct?

UNITED STATES DISTRICT COURT

**2-ER-0239**

A. Correct.

Q. Okay. Can you turn to page 149 of the Exhibit. And I'm looking about one-third up from the bottom of the page. Do you see your result note there?

A. I do.

Q. Okay. I read that it says estrogen is low as expected and testosterone is mildly low for male at birth. Let's stop there. You didn't see any significant results for the testosterone?

A. No.

Q. Then it says testosterone was mildly low for male at birth but far too high for transgender female. Is it your opinion that every transgender individual should have hormone levels consistent with their gender identity?

A. No. It's individualized by the patient.

Q. Okay. So would you agree with me that every gender dysphoric person may not benefit from hormone therapy?

A. Yeah. Some -- some may not.

Q. And would you agree with me that hormone therapy is not medically necessary for every gender dysphoric person?

A. Yes. I would agree that for some -- yes, I agree.

Q. Okay. Would you agree with me that a gender dysphoric patient may have their dysphoria controlled in other ways besides hormones and surgery?

A. That is possible.

Q. Okay. So how did you decide that hormone therapy was appropriate for Ms. Wagoner?

A. Well, she expressed that she had -- and I diagnosed that she had gender dysphoria, and we talked about the changes that could occur with feminizing hormone therapy. And the patient, Emalee, agreed that these would be desirable for her and consistent with her gender identity. And after reviewing the risks and benefits, I decided to proceed with the estrogen therapy.

Q. Now, I think I heard Ms. Kerr ask you if your care was consistent with guidelines on gender dysphoria and you answered yes. Is that correct?

A. I believe so.

Q. What are the guidelines on gender dysphoria?

A. In regards to hormone therapy or --

Q. I -- my question is just where you get your guidelines on how to treat patients with gender dysphoria?

A. Okay. The guidelines that I reference are from the WPATH and also I often reference a John Hopkins gender-affirming guideline website as well as the UCSF guidelines.

Q. What version of WPATH guidelines are you using?

A. Well, that WPATH isn't my primary source for the guidelines but the most recent one.

Q. So now let's turn to page 141 of the Exhibit 1057. For the record, I think we lost Dr. Samuelson's feed. There we go.

UNITED STATES DISTRICT COURT

So this appeared to be a list of requirements from DOC. Would you agree with that, Dr. Samuelson?

A. Yes. This is something that I don't think I reviewed while caring for Emalee but it does appear to be that.

Q. Okay. Do you treat any other offenders in custody?

A. A few.

Q. Not asking for names obviously but you do?

A. Yeah.

Q. Can you approximate how many?

A. Somewhere in two or three.

Q. Okay. One of the guidelines here says do not ask offenders about their crimes. Have you ever asked any offender that you're treating about their crimes?

A. No.

Q. So you don't know anything about the nature of Ms. Wagoner's crimes?

A. I do not.

MR. GROSS: Objection. Relevance.

THE COURT: What is the relevance?

MS. MICHALETZ: I'm going to go into that because my next question is do you know anything about her mental health disorder diagnosis.

THE COURT: Okay. So, at this point, I will overrule the objection but go ahead and connect it up as soon as possible.

UNITED STATES DISTRICT COURT

**2-ER-0242**

MS. MICHALETZ: Right.

BY MS. MICHALETZ:

Q. I heard no. But my next question then is do you know anything about her mental health disorder diagnosis, Dr. Samuelson?

A. I do not know much about that.

Q. Do you know the fact that they include that she has borderline and antisocial personality disorders?

THE COURT: Be sure you speak in the microphone. There's one right there you can speak into. Go ahead and identify yourself for the record.

MS. KERR: Sonja Kerr for plaintiffs. I was objecting on the basis of relevance and foundation because the question presumes a period of time that has not been defined and we've already heard that there's periods of time where there was no diagnosis of this personality disorder.

THE COURT: Okay. So I guess we need to establish that the diagnosis preceded Dr. Samuelson's observation of her. So if you can lay further foundation about the time frame of the diagnosis, and -- I also heard -- pardon me. I also heard a renewed objection as to relevance. And, again, I'll overrule that objection but subject to connection so as soon as you can.

Go ahead and connect that up. And if it's not connected, I'll be happy to entertain that objection. Again, go ahead, ma'am.

UNITED STATES DISTRICT COURT

MS. MICHALETZ: Thank you, Your Honor. And I think I can make my point a simpler way

BY MS. MICHALETZ:

Q. Dr. Samuelson, when you were evaluating Ms. Wagoner to determine her -- the extent to which you were evaluating her gender dysphoria, did you ask for any information about any mental health disorders she may have been suffering from or --

A. I asked the patient but not the department of corrections.

Q. I think I'm going to fast forward to the April 11th note Ms. Kerr discussed with you. In discussing your narrative, you said that the question was you've come to the conclusion that Ms. Wagoner has severe gender dysphoria. Correct?

A. That is correct.

Q. And that's based in part on the fact that psychologically she feels distressed by this?

A. Correct.

Q. Are you qualified to opine on what she has been psychologically distressed by?

A. Well, I'm not an expert, but as a family medicine provider, I, you know, deal with and treat psychological disorders as well.

Q. In evaluating Ms. Wagoner about her distress, did you evaluate or seek any outside information aside from what she was telling you?

A. In terms of her psychological state?

Q.  No.  I guess in terms of the information that she was giving to you during her visits?

MR. GERLACH:  Pardon me.  This is Scott Gerlach.  I'll just object to the form.

THE COURT:  All right.  What's objectionable about the form?

MR. GERLACH:  It's vague.  She can restate the question.  I'm not sure what she's asking the witness.

BY MS. MICHALETZ:

Q.  I did hear the testimony that when you were asked whether or not Ms. Wagoner was a reliable reporter regarding her medical care you said yes.  Do you stand by that answer?

A.  I -- yeah.  I -- I think so. You know, everybody interprets their history differently so it's hard to know for certain for anybody.

Q.  Are there things as a provider you can do to follow up to ensure that what you're hearing from your patient is reliable?

A.  Yes.

Q.  Like what?

A.  Well, we can collect outside records.

Q.  Did you do that in this case?

A.  I -- no.  No, I did not.

Q.  Then on page 116 of the exhibit.  And this is -- this is a note from April of '23.  Are you there?

A.  Yes.

Q. Okay. So the first question is -- or the first sentence of the narrative here under assessment and plan says persistent gender dysphoria. Are the terms persistent and severe medical terms of art?

A. I'm sorry. Can you repeat the question.

Q. Sure. Are the terms clear, persistent and severe medical terms of art when you describe the level of gender dysphoria someone is experiencing?

A. They are descriptors but not separate diagnose.

Q. Okay. The second sentence says this dysphoria is so distressing to the patient that in the past she attempted to make her own neovagina by self mutilating her penis. Where do you get this information, Dr. Samuelson?

A. From the patient.

Q. Okay. In the third sentence, her penis continues to be mutilated, is not functional for sexual purposes and makes urination and hygiene -- and then we acknowledge there's a word left off. Where did you get this information?

A. This is from the patient.

Q. Then it says down here -- I mean, I think we talked about the severe dysphoria. We have that covered.

As I do not specialize in gender-affirming surgery, I am unable to make -- to recommend a specific surgery. I know that the logistics for surgery would be significant and I'm making this recommendation on the best interest of the patient.

UNITED STATES DISTRICT COURT

**2-ER-0246**

What does that mean, the term best interest? Is this a term that you typically use?

A. What I mean by that is that this is an -- undergoing a procedure for gender-affirming genital surgery I thought would be beneficial for the patient.

Q. Okay. Would it be medically necessary for the patient? Do those words mean anything to you?

A. Yes. Medically necessity is a term we often use or sometimes used in -- usually in relation to insurance coverage, but, yes.

Q. So is beneficial and necessary the same to you, medically necessary the same to you, those two descriptors?

A. Those are different.

Q. So what does best interest mean?

A. Well, I -- I can just rephrase that. I think that it was in the patient's medical -- it would improve her health by having this procedure.

Q. But then you end the sentence saying knowing that logistically it may not be possible for the surgery to be completed while institutionalized. When you wrote this note, were you expecting that this note would result in surgery for Ms. Wagoner while she was institutionalized?

A. I did not know one way or the other.

Q. Dr. Samuelson, have you been to Goose Creek ever?

A. No.

UNITED STATES DISTRICT COURT

**2-ER-0247**

190

Q. Are you familiar with Ms. Wagoner's activities and interests there?

A. No.

Q. It sounds like you haven't reviewed, like, for instance, the Alaska Urology records. Have you reviewed Ms. Wagoner's correctional records?

A. No.

Q. Has she talked to you about any of the jobs that she's had and taken pride in?

A. I know that she had -- had or has a job, but I don't know what it is.

Q. Right. Have you ever -- I mean, these records are kind of replete with discussion of discharge. Have you ever yourself observed discharge relating to Ms. Wagoner's penis in relation to an inspection of her genitals?

A. No.

Q. Have you ever seen any evidence of UTI in relation to your inspection of her genitals?

A. Well, a UTI can't be diagnosed on inspection of the genitals.

Q. Okay. But it seems like you agree she's had UTIs?

A. That is what she -- she relayed to me.

Q. So your belief she experiences UTIs is based on things that she's telling you?

A. Yes.

UNITED STATES DISTRICT COURT

Q. Okay. Let's go to page 80, Dr. Samuelson.

Now this is an office visit from October of 2023. Do you agree?

A. Yes.

Q. Okay. And I'm looking at the narrative under assessment and pain. And you acknowledge you're acting as a consultant for DOC for gender-affirming care only. Long time gender dysphoria since early childhood. Where did you get that information, Dr. Samuelson?

A. From the patient.

Q. All right. So it seems like this is good news in the second paragraph that she reports she has had good feminizing changes with the estrogen. She reports her skin is softer and moodiness has improved somewhat. Is the moodiness something that she has been discussing with you along the way, Dr. Samuelson?

A. She did note that in the beginning of the treatment with estrogen that she had difficulty with mood.

Q. So then the paragraph says she has concerns that her pain is not being controlled with Meloxicam for the genital mutilation injury. She reports she stopped taking the Meloxicam for this for concerns regarding long-term safety of this medication.

Have you spoken with her about taking pain medication as a sort of an element of her comprehensive treatment?

A. No.

Q. The third paragraph after assessment and plan it says I continue to recommend that it would be in the best interest of the patient to have gender-affirming bottom surgery due to the very significant gender dysphoria that is present. And that this surgery would be very affirming to the patient and likely improve mental health. Why did you write that?

A. Because that's what I continued to believe.

Q. All right. And then the last sentence here says I also continue to understand that this would be very difficult to accomplish while incarcerated. Is that indicative of your belief that it wasn't likely to happen while she was incarcerated?

A. Once again, I don't know. I was just acknowledging the logistical difficulties.

Q. So some of these visits I'm seeing are video -- by video and some of them are in person. Am I correct on that?

A. That is correct.

Q. Okay. And when you're meeting with Wagoner during these, I think they're probably like quarterly visits. What do you discuss at each visit?

A. So we start out by asking her how she's feeling in terms of her gender-affirming care. We discuss lab results. Any possible side effects. Then we discuss what the ongoing treatment plan will be.

UNITED STATES DISTRICT COURT

Q. Are you discussing, specifically, depression and anxiety?

A. No.

Q. Why not?

A. Because my role in this -- in the treatment plan is regarding gender-affirming care.

Q. So you see your role as sort of the medical part of the evaluation of the gender dysphoria?

A. Yes.

Q. And so you would defer to another provider for the mental health part. Is that correct?

A. Yes.

Q. So what, if anything, did you do when Ms. Wagoner was referred to you to ensure that she was actually experiencing gender dysphoria?

A. What did I do to -- sorry. Can you please repeat the question.

Q. What, if anything, did you do when Ms. Wagoner first came into your care to ensure that she was experiencing gender dysphoria, that your care and treatment will be accurate for a condition she actually had?

A. Well, I -- the patient was referred to me for gender-affirming care and then the rest of the history is based on the patient's experience and that's the same as it is with any patient.

Q. Do you have patients that are better on hormone therapy

UNITED STATES DISTRICT COURT

alone that aren't going to require a step up to surgery, in your opinion?

A. Yes. And it is mainly based on the -- you know, the preference or the desires of the patient, if they want gender-affirming bottom surgery or not.

Q. I want to make sure I understand you completely. Your determination of whether somebody would benefit from surgery is based on their perception of whether they would benefit from surgery?

A. Well, it is -- you know, some people have gender dysphoria without genital dysphoria. And so there -- the presence of their genitals that don't conform with their gender identity is not distressing for them, and, for some people, it's very distressing. And so it is based on the -- the distress of the patient that has with their genitals.

Q. Have you ever consulted with a patient who has requested surgery and not referred them to surgery?

A. The -- this has happened if I did not feel like the patient was medically fit for surgery for some other reason.

Q. All right. At one point Ms. Wagoner says that -- excuse me -- that she sees a tie between her tongue and gum pain that she thinks is because her estrogen levels are too low. Did you give any credence to that theory at all?

A. That's not a common side effect but patients do experience a variety of things. You know, everybody is a little bit

UNITED STATES DISTRICT COURT

195

different in their experience so I took it at her word there.

Q. Does anyone at your clinic provide any psychotherapy or mental health care?

A. Yes.

Q. Have you consulted with any of them on this case?

A. No.

Q. Do you know any surgeons licensed in Alaska who provide vaginoplasty for gender-affirming care, Dr. Samuelson?

A. No.

Q. So this is a surgery that would need to be treated outside. Is that your understanding?

A. That is correct.

Q. Okay. Have you ever performed -- I assume the answer is you're not a surgeon. Right?

A. I am not a surgeon.

Q. So you haven't performed a vaginoplasty. Have you been involved in or, you know, as a resident, been involved in a vaginoplasty?

A. No.

Q. Have you discussed the risks of vaginoplasty with Ms. Wagoner?

A. I have discussed the risks in a vague way, but it is up to a surgeon to discuss the risks and benefits of surgery.

Q. But you believe that Ms. Wagoner is capable of conveying confirmed consent I think is what I heard?

A.  Correct.

Q.  In March, did you submit a letter to the Alaska State Legislature -- Legislature urging it to oppose the Alaska State Medical Board's request for litigation relating to gender-affirming care to minors?

MS. KERR:  Objection.  Relevance.  This is a treating physician, not an expert.

THE COURT:  What is the relevance of a letter?

MS. MICHALETZ:  One, I think it goes to potential bias here, Your Honor.  But two, in the letter, if I might question Dr. Samuelson further, she also acknowledged that despite her opinion, she did not have the training to provide gender-affirming care to minors.

THE COURT:  Okay.

MS. KERR:  Again, relevance.  It's not a minor.

THE COURT:  Yeah.  I'm -- she may not have the expertise for training to provide gender-affirming care to minors.  Ms. Wagoner is not a minor.  You can ask her if she provided a letter.  How that's reflective of bias is -- it's not apparent to me but you can ask if she submitted a letter.

MS. MICHALETZ:  Let me back up.

THE COURT:  Sure.

MS. MICHALETZ:  Dr. Samuelson, do you acknowledge you do not have the training to provide gender affirming care to minors?

UNITED STATES DISTRICT COURT

**2-ER-0254**

MS. KERR:  Objection.  Relevance again.

THE COURT:  She can ask the question.  I don't see it as relevant but we can take the answer.  It's fine.  Go ahead and answer, ma'am.

THE WITNESS:  I do not do gender-affirming care for minors.

MS. MICHALETZ:  Notwithstanding, did you submit a letter to the Alaska State Legislature relating to gender-affirming care to minors and state an opinion regarding that?

MR. GERLACH:  Your Honor, this is Scott Gerlach.  Again, I'm going to also have an objection on this as far as relevance.  This has nothing to do with, you know, gender-affirming care for pediatric patients, and I think this is getting into the area of potential sideshow distraction.

THE COURT:  I am inclined to agree.  I'm not sure what the relevance is.  If you want to lay further foundation, I'm happy to hear it.

MS. MICHALETZ:  There are other ways to get this information in, Your Honor, if we need to down the line.

THE COURT:  All right.  The objection is sustained.

MS. MICHALETZ:  Great.  I don't have anything further.

THE COURT:  All right.  Thank you very much.

Ms. Kerr, you got about eight minutes for redirect.

MS. KERR:  I'll make it quick, Your Honor.

UNITED STATES DISTRICT COURT

**2-ER-0255**

198

THE COURT: Famous last words.

REDIRECT EXAMINATION BY MS. KERR:

Q. Dr. Samuelson -- and for the court reporter, I'm Sonja Kerr.

First of all, Dr. Samuelson, do you know if your records go to the department of corrections since they asked you to become involved in the case? In other words, do they routinely go to the department as far as you know?

A. I am not entirely sure.

Q. Okay. And did you have to know if -- did you have to know if a patient has committed a crime to know how to treat their gender dysphoria?

A. No.

Q. And would you treat any patient differently if they had committed a crime?

A. I don't believe so.

Q. Okay. And for Ms. Wagoner, is there any other option besides surgery that will treat her genital dysphoria?

A. I do not believe that there is.

Q. Okay. And you mentioned that Dr. Lawrence had contacted you. Do you recall sitting here today, what, if anything, he told you about Emalee's gender dysphoria?

A. I only recall that he said she had gender dysphoria and that she had done something to her -- to her penis at some point.

UNITED STATES DISTRICT COURT

2-ER-0256

Q. So when you made the determination to treat her for gender dysphoria at that first visit, you had not only Ms. Wagoner's statement that she had gender dysphoria, you had the indication from the Department of Corrections Chief Medical Officer Dr. Lawrence. Right?

A. I believe that's correct but I don't remember specifically if he said for -- a referral to me for -- to -- for gender-affirming care or if she said she has gender dysphoria. I don't recall that exact verbiage.

Q. Okay. But in any event, you understood she was coming to you from the department of corrections to look into the gender dysphoria situation. Right?

A. Correct.

Q. Okay. And with regard to care for Ms. Wagoner outside of the -- Alaska, how common is it that individuals in Alaska for many types of care have to go outside of Alaska for that care?

A. It is not uncommon if the care is not available here in Alaska, then the patient will need to travel.

Q. Okay. Thank you. No other questions then. I do appreciate your time.

THE COURT: All right. Thank you, Ms. Kerr.

Will there be recross? All right. Any reason this witness cannot be excused, Ms. Kerr?

MS. KERR: Yes. And thank you.

THE COURT: All right. Dr. Samuelson, thank you so

UNITED STATES DISTRICT COURT

**2-ER-0257**

much for your time. You can go ahead and disconnect. All right. Anything for the record before we break for the day from the plaintiffs?

MR. GROSS: No, Your Honor. Thank you.

THE COURT: All right. From the defendants?

MS. MICHALETZ: Okay.

THE COURT: Okay. We'll start with Dr. Ettner tomorrow morning. Is that the plan? We got a plan. All right.

MS. MICHALETZ: That's 9:00 tomorrow?

THE COURT: 9:00 tomorrow morning. All right. Thank you all very much. We are adjourned for the day.

COURTROOM DEPUTY: All rise. This matter is in recess until May 13th, 2025 at 9:00 a.m.

(The record was concluded at this point at 4:55 p.m.)

---oOo---

UNITED STATES DISTRICT COURT

**C E R T I F I C A T E**

I, ANDREA K. BLUEDORN, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED this 13th day of May, 2025.

/s/ Andrea K. Bluedorn
Andrea K. Bluedorn, RMR, CRR

UNITED STATES DISTRICT COURT

**2-ER-0259**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

_____

| | |
|---|---|
| **Emalee Wagoner,** )<br> ) No. 3:18-cv-00211-MMS<br>    Plaintiff, )<br> )<br>    vs. )<br> ) Anchorage, Alaska<br> **Nancy Dahlstrom, et al.,** ) May 13, 2025<br> ) 9:06 a.m.<br>    Defendants. )<br> )  **(AMENDED)** | |

**BEFORE:  THE HONORABLE MATTHEW M. SCOBLE, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**VIA HYBRID ZOOM VIDEOCONFERENCE**

**BENCH TRIAL – DAY 2**

**(A.M. SESSION)**

**(Pages 202-285)**

Official Court Reporter:
**Andrea K. Bluedorn, RMR, CRR (By Zoom Videoconference)**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona 85003-2151
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**2-ER-0260**

**A P P E A R A N C E S**

For the Plaintiff:
    LAMBDA LEGAL DEFENSE AND EDUCATION FUND
    By:  **Richard Saenz, Esq.**
         **Morgan Walker, Esq.**
    120 Wall Street, 19th Floor
    New York, NY 10005-3919

For the Plaintiff:
    LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
    By:  **Sasha Buchert, Esq.**
    815 16th Street NW, Ste 4140
    Washington, DC 20006

For the Plaintiff:
    LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
    By:  **Sonja D. Kerr, Esq.**
    3500 Oak Lawn Avenue, Suite 500
    Dallas, Texas 75219


For the Defendants:
    BIRCH HORTON BITTNER & CHEROT
    By:  **Mara Michaletz, Esq.**
         **David Karl Gross, Esq.**
    510 L. Street, Suite 700
    Anchorage, Alaska 99501

**I N D E X**

**WITNESSES:**                                              **PAGE:**

UNITED STATES DISTRICT COURT

**2-ER-0261**

Dr. Randi Ettner
        Cross-Examination by Mr. Gross              212
        Redirect Examination by Mr. Saenz           220
        Recross Examination by Mr. Gross            243
        Continued Redirect Examination by Mr. Saenz  247

Emalee Wagoner
        Direct Examination by Mr. Saenz             248

**EXHIBITS:**                                          **PAGE:**

311-1                                                  211

2084- Records at ESI000587  ESI000592                  244

2086- Article: Long-Term Follow-Up of Transsexual      228
Persons Undergoing Sex Reassignment Surgery:
Cohort Study in Sweden, Cecilia Dhejne, et al., |
February 2011

2087- Article: Examining Gender-Specific Mental        231
Health Risks After Gender-Affirming Surgery:
a National Database Study, Joshua Lewis, et al.,
January 25, 2025

2089- Article: Association Between Gender-Affirming     240
Surgeries and Mental Health Outcomes, Anthony Almazan,
et al., April 28, 2021

UNITED STATES DISTRICT COURT

**P R O C E E D I N G S**

COURTROOM DEPUTY:  Your Honor, we're on the record in case number 3:18-cv-211.  Wagoner versus Nancy Dahlstrom, et al.

Counsel, identify yourselves for the record.

MR. SAENZ:  Good morning, Your Honor.  Richard Saenz, Lambda Legal, for Ms. Wagoner.

MS. WALKER:  Yes, Your Honor.  Good morning.  Morgan Walker for the plaintiff, who is seated to my left in custody.

MS. BUCHERT:  Good morning, Your Honor.  Sasha Buchert for the plaintiff.

MS. KERR:  Good morning.  Sonja Kerr for the plaintiff.

MS. MICHALETZ:  Good morning, Your Honor.  Mara Michaletz, David Gross, Mackenzie Milliken for the defendants.

THE COURT:  All right.  Good morning, everyone.  Let's see.  Pardon me.  Some housekeeping matters -- and I'm sorry.

Good morning, madam court reporter as well.

Some housekeeping matters.  I have a document here captioned update on exhibits from counsel, and I believe this is from the plaintiffs.  Do I have that right?

MS. KERR:  Yes, Your Honor.

THE COURT:  And so this is a list of additional exhibits.  And then there are some exhibits that have asterisks

and those exhibits are stipulated to.  Am I reading that right?

MS. KERR:  Yes, Your Honor.  There were some exhibits that from our original submissions were not stipulated and then we stipulated yesterday.  So if there's an asterisk it was stipulated, more or less, yesterday.

THE COURT:  Okay.  All right.  So I -- and had this -- and I'm sorry if I'm being obtuse.  Has this document been filed?

MS. KERR:  We have not filed it yet.  We weren't sure how we should do it, Your Honor.

THE COURT:  Sure.  What I would ask is that you take your original exhibit list and then add this to it and then re-file that as an amended exhibit list so we have a single document that has everything that's been stipulated to in that one master document.  Does that make sense?

MS. KERR:  Sure.  Do you want us to do that each day?  There may be other ones is what I'm thinking.

THE COURT:  Here is what I would like to do for stipulated exhibits going forward.  Go ahead and update your list as I just described, and then we have additional stipulated exhibits, I want to deal with it on the record.  Because what I don't want to have is a list and then an amended list and an amendment to the amended list and we're just not going to have a good record if we do that.

MS. KERR:  Sure.

THE COURT: So I appreciate the efficiency of stipulated things in advance. That's helpful. And I appreciate the efficiency of generating a list that subsumes a majority of the stipulated exhibits, but I would like to get that list locked in and then going forward, we'll take them up sort of as an ad hoc basis. Does that make sense to everybody? All right.

And from the defendants, I don't think -- well have -- obviously you haven't gotten in your case yet. You don't have any additional stipulated exhibits beyond what's on your list. Is that right?

MR. GROSS: Yes.

THE COURT: Okay. So the defendants' list of exhibits will remain as it is. And then going forward, if you have additional stipulated exhibits, as I said, we'll take them up as they come.

MR. GROSS: Understood.

THE COURT: Yes, ma'am.

MS. MICHALETZ: I do have one question. The parties yesterday talked about stipulating to the CVs of the experts, and I think the plaintiffs took the approach that we had sort of a number and a letter A or something like that.

THE COURT: That is correct.

MS. MICHALETZ: I guess we're looking for direction from the Court as to how it wants those additional -- to make

UNITED STATES DISTRICT COURT

our exhibits. Do you want us to update our exhibit list with those two or?

THE COURT: I want to keep this as straightforward as we can. And I think I may have done things in an unnecessarily confusing way. So if there are additional exhibits, I would just say just make it next in order. So the -- I'm looking at the defendants' list right now. It ends with 2105. There's another exhibit, make it 2106.

MS. MICHALETZ: Great.

THE COURT: Does that make sense?

MS. MICHALETZ: Yes.

THE COURT: All right. And I know I was unnecessarily difficult yesterday and I told you to make your Exhibit 1080A or whatever. Going forward, just make it next in order.

MR. SAENZ: Understood.

THE COURT: All right. I appreciate your patience as we figure this out.

One other housekeeping matter, the parties yesterday I think asked about the idea of rather than doing oral closing arguments doing written proposed findings of fact, conclusions of law, that was a mutual request.

MR. SAENZ: Yes, Your Honor.

THE COURT: I'm fine with that. And what I would propose is once we conclude evidence, the Court will order transcripts, and once those transcripts are received, I'll set

UNITED STATES DISTRICT COURT

**2-ER-0266**

a deadline for filing those post hearing -- those post-trial briefs.  You can reasonably anticipate that deadline will be about two weeks after we receive the transcripts.  And what I would propose is doing simultaneous briefing so you would both have the same deadline.

Is that agreeable, Mr. Saenz?

MR. SAENZ:  Yes, Your Honor.

THE COURT:  And from the defendants.

MS. MICHALETZ:  Yes, Your Honor.

We do have some other deadlines coming up so if I could -- I don't know how long the transcripts will take typically in a case like this in Federal Court, but I think we can generally agree to that.

THE COURT:  And, generally speaking, if we need to move the deadline a week or two to accommodate your other work, that shouldn't be a problem.

MS. MICHALETZ:  We appreciate that.

THE COURT:  Of course.  We can work with you on that.

Do the parties have a requested page limit, Mr. Saenz?

MR. SAENZ:  I'm sorry, Your Honor.

THE COURT:  I was just asking if the parties have a requested page limit for those post trial briefs.

MR. SAENZ:  Twenty-five pages, Your Honor.

THE COURT:  Twenty-five pages.

MS. MICHALETZ:  I'm not sure we thought of that, Your

Honor, quite yet but I think that will be fine.

THE COURT: It will be 25 pages. And that will be 25 pages including any exhibits. There shouldn't be a need to attach exhibits to your brief so just cite to an exhibit in the record or a portion of the transcript but 25 pages would be the limit.

All right. That I think is all the housekeeping that I have. Is there anything else the parties need to take up before we begin, Mr. Saenz?

MR. SAENZ: Thank you, Your Honor. Good morning.

I just wanted to just bring to the Court's attention what's been filed as docket number 311-1. It's stipulations of facts that were filed on Monday.

THE COURT: I'm sorry. Give me that exhibit number again.

MR. SAENZ: 311-1.

THE COURT: 311-1. Okay.

MR. SAENZ: These were filed on May 11th.

MR. GROSS: That was a Sunday. I think they were filed on May 12th.

(A discussion was held off of the record.)

THE COURT: All right. So you're flagging those for my attention.

MR. SAENZ: Just to confirm that we were talking about stipulations to the evidence and just wanted to bring it to the

Court's attention that there was stipulations of facts also reached between the parties.

THE COURT: All right. So -- let's see here. All right. I can pull that up. It's just going to take me a second.

So this is Exhibit 311-1. And you're moving to -- the parties have stipulated to that, and, Mr. Saenz, you're moving to admit that exhibit?

MR. SAENZ: If we need to move it as an exhibit or as -- as a stipulation is sufficient.

THE COURT: I would prefer to treat it as an exhibit. We can just call it Exhibit 311-1 from the plaintiffs.

MR. SAENZ: That would be fine.

THE COURT: All right.

MR. SAENZ: Thank you.

THE COURT: So stipulated. And any objection to admitting that exhibit?

MS. MICHALETZ: No.

THE COURT: Without objection, 311-1 is admitted. All right.

Any other housekeeping matters, Mr. Saenz?

MR. SAENZ: No, Your Honor.

THE COURT: Any other housekeeping matters?

MS. MICHALETZ: No, Your Honor.

THE COURT: All right. Then I believe we were -- we

UNITED STATES DISTRICT COURT

**2-ER-0269**

212

had broken with Dr. Ettner's testimony and were going to take up with her again this morning. Is that the plan? All right. Dr. Ettner, if you would be so kind.

All right. Good morning, ma'am. Let's see. So as of -- as you were yesterday, you were still under oath. All right.

And, Mr. Gross, you may cross examine.

CROSS-EXAMINATION BY MR. GROSS:

Q. I think we spoke about this yesterday, but just to confirm, you are not licensed to practice psychology in the State of Alaska. Correct?

A. Correct.

Q. And, therefore, you are not here offering any type of treatment plan for Ms. Wagoner. Correct?

A. Only insofar as I've given an opinion about a treatment plan.

Q. Okay. But you're not treating Ms. Wagoner. Correct?

A. Correct.

Q. And you're not offering any type of treatment plan specific to Ms. Wagoner. Correct?

A. I'm offering a recommendation of what I think a treatment plan should consist of.

Q. Okay. And you understand that not being licensed in the State of Alaska, you cannot provide any sort of treatment to Ms. Wagoner?

UNITED STATES DISTRICT COURT

**2-ER-0270**

A. I understand that. Yes.

Q. And you're not offering any type of diagnosis of Ms. Wagoner. Correct?

A. I confirmed her diagnosis.

Q. And you're not offering any type of opinions regarding what is needed to ameliorate any type of psychological condition Ms. Wagoner might have. Correct?

MR. SAENZ: Objection, Your Honor. Asked and answered.

THE COURT: Yeah. I think she's answered that question. Sustained.

BY MR. GROSS:

Q. Between leaving the stand yesterday and now, did you have the opportunity to speak with anybody about your testimony?

A. No.

Q. Would you generally agree that when you're dealing with surgery, especially a surgery that is permanent, you should take a conservative approach?

A. Hypothetically are you speaking?

Q. Generally speaking, would that be fair to say?

A. If a surgery is an emergency, no, I wouldn't agree with that.

Q. Okay. So if it's not an emergency and it's simply a surgery to provide care, would you agree a conservative care approach is appropriate?

UNITED STATES DISTRICT COURT

**2-ER-0271**

214

A. I would say it depends on the surgery.

Q. Okay. And you yourself, again, are not a surgeon?

A. Correct.

Q. And you're not a doctor?

A. I'm a doctor but not a medical doctor.

Q. Okay. Now, in this particular instance, you cannot guarantee any type of outcome of this particular surgery. Can you?

A. No.

Q. You cannot guarantee that after the surgery Ms. Wagoner is going to be cured of, for example, any kind of depression she has as a result of childhood trauma. Correct?

A. Correct.

Q. And as a result of this surgery, you can't guarantee that the depression and anxiety that she may suffer as a result of her crimes are going to be ameliorated. Correct?

A. Correct.

Q. And you can't guarantee that the trauma or emotional distress she has relating to family issues including a divorce and the loss of children, those aren't going to go away with this surgery. Are they?

A. I can't guarantee that any particular issue from her past would go away after surgery.

Q. And this surgery is not going to alter any outward appearances of Ms. Wagoner. Will it?

UNITED STATES DISTRICT COURT

**2-ER-0272**

215

A. It will alter the appearance of her genitals.

Q. But outward appearance to the public is not going to alter any type of her appearance?

A. Correct.

Q. She's going to be the same height; she's going to be the same weight?

A. Correct.

Q. She's still going to have broad shoulders and a deep voice?

A. Yes.

Q. And this surgery won't prevent people from misgendering her going forward. Will it?

A. It won't prevent that. No.

Q. That can still happen. Right?

A. It's possible, yes.

Q. To the extent she has trauma or stress as a result of being misgendered, that could still happen. Right?

A. Yes.

Q. In this particular case -- let me back up. In your testimony you seem to be particularly critical of the DOC in general but you understand the DOC is not --

MR. SAENZ: Objection, Your Honor.

THE COURT: I'm sorry. I -- I -- because of the objection, I didn't hear the full question. Go ahead and restate your question.

MR. GROSS: Full question is are you aware that the

UNITED STATES DISTRICT COURT

**2-ER-0273**

DOC, the Department of Corrections, is not an actual defendant in this case.

THE COURT: Okay. So that's the question. And what's your objection?

MR. SAENZ: It's been rephrased, Your Honor.

THE COURT: Okay.

MR. SAENZ: Withdraw the objection.

THE COURT: All right. Doctor, go ahead and answer.

THE WITNESS: I'm not aware.

BY MR. GROSS:

Q. Do you think they are or they are not a defendant?

A. I don't think they're a defendant.

Q. Okay. Do you have an understanding who the defendants are in this case?

A. I recall Nancy Dahlstrom is a defendant in this case.

Q. Okay. And who is Nancy Dahlstrom?

A. She's an administrator, I believe.

Q. Okay. And do you think she still works for the DOC?

A. I don't have knowledge of that.

Q. Okay. Do you think that she's in a position where she could enforce the Court's order if the Court were to order something?

A. I'm sorry. Would you repeat that.

Q. Sure. If this court were to issue an order asking or enforcing or telling the DOC to do something, do you think

UNITED STATES DISTRICT COURT

217

she's currently in a position where she can enforce that order?

A.  I don't know.

Q.  Okay.  So if I told you she no longer is the commissioner of the Department of Corrections, would that surprise you?

A.  No.

Q.  Who is Laura Brooks?

A.  I don't know.  I think she was a person who worked in the Department of Corrections.

Q.  Okay.  Do you think she currently works in the Department of Corrections?

A.  I don't know.

Q.  Okay.  If I told you that she's probably at this moment on a golf course in St. George, Utah, enjoying her retirement, would that surprise you?

A.  No.

         MR. SAENZ:  Objection, Your Honor, to this line of questioning.  Counsel is asking Ms. -- is asking the question to draw legal conclusions.

         MR. GROSS:  No, I'm not.  I'm asking her knowledge or understanding of who these defendants are.

         THE COURT:  So as to whether or not she is being asked to draw legal conclusions, that objection is overruled.  But what exactly is the relevance as to her expert opinion regarding who she may believe the defendants to be?

         MR. GROSS:  Well, she's being critical of the

defendants in this case, and I should be able to explore what basic understanding she has of these defendants.

THE COURT: Well, I -- I, frankly, didn't understand her testimony to be particularly critical of any individual or group of individuals. Rather, I heard her state that there was -- the care that, in her estimation, Ms. Wagoner had received didn't meet standard of care.

MR. GROSS: Okay. Your Honor, let me rephrase.

THE COURT: Sure.

BY MR. GROSS:

Q. Okay. Let's go back to Nancy Dahlstrom. Can you tell me what your understanding of what her role in Ms. Wagoner's care was? What role did she have in caring for Ms. Wagoner?

A. My understanding is she did not directly provide care --

Q. Okay.

A. -- to Ms. Wagoner.

Q. What about Ms. Brooks?

A. I don't know.

Q. Okay. Do you have any understanding of whether she provided any care, had any role in the care being provided to Ms. Wagoner?

A. I don't know.

Q. Do you know if she had any role in creating the policies that DOC follows with regard to the treatment of gender dysphoria?

A. I don't know.

Q. Robert Lawrence. Do you know who that is?

A. Yes.

Q. Do you know if he had any role in the care of Ms. Wagoner?

A. I believe he did.

Q. And what was his role?

A. I believe that he offered opinions about her care.

Q. Okay. And do you know if he currently is participating in the care of Ms. Wagoner?

A. That I don't know.

Q. Okay. So you don't have an idea or understanding whether he even works for the Department of Corrections anymore?

A. That is correct.

Q. Okay. And what about Adam Rutherford. Who is that?

A. That was an individual that provided care to Ms. Wagoner.

Q. What care did he provide to Ms. Wagoner?

A. Mental health care.

Q. Okay. Do you know if he had any role at all in formulating the policies for the DOC?

A. I don't know.

Q. Do you know if he is currently working for the DOC?

A. I don't know.

MR. GROSS: Your Honor, those are all of the questions I have.

THE COURT: All right. Thank you.

UNITED STATES DISTRICT COURT

**2-ER-0277**

220

Any redirect of this witness?

MR. SAENZ:  Yes, Your Honor.

THE COURT:  All right.  Go ahead.

MR. SAENZ:  From the podium, Your Honor --

THE COURT:  If you prefer, sure.

MR. SAENZ:  This is Richard Saenz for the plaintiff.

REDIRECT EXAMINATION BY MR. SAENZ:

Q.  Good morning, Dr. Ettner.  How are you?

A.  Good morning.  I'm well.  Thank you.

Q.  Dr. Ettner, why might a transgender person with gender dysphoria not seek care until later in life?

A.  If the individual is, perhaps, from a resource poor family or prior to the explosion of social media, many people are not even aware that there are resources or even a name for the feelings of misalignment that they've been experiencing.

Q.  Is this common?

A.  It's quite common in people of a certain age.  Yes.

Q.  When was Ms. Wagoner diagnosed with gender dysphoria?

A.  In 2017.

Q.  And by whom?

A.  By the Department of Corrections.

Q.  Dr. Ettner, how important is patient self reporting to developing a treatment plan as it relates to treatment for gender dysphoria?

A.  It's very important because the patient's feminology can be

221

a barometer of the distress that they're experiencing that may not otherwise be obvious.

Q. In your review of Ms. Wagoner's records and other documents that you have testified to -- in reviewing, is what Ms. Wagoner told you consistent with those records?

A. Yes.

Q. Were the psychological tests you gave to Ms. Wagoner, were these valid and reliable tests?

A. Yes.

Q. What is that based on?

A. That's based on statistical constructs, reliability. There are different types of validity. There's construct validity, criterion validity. I think it's safe to say that the tests are valid.

Q. Do you recall counsel asking you if you had done anything to confirm what Ms. Wagoner told you was correct?

A. Yes.

Q. Were these steps you took to confirm the validity of what Ms. Wagoner reported to you?

A. I'm sorry. What steps?

Q. I'll rephrase.

As part of confirming what Ms. Wagoner told you, did you review documents to see if they were -- if what she told you was consistent?

A. I didn't see an inconsistency between her medical records

UNITED STATES DISTRICT COURT

**2-ER-0279**

and the depth of the distress she was experiencing when she spoke with me.

Q.  Dr. Ettner, who is Mr. Reed?

A.  Mr. Reed was an outside consultant who was hired by the department to evaluate Ms. Wagoner.  He had experience with gender dysphoria.

Q.  Do you recall reviewing any records from Mr. Reed?

A.  I do.

Q.  And in those records, did you see any testing conducted by Mr. Reed?

A.  Yes.

Q.  What testing did Mr. Reed perform, if you can recall?

A.  Well, the test I recall was the traumatic symptom inventory because it was a test that I also gave.

Q.  And what did Mr. Reed conclude based on that test?

A.  He concluded that she responded with a valid test and his conclusions were similar to mine on that particular test.

Q.  Dr. Ettner, would a -- how -- would any health care provider who is providing care to a patient with gender dysphoria have the ability to recognize and diagnose co-existing mental health concerns and distinguish those from gender dysphoria?

A.  No.

Q.  Why not?

A.  Because that takes experience and training.

UNITED STATES DISTRICT COURT

223

Q. What type of training?

A. Special training and continuing education and experience in this particular specialty of transgender health care.

Q. You testified that you know who Mr. Rutherford is. Is that accurate?

A. Yes.

Q. And you said he was one of Ms. Wagoner's providers. Correct?

A. Yes.

Q. Were there any indications in the records you have reviewed that Mr. Rutherford has this special training or experience to treat people with gender dysphoria?

A. No.

Q. What's the difference between anxiety attendant to gender dysphoria and just anxiety?

A. One is a co-occurring condition. It can be a generalized anxiety disorder. It could be a phobia. It could be, for example, agoraphobia. The anxiety attendant to gender dysphoria is the -- what we would call the stress of the condition, and it's fairly typical that there is anxiety and or depression with the condition.

Q. Why is this understanding of what attendant to gender dysphoria and a diagnosis of anxiety or depression on its own important for Ms. Wagoner's treatment?

A. Because co-occurring conditions, mental health conditions

UNITED STATES DISTRICT COURT

**2-ER-0281**

or even medical conditions do need to be treated.  And if there is anxiety or depression that is a co-occurring condition, it should respond to antidepressants, anxiolytics, and psychotherapy.  If the anxiety and depression is attendant to this underlying medical condition, it doesn't respond to psychotropic medication.

Q.  Do you recall seeing any treatment using psychotropic medication for Ms. Wagoner?

A.  Yes.

Q.  And did the psychotropic medication treat Ms. Wagoner's gender dysphoria?

A.  It didn't treat her gender dysphoria.  No.

Q.  Is psychotropic medication a treatment for gender dysphoria?

A.  No.  It's a treatment for other conditions that may appear with gender dysphoria.

Q.  What is gender-affirming genital surgery a treatment for?

A.  It is a treatment for gender dysphoria.

Q.  Is gender-affirming genital surgery treatment for anxiety?

A.  No.

Q.  Is gender-affirming genital surgery a treatment for depression?

A.  No.

Q.  Dr. Ettner, do you recall counsel asking you about self surgery incidents in 2017 and 2018?

A. Yes.

Q. And counsel asked you what did Ms. Wagoner use in 2017. Do you recall that question?

A. Yes.

Q. Okay. Can we pull up Defendant's Exhibit 2018, please.

A. Excuse me. Will that appear on my monitor? Okay.

MR. GROSS: Your Honor, if I could, this screen does not appear to be on plaintiff's table.

(A discussion was held off the record.)

BY MR. SAENZ:

Q. Dr. Ettner, do you see Exhibit 2018 on your screen?

A. I see it but it's quite small on my screen. It's a little difficult to see. Thank you.

Q. Okay. Do you see it now?

A. Yes.

Q. Okay. Have you seen this document before?

A. Can you scroll down, please. I'm only seeing the heading.

Q. Can you scroll down. Madam Clerk, does the witness have control over moving the document?

Okay. So we'll do it right here. Dr. Ettner, have you seen this document before.

A. Yes.

Q. What is it?

A. It is a note -- it's a note in a physician's record in the emergency department.

UNITED STATES DISTRICT COURT

**2-ER-0283**

Q.  And what is the date on this record?

A.  June 20, 2017.

Q.  Can you scroll down, please.  Can you scroll down, please.  Can -- okay.  Go please.  Okay.  Scroll down, please.  Keep scrolling.  Keep scrolling, please.  Keep scrolling, please.  Okay.  Can you get it where it says received call from.  Okay.

Dr. Ettner, do you see the highlighted section of this document?

A.  Yes.

Q.  Could you please read what's in the -- what's in the highlighted section.

A.  Yes.  Received call from MOD officer stating the inmate stated had mutilated his penis and there was blood on pants.  Patient arrived in medical AO ambulating.  States he was angry because he has wanted a sex change and keeps getting the runaround so he -- so he showed his -- he shoved his finger into penis.  Penile split due to old laceration.  However, small new laceration noted.  Considerable bleeding patient states.

Q.  Okay.  You can take that down.  Dr. Ettner, and in 2018, what did Ms. Wagoner do to her genitals?

A.  She further lacerated them.

Q.  Okay.  Dr. Ettner, is it difficult for you to recall when and how Ms. Wagoner attempted to change her genitals since 2016 until the present?

A.  I'm sorry.  Is it difficult for me to recall what?

Q.  When and how Ms. Wagoner attempted to change her genitals since 2016?

A.  No.  I remember when and how she -- she attempted that.

Q.  Okay.  If we can pull up Defendant's Exhibit 2086, please.

Dr. Ettner, do you recall counsel asking you questions about a study done in Sweden in 2011.

A.  Yes.

Q.  And it is Exhibit 2086 Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery:  Cohort Study in Sweden.  Is this the article that you understood counsel to be referring to?

A.  Yes.

Q.  What is this article?

A.  This was an article that compared transsexual people who had undergone surgery with the general population in Sweden.

THE COURT:  And I'm sorry to interrupt you, Mr. Saenz. Has 2086 been admitted yet?

COURTROOM DEPUTY:  No, Your Honor.

THE COURT:  So this is defendants' exhibit.  Do defendants want to admit 2086?

MR. GROSS:  Sure.

THE COURT:  All right.  Mr. Saenz, I assume no objection?

MR. SAENZ:  We do object to it coming in, Your Honor.

UNITED STATES DISTRICT COURT

**2-ER-0285**

228

And you'll hear testimony from -- from our witnesses that this is hearsay, and -- and it doesn't include any of the exceptions to come in.

MR. GROSS: But I think the problem with that is they're asking this witness comment on this particular article, including refreshing her recollection of what the article says. Therefore, pursuant to the rule, I have the right to have this document admitted into evidence.

THE COURT: I would be inclined to agree. Otherwise, there's no record of what you're talking to her about. I think it needs to be admitted if you want to continue with this line of questioning. If you want to take a second and confer, that's fine.

MR. SAENZ: Yes. Plaintiff will stipulate to its admission, Your Honor.

THE COURT: All right. So by stipulation and without objection, Defendants' Exhibit 2086 -- 2086 is admitted. All right. Go ahead, Mr. Saenz. I'm sorry to interrupt you.

BY MR. SAENZ:

Q. Dr. Ettner, what is this study?

A. This was a study performed by Cecilia Dhejne and her colleagues comparing individuals who had undergone what was then called sex reassignment surgery and compared their post surgical sequela to general population in Sweden.

Q. Why did you not include this study in your report?

UNITED STATES DISTRICT COURT

**2-ER-0286**

A.  This study is -- has been often used in a mischaracterized way or in a misinformed way to conclude that sex reassignment surgery caused suicide.  And, yet, if you look at the article closely, it was only the group that had surgery prior to 1989 that had the high-risk of surgery.  And an appropriate control to determine if the -- that group had that outcome would have been to compare them to transgender people who had not had surgery rather than the general population.

And so the author has written in this article that this should not be viewed as a rejection of the efficacy of sex assignment surgery.  And to that end, she wrote in 2017 -- after this article had been so frequently mischaracterized -- in 2017, she published an article in her dissertation and on the Internet stating that researchers lose control after they publish an article of how their article is used, and that this article had been frequently misused and she had been informed of this by colleagues and other individuals and she wanted to set the record straight.

So she wrote that rebuttal stating that sex reassignment surgery, when the WPATH standards were followed, was an effective treatment for gender dysphoria and that people do need social support.  And in the early years, particularly prior to 1989, people did suffer stigma in Sweden and that was a factor that needed to be considered in these results, why that group had a higher risk of surgery.

Q.  Does -- does this study say anything about gender-affirming treatment on mortality risk?

A.  What part of the study are you asking about?  You mean the conclusion?

Q.  Let me rephrase it.  Does this study's conclusion say anything about gender-affirming treatment on mortality risk?

A.  Death from suicide was higher in one Cohort than in the general population.  That's the conclusion.

Q.  Is there any language in the article itself disavowing the use of this study to show that gender-affirming genital surgery is not clinically effective?

A.  Yes.  She states that in this article directly.

Q.  You testified that a rebuttal was published in 2017.  Is that correct?

A.  Yes.  Yes.

Q.  In your experience and -- in your experience, since 2017, have people continued to mischaracterize or misuse the conclusions of this study?

A.  Yes.  Frequently newcomers to the field will look at this study and conclude that sex reassignment surgery caused suicide, which that is not the case and I think the author makes that clear.

Q.  If you can pull up -- do you see the highlighted section starting with conclusions?

A.  Yes.

231

Q. Could you read that for us for the record, please.

A. Persons with transsexualism after sex reassignment have considerable higher risk for mortality, suicidal behavior, and psychiatric morbidity than the general population. Our findings suggest that sex reassignment, although alleviating gender dysphoria, may not suffice as treatment for transsexualism and should inspire improved psychiatric and sematic care after the sex reassignment for this patient group.

Q. Does this conclusion change your opinion as to whether gender-affirming genital surgery is medically necessary for Ms. Wagoner?

A. No.

Q. Okay. We can pull up Defendants' Exhibit 2087 and plaintiff will stipulate to the admission of Defendants' Exhibit 2087.

THE COURT: Any reason not to admit this?

MR. GROSS: No. That sounds fine.

THE COURT: Okay, 2087 without objection, by stipulation, is admitted.

BY MR. SAENZ:

Q. Dr. Ettner, do you recall counsel asking you questions about a study from 2025?

A. Yes.

Q. Can you scroll up, please. And is this the study from 2025?

UNITED STATES DISTRICT COURT

**2-ER-0289**

A. Yes.

Q. What is it?

A. It's a study based on a database of electronic medical records from a large group that was used to compare individuals who had undergone gender-affirming surgery with individuals who had a diagnosis of gender dysphoria but did not undergo surgery. And it was a retrospective study so it looks at one point in time.

Q. Did the conclusion of this study say anything about the importance of providing surgical treatment?

A. It said that gender-affirming surgery is essential.

Q. Could you see the highlighted section?

A. Yes.

Q. Can you read that into the record, please?

A. Despite the observed increase in mental health issues, gender-affirming surgery remains essential in aligning transgender individuals' physical appearance with their gender identity, offering significant psychological benefits.

Q. Who are the comparators in this research studying?

A. Well, the two main comparators were a group that by looking at coding had undergone surgery with another group that had a coding that they had received a diagnosis of gender dysphoria but they had not undergone surgery.

Q. Do you --

A. And then there were additional cohorts of people who had

not received a diagnosis but had undergone surgery.

Q. Do you reject large portions of this study?

A. Parts of this study are not compelling because we don't know if the gender dysphoric group desired surgery or not, as in other studies where you compare individuals who have undergone surgery with individuals who want surgery but have not yet undergone it.

And because you can't tell from the data anything about the particulars, like age, ethnicity, race, the authors have had to use prospective scoring which is a statistical technique to kind of account for those cofounders. But on the face of it, if you have two groups and one has undergone surgery and you have another group that is gender dysphoric but hasn't undergone surgery, you could assume that that group has a milder form of gender dysphoria and that the group that's undergone surgery and the determination to go through surgery, that they would have had a more intense or severe form of gender dysphoria and, therefore, more attendant mental health issues.

And the authors do list that as a limitation of the study suggesting that if that's the case, then there is some significant, in their words, selection bias. So Ms. Wagoner would actually be in the group that hadn't undergone surgery. But that doesn't -- using this paper, that would mean that she has less psychopathology, less morbidity than the other group.

234

So it's not as -- it's not as compelling to me as some of the other research.

Q. What is some of the other research that you find more compelling than this study?

A. Park in 2022 recorded individuals who had gone through surgery four decades ago. And after 40 years, all of that group had improved wellbeing and sustained appreciation and comfort living in their affirmed gender. And he said that that meant that there were durable mental health benefits from undergoing surgery.

And also, the Almazan article which was based on a survey of 27,000 transgender people did compare people who had undergone gender-affirming surgery with people who hadn't but desired surgery. And the group that had undergone surgery did have improved mental health. And there are many other studies that also indicate improvement in various aspects of life post surgery.

Q. Ms. Walker, can you scroll up, please.

Do you see the highlighted section that says conclusion?

A. Just one moment, please. I see the highlighted section. I don't know what it's from though. I don't see the --

Q. Okay. Can -- okay. Is that --

A. This is the same article. Yes. I see the highlighted section.

UNITED STATES DISTRICT COURT

**2-ER-0292**

Q.   Okay.  Could you please read into the record the conclusion.

A.   Gender-affirming surgery, while beneficial in affirming gender identity, is associated with increased risk of mental health issues, underscoring the need for ongoing gender sensitive mental health support for transgender individuals post surgery.

Q.   Dr. Ettner, does the conclusion of this study change your opinion as to whether gender-affirming genital surgery is medically necessary for Ms. Wagoner?

A.   No, it does not.

        MR. SAENZ:  And we can pull up Defendants' Exhibit 2089.  And plaintiff will stipulate to the admission of this exhibit.

        THE COURT:  Defendants' 2089.

        MR. GROSS:  No objection.

BY MR. SAENZ:

Q.   Dr. Ettner --

        THE COURT:  I'm sorry.  Hang on, Mr. Saenz.

        MR. GROSS:  One moment.

        THE COURT:  I want to make sure we can admit this.

        MR. GROSS:  I do have an objection to this, Your Honor.  I think that this would not -- this would effectively be hearsay.  It's not a learned treatise.  I don't think that that this would come in. You know, she's not -- this is a

UNITED STATES DISTRICT COURT

**2-ER-0293**

situation where she's refreshed her recollection because this is direct examination and not -- not something other than that. I would object to this document coming in.

THE COURT: All right. So, Mr. Saenz, the purpose of you asking Dr. Ettner about this document is to either affirm the conclusions of this study or dispute them.

MR. SAENZ: This is defendants' exhibit, and the questioning about the medical literature, Dr. Ettner just testified about this specific study and it -- counsel had asked questions about the other studies and this is directly related to the one that she was just talking about.

MR. GROSS: I didn't ask about this particular study. This is simply a self-serving effort to get an article that's beneficial to them into evidence when there's no foundational -- foundation for allowing it into evidence.

THE COURT: All right. Mr. Saenz, if you want to lay some additional foundation for the admission of this article, go ahead.

BY MR. SAENZ:

Q. Dr. Ettner, are you familiar with the study association between gender-affirming surgeries and mental health outcomes?

A. Yes.

Q. Who are the authors of this study?

A. Almazan and Keuroghlian.

Q. And in reviewing the January 2025 study that we just talked

about, did you -- did you review other studies informing your opinions about the 2025 study?

A. I'm not understanding your question. Could you rephrase.

Q. When you reviewed the 2025 study that we just talked about --

A. Yes.

Q. -- did you review additional studies?

A. Yes.

Q. Was the Almazan study one that you reviewed?

A. Yes.

Q. Why was that?

A. Because it was a large study, 27,000 individuals and there was enormous information about the individuals pre and post surgery, their support, the number of gender-affirming surgeries they had gone through. But most importantly, it was --

Q. Dr. Ettner, it still hasn't been admitted yet.

A. I'm sorry.

Q. Do you recall the defendants' counsel asking you about studies you are aware of concerning gender-affirming genital surgery?

A. Yes.

Q. Is Defendants' Exhibit 2089 a study you're aware of and reviewed?

A. Yes.

238

MR. SAENZ: Your Honor, we would ask to -- move to admit Defendant's Exhibit 2089.

MR. GROSS: Your Honor, Evidence Rule 703 is clear that this witness can certainly talk about this exhibit but it doesn't come in. It's hearsay. It's not a learned treatise. It's basically a document full of hearsay. Again, she -- 703 allows her to talk about the underlying data and facts that she relied on in coming to her opinions, but that doesn't mean this comes into evidence.

THE COURT: It isn't a learned treatise but it is a peer article. It's the Journal of JAMA.

MR. GROSS: But it doesn't reach the standard you would expect when you read it into evidence --

THE COURT: It's specifically contemplated by the rule.

MR. GROSS: Well, I would disagree with that. In order to get past the rule, it has to be something that is a significant piece of literature that's relied on by all parties. There are people who I spoke to that don't think this is an appropriate conclusion for this particular article so I think it's still controversial and I don't think it gets past the rules.

And even if it did, Your Honor, I still think it doesn't come in because, again, 703 is clear that she can talk about this, she can talk about this article and what she relied

**2-ER-0296**

on, but that doesn't mean it comes into evidence.

THE COURT: So I'll admit it. I mean, I think it's an exception to the hearsay rule. The headline of this specific section is statements in learned treatises, periodicals, or pamphlets -- this is the Journal of the American Medical Association, and I think it's definitionally a periodical. I think it goes to -- if she agrees with it or disagrees with it, I think it goes to weight not admissibility.

I think if your expert -- if you want to propound an expert that disagrees or agrees with the conclusions in this article, I think it goes to weight, not admissibility so.

MR. GROSS: But my objection is based on 703. And 703 would allow me, as the opposing party, to allow this piece of evidence to go into evidence, but it doesn't allow the -- the questioner to introduce evidence that the expert relied on.

MR. SAENZ: Your Honor, under 803(B), we could ask the witness who has been qualified as an expert if JAMA Surgery is a reliable authority.

THE COURT: Yeah. I think if you -- I think with that additional foundation -- frankly, I think you've gotten it with foundation. But I think with that additional foundation, I do think it's admissible. So go ahead and lay some additional foundation.

BY MR. SAENZ:

Q. Dr. Ettner, are you familiar with the publication JAMA

Surgery?

A. Yes.

Q. What is it?

A. It's a medical journal the American Medical Association publishes specific to surgery.

Q. Is the JAMA -- is JAMA Surgery a reliable authority in your field?

A. Yes.

MR. SAENZ: Your Honor, we would like to move to admit Defendants' Exhibit -- this exhibit, Your Honor.

THE COURT: All right. So this is 2089. Mr. Gross, anything else you want to state for the record as far as your objection?

MR. GROSS: No. I'll stand on my objection. I think it's impermissible pursuant to Rule 703.

THE COURT: I understand your objection. Thank you, sir. All right, 2089 over objection is admitted.

BY MR. SAENZ:

Q. Dr. Ettner, are you familiar with this study?

A. Yes.

Q. And what is this study? Can you go back to the study and -- I'll let you know when to --

A. It's a study regarding the association between gender-affirming surgery and mental health outcomes.

Q. What did this study find?

A.  In relevant part, the study found that transgender individuals who had undergone surgery showed improvement in various areas when compared to transgender individuals who had not had surgery but desired surgery.

Q.  What, if anything, does this study mean in relation to Ms. Wagoner's need for gender-affirming genital surgery?

A.  It confirms that surgery which treats gender dysphoria also has mental health benefits.

Q.  What are those mental health benefits?

A.  Well, in this study, they were less suicide attempts and ideation, less cigarette smoking, and less depression.

Q.  Dr. Ettner, when you say that gender-affirming genital surgery will effectively resolve Ms. Wagoner's gender dysphoria, what do you mean by that?

A.  I mean that if she can align her genitals with her gender identity, she will feel whole and she will be free of the agony that her genitalia currently cause her.

Q.  Can you scroll down, please.  Do you see where it says conclusions and relevance?

A.  Yes.

Q.  Could you please read that into the record.

A.  This study demonstrates an association between gender-affirming genital surgery and improved mental health outcomes.  These results contribute new evidence to support the provision of gender-affirming surgical care to transgender and

UNITED STATES DISTRICT COURT

2-ER-0299

gender diverse people.

Q.  Dr. Ettner, would gender-affirming genital surgery eliminate all of Ms. Wagoner's gender dysphoria permanently?

A.  It may, yes.

MR. SAENZ:  No further questions.

THE COURT:  All right.  Thank you.

Mr. Gross, do you have additional cross?

MR. GROSS:  I do.

THE COURT:  Why don't we take our morning break now and then you can come back and cross so be in recess for 15 minutes.

COURTROOM DEPUTY:  All rise.  Matter is in recess for 15 minutes.

(Proceedings reconvene at 10:34 a.m.)

THE COURT:  All right.  Just briefly, before you take up your cross examination, Mr. Gross.  Regarding the admission of the article that we were talking about just before the break at Exhibit 2089, I am going to partially reverse myself.

I will go ahead and admit the document because we did talk about it so just so the record is clear, I will admit it. But the only portions the Court will consider are the portions that were actually read into the record by Dr. Ettner.  And I believe that it's consistent with 803(18)(B).

Anything else for the record on that subject, Mr.

Saenz?

MR. SAENZ: No, Your Honor. Thank you.

THE COURT: Mr. Gross.

MR. GROSS: No, Your Honor.

THE COURT: All right. Sir, do you wish to cross examine?

MR. GROSS: Very briefly.

RECROSS EXAMINATION BY MR. GROSS:

Q. I believe in your redirect you indicated that you had looked at some tests that were done by a Mr. Reed?

A. Yes.

Q. And I believe you testified that those tests helped to support the tests that you ran with regard to Ms. Wagoner?

A. No. Not to support. One of the tests was the same tests that I administered.

Q. Okay. And he also -- Mr. Reed -- also administered a test called the Symptom Checklist-90-Revised. Correct?

A. Yes.

Q. Okay. And that test is designed to measure the degree of symptoms that a person has suffered. Right?

A. Correct.

Q. Let's take a look at that. If we could pull up trial Exhibit 2084. This is going to be a document dated June 17th, 2017 authored by Mr. Reed. And if we turn to page 3.

THE COURT: I'm sorry, sir. This has been stipulated

UNITED STATES DISTRICT COURT

**2-ER-0301**

to, right, 2084?

MR. SAENZ: Yes.

THE COURT: All right. Mr. Gross, are you moving to admit this?

MR. GROSS: I think its already -- yes, I'll move to admit.

THE COURT: 2084 is admitted.

BY MR. GROSS:

Q. If we look at page 3, bottom of the page, the last paragraph there. All of Ms. Cancel's clinical scales on the SCL-90-R were elevated. The findings indicate a distorted responding pattern in her answers. For example, her T-score for the psychotic scale was 79, significantly elevated. However, during the clinical interview, there was no evidence that she ever experiences any symptoms of psychosis and especially not recently. Due to the extreme elevations on all of the scales, no interpretation can be offered based upon these results. Do you see that?

A. Yes.

Q. What Mr. Reed is explaining is that Ms. Wagoner intentionally elevated her symptoms in order --

MR. SAENZ: Objection, Your Honor.

THE COURT: What's the objection.

MR. GROSS: I would appreciate -- I would appreciate --

THE COURT: All right.

MR. GROSS: -- my question first.

THE COURT: Everybody stops. So, first of all, what is the objection?

MR. SAENZ: Your Honor, counsel is testifying to -- and doing his interpretation of what the record says. The record should speak for itself.

MR. GROSS: She can disagree with me.

THE COURT: Okay. All right. Hang on. So it is cross examination so I think he's entitled to ask leading questions and that often does involve proposing, in this case, particular interpretation and then the witness can agree or disagree. If it becomes argumentative, that's another matter. And I understand that in litigation we often are -- our words sometimes get ahead of our thoughts, but just as a general matter, let's all try to be cognizant of allowing the question, ask the complete question, and then interpose an objection.

So all of that being said, the objection is overruled. And you might want to go ahead and re-ask your question, sir.

MR. GROSS: Yes. Thank you.

BY MR. GROSS:

Q. So what Mr. Reed is indicating in that paragraph is that Ms. Wagoner answered the questions in such a fashion as to exaggerate her symptoms and get an elevated score on this particular test. Isn't that what Mr. Reed is indicating?

UNITED STATES DISTRICT COURT

**2-ER-0303**

MR. SAENZ:  Objection, Your Honor.

THE COURT:  What's the objection?

MR. SAENZ:  Counsel is misstating the evidence.

THE COURT:  All right.  Are you able to answer that question, Doctor?

THE WITNESS:  I believe so.

THE COURT:  Okay.  Go ahead and answer.

THE WITNESS:  It shows that she's responded in an extreme manner.  It doesn't give any indication of a motivation for the response pattern.

BY MR. GROSS:

Q.  But, ultimately, Mr. Reed concludes that no interpretation can be offered based upon these results as a result that heightened, exaggerated -- the answers that she provided on this test.  Correct?

A.  Correct.

MR. GROSS:  Okay.  Those are all of the questions I had.  Thank you.

THE COURT:  Thank you sir.  Very brief redirect.

Did you have a concern, Mr. Gross?

MR. GROSS:  I do.  I generally understood there's a limit to the back and forth and after recross that ended the questioning.  That -- but you're the Judge so I'll --

THE COURT:  I don't intend to impose hard limits like this.  And if Mr. Saenz asks questions that are repetitive or

go beyond the scope of your cross examination, you're free to object, and I will -- or I may cut him off sua sponte but I generally like to let the parties try their case.

So, Mr. Saenz, brief redirect.

REDIRECT EXAMINATION BY MR. SAENZ:

Q. Dr. Ettner, do you know if Mr. Reed ever provided mental health services to --

MR. GROSS: Objection, Your Honor. Beyond the scope of recross.

THE COURT: It is.

MR. SAENZ: Okay. No questions, Your Honor.

THE COURT: All right. All right. Any reason why this witness should not be excused, Mr. Saenz?

MR. SAENZ: No, Your Honor. Thank you.

THE COURT: All right. Do the defendants -- you wish her subject to recall?

MR. GROSS: No, Your Honor. No.

THE COURT: All right. Dr. Ettner, thank you so much for your time. You can step down. If you want to remain in the gallery, you're welcome to do so. Of course, if you want to return to your regular life, you may do that too. Thank you so much, ma'am.

All right. From the plaintiffs, do we have another witness?

MR. SAENZ: Yes, Your Honor. Plaintiff would call Ms.

UNITED STATES DISTRICT COURT

Emalee Wagoner.

THE COURT: All right. From a logistics standpoint, stand by everybody. Any issue with her taking the witness stand?

MR. SAENZ: No.

THE COURT: All right. Let's do that. Ms. Wagoner, if you would step up to the witness stand, remain standing, and be sworn in, please.

COURTROOM DEPUTY: Please raise your right hand.

EMALEE WAGONER, after being first duly sworn, testifies as follows:

THE WITNESS: Yes, ma'am.

COURTROOM DEPUTY: Please be seated. For the record, please state and spell your full name.

THE WITNESS: Emalee Rain Wagoner. E-M-A-L-E-E. Rain is R-A-I-N. Wagoner, W-A-G-O-N-E-R.

COURTROOM DEPUTY: Thank you.

THE COURT: Ma'am, do you have your listening device with you?

THE WITNESS: It echos real bad though.

THE COURT: Is it helpful or not?

THE WITNESS: It echos.

THE COURT: Okay. If you have any trouble hearing, just let us know. All right.

Mr. Saenz, go ahead, sir.

UNITED STATES DISTRICT COURT

**2-ER-0306**

DIRECT EXAMINATION BY MR. SAENZ:

Q. Good morning, Ms. Wagoner.

A. Good morning, Mr. Saenz. How are you?

Q. I'm good. How are you doing today?

A. All things considered sir, well.

Q. What things considered?

A. This is a stressful situation.

Q. What's stressful about it?

A. You know, it's -- obviously, it's a courtroom. I've been in prison for a long time so anxiety -- and then, you know, being in yellow, I don't feel I'm appropriately dressed and stuff. Just things like that.

Q. If you could dress yourself, what type of outfit would you prefer to wear?

A. I would be wearing a blouse and probably some dress slacks.

Q. Is Emalee Rain Wagoner your legal name?

A. It is.

Q. Has it always been your legal name?

A. No, sir.

Q. When did you start using the name Emalee?

A. 2016.

Q. And why did you choose the name, why did you choose to use the name Emalee?

A. For multiple reasons. My name was masculine so I had to

change my name to a feminine to fit my personality and who I am. As well as I really like the name Emma and I like the name Lee so I put them together as Emalee.

Q. Has Wagoner, your surname Wagoner, has that always been your legal surname?

A. No. That was Cancel.

Q. And did -- why did you change your surname?

A. I was already changing my name and my fiance's last name was Wagoner at the time so I asked her if I could use her last name and she said yes, so I did.

Q. How old are you, Ms. Wagoner?

A. I'm 44 years.

Q. Where were you born?

A. Anchorage, Alaska.

Q. Could you please tell me about your educational background.

A. I've got a GED that I took after dropping out of school in seventh grade.

Q. Why did you drop out of school at seventh grade?

A. I was involved with an older woman and she had kids and I needed to be able to work.

Q. Okay. When did you complete your GED?

A. I want to say around '03.

Q. How long have you been incarcerated, Ms. Wagoner?

A. Since 2010. Been down 15 years now.

Q. And you were transported this morning from the Goose Creek

facility.  Correct?

A.  Yes, sir.

Q.  How long have you been at Goose Creek?

A.  I've been in at Goose Creek most of my time.  Around September of 2013 to date.

Q.  What kind of facility is Goose Creek?

A.  It's a large holding tank.  It's 1,500 individuals.

Q.  And these individuals, are they men or women?

A.  It's a men's facility.

Q.  Okay.  What are you -- what kind of activities do you do each day at -- at Goose Creek?

A.  At this time, I'm a mentor.  And I run a Christian study Bible.

Q.  Do you have a job at Goose Creek?

A.  I do not.

Q.  Have you ever had a job at Goose Creek?

A.  I've had multiple jobs at Goose Creek.

Q.  What type of jobs have you had?

A.  Maintenance, kitchen, caregiving, MOD work.  I mean, it's just MOD sanitizing, mopping, sweeping, so on.  Laundry as well.  I worked in laundry.

Q.  Do you participate in any programming at Goose Creek?

A.  Not at this time.

Q.  Previously, had you engaged in any programming?

A.  Yes, sir.  I'm OMP compliant.

UNITED STATES DISTRICT COURT

Q. I'm sorry. Could you repeat that.

A. I'm OMP compliant. It's a offender management plan. It comes down from the probation office and we have to do a specific programming decided by the Court or decided by the POs at the time so I've done anger management and domestic violence intervention and some others.

Q. Ms. Wagoner, are you a woman?

A. Yes, sir.

Q. How do you understand yourself to be a woman?

A. I wholeheartedly believe inside me and feel as a woman. I just have incorrect genitalia.

Q. Do you know the term gender identity?

A. I do. Yes, sir.

Q. What does that term mean to you?

A. It's how I see myself, how I portray myself, and how I desire others to do so.

Q. When do you first remember feeling that you are a woman?

A. Very young age. I was around three years old. Two to three years old and it's just worsened as I've gotten older.

Q. At that young age, did you have an understanding of what you were feeling?

A. No. It was confusing.

Q. What made it confusing to you?

A. I believed I was female but my parents argued with me about it so it was confusing.

UNITED STATES DISTRICT COURT

Q. Okay. Was there any time during your childhood that you felt less confused about who you were?

A. There were points later in life when I got a little older and could understand more. There were parts where it was easier.

Q. Like when?

A. I remember when I was anywhere between 7 and 12 years old, my grandma couldn't figure out why I wouldn't maqii with the other individuals in the house. And in our native culture, we steam bath separately, men and women. And she invited me to maqii with the women. When she asked me what was wrong and I explained it to her and she took me to the maqii with them.

Q. And how did that make you feel?

A. I felt normal.

Q. What does feeling normal mean to you?

A. Accepted, seen as I am without judgment or I guess frowning upon me.

Q. Ms. Wagoner, when you first entered the custody of the Alaska Department of Corrections, how were you presenting externally at that time?

A. Male.

Q. What do you mean?

A. I was presenting as masculine. I kept my hair short. At times, I wore a mustache. Obviously the tattoos. Worked out a lot.

UNITED STATES DISTRICT COURT

254

Q. Did there come a time since you had been in the custody of the Alaska Department of Corrections that you have changed how you present yourself externally?

A. Yes, sir, 2016 to date.

Q. What happened in 2016 that -- or what -- strike that.

How did you change your external presentation in 2016?

A. In 2016, I started growing out my hair. I changed my name. And I would make my own personal makeup out of Skittles and other things and present female as much as possible.

Q. Why?

A. Condemnation of me had already come to a halt. It had already became what it was. I had nothing left to fear and why not be myself and hope that people could see me for me versus the continued internal suffering which was much worse.

Q. What does it feel like to you to be a woman in your current physical body?

A. It is extreme. I am distraught at all times. There's things that have helped but I'm still not whole at all by any means.

Q. Ms. Wagoner, are you currently receiving any treatment for medical or mental health conditions?

A. I'm receiving some things. I'm receiving Estradiol for gender-affirming care. And I'm receiving some other medications to keep me stable as far as my physical body goes.

Q. What is the Estradiol for?

A.   The Estradiol is -- it keeps my hormone levels equal and helps my sense of wellbeing.

Q.   Have you been diagnosed with a medical condition called gender dysphoria?

A.   Yes, sir.

Q.   What is your understanding of that condition?

A.   My understanding of that condition is the incongruence between my mental thought process and my physical body as portrayed.

Q.   When were you diagnosed with gender dysphoria?

A.   2016 running into 2017.

Q.   Who first diagnosed you with gender dysphoria?

A.   Adam Rutherford.

Q.   Who is Adam Rutherford?

A.   At the time, he was our mental health clinician II, I do believe.

Q.   Do you know if Mr. Rutherford is still employed with the Alaska Department of Corrections?

A.   To my understanding, he is their now chief medical officer III for mental health.

Q.   Do you know if Mr. Rutherford is a doctor?

A.   I can't speak to that.  I know he works for the department and he's a mental health clinician.

Q.   Did you ever receive mental health services from Mr. Rutherford?

A. No, sir.

Q. Did you ever seek services from Mr. Rutherford?

A. I had put in multiple RFI requests for a mental health psychologist to see me.

Q. Are your feelings about gender dysphoria -- take your time.

A. You're fine.

Q. Are your feelings about your gender dysphoria stronger, sometimes weaker, or constant?

A. They're constant to the point of even waking me up.

Q. Tell me about that.

A. There are times when I will be sleeping and have a crazy dream and will wake up from it. There's other times that I will wake up with burning sensations in my genitals that will trigger my gender dysphoria or I'll wake up soaking wet from the urine leakage from the damaged testicles which causes the gender dysphoria and it also goes on throughout the day at all times.

Q. Are mornings the most difficult for you during the day because of your gender dysphoria?

A. Yeah. The mornings are hard for multiple reasons. Having to be able to shave and get feeling comfortable in my skin before I go about my day is very disruptive as well as having to get clean physically every single day because of -- I can't even go halfway through the day because the -- the urine all over me and tearing and bleeding and just going through the day

UNITED STATES DISTRICT COURT

in pain.  It's -- mornings are very uncomfortable.

Q.  How often do you shave?

A.  I use my dry razor two, three times a day.  And I use wet razors when we're able to receive them.  DOC has since changed our policy so we can only receive them from 6:30 in the morning to 2:00 in the afternoon.

Q.  Have there been any days when you were unable to shave?

A.  There's been many a days I've been unable to shave.

Q.  And how has that made you feel?

A.  Pretty -- break down.  It's one of the worst parts.  It's bad enough I know I have male genitalia that are the way they are let alone to outwardly present as masculine.  It is very frustrating.

Q.  What treatment are you currently receiving for gender dysphoria?

A.  As I previously stated, I receive Estradiol in the dosage of 0.2 milligrams weekly.

Q.  How do correctional officers in Goose Creek address you?

A.  Most try to be respectful.  Some officers will slip and call me sir multiple times until I have a discussion with them. Others refuse to use feminine pronouns so I've gotten to the point where I request of them that they call me Wagoner.

Q.  Why is that?

A.  Because at least if they call me by my name, they're not disrespecting me or purposely trying to be rude to me.

UNITED STATES DISTRICT COURT

**2-ER-0315**

258

Q. How do healthcare providers at Goose Creek refer to you?

A. Most of them call me she but then will write in their documents he. So that's frustrating.

Q. Does your appearance as a woman sometimes create problems for you?

A. On a regular basis.

Q. What do you mean regular basis?

A. I get sexually harassed a lot.

Q. By whom?

A. Other inmates. I get called toots, tits. Men walk past me on the stairs and swipe my ass or rub their hand across my ass. Then there's of course, you know, the guys that will harass me for looking the way I do as well on top of all of that.

Q. When that happens, do you do anything?

A. I normally say something outrageous to them, put them on the off, you know, like say something smartass about.

(Court Reporter interrupts for clarification.)

THE WITNESS: No, what I was saying is sometimes the guys will harass me for looking the way I do and I'll say something like, oh, you're just saying that because you want a blow job. And that normally tends to cause them to stop talking to me. And they'll walk away or others will talk crazy to me, and -- which is that -- the ass slaps, and I'll normally just laugh at them and walk away most of the time.

BY MR. SAENZ:

UNITED STATES DISTRICT COURT

**2-ER-0316**

Q. You said most of the time. Are there times when you do anything else in response to that?

A. There has been times when it got to the point of somebody putting their hands on me because I refused to stand down and I've had to defend myself.

Q. And what happens when you have defended yourself?

A. There's no such thing as self defense in Goose Creek. It's automatic trip to the hole and mutual combat write-up which is a C1.

Q. Within the past five years, have you been sent to the hole?

A. I've been in the hole many times in the last five years.

Q. About how many times?

A. I can't be accurate on that. About a guesstimation is the best I can do for you, sir.

Q. I'll move on. When you're in the hole, are you able to shave? When you are in the hole, are you able to shave?

A. That's one of the worst places for shaving. That is -- you're at the disposal of being moved to a shower and being given a razor at 5:30 or 6:00 in the morning by staff. Normally, when you're intaked into the hole, you normally go three days without a shower, without a razor, without a change of clothing. And that proceeds to be every other day and no showers on Wednesday due to inspection.

Q. When you are in the hole or when you have been in the hole, were you able to use makeup?

UNITED STATES DISTRICT COURT

A.  No, sir.

Q.  Ms. Wagoner, if you want something in prison, how do you ask for it?

A.  You have to do it through a request for information, earlier known as a copout.

Q.  Okay.  And what do you do with that request for information?

A.  You fill it out, you turn it in, and you wait for a response.  They have up to five business days to give you a response.

Q.  And when you get your response, if they give you what you're asking for, that's over.  Correct?

A.  Yes, sir.

Q.  What happens if they deny what you're asking for?

A.  That's -- most of the time you don't even receive the RFI back.  But if you do receive the RFI back and they deny it, you can then go to the grievance process.

Q.  Can you tell me what is the grievance process at Goose Creek, your understanding of the grievance process?

A.  Goose Creek grievance process is you fill it out and as long as you have an RFI attached to it, it goes to a grievance coordinator officer and they decide if they're going to screen it or if they're going to say that it holds no merit or they're going to go ahead and remedy it.

Q.  Are there additional steps after that?

UNITED STATES DISTRICT COURT

**2-ER-0318**

261

A. You have appeals and then you have court appeals after that.

Q. Okay. Have there been times you have gone through the appeal level at Goose Creek?

A. Multiple times.

Q. On what type of issues?

A. Everything from showers, razors, clothing, medications, mental health care, medical, healthcare. That's close to the list of them.

Q. And the times when you have been in the hole, were you able to clean yourself?

A. They have a sink right there in the room so the best cleaning I was able to do was washing myself in the sink. We call them bird baths.

Q. Were you provided with any wipes?

A. For a short time, medical would bring me wipes and pads. They have since stopped that. Goose Creek now only offers paper -- toilet paper.

Q. Can you tell me what -- what is -- how do you take a shower at Goose Creek?

A. Goose Creek showers are very large. They're probably about the depth of that front table here. And they have ten shower heads in them with curtains that are half see-through and you just go in and you shower.

Q. Do you shower with everyone else?

UNITED STATES DISTRICT COURT

**2-ER-0319**

A. At times others get in the shower.

Q. Okay. Do you keep copies of the grievances you have filed and the responses you have received?

A. Yes, sir.

Q. When did you file this lawsuit?

A. I filed this lawsuit 2018.

Q. When you filed this lawsuit, did you have an attorney?

A. No, sir.

Q. And after you filed this lawsuit in 2018, did you engage in discovery with the defendants?

A. As much as I was able to I did.

Q. What do you mean?

A. It was very confusing. It's very confusing. I made the best requests I could. Most of the time, I was -- I don't even know the word for it. I was a kindergartner in high school. You know what I mean? There was really -- I was at a complete loss at getting any appropriate documentation.

Q. What type of documentation were you seeking?

A. I was seeking mainly medical records and documentation from the MAC Committee and some documentation from the attorney's office with the MAC Committee to which -- and my regular incarceration records to which they did finally give me those documents but they were two-sided. It was impossible for a lay person as myself to pick a document. But you need both sides of it and you can't get photocopies, and it was -- it was

UNITED STATES DISTRICT COURT

really a situation.

Q.  And Ms. Wagoner, you filed a motion for summary judgment in this case.  Correct?

A.  I did.

Q.  Do you know what -- what did the Court do with that motion?

A.  That motion was ultimately denied at the end.

Q.  I want to switch topics, Ms. Wagoner.  And, you know, please continue to respond as you have been.

You testified earlier that in 2016 you began to present -- you changed how you presented externally.  Do you recall that testimony?

A.  Yes, sir.

Q.  And can you remind us why did you make that change?

A.  I had -- I had to just be -- I had to be me at any cost.  I had already cut myself to try and create a vagina through an inversion surgery at that time.

Q.  What do you mean you cut yourself?

A.  I took a razor blade apart and tried to separate my penis in order to tuck it in and create a neovagina.

Q.  Can you describe how are you feeling at that time?

A.  Completely at a loss.  My desire to be whole was over -- over thinking any logical thought process at the time.

Q.  What were you attempting to do?

A.  Be the woman that I am.  I had such an overwhelming feeling that I just had no choice, I couldn't do anything but --

UNITED STATES DISTRICT COURT

**2-ER-0321**

Q. This overwhelming feeling, how did it affect you?

A. I would say it made me unreasonable. Yet there was reason there, a purpose -- created a purpose-driven thought process to be whole and to be able to feel comfortable in my skin.

Q. What did you do to yourself?

A. As in?

Q. You said you took a BIC razor. Is that correct?

A. You'd like me to explain what happened?

Q. Yes. Please.

A. Okay. I -- I had seen a surgery when I was younger. And they were doing this penile inversion surgery in Mexico and it was pretty simple. First thing they would do is they would make sure you were circumcised, which I already was. They would separate the penis down the penile wall or raphe in the spongiosum of the penis. And once it was split down to the root of the penis, would tuck it in and then remove the testicles and create a labia minor and major labia with the scrotum.

So seeing it done on the Internet as he did it, here comes the non reason, I got a razor blade and I had -- I had lived on farmland, you know, so we knew that -- I knew that garlic and salt would not only coagulate but would swell the area and stop bleeding. Not realizing how thick penile tissue really is, I attempted to pull that surgery off, thus the first failing in 2016 where I had to go to the emergency room.

Q. What happened at the emergency room?

A. At that point I still believed in my mind that I could pull it off, that I could get the surgery completed so nothing happened. He didn't stitch it up. The doctor looked at me and he asked me was this an accident, and I just looked at him like, you know, not really, you know, and he understood what I was saying. He said would you like stitches and I said, no, not at all. So he did not perform any further --

Q. What do you mean when you told the doctor not really?

A. He asked me if I wanted stitches.

MR. GROSS: I'm going to object to hearsay.

THE COURT: So the answer was that Ms. Wagoner told the doctor not really, and I heard Mr. Saenz ask a follow-up question what did you mean by not really. Did I misunderstand that?

MR. GROSS: The testimony is talking about what the doctor said to him, and I believe that's hearsay.

THE COURT: All right. Do you have a response for how the doctor's statements to Ms. Wagoner are or are not hearsay?

MR. SAENZ: Well, Your Honor, I was asking Ms. Wagoner just to confirm that we have discussed with the Court the -- the respect that we would give to Ms. Wagoner and anyone in the courtroom to use their correct names and pronouns. Just to reiterate that, that I was asking Ms. Wagoner what did she mean when she said not really.

THE COURT: Right. And I understood you to be asking her to clarify something that she said.

MR. SAENZ: Yes.

THE COURT: Not something that the doctor said.

MR. SAENZ: Correct.

THE COURT: Okay.

MR. GROSS: I would ask to move to strike the testimony regarding what the doctor said.

THE COURT: All right. Well I -- I think insofar as it is -- I don't know that she could relate a one-sided conversation and have it be sensible or intelligible in any way. So I won't receive it for the truth of the matter but insofar as it informs the statements that she made and makes those statements sensible in some way, then the Court will allow that. But if there is -- I don't hear Mr. Saenz trying to elicit anything substantive that the doctor may have said rather just, to coin a phrase, for the effect on the listener.

So insofar as the doctor's statements provide context and make the conversation -- make Ms. Wagoner's statements sensible, he can elicit them. If it's anything beyond that, then it would clearly be hearsay. Does that make sense?

MR. GROSS: Yes, Your Honor.

THE COURT: All right. So I completely lost track of your question. Go ahead and ask it again.

MR. SAENZ: Could the court reporter read the

question.

THE COURT:  I don't know that we can.  Madam Court Reporter, can we do that?

(Court Reporter reads back the requested portion of the record.)

THE COURT:  All right.  So the question is what did you mean when you told the doctor not really.  Is that the question?

MR. SAENZ:  Yes, Your Honor.

THE COURT:  Ms. Wagoner, are you able to answer that question?

THE WITNESS:  I believe so, Your Honor.

THE COURT:  Go ahead and answer that question.

THE WITNESS:  Yes, sir.

The doctor had explained to me that because it had stopped bleeding, that he would have to create abrasion to the area again and hadn't been ordered to put stitches in and that they weren't really necessary because they had already stopped bleeding.  So when he asked me if I wanted that done so I could have it stitched back together, I told him not really; meaning, I did not want stitches to close the wound.

BY MR. SAENZ:

Q.  Ms. Wagoner, did you tell the doctor what happened?

A.  No, sir.

Q.  What did you tell the doctor?

A. I told him that I hit it on the edge of a table.

Q. Did you hit it on the edge of a table?

A. No, sir.

Q. Why did you tell the doctor that?

A. I was afraid of DOC putting me in segregation and me not being able to finish what I had started.

Q. Ms. Wagoner, how long were you in the emergency room?

A. I'll say approximately an hour and a half, maybe two.

Q. And then what happened?

A. I was sent back to DOC.

Q. After you were back at DOC, did you suffer from -- tell me about the condition of your, of your genitals after you were sent back to DOC?

A. Extremely swollen. Soft tissue so it was probably three times the size of normal. Purple, irritated, very painful.

Q. Did there come a time after you were released from the emergency room where you met with a health care provider from the DOC?

A. That was the next day. I was -- immediately after being sent back to DOC, I went into medical. As always, they check your blood pressure and such before they send you back to the MOD. They said something to me. I don't remember what that was, and then sent me back to the MOD.

I was later called back to medical probably an hour later and was told by the medical nurse that was on at night

that I had to be cathetered and if I did not want a catheter that I needed to sign the paper. I refused the catheter and was instantly put into cuffs and had to sign the paper behind my back and was taken to segregation for I want to say four or five days for observation of healthy healing.

Q. During those four or five days of observation, did anything happen to your genitals?

A. At that time, it was just swollen and hurting and painful.

Q. Did you receive any treatment for -- for genital care during this time period?

A. They gave me a couple of alcohol wipes and some Bacitracin.

Q. During this same time period, did you speak with anyone at mental health services?

A. Not that I recall at this time.

Q. Ms. Wagoner, after this incident in 2016, did there come a time when you -- when you asked to speak with someone at mental health services?

A. Yes. After I went back to the MOD, I filled out an RFI requesting I be seen.

Q. What did you want to be seen for?

A. For gender dysphoria purposes.

Q. What do you mean?

A. Couldn't make sense of anything so I was asking for mental health help to make sense of those things.

Q. And did --

MS. WALKER: Your Honor, I do apologize for interrupting. The trooper here is asking for instructions of regarding where they should sit.

THE COURT: I will defer to their expertise on this. Okay. So, madam trooper, if you stage yourself in the jury box, does that suffice? Okay. Are you okay there? Would you like to have a seat in the jury box? That's fine by me.

All right. So we're good?

All right. Mr. Saenz.

MR. SAENZ: I'm sorry. Could the court reporter please repeat the last question.

(Court Reporter reads back requested portion of the record.)

MR. SAENZ: I will strike that and ask the question again.

BY MR. SAENZ:

Q. And did you meet with someone from mental health services?

A. Yes. I do believe I was met by Adam -- no. Sorry. I can see his face. For the life of me I cannot remember the man's name right now.

Q. Okay. Do you remember speaking with someone from mental health services at that time?

A. Yeah. I want to say his last name is Smith. Rod Smith I do believe. Thank you.

Q. Who is Rod Smith?

271

A. He's a mental health clinician II at DOC.

Q. Okay. And did you tell Rod Smith why you wanted to speak with someone?

A. Yes, I did.

Q. What did you say?

A. He told me those services weren't available at the Alaska DOC.

Q. What services?

A. Mental health or any medical care for gender dysphoria. That's a nontherapeutic environment and it was just unavailable.

Q. How did you feel hearing that?

A. It reasserted and assured in my mind that my initial attempt to fix my problem was logical.

Q. What made it logical to you?

A. The main reason why I attempted it myself was because I knew DOC would not help me. I had been incarcerated for about six years at that time and I had watched person after person go into medical for many other reasons and all of those reasons were always denied or DOC would give care in such a way that was just asinine.

Q. Since 2016 and after meeting with Rod Smith, have you made any other attempts to treat your gender dysphoria on your own?

A. I don't quite understand what you're asking me.

Q. Did there come a time that you started to receive treatment

UNITED STATES DISTRICT COURT

**2-ER-0329**

for gender dysphoria?

A. No. As a matter of fact, I was stonewalled on any type of treatment for my gender dysphoria. It became excuses and reasoning. It went on for quite some time like that before I was given some study books for learning coping skills.

Q. When did you get study books?

A. I'm not sure of the year. I'm sorry. I couldn't be accurate to that.

Q. Who provided you with study books?

A. Rod Smith.

Q. And did you use those study books?

A. I did. I used them as much as I could in the environment I was in. They were designed for people in the free world.

Q. How are you feeling at this time that you were completing these study books?

A. I was confused why is it that I was receiving a book that has nothing to do with my environment or the things I was going through and being told that this was my care.

Q. Where were you going through?

A. My desires to remove my genitals. Fear of assault due to the way I was walking around in a male prison dressed as a female. And, you know, then of course the confusion of just trying to make through it on my own.

Q. What did that confusion feel like?

A. Very lonely. I was very lonely.

UNITED STATES DISTRICT COURT

**2-ER-0330**

Q. After you attempted what you have called an inversion procedure, have you attempted to do this again?

A. Yes, sir.

Q. How many times have you attempted to do this again?

A. Matters on if you consider me trying to remove my testicles as well as the inversion process or we're talking about surgical tries.

Q. Can you tell me how many times have you tried to make any changes to your genitals, including your penis, your scrotum, your testicles?

A. With razor blades and instruments, three times. And on a daily basis with testicle crushing, stuff like that, continual.

Q. What is testicle crushing?

A. So as I stated earlier, I grew up around farm animals. And strangulation is the easiest way to rid an animal of its testicles or its body parts if they have issues with them. So I strangulate my testicles with hopes that the spermatic cord will no longer allow blood flow to them.

Q. When did you start doing this?

A. 2016.

Q. When was the last time you crushed your testicles?

A. Yesterday.

Q. What are you trying to -- what are you attempting to do by crushing your testicles?

A. Two things. One, as long as the Leydig cells don't

reproduce, I don't deal with the testosterone in my system. And, secondly, at some point, the testicles are going to have no choice but to give up the fight.

Q. Does this have -- does the testicle crushing have an effect on your -- your mental health?

A. I don't understand what you're asking me.

Q. I'll rephrase. Ms. Wagoner, how does it feel to crush your testicles?

A. Very painful.

Q. Have you reported to the Alaska Department of Corrections or any of its staff, employees, or officials about your ongoing efforts to -- or your ongoing efforts to crush your testicles?

A. It's been discussed with multiple DOC officials. One medical provider. I can't remember her name. I want to say it's Donovan or something to that effect.

And also a mental health specialist. Her name is Traci Tusha. We discussed that and the fact that my desire to wrap a rubber band around my testicles and penis to remove them, I've done that many times.

Q. Have there been times that you decided not to report what you have been doing to change your genitals to anyone at the Alaska Department of Corrections?

A. Quite often. Quite often I avoid the conversation due to the fact of the continued punishment of me for the problem.

Q. What punishment?

A. Write-ups for self mutilation. They will take you to segregation and put you on 23 hour lockdown. It holds heavy ramifications.

Q. Have you been punished for this before?

A. Multiple times. I have been put through the boards and housed in segregation over it multiple times.

Q. Ms. Wagoner, can you describe what is the current physical state of your genitals?

A. They are completely mangled. They are three times the size of what they should be all the way up to the spermatic cords. The testicles are quite large, probably three to four times the size of normal. My penis is swollen at all times and tears and bleeds and is separated from the top to the base.

Q. How does this make you feel?

A. Physically, mentally are you asking me?

Q. Both.

A. I'll answer the mental aspect of it first.

Q. Go ahead.

A. It's kind of a conundrum being stuck in between being able to survive versus being healthy. I'm extremely distressed over the situation on a regular basis -- all the time because of it and that causes me anguish that throughout the day, throughout the night, hurts to pee. So that causes me the anguish again and again.

And just knowing that it's there is the anguish I

speak of, those pains and stuff just make it worse and multiplies it so the physical aspect is a huge driver of it as well.

The physical aspect takes on many other things though. It's not just the physical pain I deal with from it. It's the fact that it's there. It's the fact that I have to use a male restroom and people -- I sit here and people will come in and do the -- they look over or -- so it causes that -- that anguish as well mentally and physically.

But more than anything, there's just really no -- there's no pain management for it so I sit in pain 24 hours a day from my knee caps to my chest.

Q. Are you currently receiving any treatment for your genital pain?

A. DOC provides me with 970 milligrams of Tylenol three times a day and a pill called Meloxicam so it helps some. But as far as the actual pain, the levels are so extreme that you don't really -- I -- I'll speak in I -- I don't really notice any change from taking it unless I put myself through excruciating pain like I have in this courtroom for the last day and a half of not taking my Tylenol to where when I take it in the evening it provides me enough numbing to the area or desensitization that I can fall asleep.

Q. Throughout the day, how often are you thinking about your genitals?

A. As I just stated, that's a consistent thing.

Q. Does thinking about your genitals affect your daily life?

A. Very much so.

Q. How so?

A. Well, the pain obviously affects me so I'm always having to move my genitals whether there's people around or not. So there's that effect. And then there's always trying to make sure I have my pad in place so I'm not leaking urine down my pants and trying not to have my large testicles or large penis showing through my pants.

And then, you know, then there's the aspect of restrooms and showers where I'm around men. There's very few people like me in our population. And they keep us separated, you know, divide and conquer. We're not allowed to -- or at least not put into the same MOD for whatever reasoning. I've been given many excuses for that so that I'm always alone and I'm either the topic on the topic. Either I'm being hated on or I'm being lusted upon.

And please keep in mind we're a male facility so there's all sorts in that environment and so that causes me a lot of stress, you know, just trying to navigate through my day, a woman in a male's facility and it's extreme. Then, you know, there's a situation of always having to worry about having a celly.

I've been lucky lately. I had a few decent cellies.

Sergeants have paid closer attention to make sure I have adequate or reasonable roomies as I like to call them.

Q. Ms. Wagoner, you testified earlier that you are on Estradiol. Correct?

A. Yes, sir.

Q. What -- is that hormone therapy?

A. Yes, sir.

Q. And is that hormone therapy related to your gender dysphoria?

A. Yes, sir.

Q. When did you start taking this hormone therapy?

A. July of '22.

Q. Prior to July of 2022, when did you first ask for this hormone therapy?

A. I've asked for hormone therapy since 2016.

Q. And you did not start on it until July of 2022. Do you know why?

A. Well that's a big question. They gave reason after reason of not starting me. It's a brand new thing they were dealing with in DOC. They've never seen anyone like me that they had no understanding of people like me -- that they had no adequate training how to deal with people like me, that it just wasn't done within the confines of prison, that it wasn't a therapeutic environment, that it wasn't a necessary treatment, that it would -- Mr. Lawrence told me that.

UNITED STATES DISTRICT COURT

MR. GROSS: Object to hearsay, Your Honor.

THE COURT: Just --

MR. SAENZ: I'll ask a question about that.

BY MR. SAENZ:

Q. Who is Dr. Lawrence?

A. Dr. Lawrence is -- he was -- at the time when I was dealing with him -- the Chief Medical Officer for the Department of Corrections in Alaska.

Q. Okay. And if I ask a question about it, I'm asking what did you say or what did the effect of what Dr. Lawrence had on you, not for what Dr. Lawrence told you. Do you understand?

A. So not for the substance of what he said but what they -- the situation was?

Q. Right.

A. Yes, sir.

MR. GROSS: Your Honor --

THE COURT: All right. So insofar as Ms. Wagoner may have been told information about why she was or was not getting the treatment that she wanted, it's I think relevant to an -- and admissible as to her statement of mind and actions she may have taken.

As to the truth of those statements, they would be hearsay but I don't hear them being offered for that purpose. So insofar as Ms. Wagoner is testifying about what actions she took and why she took them or what her state of mind was, she

280

can testify to that. And insofar as there are statements that were made to her that informed her state of mind or caused her to take certain actions, I will allow it. I won't consider such hearsay statements for the truth.

So go ahead and re-ask your question.

BY MR. SAENZ:

Q. All right. Ms. Wagoner --

A. If that's all right, I'll just pick up where I was.

Q. Let me ask you the question. What, if any, actions did you take based on what Dr. Lawrence told you?

A. I filed grievances. I filed requests to the providers to give me physical exams and evaluate whether or not that was a fact. It was stated that hormone therapy would cause bone degradation and heart problems and possible lung problems for me.

MR. SAENZ: Your Honor, just to renew my response concerning Dr. Lawrence, Dr. Lawrence is a named defendant and statements made by him are subject to hearsay exception as a party mentioned.

THE COURT: Mr. Gross.

MR. GROSS: I think you overruled the objection so I'm not sure what the point of that would be but --

THE COURT: Yeah. I mean, I don't hear you eliciting statements that were made to Ms. Wagoner for the truth of those statements. I heard you eliciting them for their effect on her

or how they informed actions that she took.  If you are trying to elicit statements made by other individuals for the truth of those statements, then I do think we need some additional foundation and I would be open to revisiting an objection on that basis.

MR. SAENZ:  Okay.

BY MR. SAENZ:

Q.  Who is Dr. Rachel Samuelson?

A.  She's my providing physician.

Q.  And what does she provide you?

A.  She provides me with gender-affirming care.

Q.  What type of gender-affirming care?

A.  At this point, she has prescribed me Estradiol which I take weekly and manages that for me.

Q.  When did you first meet Dr. Samuelson?

A.  July of 2022.

Q.  And do you recall what happened the first time you met with Dr. Samuelson?

A.  Yes.  We went over informed consent, we discussed my gender dysphoria, how it originated, where I was suffering.  She did a physical exam on me of my genitals and my body.  And we discussed my weight, and we discussed the ability that, you know, hormone therapy can be hard on the system and some of the other side effects that are possible.

Q.  Since July of 2022, have you had any issues in getting the

UNITED STATES DISTRICT COURT

2-ER-0339

hormone therapy?

A. There was one lapse by a day they mis-ordered my medication, and then that's -- it's been pretty consistent since.

Q. In the past few months, have you noticed any changes to how your hormone therapy affects you?

A. What do you mean?

Q. Any physical changes to -- or strike that.

Have there been any effects to you physically from your hormone therapy?

A. Yeah. At the two year mark, started putting on a little bit of weight. My weight distribution changed. Thick hips, a lot of frontal weight in my chest. My arm density changed. It's very hard to keep any type of muscle on. Leg muscle is now more fat than leg muscle. Hair growth on my body. My skin has gotten softer. My skin is no longer producing the hair that it used to on my arms and chest and legs.

Q. And has hormone therapy affected you mentally?

A. Yes.

Q. How so?

A. It's given me a nice calm, peace. Rather peaceful. The last six to eight months it has -- it has helped me feel more at peace.

Q. Ms. Wagoner, to your knowledge, what is gender-affirming genital surgery?

UNITED STATES DISTRICT COURT

**2-ER-0340**

A. It would be two parts. It would be aligning my body with my mind. That's first and foremost. That is its purpose. And it's the creation of a neovagina to where my genitals would be correct to who I am.

Q. What was the first time you ever spoke to a medical or mental health provider at the Alaska Department of Corrections about gender-affirming surgeries?

A. That was sometime in '17 when I was talking to them about medications and some other things.

Q. Do you recall who you spoke with?

A. Can't remember her first name but it was Dr. Sawyer.

Q. And after speaking with Dr. Sawyer, what was your impression of what Dr. Sawyer said?

MR. GROSS: Well, Your Honor, I'm going to object on the basis of hearsay.

THE COURT: Yeah. So I think it could be a party-opponent admission but I would need more foundation, so, at this point, I would sustain the objection.

MR. SAENZ: Your Honor, Ms. Wagoner's testimony is being offered to prove that the defendants denied, delayed, or interfered with her care. It is not hearsay under F -- Rule of Evidence 801(D)(2). The denial of request for care is the act constituting the 1983 violation and the objection should be overruled.

THE COURT: Okay. So I see why it would be relevant.

UNITED STATES DISTRICT COURT

**2-ER-0341**

284

That's not the issue. My greater concern is here is a Dr. Sawyer. We don't know Dr. Sawyer's first name. I don't know exactly in what capacity Dr. Sawyer was working. I don't know that Dr. Sawyer had the authority to make statements on behalf of the institution.

So this is the kind of foundation I would need to admit this sort of hearsay evidence. So if you can lay that foundation, go ahead and do so, otherwise, I'll sustain the objection.

MS. KERR: Can I have a moment, Your Honor.

THE COURT: Yeah. Well, it's ten to noon right now so if we could break right now, you can take ten minutes and then we'll come back at 1:00. Is that agreeable? Is that agreeable with everybody? Yes.

MR. GROSS: My thought was to try to conserve time we could do ten to 1:00 so we are efficient with our time.

THE COURT: I appreciate that. I don't think ten minutes is going to break us. We'll come back at 1:00.

We are adjourned until 1:00.

COURTROOM DEPUTY: All rise. Matter is in recess until 1:00 p.m.

(The record was concluded at this point at 11:50 a.m.)

---oOo---

UNITED STATES DISTRICT COURT

**2-ER-0342**

**C E R T I F I C A T E**

I, ANDREA K. BLUEDORN, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED this 13th day of May, 2025.

*/s/ Andrea K. Bluedorn*
Andrea K. Bluedorn, RMR, CRR

UNITED STATES DISTRICT COURT