No. 25-6813

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

EMALEE WAGONER,

*Plaintiff-Appellee*,

v.

JENNIFER WINKELMAN,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
District of Alaska, No. 3:18-cv-00211 (Scoble, J.)

## EXCERPTS OF RECORD
## VOLUME V

J. Michael Connolly
Jeffrey M. Harris
Rachael C.T. Wyrick
Ryan M. Proctor
Marie E. Sayer
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
jeff@consovoymccarthy.com
rachael@consovoymccarthy.com
ryan@consovoymccarthy.com
mari@consovoymccarthy.com

STEPHEN J. COX
ATTORNEY GENERAL

Jenna Lorence
*Solicitor General*
Jessica M. Alloway
*Deputy Solicitor General*
ALASKA OFFICE OF THE
ATTORNEY GENERAL
DEPARTMENT OF LAW
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
(907) 269-7938
jenna.lorence@alaska.gov
jessie.alloway@alaska.gov

March 18, 2026

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

_____

| | |
|---|---|
| **Emalee Wagoner,** | ) |
| | ) No. 3:18-cv-00211-MMS |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Anchorage, Alaska |
| **Nancy Dahlstrom et al.,** | ) May 15, 2025 |
| | ) 1:06 p.m. |
| Defendants. | ) |
| | ) **(AMENDED)** |

**BEFORE:  THE HONORABLE MATTHEW M. SCOBLE, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**VIA HYBRID ZOOM VIDEOCONFERENCE**

**BENCH TRIAL - DAY 4**

**(P.M. SESSION)**

**(Pages 767-888)**

Official Court Reporter:
**Andrea K. Bluedorn, RMR, CRR (By Zoom Videoconference)**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona 85003-2151
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiff:
        LAMBDA LEGAL DEFENSE AND EDUCATION FUND
        By:   **Richard Saenz, Esq.**
              **Morgan Walker, Esq.**
        120 Wall Street, 19th Floor
        New York, NY 10005-3919

For the Plaintiff:
        LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
        By:   **Sasha Buchert, Esq.**
        815 16th Street NW, Ste 4140
        Washington, DC 20006

For the Plaintiff:
        LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
        By:   **Sonja D. Kerr, Esq.**
        3500 Oak Lawn Avenue, Suite 500
        Dallas, Texas 75219

For the Defendants:
        BIRCH HORTON BITTNER & CHEROT
        By:   **Mara Michaletz, Esq.**
              **David Karl Gross, Esq.**
        510 L. Street, Suite 700
        Anchorage, Alaska 99501

**I N D E X**

**WITNESSES:**                                              **PAGE:**

UNITED STATES DISTRICT COURT

**5-ER-0829**

Mr. Ray Mercer
    Direct Examination by Ms. Michaletz        770
    Cross-Examination by Ms. Kerr              796
    Redirect Examination by Ms. Michaletz      820
    Recross Examination by Ms. Kerr            823

Dr. Robert Lawrence.
    Direct Examination by Mr. Gross            826
    Cross-Examination by Ms. Kerr              875


**EXHIBITS:**                                  **PAGE:**

2803-  Records at SOA000305  SOA000307,        771
SOA000295 - SOA000296

2105- Records at WRDOC_000971  WRDOC_000978;   781
WRDOC_000749; SOA005186; SOA005539  SOA005546;
SOA005088  SOA005089; SOA005532  SOA005538;
SOA005517  SOA005523; SOA004929

2041- MAC Decision for GCC22-673, dated        858
November 14, 2022 (SOA006334)

2043- MAC Decision, dated August 22, 2022      866
(SOA004167)

UNITED STATES DISTRICT COURT

**5-ER-0830**

**P R O C E E D I N G S**

COURTROOM DEPUTY:  United States District Court is again in session.  Please be seated.

THE COURT:  All right.  Good afternoon, everyone. Thank you for your patience.  The parties are present.  Ms. Wagoner is present.

And Mr. Mercer is still on the witness stand.  Sir, you're still under oath.  Ms. Michaletz, you were on direct.

MS. MICHALETZ:  Thank you, Your Honor.

DIRECT EXAMINATION BY MS. MICHALETZ:

Q.  Good afternoon, Mr. Mercer.  I'm going to pick up on another exhibit here.  Let's look at trial Exhibit 2083.  Is that in your binder?

A.  Yes.

Q.  Do you recognize that exhibit?

A.  I do.

Q.  And is it a DOC record?

A.  Yes, it is.

Q.  What kind of record is it?

A.  This looks like -- can I see the last page, please.

Q.  Yeah.  Oh, you mean on the screen?

A.  Yeah.

Q.  Okay.

A.  It is a mental health assessment.

UNITED STATES DISTRICT COURT

Q. And the date of that is?

A. It looks like 8-15-19.

Q. Great. And this is a record upon which mental health would have relied?

A. Yes.

Q. And it's a record generated by it looks like Rodney Smith who we've established is a mental health clinician 2. Is that correct?

A. Yes.

MS. MICHALETZ: I move to admit 2083.

THE COURT: Ms. Kerr, 2083.

MS. KERR: Yeah.

THE COURT: Ma'am, if you could pull your microphone in close.

MS. KERR: Sonja Kerr for the plaintiffs.

We don't object to 2083.

THE COURT: 2083 without objection is admitted.

BY MS. MICHALETZ:

Q. Okay. Let's look at the -- Ms. Milliken -- the paragraph that begins inmate has some apparent control issues. It's on page 5 -- or page 3.

Inmate has some apparent control issues likely stemming from his personality and substance disorders. Focusing on treatment issues would be more beneficial for this inmate rather being -- him being in a position of power and

UNITED STATES DISTRICT COURT

**5-ER-0832**

control.  Has mental staff observed Ms. Wagoner struggling with feelings relating to not being in power and control?

A.  Yes.

Q.  In what context?

A.  Frustration.  Being an inmate is very frustrating having very little control over much and it does seem to affect Ms. Wagoner.

COURTROOM DEPUTY:  Ms. Kerr, I think your laptop is too close to the microphone.

(A discussion was held off the record.)

BY MS. MICHALETZ:

Q.  So let's pull up trial Exhibit Number 2048.  This has been admitted.  And, Ms. Milliken, let's take a look at the second page under current mental health symptoms reported.

First of all, Mr. Mercer, what is this document?

A.  This is the individualized treatment plan that is a product of the committee meeting.

Q.  Dated June 15th, 2023?

A.  Yeah, I do believe it is.

Q.  Okay.  This states, overall, inmate appears to be managing her daily life skills with proper hygiene, maintaining an institutional job, attending programming.  She has been given the dialectical behavior therapy skills chapter one which she did not bring to this meeting.  Reports having support in the MOD from others and within her own peers.

UNITED STATES DISTRICT COURT

**5-ER-0833**

Mr. Mercer, what's the dialectical behavior therapy skills?

A. It's the most evidence-based approach for helping folks with borderline personality disorder or emotional regulation, in general, does not have to be a personality disorder. It's a great tool for learning emotional regulation.

Q. And what does -- what is the workbook comprised of?

A. It's comprised of techniques and interventions that you can actually, you know, use right out of the workbook for yourself to learn how to manage your emotions and manage your behavior.

Q. And when I hear the term workbook what I hear is that it's sort of an interactive resource. Is that just -- just asking him what workbook means?

THE COURT: The objection's overruled.

(Court Reporter interrupts for clarification.)

THE COURT: I think we've got to adjust the microphone here. All right. So, Ms. Kerr, can you go ahead and identify yourself and restate your objection.

MS. KERR: Sonja Kerr for the plaintiffs. The objection was leading.

THE COURT: All right. And I will overrule that objection.

Madam Court Reporter, is the sound better now? All right. Go ahead, ma'am.

BY MS. MICHALETZ:

UNITED STATES DISTRICT COURT

**5-ER-0834**

Q. Mr. Mercer, the point of my question is a follow up question on what the workbook is, means, and what it can provide to the inmates.

A. Yes. It's an instructional set of tools and it is interactive and it's designed to be largely workbook or --

MS. MICHALETZ: It sounds like it's.

THE COURT: I think that is coming from Mr. Mercer's microphone.

COURTROOM DEPUTY: Your Honor, this is the courtroom deputy. I just adjusted his volume. I think it's a little high.

THE COURT: We reduced the gain on Mr. Mercer's microphone and we'll see how that goes.

THE WITNESS: So it's a combination of a textbook and interactive workbook where you can learn the techniques and strategies for managing your emotions and your behavior and it's a self exploration.

BY MS. MICHALETZ:

Q. So going back to this summary, is this a summary that the Gender Dysphoria Review Committee would have relied on in coming up with the treatment recommendation --

A. Yes.

Q. -- as part of this report?

A. Yes.

Q. And just wait for me to finish my question before you

UNITED STATES DISTRICT COURT

**5-ER-0835**

775

answer.  Thank you very much.

So what's the takeaway from this report?

A.  This report shows that Ms. Wagoner is functioning relatively well.

Q.  And when you evaluate the gender dysphoria treatment for Ms. Wagoner, what are you looking at in terms of this report and what are you considering?

A.  We're looking at reported symptoms and signs and observable objective signs of functioning.  And it does appear in this assessment that Ms. Wagoner is functioning even maybe above average.

Q.  Why would you say that?

A.  Having a job and going to programming, support from others, social --

Q.  These are all factors you're taking into consideration?

A.  Yeah.  Absolutely.

Q.  Okay.  Let's turn to trial Exhibit 2049.  This has also been admitted.  Do you see that on the screen, Mr. Mercer?

A.  Yes, I do.

Q.  And what does that appear to be?

A.  It looks like another committee meeting notes and treatment plan.

Q.  Now I see your name on here as a committee member.  And what's the date on here?

A.  9-19-23.

UNITED STATES DISTRICT COURT

**5-ER-0836**

Q. So this represents another meeting of the gender dysphoria treatment review committee and you're looking at Ms. Wagoner's case specifically?

A. Yes.

Q. Okay. Let's turn to the second page under current mental health treatment. And zoom in on that first paragraph. It says Ms. Wagoner is currently residing in segregation. Ms. Wagoner reported that she had not received the dialectical therapy workbook chapter one prior and was given it today. Ms. Wagoner does not show interest in completing workbook or working with MHC. As DOC does not do traditional therapy as this is not a therapeutic environment, it would not be an option to utilize any other forms of treatment. She continues to see MH providers for medication management within DOC.

Several follow up questions for this. One, MHC in this means mental health what?

A. Clinician.

Q. Okay. Do we know who would have written this note?

A. No. It's not signed. But I am assuming that it's our other mental health clinician 3, Ms. Tusha.

Q. So if we were to look back at the records. If Ms. Tusha had generated a note just prior to this meeting, we could put two and two together?

A. Yes.

Q. Okay. Ms. Tusha here says DOC does not do traditional

UNITED STATES DISTRICT COURT

**5-ER-0837**

777

therapy as this is not a therapeutic environment. Can you explain to me what that means.

A. Well actually we don't provide traditional one-to-one like weekly talk therapy, largely because of a lack of resources, less than it's not a therapeutic environment. We just don't have the personnel to provide, you know, weekly or even bi-weekly one-to-one, hour long sessions.

Q. So even though Ms. Tusha says it's not a therapeutic environment, are there therapeutic resources available to inmates?

A. Yes.

Q. And can you describe some of those resources.

A. We do rely pretty heavily on an evidence-based library of workbooks and information sheets that are self study, self taught, and then you can check in with your clinician at your next assessment about what you learned or go over your workbook with us.

Q. So when inmates are given these resources at a meeting, for instance, and they can take them away, work on them, can they bring them back to the next meeting?

A. Yes.

Q. And go over their answers?

A. Yes.

Q. All right. So they're able to discuss then their work -- homework as it were -- to go work on themselves with their

UNITED STATES DISTRICT COURT

**5-ER-0838**

mental health clinician?

A. Yes.

Q. Okay. All right. And it's required to work with mental health clinicians?

A. No.

Q. Let's read the next paragraph where it says mood there. Mood appears to be angry and irritable but only towards this staff. Denied any hallucinations, delusions, or paranoia and denied any suicidal or homicidal ideation. She reported having many issues during her time in segregation such as not being able to shower, not getting a razor, and being housed with a male inmate.

Due to this, she is reporting that her, quote, gender dysphoria is suffering. Symptoms appear as behaving aggressively, attempting to control others' behavior, manipulation, and lying.

Is this a summary that the Gender Dysphoria Review Committee would have relied on?

A. Yes.

Q. And is this a summary that you would have taken into consideration in coming up with Ms. Wagoner's individualized treatment plan, recommendations?

A. Yes.

Q. And how so?

A. Well, I mean we need to take her current mental state and

779

mood into consideration and adjust accordingly or remain consistent with our recommendation which I think we probably were.

Q. We can -- we can look at the recommendations. Ms. Milliken, do you want to zoom in on those at the end.

So let's go through these because these appear on other Gender Dysphoria Review Committee recommendations. Why would you recommend to continue employment?

MS. KERR: I'm sorry. I couldn't hear you, counsel.

BY MS. MICHALETZ:

Q. Why would you recommend to continue employment?

A. It provides structure in a person's day and life, helps a person have meaning, and -- and a healthy preoccupation. Keeps her mind busy. Lots of inmates really like their job. It's part of their coping with incarceration.

Q. Why would it be a suggestion to continue with programming as available?

A. Similar reasons. Programming is a general term for our group therapy and rehabilitation groups. Due to resources, DOC mental health and education do a lot of our work in group settings. And so we would ask her to -- and any other patient that's working on an issue, she would go to programming and learn new ways of thinking and learn new coping skills.

Q. What about continuing medication as prescribed by MH provider?

UNITED STATES DISTRICT COURT

**5-ER-0840**

A. Yeah. I mean that's kind of given. We don't necessarily have to put that on there because it's already ordered by the physician but we do. We do recommend it be consistent with medication compliance.

Q. I see there's continue Estradiol as directed by ANHC?

A. That would be our medical personnel that recommended that.

Q. Okay. Continue to meet with mental health to work through the dialectical behavior therapy workbook for emotion regulation and distress tolerance?

A. Indeed. That is the closest thing to an individual session that you're probably going to be able to get in DOC mental health.

Q. And then it says gender dysphoria treatment team will continue to assess quarterly and refer to MAC Committee for treatment referral as requested by ANHC?

A. So ANHCM, I think this is probably some of the medical referrals that her outside medical folks were wanting and we were asking the MAC Committee, you know, if they were going to allow.

Q. Okay. So that -- that recommendation that comes from outside is deferred to the MAC Committee to make that decision?

A. Yes.

Q. Let's go to trial Exhibit 2105. Have you reviewed these records? Look at them in the notebook because that's where you're going to find --

UNITED STATES DISTRICT COURT

**5-ER-0841**

781

A.  Yeah, I have reviewed these.

Q.  And what are those records?

A.  This is a mental health assessment follow up by mental health clinician 3 Tusha.

Q.  Well, there's several mental health progress notes.  Is that correct?

A.  Okay.  Stacks of them.  Yes.

MS. MICHALETZ:  I'll represent to the Court, Your Honor, that 2105 is a compilation of basically the most recent -- many of the most recent mental health progress reports.  So this would be from February, June, August, December -- two in December -- January of 2024, April of 2024, June of 2024.  And all of them relate to Ms. Wagoner and all of them are generated by mental health staff.

THE COURT:  Okay.  And you're moving for admission of 2105?

MS. MICHALETZ:  That's correct.

THE COURT:  Okay.  Ms. Kerr, any objection to 2105?

MS. KERR:  This is Ms. Kerr for the plaintiff.  I do object as to completeness.  I understand this is -- these are items they gathered but we have no information as to whether these are the complete -- whatever the records are that they're claiming.

THE COURT:  All right.  On that basis, the objection is overruled.  2105 is admitted.

UNITED STATES DISTRICT COURT

MS. MICHALETZ: Thank you.

BY MS. MICHALETZ:

Q. Let's look at page 21 of 35 and Mackenzie will pull up on the screen, Mr. Mercer.

A. Thank you.

Q. Let's focus on the first two sentences, first two lines. The patient seen today was taken off Wellbutrin at her request -- I think that's supposed to read at her request. Since she was not consistently taking Wellbutrin, it was DC'd. Patient states she had massive withdrawals. Quote, you took it off me cold turkey. MAR shows she was non-med adherent. Patient says she has been fighting the sads and says she is not working.

Just so the record is clear, what does DC'd mean?

A. Discontinued.

Q. Okay. What is MAR?

A. Medication administration record.

Q. All right. So when a patient takes a medication, that's recorded?

A. Yes.

Q. And so mental health would be able to see the extent to which a patient was agreeing to take the medication on a daily basis or however prescribed?

A. Yes.

Q. Okay. And is that something that mental health takes into consideration with regards to an inmate's treatment and care?

783

A.  Definitely.

Q.  Why do you say definitely?

A.  It's a pretty key component to treating mental health issues in the Department of Corrections as our resources for individual talk therapy are so thin.  It's largely a clinical model.  And so if someone is on a medication for their symptoms, we think it's very important to consistently take them.

Q.  Now let's go down to where -- Ms. Milliken, it starts MHC. MHHC offered psychoeducation materials.  Patient states --

(Court Reporter interjects.)

BY MS. MICHALETZ:

Q.  This patient was quick to anger, argumentive when discussing the importance of psychoeducation materials. Patient also escalated when she was informed that she appeared to be doing well.  Patient states, quote, I am not doing well. If you tell them that, I will never get the procedure.  I'm not fine, but I'm dealing with the day-to-day stress.

Mr. Mercer, is this a note that the Gender Dysphoria Committee would have reviewed and taken into consideration?

A.  Yes.

Q.  And why is that significant?

A.  Any -- any mental health note between review meetings is relevant.  And why is this particular one significant?

Q.  Yes.

UNITED STATES DISTRICT COURT

784

A. I think it shows some frustration with working with the psychoeducational materials. I think Ms. Wagoner was -- she tried it for a while and got frustrated and stopped. And it also shows a little bit of the difference between observed signs of a mental disorder of some kind and reported symptoms. Difference between what's reported and what's observed.

Q. Let's turn to trial Exhibit Number 2052. This has been admitted I believe.

THE COURT: Show it as admitted.

MS. MICHALETZ: Okay. Great.

BY MS. MICHALETZ:

Q. Do you see that note Mr. Mercer?

A. I do.

Q. And am I correct that it appears to be an updated January 22nd, 2024 -- this is progress note MAC Committee Review. Do you see that?

A. Yes.

Q. Do you -- is that what this is?

A. That's what it is.

Q. As a member of the Gender Dysphoria Review Committee, were you tasked by the MAC to evaluate and monitor the gender dysphoria inmates at Goose Creek?

A. Yes.

Q. And then was the committee responsible for reporting their positions to the MAC on a regular basis?

UNITED STATES DISTRICT COURT

**5-ER-0845**

A. Yes.

Q. Okay. So let's zoom in on this progress note which states that MAC was updated that the GCCC, gender dysphoria management review committee -- wait, let me back up -- presented to the MAC today regarding the GCCC, gender dysphoria management committee review meeting. MAC was updated that the GCCC is recommending no changes to her current treatment plan. They also report further information can be obtained by accessing the medical misc and psychiatric provider note in this EHR.

The GCCC committee further stated that the patient does not meet the DSM-5 TR definition for gender dysphoria due to the patient not meeting the diagnostic criteria #B. The condition is associated with clinically significant distress or impairment with social, occupational, or other important areas of functioning. The GCCC committee stated that the patient is well adjusted, working, and displaying appropriate interpersonal relationships.

Were you a part of the conversations around Ms. Wagoner's status in January 2024?

A. Yes.

Q. And was this the committees opinion that in January of 2024 Ms. Wagoner didn't meet the gender dysphoria criteria under the DSM-5?

A. Criteria B. And she did not.

Q. Tell me why.

UNITED STATES DISTRICT COURT

**5-ER-0846**

A. Well, that's the -- that's the functioning portion of any diagnosis. It's not a disorder if you can still function in the major areas of your life. And at this time, Ms. Wagoner is showing her strength and her resilience and her ability to function and did not meet criteria B.

Q. And this is based on the committees review of what? The self -- the reporting what Ms. Wagoner was reporting she was feeling. Is that correct?

A. Uh-huh.

Q. Okay. And what else?

A. And almost any correctional or educational or probation staff had observed day-to-day and her -- and her observed presentation in interviews. So like objective observable information.

Q. Let's go to trial Exhibit 2050. This would appear to be a March 14th, 2024 record from the Gender Dysphoria Review Committee. And, same thing, you kept on track even though you had reported to the MAC that the committee did not believe that she was gender dysphoric?

A. We didn't just decide to no longer have a gender dysphoria meeting on this person.

Q. That's right?

A. The gender dysphoria diagnosis remained.

Q. Okay.

A. And, therefore, we would continue, per our own clinical

UNITED STATES DISTRICT COURT

**5-ER-0847**

care guide.

Q. Let's flip to the part where it says recommendations, Ms. Milliken.

Many of these are consistent with the recommendations that we read in the prior record. This one says find institutional employment. So I think we can assume that Ms. Wagoner was not employed at that time.

A. Correct.

Q. So despite the fact that the Gender Dysphoria Review Committee had come to the conclusion that Ms. Wagoner's ability to engage in active daily living didn't rise to that level of dysphoria, you still recommended that she continue with her treatment, care, and employment and workbooks.

A. Yes.

Q. Okay. Actually this says recommendation continued to meet with MH on a three month basis for review as inmate is not currently working on any workbooks. And an inmate is not required to work on workbooks. Are they?

A. Not required.

Q. So if an inmate decides they do not want to work on a workbook despite mental health's recommendations, they don't have to?

A. Correct.

Q. Let's look at trial Exhibit 2105. I promise I'm getting to the end of these. And, Ms. Milliken, if you can zoom on -- on

page 28 and the part that starts is upset today.

It looks like, first of all, this is a progress note from April 5th, 2024. Is that consistent with what you've seen, Mr. Mercer?

A. I'm sorry. I was reading. One more time.

MS. KERR: Which page?

MS. MICHALETZ: 28, Exhibit 2105.

MS. KERR: Oh, 28. Okay. Thank you.

BY MS. MICHALETZ:

Q. Mr. Mercer, do you agree with me that the date of this is April 5th, 2024?

A. Yes.

Q. And in the body it says this record is about Ms. Wagoner is upset today as she was caught tattooing someone and expects to lose her job which she enjoyed. She states she has no friends, just acquaintances, and that prison staff break up any budding relationships she's had with anyone else. She currently has a celly and she's okay with it.

She has done quite a lot of programming and is currently working through a workbook provided by the MHC. She's future orientated and talks about becoming a tattoo artist and other things she was would like to do when she's released. Emalee is alert, pleasant, and cooperative today. She is quite talkative.

This would appear to be a good progress report. Do

789

you agree?

A. It is. Losing her job isn't great but she appears to be functioning relatively well.

Q. Is it consistent with someone who is suffering from horrible depression and anxiety?

A. Not horrible depression or anxiety.

Q. Do you see inmates at Goose Creek who do suffer from severe depression?

A. Yes.

Q. Severe anxiety?

A. Yes.

Q. Do they report liking their jobs and are upset when they lose them?

A. People who have severe depression and anxiety generally can't work.

Q. What about looking towards vocational opportunities or future or when they get out?

A. Well, with severe depression and anxiety, it's very hard for a patient or inmate to be future orientated or have positive goals for the future and have a hard time looking forward to the future.

Q. Let's look at the -- this is the last exhibit we're going to publish, 2051.

Mr. Mercer, do you agree with me this appears to be treatment recommendations from the Gender Dysphoria Review

UNITED STATES DISTRICT COURT

**5-ER-0850**

790

Committee dated June 13th, 2024?

A. I do.

Q. Okay. Let's look at page 2, about the fourth sentence starting there appears.

There appears to be an improvement in mood as she has been more social in meeting with her consults. Ms. Wagoner is no longer taking any mental health medications. She will continue to see mental health providers for any future medication management within DOC as needed.

Does this sound like a good progress report?

A. Yes.

Q. She's no longer taking medication?

A. And she is function -- still functioning relatively well. That is a very good report.

Q. All right. And so the Gender Dysphoria Review Committee continues with its recommendations. Can we flip to the last part, Ms. Milliken.

Find employment. Continue with programming. Continue medication -- currently none at this time. Continue the Estradiol and progesterone and continue to meet with MH and medical.

Is this a sign that, according to the committee, her symptoms are generally controlled?

A. Generally controlled and improving.

Q. Okay. At some point did Ms. Wagoner get transferred to

UNITED STATES DISTRICT COURT

**5-ER-0851**

791

your client list?

A. She has very currently, yes.

Q. Your patient, your inmate list, I should say.

A. Caseload we call it.

Q. Caseload. And what did you do in terms of your homework when she was transferred?

A. Well, fortunately, I've been involved in her treatment teams and we staff all of our cases together as a single team so I'm pretty familiar with her case. But if I go to see any inmate, I read at least the last couple mental health notes, some of the nursing notes and definitely speak with officers that work with her 12 hours a day.

Q. With the guards in her MOD?

A. Uh-huh.

Q. And you speak to other mental health clinicians?

A. Uh-huh.

Q. All right. And have you had a chance to meet with Ms. Wagoner?

A. I have.

Q. And what were your opinions of her?

A. I thought she was pretty resilient and had a sense of humor, was coping with a lot of frustration over control of her life because she's incarcerated and wants more control but is coping fairly well. Her humor might have been a little sarcastic but I appreciated it.

UNITED STATES DISTRICT COURT

**5-ER-0852**

Her mood was euthymic, like mid-range.  Even her reported mood was mid-range.  But the signs of mood, being social, sleeping well, functioning, mentoring other inmates indicated to me her mood was pretty good actually.  And her functioning level was, you know, average.

Q.  You mentioned --

A.  Or better.

Q.  I didn't mean to interrupt.  You mentioned mentoring other roommates.  Is something -- is that something that she told you?

A.  Yes.

Q.  In what way did she mentor them?

A.  Well, I'm not positive.  It's some kind of a spiritual or study group that Ms. Wagoner is -- is heading up in -- and coaching and mentoring other inmates.  She historically likes to help her peers.

Q.  And when you met with her, did she seem to you to be exhibiting symptoms consistent with gender dysphoria?

A.  Not criteria B, the functioning level.

MS. KERR:  I'm sorry.  I couldn't --

BY MS. MICHALETZ:

Q.  If you want to repeat that.

A.  Not criteria B of the gender dysphoria diagnostic criteria which would be her function level.

Q.  Do you provide mental health services to inmates who are

UNITED STATES DISTRICT COURT

**5-ER-0853**

793

experiencing extreme distress?

A. Yes.

Q. Are they able to undertake activities of daily living when that happens?

A. Not under extreme distress, no.

Q. Do you provide services to inmates who are in severe pain?

A. Yes.

Q. Are activities of daily living problematic for them?

A. Yes.

Q. Mr. Mercer, have you been formally educated in college or in the pursuit of your Master's on borderline personality disorder?

A. Yes.

Q. And you've been working with inmates for 30 years. During your career, have you provided mental health for inmates diagnosed with borderline personality disorder?

A. Yes.

Q. In your experience, what are some of the characteristics of individuals with borderline personality disorder?

A. Well, unstable emotions, very hard time managing and regulating emotions. Significant interpersonal difficulties ranging from extremes; very close, very tight relationships alternating with very distant, very angry upset relationship and not so much in between.

A tendency to behave recklessly and emotionally

UNITED STATES DISTRICT COURT

**5-ER-0854**

794

disregulated, like self harm or suicide threats or even violence. Emotional disregulation often trends towards anger and the inability to manage anger. Also a significant fear of being abandoned or not supported.

Q. And do you understand that Ms. Wagoner has during her time at Goose Creek been diagnosed with borderline personality disorder?

A. I am aware. However, currently, I think it's personality disorder unspecified.

Q. What does that mean?

A. That means there's definitely personality disorder symptoms, possibly one or two personality disorders concurrently.

Q. Would borderline personality disorder be one of those --

A. Yes.

Q. -- in your experience?

A. Yes.

Q. And, what, if any, characteristics has Ms. Wagoner exhibited during the course of her interactions with you that are consistent with borderline personality disorder?

A. Well in direct interactions with me during the one time I met with her, those disorders -- that disorder was fairly well controlled. However, in my knowledge of her case and working in the -- on the treatment team, she has definitely had the emotional instability and it's shown in the records off and on.

UNITED STATES DISTRICT COURT

**5-ER-0855**

Definitely the self harm when under duress. Definitely volatile interpersonal relationships so there's several. Trouble managing anger.

Q. So what are the mental health resources utilized to assist inmates with borderline personality disorder?

A. Well, personality disorders are not as treatable by medications. And so they generally require long-term therapy, which DOC doesn't have the resources to provide so we use our evidence-based workbooks and bibliotherapy.

And also the school of life helps with personality disorders. They tend to become less disordered as they mature and get older and life kind of teaches them that positive things happen to you when you manage your interpersonal relationships better, when you don't self harm, when you manage your anger better, you know, your own personal experience is more reinforcing. So one of the sad parts about that is you kind of age out.

Q. Is there a specific workbook that mental health assigns to inmates with borderline personality disorder?

A. The gold standard is dialectical behavior therapy.

Q. Okay. In your assessment of Wagoner's treatment, has she been taking full advantage of Goose Creek's available resources for the management of her borderline personality disorder?

A. She is taking advantage of the resources and she has worked pretty hard in different periods, right, in stages, but not as

796

of late has not really wanted to do that at all. So we're talking about, you know, a long timespan here but for some it, yes. Worked pretty hard at it but not recently.

Q. And when the Gender Dysphoria Review Committee was discussing Ms. Wagoner's case and assessing what her treatment plan should look like, was it taking into consideration the fact that she had been diagnosed with borderline personality disorder?

A. Yes.

Q. How so?

A. Well, that's right in our clinical care guide in the diagnostic process as to, you know, look for and diagnose on compounding diagnosis. And I think some of the depression disorder, anxiety disorders, personality disorders can kind of mask or compound and make the diagnosis of gender dysphoria a little less concrete and clear. It's very good to note there are other diagnose as well.

MS. MICHALETZ: All right. I think that's all the questions I have for now. Thank you.

THE COURT: All right. Ms. Kerr, cross examination.

CROSS-EXAMINATION BY MS. KERR:

Q. Afternoon, Mr. Mercer. I'm Sonja Kerr. Counsel for plaintiff. How are you doing?

A. Good afternoon.

Q. Okay. I have -- we got to make sure I don't step over you

UNITED STATES DISTRICT COURT

**5-ER-0857**

so I'll try and do that.

Okay. Mr. Mercer, my understanding is you've been with the Department of Corrections at Goose Creek for about eight years. Is that right?

A. That is right.

Q. And has your -- in your capacity at Goose Creek, you have not worked with Ms. Wagoner until about a couple weeks ago?

A. I have not directly assessed her.

Q. Okay.

A. I don't think until -- I think it was 30th of March of this year.

Q. Okay. And you spoke earlier about someone named Traci Tusha?

A. Yes.

Q. And she has the same position as you at Goose Creek?

A. Yes. She's a mental health clinician 3.

Q. Mental health clinician 3. All right. And isn't it the case that Ms. Tusha has been the person primarily working with Ms. Wagoner over the last eight or so years?

A. Yeah.

Q. So what's the reason for the change?

MS. MICHALETZ: Your Honor, objection.

MS. KERR: I'll just rephrase it.

BY MS. KERR:

Q. When you -- when did you learn that you were going to be

UNITED STATES DISTRICT COURT

having Ms. Wagoner on your caseload?

A. Let's see. Right about a month before the most recent Gender Dysphoria Committee, Ms. Tusha was going to be on vacation and she was -- also her team was extremely short staffed and she asked me if I would take that case and do the assessment for the Gender Dysphoria Committee and then participate in the committee as the lead clinician.

Q. Okay. Now you were aware -- when did you become aware you were going to be listed as a witness for this case?

MS. MICHALETZ: Objection, Your Honor.

THE COURT: What's the objection?

MS. MICHALETZ: Well, she's asking between I think communications between the defendants and a person that we've qualified as being under that attorney client. So to the extent it covers communications between counsel and Mr. Mercer, I think that is protected privileged information.

MS. KERR: I can rephrase it.

BY MS. KERR:

Q. Mr. Mercer, without discussing anything that's attorney client type of information, when approximately did you learn you were going to be testifying in this trial?

A. Not very long ago. Let's see, a month ago, three weeks ago.

Q. Okay. And what, if anything, did you review prior to coming to testify today?

A. All these.

Q. Okay. Can you just tell me the number on those, on that book?

A. Okay.

Q. It should say like 2000 something I think.

A. Yeah. So 2038 through 2105.

Q. Okay.

MS. MICHALETZ: What? No. You didn't -- there's not 75 exhibits in there.

THE WITNESS: 2105 is the end and the beginning is 2021.

BY MS. KERR:

Q. Okay. And did you review them in that kind of a book?

A. No.

Q. Okay. And have you ever testified in any type of proceeding before?

A. Yes.

Q. Okay. When you reviewed the documents in defendants book for this proceeding, did you review any other documents?

A. No.

Q. All right. You said that you had not done or completed an assessment of Ms. Wagoner at this time. Right?

A. At which time.

Q. I think you said earlier you got assigned to her case and because it's -- Tusha was going out of town but you haven't

UNITED STATES DISTRICT COURT

**5-ER-0860**

800

completed an assessment of her. Is that right?

A. I don't think so. I mean, it's been eight years and I have a big caseload and we help each other all the time. I might have seen Ms. Wagoner. I don't think she's going to help me.

Q. No. She can't help you, sir.

A. I might have seen her. I don't remember.

Q. But if you hadn't seen her before recently when she was assigned to your case, you haven't assessed her. Correct?

A. No.

Q. And when you say you were asked to assess, what does that involve, Mr. Mercer?

A. Well it involves the same progress note in -- and a quarterly assessment. If you're not on medications, we need to see you at least every 90 days because you might need to go back on. We need to see how you're doing. So it's -- it's -- in our clinical model, it's more of an ongoing assessment process and adjusting the treatment plan.

Q. Okay. I'm wondering if you can answer a few questions for me about the Gender Dysphoria Review Committee. You talked about being on that committee. Right?

A. Yes.

Q. Can you explain like how long has Goose Creek had a Gender Dysphoria Review Committee?

A. I do believe we have -- have them all right here. I think it was -- if you flip back to the first one.

UNITED STATES DISTRICT COURT

**5-ER-0861**

801

Q. The 2023?

A. Yeah. That got us on track on with our care guide for gender dysphoria.

Q. Okay. So -- and you recall that the -- that care guide was like July of 2022 just as commissioner Winkelman was taking over?

A. Well, I think there's been a couple versions of it. I think the newest one is 2022.

Q. Okay. And so after the care guide was created, then you started having the Gender Dysphoria Committee. Right?

A. I think they coincide. I'm not positive.

Q. All right. And you're referring to the ones you just looked at with your counsel. Right?

A. Yeah.

Q. So prior to that time, Mr. Mercer, were there any type of -- was there any type of Gender Dysphoria Committee that wrote up plans like we've looked at today?

A. No.

Q. Okay. All right. Now, are you aware that Dr. Rachel Samuelson is Ms. Wagoner's treating physician for hormone therapy?

A. I was not aware of the doctor's name.

Q. You don't know about Dr. Samuelson?

A. No.

Q. Do you know that Ms. Wagoner is on hormone therapy?

A. I do.

Q. You do. How did you learn that?

A. Through treatment team interactions with Ms. Tusha and her team. She helps us with our cases. Her team helps -- I think we help her with her cases.

Q. Sure. But you never like had conversations or interactions of any kind with Dr. Samuelson who is treating Ms. Wagoner?

A. No.

Q. Okay. So would you tell me Ms. Wagoner is not part of the Gender Dysphoria Committee. Right?

A. Correct.

Q. And can the Gender Dysphoria Committee approve surgery for Ms. Wagoner?

A. No.

Q. Okay. Who can do that?

A. I'm pretty sure only the MAC Committee can.

Q. Okay. So help explain the structure for me if you would. There's the Gender Dysphoria Committee, then there's the MAC Committee. How do they -- how do they -- like is one higher than the other? Or how do they work?

A. Think about us as the line staff providing the direct care and --

Q. Okay.

A. And then the MAC Committee would be the administrative body that supervised us.

UNITED STATES DISTRICT COURT

**5-ER-0863**

Q. Okay. All right. And with respect to your being on the Gender Dysphoria Committee, before you went to that committee -- which we're estimating was around June of '23 -- did you receive some type of training in gender dysphoria?

A. Not -- not formal training. No.

Q. Okay.

A. Familiarization with the clinical care guide and how to proceed was excellent assistance though.

Q. Okay. So you looked at the clinical care guide which we think is the 2022 one, but other than that, you didn't have any classroom training or big meeting about it or anything like that?

A. No.

Q. Okay. And I just want to clarify your background. I understand you're -- you have a BA and a Master's Degree from University of Alaska?

A. Yes.

Q. Go Huskies.

A. Seawolfs.

Q. Seawolfs. Okay.

And are you a licensed mental health clinician in -- in Alaska?

A. No.

Q. Okay. Could you provide counseling services if you were not working for the Department of Corrections?

UNITED STATES DISTRICT COURT

A. I couldn't do -- I couldn't do an independent practice on my own.

Q. Okay. And do you have any particular certification in mental health counseling for people with gender dysphoria?

A. No.

Q. Do you know who Ms. Wagoner's current mental health provider is?

A. Yes.

Q. Who is it?

A. If you're meaning psychiatric provider --

Q. No. I mean, like the person who's supposed to meet with Ms. Wagoner, like that would be a mental health clinician 2?

A. Oh, that's me.

Q. It's just you. Okay. So you recall looking at records and it was someone named Rod Smith for a while. Right?

A. I would call to get records from Rod Smith.

Q. Yeah. Do you remember he was her counselor for a while?

A. Yes.

Q. Okay. He's no longer her counselor?

A. No.

Q. Ms. Tusha is no longer her counselor, she just meets with her for the committee?

A. I meet with her for the committee.

Q. Okay. And before you did, Ms. Tusha did?

A. Yes.

UNITED STATES DISTRICT COURT

805

Q. And when you meet with someone for the committee, how long is the meeting?

A. Usually about a half hour.

Q. Usually about a half hour. And that's usually about once every 90 days?

A. Yeah.

Q. Okay. And so other than meeting with Ms. Wagoner for the assessment prior to the committee every 90 days, during this last period of time, say 2023 to now, is someone meeting with Ms. Wagoner for mental health services beyond that?

A. Yes.

Q. Who?

A. That was Ms. Tusha primarily.

Q. Ms. Tusha primarily?

A. And anybody she supervised. No mental health clinician 2 can take on that role.

Q. Okay. And do those individuals who are meeting directly with Ms. Wagoner, from your recollection, do they have training in gender dysphoria counseling?

A. I don't think direct training.

Q. Okay.

A. Guidance and supervision, yes.

Q. Okay. Now does the Gender Dysphoria Committee assess people for surgery?

A. Well, we assess people for any treatment they may need.

UNITED STATES DISTRICT COURT

**5-ER-0866**

Yes.

Q. And that's that -- and has the Gender Dysphoria Committee ever met with and discussed whether Ms. Wagoner should receive surgery?

A. Yes.

Q. Okay. And were you on that meeting at the beginning?

A. Yes.

Q. Okay. And who on that team had experience in gender dysphoria when you were talking about surgery for Ms. Wagoner?

A. I don't want to guess. Our medical team may have experience with medical treatment for gender dysphoria and possible surgery.

Q. And that would have been Dr. Lawrence?

A. Dr. Lawrence or some of the nurse practitioners that were taking care of her.

Q. Okay. You said you weren't familiar with Ms. Samuelson when you were on the Gender Dysphoria Committee, and there was discussion about Ms. Wagoner having surgery. Did you know that Dr. Samuelson had recommended she be referred to a surgeon?

A. Yes.

Q. Okay. And did anyone from the team talk to Dr. Samuelson about that?

A. I don't know.

Q. Okay. Okay. You didn't?

A. I didn't. I know that much.

UNITED STATES DISTRICT COURT

**5-ER-0867**

Q. All right. Okay. I think you made reference to a Mr. Reed. Do you remember that?

A. I did?

Q. Did you make reference to Mr. Reed?

A. I know of a Mr. Reed.

Q. Okay. Do you know an individual counselor psychologist named Mr. Reed who interacted with Ms. Wagoner?

A. I know that Mr. Reed did assess Ms. Wagoner, yes.

Q. Okay. Let's look at Defendants' Exhibit 2084. Okay. Have you seen this report from Mr. Reed?

A. I have not.

Q. Okay. And would you go to -- I think it's the third page. Keep going. It must be the next page. Sorry. So recommendation part.

All right. So on page 5 Mr. Reed states that Ms. Wagoner meets the current American Psychiatric Association's DSM-5 diagnostic criteria for gender dysphoria as follows. Do you see that?

A. Yes.

Q. Okay. And that was back in 2017, right, if you know?

A. If -- that sounds about right. And I would have to look at the top of this form but it sounds about the right era.

Q. Okay. And then if you could go down to the recommendations, Ms. Walker.

Okay. Ms. Wagoner should engage in bimonthly

808

individual therapy sessions.  Do you see that?

A.  I do.

Q.  So bimonthly, that would be 12 sessions to work through emotional behavioral issues as well as symptoms related to gender dysphoria.  Do you see that?

A.  I do.

Q.  And were you -- you were working for Goose Creek then in 2017?

A.  Yes.

Q.  Do you know why Ms. Wagoner didn't receive those sessions?

A.  Because he was going to provide them.

Q.  Okay.  And what happened?

A.  He never followed up.

Q.  Okay.  Can we look at Petitioner's Exhibit 1039.  Mr. Mercer, would you take a moment and look at this document and tell me when you've seen it before.

A.  I have not seen it before.

Q.  Okay.  This is a letter that Mr. Reed sent to Ms. Wagoner stating he had sent five separate emails regarding her case to the DOC and not receive a response about not providing the therapy.  Did you know about this?

A.  I did not know about five emails.  I do know he can't contact our scheduler to see her.

Q.  But you didn't know he reached out and tried to send emails?

UNITED STATES DISTRICT COURT

**5-ER-0869**

A. I was not aware of five emails. I just was aware of no follow through on counseling.

Q. So that's why you thought it fell apart? You thought it was Mr. Reed's role to follow up?

A. Yes.

Q. Okay. You never attempted to call or speak with Mr. Reed about counseling sessions?

A. No.

Q. Now -- okay, we can take that down.

Mr. Mercer, other than the conversation you referred to sometime after March and before today, you haven't had any actual counseling sessions with Ms. Wagoner?

A. Before my one in like the end of March?

Q. Yeah.

A. I don't think so.

Q. Okay. And the one you had at the end of March, how long was that?

A. Twenty minutes.

Q. Did you keep any notes?

A. Yeah.

Q. Did you do a progress note?

A. Uh-huh.

Q. Yes?

THE COURT: I'm sorry, sir. Please answer yes or no.

THE WITNESS: Yes.

UNITED STATES DISTRICT COURT

**5-ER-0870**

810

BY MS. KERR:

Q. And did you -- you said you participated in -- participated in a progress note that Ms. Michaletz had you look at. It said -- it's at Defendants' Exhibit 2052. Go back to that, please, Defendants' 2052. And if we can highlight. There you go.

So this was the meeting in February -- January of 2024. Do you see that?

A. Why am I not seeing the date? Give me a second.

Q. Yes, sir. It might be at the top.

A. There it is. Yes.

Q. Okay. It says it's completed by Doug Zock. Who is Doug Zock?

A. Doug Zock was the deputy chief mental health officer at the time.

Q. Okay. So he outranked you?

A. Yes.

Q. Okay. And did he write this?

A. He did.

Q. Was he at the meeting you were at for -- with the Gender Dysphoria Committee?

A. No.

Q. Okay. I just want to make sure I understand this. The Gender Dysphoria Committee met and then you gave some information to the MAC and then this resulted?

A. That's my understanding. Yes.

UNITED STATES DISTRICT COURT

**5-ER-0871**

811

Q.  Okay.  And what information did you give to the MAC as the Gender Dysphoria Committee?

A.  It would be the same form that we just went over.

Q.  Those progress notes?

A.  Uh-huh.

Q.  Or the gender dysphoria notes?

A.  The Gender Dysphoria Review Committee notes with our recommendations.

Q.  Okay.  And, by the way, those notes we looked at -- I want you to look at the first one to remind ourself.  If we look at Gender Dysphoria Committee at 2049, Defendants' Exhibit 2049.

So these are the notes you were referring to earlier that you look at with -- with counsel.  Right?

A.  This is definitely one of them.

Q.  Okay.  So let's look towards the bottom of this one.  It's the next page.  Sorry.  And it says does offender currently meet diagnostic criteria for gender dysphoria and it says no. Do you see that?

A.  Yes.

Q.  And we looked earlier at the paragraph up there where she reported being sad.  She reported being not sleeping, all of those things.  Do you see that under current mental health symptoms?

A.  Uh-huh.

Q.  Right.

UNITED STATES DISTRICT COURT

**5-ER-0872**

A. Almost done.

Q. Okay. Take your time.

A. Okay. I'm good.

Q. Okay. And so you were saying that despite the fact there had been no notable improvement in her mood and had -- and she had symptoms such as behaving aggressively, etcetera, she did not meet criteria for gender dysphoria?

A. At this snapshot, she was doing worse than her average baseline, and so for a diagnosis, it can't be just on a given day.

Q. Uh-huh.

A. It's, you know, several weeks of functioning. This was a low spot in segregation is what it looks like to me.

Q. Okay. And so currently -- just so I'm understanding, currently, your view as the mental health clinician 3 is Ms. Wagoner does not have gender dysphoria?

A. Doesn't have gender dysphoric disorder.

Q. Is that your position?

A. Yes.

Q. And when did you inform Ms. Wagoner of that?

A. I have not. She still has the diagnosis.

Q. Oh. This is what's confusing. You just said she didn't and now you say she does?

A. Yeah. I wasn't going to go in and change the psychiatrist diagnosis.

UNITED STATES DISTRICT COURT

813

Q. You're not a psychiatrist?

A. Correct.

Q. Does a psychiatrist sit on the Gender Dysphoria Committee?

A. Yes.

Q. Was there any testing -- specific evaluation or testing done to determine that Ms. Wagoner did not meet criteria B?

A. No. Not psychometric testing, no.

Q. Are you aware or unaware that Ms. Wagoner has reported crushing of her testicles?

A. I am aware.

Q. And what do you know about that?

A. Not a lot of detail but something about self harm to testicles.

Q. Do you know an approximate time frame for that, Mr. Mercer?

A. I think it's quite recent.

Q. Okay. Have you investigated to find out how recent or how long ago the crushing of the testicles has been?

A. No. But that would be part of my very next assessment because I think it's been that recent.

Q. Okay. And why do you think it's been that recent? What makes you believe that?

A. Well, treatment team meetings. I think that I heard that that's been a recent issue. I think medical let us know.

Q. So if Ms. Tusha -- do you know Ms. Villars?

A. Villars.

UNITED STATES DISTRICT COURT

**5-ER-0874**

814

Q. Villars. Okay. If Ms. Tusha reported crushing testicles more than once in the last couple of years, you weren't aware of it?

A. I don't remember.

Q. You don't remember anything from medical about Ms. Wagoner reporting that she was experiencing pain from her -- from her genital area?

A. Pain from genital area, yes.

Q. Okay. And, in fact, can we look at Defendants' Exhibit 2050. Keep going. So you can stop right by history of self injury suicidal harm.

So when this document, Defendants' Exhibit 2050 was created in I think June of '23 -- can you go back and look at the date. March of 2024. The only information reported by the committee was that there had been suicidal or self injurious behavior in 2016.

A. That does seem to be case.

Q. Yeah. So you -- no one reported or put in there the testicle crushing or the penis problems?

A. Well, I think the penis problems are probably of the medical summary. The medical examination for this review period.

Q. Okay. Let's go down and see. Do you see any references to self harm in this document other than from 2016?

A. I don't.

815

Q. So, fair to say then, that the committee that met in June of 2024, March of 2024, I believe that they -- only self harm was back in 2016?

A. Must have.

Q. And you'd agree that you would want up-to-date information about any potential self harm. Right?

A. Yes.

Q. That's very important. Isn't it?

A. Yes.

Q. And why is it so important?

A. Because it's -- it's a definite marker for dysfunction and difficulty functioning which is so important.

Q. And the difficulty functioning affects where you qualify under criteria B. Right?

A. Yes.

Q. So do you believe if the team understood that there was self harm occurring in March of 2024, that you would have decided that she didn't meet criteria?

A. It would be weighed against general functioning. Self harm -- and you're still able to go to work and you're still able to take care of your kids and go to church and vote and pay your taxes and testify in court and -- you know, take your family on vacations, you know, you have to weigh it all in.

Q. Sure.

A. If you were self harming at the same time, you probably

UNITED STATES DISTRICT COURT

**5-ER-0876**

wouldn't be considered disordered.

Q. Uh-huh. But you would agree in an incarcerated setting that if the inmate admits self harm, they can be punished for it. Right?

A. Punished?

Q. Yeah. That's what one of the sergeants told us.

MS. MICHALETZ: Objection, Your Honor.

THE COURT: What's the objection?

MS. MICHALETZ: I guess it mischaracterizes the evidence to a certain extent.

MS. KERR: I thought one of the sergeants said something about that. I can rephrase it, Your Honor.

THE COURT: Go ahead and rephrase.

BY MS. KERR:

Q. Are you aware if -- that it can be an infraction in an incarcerated setting if you cause yourself harm?

A. There isn't punishment for self harm.

Q. Okay. So if Ms. Wagoner was punished for self harm, that would have been a mistake?

A. Yes.

Q. So you're unaware that she has been?

A. I am unaware that she has been.

Q. Okay. And have you at any time reviewed all of her file?

A. No. This was my first opportunity to see the entirety.

Q. You think that's the entirety that you have there?

UNITED STATES DISTRICT COURT

**5-ER-0877**

817

A. Oh, I'm sure there's security notes and stuff. That's not the entirety of all of the documentation.

Q. Okay. All right. You talk about these workbooks. Do the workbooks, the dialectical behavorial therapy workbooks, DBT, do you refer to that as the gold standard?

A. DBT is generally the accepted, you know, best practice for personality disorders and emotional regulation.

Q. Okay. Do you have any knowledge that it's the gold standard for someone who has gender dysphoria?

A. I think it's indicated but I wouldn't say the gold standard --

Q. Did you --

A. -- for gender dysphoria.

Q. Did you ever investigate whether it was gold standard for gender dysphoria?

A. No.

Q. And you believe that gender dysphoria is a disorder. Right?

A. I do.

Q. And is gender dysphoria a personality disorder?

A. No.

Q. Can someone appeal a decision by the Gender Dysphoria Committee?

A. Well, I don't know about appeal but we definitely have a grievance process where it gets heard.

UNITED STATES DISTRICT COURT

**5-ER-0878**

818

Q. All right. And does that also apply to a MAC decision?

MS. MICHALETZ: Objection. Foundation, Your Honor.

BY MS. KERR:

Q. Well, can a person appeal a MAC decision like they can a gender dysphoria decision?

A. I don't know if I know that one.

Q. Okay. Can we look at Plaintiff's Exhibit 1093. You have made some reference to criteria B. Do you remember those comments?

A. Uh-huh.

Q. Okay. So this is an explanation of gender dysphoria from a DSM and can you read into the record what it says there for criteria B?

A. Yeah. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Q. Okay. So it's any of those. It's social, occupational, or other. Right?

A. Yes.

Q. Okay. And when the Gender Dysphoria Committee meets and you're making a decision about an inmate, what -- like, for example Ms. Wagoner having gender dysphoria or not having gender dysphoria or what her care should be, what guidelines do you use?

A. Well daily life functioning.

UNITED STATES DISTRICT COURT

**5-ER-0879**

Q. Sure. But I mean like -- you're familiar of course with like the DSM. Are you familiar with other types of professional guidelines like American Psychological Association guidelines or anything like that?

A. For functioning -- for what constitutes a disorder?

Q. Yeah.

A. Yes.

Q. And what guidelines would those be?

A. Those areas are the same as listed here.

Q. Okay. Okay. And you agree that criteria B says the condition is associated with clinically significant distress or impairment. Right? So you don't have to have both. Right?

A. I think distress or impairment are considered similar.

Q. But they -- they can be different. Right? That's why it says that or --

A. I suppose.

Q. Okay.

A. I read it as impairment in functioning. Distress is a reported symptom and then impairment in functioning is a sign, -- observable.

Q. Okay. So you -- you read significant distress -- you read this condition as -- criteria B rather -- as a condition having to be clinically significant distress and impairment?

A. Definitely the impairment part. I don't think there can be impairment without distress.

UNITED STATES DISTRICT COURT

**5-ER-0880**

Q.   Okay.  So even though it says or, you're reading it slightly differently by practice?

A.   By practice, distress is -- if you're distressed and you're still functioning, it's not a disorder.

Q.   Okay.  Now the Gender Dysphoria Committee never referred -- has never referred Ms. Wagoner to a surgeon to determine if she needs surgery.  Right?

A.   Correct.

Q.   And just to make sure I'm clear, not trying to be confusing, so basically your opinion is that Ms. Wagoner has gender dysphoria or doesn't?

A.   My opinion is doesn't.

Q.   She doesn't?

A.   Correct.

Q.   Okay.  And you're basing that on your knowledge as you described it today?

A.   Yes.

Q.   Okay.  Okay.

         MS. KERR:  I think that's all I have, Your Honor.

         THE COURT:  All right.  Thank you very much.  Any redirect?

         MS. MICHALETZ:  Three minutes, Your Honor.

         THE COURT:  Three minutes.  I'm going to hold you to that.

UNITED STATES DISTRICT COURT

**5-ER-0881**

821

REDIRECT EXAMINATION BY MS. MICHALETZ:

Q. Just as a housekeeping matter because Ms. Kerr referenced the exhibits that you have in that notebook and you said that you had something from numbers 2021 to 105. Can you look closely at your notebook and are all of the numbers in that range in that notebook?

MS. KERR: Your Honor, we can stipulate that we have --

THE COURT: Ms. Kerr, the court reporter won't be able to hear you.

MS. KERR: Sorry. Sonja Kerr for the plaintiff. We'll stipulate he had all of defendants' books, if you want.

MS. MICHALETZ: He doesn't have all of those exhibits. He only has a couple dozen, if that.

THE WITNESS: I have a couple dozen.

MS. MICHALETZ: Okay.

BY MS. MICHALETZ:

Q. Let's see. Would the Gender Dysphoria Review Committee be the body that makes the referral for a surgeon directly, or would that come from the committee -- committee advises the MAC and then the MAC makes that bigger decision?

A. The MAC would make the decision. Now who would make the referral?

Q. You don't have the answer to that question?

A. I don't know that one. I do know the final say is with the

UNITED STATES DISTRICT COURT

**5-ER-0882**

822

MAC.

Q. All right. Now I wanted to clarify -- because we talked about, you know, the subsection B of the DSM-5, definition of dysphoria and the commission is associated with clinically significant distress --

A. Uh-huh.

Q. -- or impairment in social, occupational, or other important areas of functioning. If someone has clinically significant distress, is that enough for a dysphoric state?

A. I don't think it's enough for any disorder diagnosis.

Q. Why?

A. You can be distressed and still function and not have a disorder. Like I could be really distressed about speaking in public, but if I can pull it together and do it and, you know, get to work on time tomorrow and get my taxes done and get on the plane with my friends and function, it's not a disorder. I'm just distressed.

Q. Okay. Have you seen that -- that aside, have you seen that Ms. Wagoner is clinically significant -- is suffering from clinically significant distress?

A. Yeah. She's -- she's distressed.

Q. Okay.

        MS. MICHALETZ: Thank you, Your Honor. I don't have further questions.

        THE COURT: All right. That was -- that was under

UNITED STATES DISTRICT COURT

**5-ER-0883**

823

three minutes.  Well done.  All right.  Any recross?

MS. KERR:  Just one.

THE COURT:  I'm going to hold you to that.

MS. KERR:  Sonja Kerr for the plaintiffs.

RECROSS EXAMINATION BY MS. KERR:

Q.  Mr. Mercer, is gender dysphoria considered a disorder under Alaska's DOC policy?

A.  It's actually listed in the DSM-5 as gender dysphoria disorder.

Q.  And that's -- that's the DOC's policy?

MS. MICHALETZ:  Objection, Your Honor.  There will be a better witness to ask this to, and the policy should speak for itself.

THE COURT:  Well, do you know the answer to that question, sir?

THE WITNESS:  If I hear it again.

BY MS. MICHALETZ:

Q.  Sure.  Is it DOC's policy that gender dysphoria is a disorder?

A.  Regarding policy, I'm not quite the pro.  I am a pro at the operational definition of our policy that's in our clinical care guide.

Q.  Okay.

THE COURT:  I think he answered he doesn't know the answer to the question.

UNITED STATES DISTRICT COURT

**5-ER-0884**

824

MS. KERR:  That's fine, Your Honor.

THE COURT:  The objection is sustained.

MS. KERR:  I made it under a minute.

THE COURT:  May this witness be excused?

MS. MICHALETZ:  Yes, Your Honor.

THE COURT:  Thank you so much, Mr. Mercer, for your time this afternoon.  You can step down.  You're welcome to have a seat in the gallery if you want to watch the proceedings or you're also welcome to return to your regular life.  Thank you.  And any binders, leave them there and you took your microphone off. That's perfect.

All right.  Additional witnesses.

MS. MICHALETZ:  I wonder if it would be a good time for a break, we've been going an hour and a half.

THE COURT:  Works for me.  We'll come back a little after 2:45.  We're in recess.

COURTROOM DEPUTY:  All rise.  Matter is in recess for 15 minutes.

(Proceedings reconvene at 2:55 p.m.)

THE COURT:  All right.  Good afternoon, everyone.  Thank you for your patience.  You all of course wouldn't know this but my chambers is at the opposite end of this building so it's about a five minute walk down the hallway so by the time I

UNITED STATES DISTRICT COURT

825

get down there and get back, that eats up about ten minutes of a 15 minute break.

I also -- bear with me here. I did get a note that some of our court security officers might have seen people in the gallery using cell phones during the course of the proceedings. So let me remind everybody that taking photographs, taking audio recordings, taking video recordings of any kind in any form in any Federal Court, including this one, is prohibited.

If any of the CSOs -- court security officers -- were to see anybody doing that during court, courthouse policy is they can take your phone. We don't want to take your phone. You want to have your phone so the best thing to do is when we're in session in court, put your phone in airplane mode, power it off, put it in a pocket, a purse, a backpack. And as we take a break -- we take regular breaks -- take your phone out, check your messages, do what you need to do.

That being said, Mr. Gross.

MR. GROSS: We'd call to the stand Dr. Robert Lawrence.

MS. MICHALETZ: And if I could grab that notebook from the stand to get more room off.

THE COURT: Yes. Dr. Lawrence, go ahead and approach, sir. And you're just going to step up to the witness stand. Remain standing and be sworn in, please.

UNITED STATES DISTRICT COURT

**5-ER-0886**

ROBERT LAWRENCE, after being first duly sworn, testified as follows:

THE WITNESS: I so affirm.

COURTROOM DEPUTY: Thank you. Please be seated. For the record, please state and spell your full name and there is a lapel microphone there.

THE WITNESS: Good afternoon. My name is Robert Lawrence. First name is R-O-B-E-R-T. Last name L-A-W-R-E-N-C-E.

THE COURT: All right. Dr. Lawrence, thank you so much. Mr. Gross, you may inquire.

DIRECT EXAMINATION BY MR. GROSS:

Q. Dr. Lawrence, good afternoon. I am going to try to speak more slowly. I've been accused of speaking too quickly and we do have a court reporter that's taking down information so I'm going to read some stuff and I'm going to try to do it slowly and I ask you also do too. It sounds like you won't have a problem with the volume of your voice but try to speak a little more slowly so the court reporter can take down the information.

Can you tell us a little bit about your undergraduate work.

A. So I'm a medical physician but that all started years ago in under grad at Harding University in central Arkansas where I earned a Bachelor of Arts Degree.

UNITED STATES DISTRICT COURT

**5-ER-0887**

827

Q.  Okay.  Did you also happen to meet your wife while you were at that facility?

A.  That's correct.

Q.  And, by virtue of you meeting her there, did you end up getting married?

A.  I did.

Q.  And did you graduate from that institution?

A.  I graduated from Harding University.

Q.  What is your degree in?

A.  My degree was in Bible and Theology.

Q.  And by virtue of your marriage, did you find your way to Alaska?

A.  I did.  My wife is from Alaska and so that's what brought us back to Alaska.

Q.  Okay.  Whereabouts did you end up?

A.  When we first came to Alaska, we lived here in Anchorage.

Q.  Okay.  And then where?

A.  In the course of time, I ended up going to get further education and that took us -- because this was when I entered into medical we spent some time in Seattle and then residency down in South Carolina -- and then eventually after completing residency, made our way back to Alaska and landed in Nome, so northwestern Alaska.

Q.  And before that when you were in Anchorage, what were you doing for work?

UNITED STATES DISTRICT COURT

**5-ER-0888**

828

A. Okay. So wind the clock back. When I first arrived in Anchorage, Alaska, I served as a minister for the TurnAgain Church of Christ.

Q. Okay. Did you also have other employment at the time?

A. I did. At the same time, I was a substitute teacher here in the Anchorage School System.

Q. Okay. And then there's a decision to go to medical school. Where did you go to medical school?

A. I decided to go to medical school and was approached to go to the WWAMI Program which is the University of Washington School of Medicine.

Q. Okay. And so when did you get your medical degree?

A. So medical degree was in 2003.

Q. Okay. Did you do a residency?

A. I did. Residency in -- excuse me. Residency was in family practice and that was in Greenwood, South Carolina.

Q. Do you have any board certifications?

A. I am board certified in family medicine.

Q. After you completed your residency, where did you go?

A. So directly after residency, that is when we moved to Northwest Alaska and I started work for the Norton Sound Health Corporation in Nome, Alaska.

Q. And what did you do for them?

A. So I was a family practice physician in the Indian Health Service Hospital there in the hospital system which is a full

UNITED STATES DISTRICT COURT

**5-ER-0889**

spectrum community type practice.

Q. As a part of that job, did DOC hire you to do some work?

A. Not during the early years. After I worked for the Norton Sound Health Corporation for about three years, we started a private practice which was a community practice in Nome and it was at that time that I contracted with the State of Alaska Department of Corrections as a contract physician to provide services there at the local jail.

Q. Okay. And eventually did DOC ask you to take a more permanent position?

A. They did.

Q. When was that?

A. In 2013, I applied for and was granted the position of chief medical officer for the State of Alaska's Department of Corrections.

Q. And can you tell us what that job entailed?

A. So that job as the chief medical officer entailed many different responsibilities but all of that can be distilled down to the primary responsibility is to ensure that all individuals who are incarcerated in any of the facilities in the state receive essential health care, specifically viewing that from the medical perspective. There are others who would look at that from the mental health perspective.

But that's really the primary job. The -- that job sort of outlined out -- entailed not only seeing patients,

UNITED STATES DISTRICT COURT

**5-ER-0890**

830

which I did from time to time, but it was more so overseeing the work done by other physicians and clinical practitioners throughout the state. So it was providing clinical oversight to those individuals.

I was also asked to help lead the development of clinical care guides and whole series of clinical care guides as well as medical operating procedures. I served on a medical -- the medical advisory committee.

MS. MICHALETZ: I'm sorry, Your Honor. Can we have the witness go slower.

THE WITNESS: I will slow down.

THE COURT: So, sir, I know it's difficult. So on the screen right there in front of you is our remote court reporter. She is being a tremendous assistance to the court. She's actually in Arizona and is taking all of this all down remotely. It's more difficult for a court reporter to work remotely than if they were actually present in the courtroom with us so she's doing us a tremendous service by assisting with the court reporting remotely, and we need to do her a service and take every effort to speak as slowly as we can.

Always in our minds, we think we're speaking at a appropriate and perfectly normal rate. And the advice I always give and the advice I try to take myself is if you think you're speaking at an appropriate rate, you're going too fast and you need to slow down. It's been a struggle throughout this trial.

UNITED STATES DISTRICT COURT

**5-ER-0891**

831

I'm not being critical or chastising you in any way, but just as a friendly reminder, please try to slow down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Thank you, sir.  All right.  Go ahead, sir.

BY MR. GROSS:

Q.  I'm guilty as charged too so we'll help each other try to go at a more reasonable pace.  After a bit, did you end up going back to school to get additional education?

A.  I did.  Yes.

Q.  Tell me about that.

A.  While serving for the Department of Corrections, there was a recognition that many of the issues that we deal with deeply involved in medical ethics and so I went back to get further education in medical ethics and earned a Master's Degree -- Master of Arts Degree in Bioethics.

Q.  And where did you get that from?

A.  That was Trinity International University in Chicago.

Q.  Eventually did you move on and take another position with the State of Alaska?

A.  I did.

Q.  Tell us about that.

A.  From 2004, I moved over to the department of health and became the chief medical officer for the State of Alaska's Department of Health.

UNITED STATES DISTRICT COURT

**5-ER-0892**

832

Q. And, in summary, what would be your current job duties and responsibilities?

A. So my current responsibility is working within the administration of the department of health. My primary role is oversee the work done in public health which is one of the divisions within the overall department.

I also serve as a clinical liaison to other divisions within the department and a clinical liaison with outside entities that helped to oversee the provision of health care throughout Alaska.

Q. And when did you take that position?

A. That was in 2004. May of 2004.

Q. 2024?

A. Did I say four?

Q. I think you did.

A. This is afternoon. 2024. Thank you.

Q. Okay. And so currently you do not work for DOC?

A. That is correct.

Q. Do you have any authority, as we sit here today, to require DOC to do one thing or the other?

A. I do not.

Q. Does DOC -- when you were there, did they have written policies?

A. Yes.

Q. Okay. I'm going to show you a 2009 version of DOC's

UNITED STATES DISTRICT COURT

**5-ER-0893**

policies and procedures. Let's pull up Exhibit 2022. This has been previously admitted.

THE COURT: 2022 is the exhibit.

MR. GROSS: 2022.

THE COURT: Thank you.

BY MR. GROSS:

Q. If we could turn to page 3. And I'd like to look under essential health care services. Top of the page under section B. So if you want to take a second and read this. I'm not going to read it out loud but I'll read the first sentence that says a prisoner has a right to receive essential health care services and it goes to provide a definition of essential health care services so if you want to take a look at that real quickly. And then question I have for you is what is your definition or understanding of what essential health care services are?

A. When working in the Department of Corrections, the operating definition of essential health care really guides all of our decisions and the care that is provided. In the United States, it's my understanding there is only one group of people that have a constitutionally protected right to health care. This is based on interpretations of the 8th Amendment, and that one group of people are our prisoners.

And in -- a varied series of decisions the definition of essential healthcare has come out by recognizing that a

UNITED STATES DISTRICT COURT

right to healthcare -- a constitutionally protected right to healthcare does not mean a right to any and all care. It also does not mean all desired care.

It also does not mean deficient care. And so the term essential healthcare is meant to find that middle ground and say -- the working definition that we would use is to say that a person has a right to the type of care that would prevent the onset of illness or the deterioration of health during the period of incarceration. The document that we have in front of us is Alaska's definition. So within the Department of Corrections, you can see the definition of essential healthcare is really broken down into three components, maybe four if you add the section D.

But those first three components which are taken together say for a particular treatment to be essential, it, first of all, has to be treatment for prisoners' symptoms that indicate a serious disease or injury. Second, that that treatment could cure or substantially alleviate the disease or injury. And then, three, that the potential for harm if the treatment is delayed or denied is going to be substantial. Four, and then separate from that, essential could refer to care that's given to help make it possible for a person to participate in activities of the institution.

Q. Okay. Help me understand the difference between desired care and what would be considered by this definition as

essential healthcare?

A.  So it's not unusual in the correctional setting for people to ask for care.  And I would say this is true on the outside of any incarcerated situation as well.  And so desired care simply means the type of care that somebody may ask for.  It may or may not be essential.  It may or may not be necessary to prevent the onset of illness or deterioration in health but it is something that a person desires.

And -- and the examples that pop in my mind immediately of times when we're weighing desired care versus essential care, it could be very simple things where people just would like to have pain medication.  Something to provide temporary comfort.  And that would be an example of that is a desired care.  The fact it's desired doesn't in and of itself make it essential.

A much bigger example we take care of on a regular basis would be things like a request for a hernia repair.  Individuals would be incarcerated sometimes for three days, sometimes for three weeks, sometimes three months, sometimes for three years or much longer.  But an individual will come in with a condition, let's say it's a hernia.  Hernias can come in different sizes.  They can be very serious and life threatening.  They can be very small.

But a person may come in and say I desire to have this hernia repaired during the period of incarceration.  That would

UNITED STATES DISTRICT COURT

**5-ER-0896**

836

be the desire to have that treated. What makes that essential care is if it's the type of hernia that would deteriorate during the period of incarceration and lead to dysfunction or threaten severe harm.

Other examples would be people that come with prior injuries. It was not uncommon for us to take care of people with severe facial injuries so it would be a desire to have a facial injury repaired. And, in some cases, the desired request is to have an improvement in facial symmetry. That in and of itself is not what it makes it essential. What would make it essential if the facial injuries were causing impairment in the ability to communicate, chew, swallow, that type of thing. That would be the definition of that treatment for the injury or surgical repair being one that's essential. And there are many examples but that's the distinction.

Q. And I think you mentioned already in your testimony the MAC. Can you tell the Court what the MAC is?

A. So the Medical Advisory Committee is an appointed group of people in the Department of Corrections that has several responsibilities. One of its primary responsibilities is to evaluate any care that is requested outside of the system itself. So if there's a request for a procedure or testing or treatment that cannot be provided within the Department of Corrections, a referral has to be placed.

And so one of the responsibilities of that Medical

**5-ER-0897**

Advisory Committee is to set the groundwork under which care -- excuse me -- under which referrals would be placed or sent to the outside and then they would review those referrals to make sure referrals in fact meet this definition of essential healthcare.

The MAC Committee also helps review any policies that will be either changed, updated, or brought into play that affect healthcare. They also oversee the development of the clinical care guides with the medical operating procedures. And there -- if there are any issues or discussions surrounding things like strategic development or strategic planning for the department itself, specifically in regards to the development of health and rehabilitation services, the MAC Committee is the body that's brought together to help with those kinds of questions.

Q. And I'm not going to hold you to a perfect answer, but could you tell us -- to the best of your knowledge -- who is on the MAC Committee. What types of people would you find on the MAC Committee?

A. So the individuals who are appointed to the MAC Committee typically would include my position which was the chief medical officer. There are also two other regional medical officers. These are physicians.

There's a lead clinician. This would be the chief mental health officer. There's a chief clinical officer. This

would generally be a physician assistant or nurse practitioner. There would be a chief medical social worker. There would be a quality assurance nurse and a chief nursing officer. So that gives you an idea of the type of people that would be asked to serve on the Medical Advisory Committee.

Q. And how often does the MAC meet?

A. So MAC Committee meets weekly.

Q. And can you describe for us what a typical meeting looks like. What happens?

A. So the typical meetings when I was with DOC occurred on Monday afternoons and lasted for several hours. So the typical meeting would be going through an agenda that included discussing any particular issues that were before the department as a whole, again, fitting into any of those categories that I mentioned earlier.

There may be questions that are being asked by different facilities or through the different representatives again who are sitting on the MAC that need to be either discussed or disclosed so there's good situational awareness between the different units. But, in general, that would be a meeting that would go several hours and discuss matters that pertain to the entire division of health and rehabilitation services.

Q. There's also a group, as I understand it, called the Utilization Review Committee. What is that?

A. When I started -- now this winds back to 2013 -- on a given Monday afternoon, we would spend almost the entire number of hours, the entire afternoon going through usually well over a hundred requests for outside care so you can imagine sitting around a table, there would be at least a hundred different charts and everyone who was on the committee would be taking the charts, reviewing the request for outside care, and then approving or not approving the referrals based on whether or not they were essential.

There was a recognition that that was not a good use of the committee's time on that Monday afternoon so a subcommittee was delegated and that is called the Utilization Review Committee. And it is made up of members who sit on the MAC Committee but it is a subset. And when I was DOC, they met on Thursday afternoons. And it was role of that -- or the responsibility of that committee to review all outside requests or referrals to the outside to ensure they met the definition of essential healthcare.

Q. And what if there was a disagreement among the numbers of the -- I think it's called the URC. There's a disagreement among the members of the URC, what happens then?

A. So the Utilization Review Committee followed a set of procedures that were written out, and these procedures were approved by the Medical Advisory Committee because any decisions made by that Utilization Review Committee are binding

UNITED STATES DISTRICT COURT

**5-ER-0900**

as if they're MAC decisions.  In other words, this is a delegated committee.

But some of the rules were -- or the operating procedures were if there were any cases in which there was not consensus of the members of the Utilization Review Committee, then those cases would be referred to the larger Medical Advisory Committee.  If there were high cost cases that were unusually costly, that is -- the weight of responsibility for approving that would fall to the overall Medical Advisory Committee.

Or if there were issues that were -- or requests that were extremely unusual or new that the entire MAC Committee would need awareness, then those issues would be referred to the Medical Advisory Committee as a whole.

Q.  I want to turn your attention and talk about DOC's policies and procedures with regard to gender dysphoria.  So I'd like to turn to 2027.  This is an exhibit that's previously been admitted, 2027.

And if we look at the front page here, doctor, what does this appear to be?

A.  This is the gender dysphoria clinical care guide that was first published in July of 2017.

Q.  Okay.  Would this be the first one of these?

A.  I believe this is the first version.

Q.  Okay.  What would be the purpose of this document?

A.  The Department of Corrections has several clinical care guides that are meant to provide guidance to all of the medical -- in some cases mental health practitioners -- throughout the state.  The purpose of the document is to ensure that there's standardization across the state so that an individual who is housed in one of our facilities in Fairbanks would be getting the same level of care that would be offered the same care as someone, say, in Juneau or in Anchorage.

So the purpose of the care guide is to distill guidance for any given medical condition that we already have guidance for let's say in the broader medical community on the outside.  But to explain to our staff how that type of medical care would be provided within an incarcerated setting and specifically the incarcerated setting within Alaska and then to ensure there's a standardization of that care across the state.

Q.  And what is the focus of this clinical care guide?

A.  This clinical care guide is specifically for addressing gender dysphoria.

Q.  Did you have a role in preparing this initial clinical care guide?

A.  One of my responsibilities as chief medical officer was to lead the development of our care guides.

Q.  And can you give the Court an idea of what went into this document.  What research did you do, what leg work did you do? Tell us a little about what went into the formulation of this

particular care guide.

A. It's important to note that a clinical care guide does not just happen one -- at one time or one night of putting together a type of report. This takes months and sometimes years to put together a full clinical care guide. When we first recognize that there is a particular clinical condition for which we need a care guide to provide the guidance as I was describing, we usually start by going to the literature.

And so the early stages of putting this care guide together would have involved a review of the medical literature on the topic. We look to national guidelines to see other guidelines that are already published. We can then adopt and adapt for Alaska. We turn to other states so I would oftentimes call colleagues and the Department of Corrections in other states and ask for a copy of their guides, perhaps that they had been putting together or at least talk to them about the process that they take.

So there would be a series of those discussions. And then there are internal discussions too about if we are to implement certain steps in this care guide, what are the steps that would need to occur, who all would need to be involved, are there any policies that would be involved or involves a review of our current policies as well. So it's a broad, step-by-step process.

Q. When you examined the literature at this time what did you

UNITED STATES DISTRICT COURT

**5-ER-0903**

find, what -- was there a robust amount of concrete literature or was it something else?

A.   There was a lot of literature at this time that -- remember we're now winding back to late 2015, probably in 2016.  There was a lot of literature on gender dysphoria or gender identity disorder or even in the older literature called transsexualism.  And as I recall, there were several things that stood out about the literature as we reviewed it.

The first was that there was -- there was not much available in regards to the presentation of what we now call gender dysphoria within a correctional setting.  There was just an absence of that.  The second thing that we really noticed is that throughout the literature, at least in the larger studies, the ones that were more reliable -- and I should clarify that by saying that one of the things that we noticed is that most of the studies were small, meaning, not many of people.  It was hard to build a large study probably back at that time.

And they were not over a long period.  So we were really looking for those studies that would be trustworthy in the sense at looking at large numbers of people over a long period of time.  And when we focused or lowered the magnifying glass let's say down over those studies that were more evidence based or trustworthy, we found something that was a bit surprising.  And that was that the individuals who have gender dysphoria have a serious medical condition.  And so there's no

question from the medical literature this is serious -- a serious medical condition.

But what made it a serious medical condition is what was surprising to us. What made it a serious medical condition was that it was associated in all of these early studies with four different causes of death. And the first of those is probably not surprising. That was suicide.

That was followed by deaths that were caused by drug overdose or substance use disorder. A third category were people that were dying because of infectious diseases, specifically sexually transmitted diseases like HIV. And then the fourth category is the one that I think surprised us the most and that was an increased risk of death from cardiovascular disease.

So as we dropped into the literature we saw that gender dysphoria is a serious medical condition and it's serious specifically because it's associated with these four different causes of death. We also noticed that at least at that time there were four recommended treatments for gender dysphoria, and those probably familiar to most would be in a stepwise order -- at least at that time presented in a stepwise order -- as starting out with some form of social transitioning or social adjustments in order to adapt to having gender dysphoria.

That would be followed by psychotherapy which would be

followed by cross-sex hormone therapy which would then be followed by surgical procedures. And it was presented in the literature as if you go through this in a stepwise fashion started conservative and then moving up. And so that's what we found in terms of the treatment literature.

And then, finally, what I think disturbed us was in the literature we noticed that even for individuals in these large studies done over a long period of time in individuals that get all four of those recommended treatments, there was not a reduction in the risk of suicide. There was not a change in the rates of death from things like overdose or cardiovascular disease. And what was really disturbing to us is that in some of those studies, there was actually an increase in those causes of death.

All that to say that in the building of the care guide in that literature review, we knew early on that our focus could not be on a fixed outcome. It would have to be taking into account what do we already do and what can we build upon that's going to prevent death from one of those four cases.

Q. And during that research, did you take into account the WPATH guidelines?

A. We did.

Q. Tell us what you did with that.

A. Throughout the U.S. there were several bodies that provided guidelines, WPATH, World Professional Association of

846

Transgender Health was one of those entities. And so just like the other, I guess, organizations that put out guidelines, we read through those guidelines and considered in what ways they could be applied but within a correctional setting and also in which ways it would not quite fit.

Q. Okay. And is the clinical care guide amended from time to time?

A. It is.

Q. What's the reason for doing that?

A. So all of the clinical care guides get updated if there is new information that comes out, if there are new national guidelines, if there are new treatments available. Or if we learn over the course of time that the applications of the stepwise process in a guideline is not working, you know, we'll get feedback from individuals within the various facilities, then we'll change the guide to make sure that the provision of care is not being interrupted by our process. So there would be many reasons but it was not unusual for our care guides to be updated on a regular basis.

Q. Okay. What I would like to do is ask you questions about a more recent clinical care guide. I'm going to look at one that's prepared or updated as of July 2022. This is going to be trial Exhibit 2023. This has been previously admitted. In particular, I would like to turn to page 5 of this document.

Doctor, this is a flowchart that's included among the

847

information in this clinical care guide. Can you please walk the Court through the point or the steps of this particular flowchart.

A. Yes. So what you're seeing -- and I'm sorry I missed which page this is on in the clinical care guide.

Q. Page 5.

A. This particular page is a way of summarizing what is found earlier in the care guide in more of a checklist form. But as a quick reference, it gives you a step-by-step just overview of the process that we go through in terms of evaluating an individual who presents with gender dysphoria. So just walking through that, you can see that a person may present -- and in a correctional setting -- may present in many different ways.

This may be at booking, at the time of coming into the correctional setting. It may be something that's disclosed as a part of a clinical encounter sometime during -- during a person's stay within the prison. It could be a written request for help addressing gender dysphoria. But for whatever -- in whatever way that a patient presents, they're first seen by a mental health clinician.

And so one of the things that we recognized and maybe this highlights, as I mentioned, there were four major causes of death in individuals who have gender dysphoria, suicide, overdose, infectious disease and cardiovascular disease. We recognized in DOC that two of those conditions are really the

UNITED STATES DISTRICT COURT

**5-ER-0908**

purview of our mental health clinicians and that would be suicide and substance use disorder. The other two are really things that are overseen by our medical team.

And so we recognized early on that if we were to appropriately take care of gender dysphoria, we had to make sure that we were involving both of those entities early on. So what you'll see in the care guide, again, back to the stepwise flow sheet, the process starts with evaluation by a mental health clinician and you would follow, as you see on page 3, a checklist and the clinicians become well aware of what to do.

The referral then goes to a psychiatrist physician or practitioner who would do the assessment for gender dysphoria. And, at the same time, there's a parallel evaluation by our medical provider.

Q. Okay. It looks like the next step -- we had some testimony already about the Gender Dysphoria Management Committee. What -- what's that the role of that committee?

A. So after an assessment has been performed by both the mental health and the medical side of the division, then that committee, the individuals involved in that evaluation meet together in the Gender Dysphoria Management Committee, usually that is at the facility in which the patient resides.

Q. Okay. And in that stage, is there an individual treatment plan prepared?

UNITED STATES DISTRICT COURT

**5-ER-0909**

849

A.  There is.

Q.  What does that look like?

A.  The individual treatment plan is probably better described as a treatment plan for the individual.  In other words, it involves this multiple disciplinary team working together both from the mental health perspective and the medical perspective, and then after evaluating the patient asking what is it that this patient truly needs to meet their underlying condition.  And then a plan is written to say here are the steps that we'll go through for this individual to -- to address this -- their condition.  And so that is documented within the medical record, and so we refer to that plan as the individualized treatment plan.

Q.  Understood.  What happens at the Medical Advisory Committee stage?

A.  So once an individual treatment plan is put together, then a review of that plan is performed by the Medical Advisory Committee.  This is where the plan would be presented usually by the chief mental health officer or a designee who would present the particular plan to the Medical Advisory Committee.  A lot of this was for just situational awareness to be aware of what was being done within each of the facilities.

        And then, from time to time, the Medical Advisory Committee -- because there would be a request for either care that was not typical at the time or requiring outside care --

UNITED STATES DISTRICT COURT

**5-ER-0910**

it would require approval by the Medical Advisory Committee. But most of the time that was just an awareness review at that stage.

Q. Okay. And informed consent, what's the importance of having that on this flow chart?

A. Of course in anything associated with medical care or mental healthcare, it is the role of the medical professional to offer the best medical guidance to put together a treatment plan that's in the best interest of the patient. But a patient retains the right to either accept or not accept that care.

So the essence of informed consent is a guarding of every individuals' right which is not lost during incarceration to maintain agency regarding whether or not care will be accepted and follow it or not.

Q. And then the last two boxes appear to sort of merge together, well for me anyway. What is the point of last two boxes?

A. This -- the last two boxes are a recognition. The care for individuals, especially those with gender dysphoria, does not end with providing the informed consent and enacting the treatment plan. This is an ongoing, long-term course of therapy. And so there is ongoing review, ongoing monitoring by the clinicians who are involved, and then that loops back to the Gender Dysphoria Committee at that facility to ensure the treatment plan is in fact meeting its intended purpose so

that's where you see the follow up as the final box.

Q. Okay. Great. I would like to now take a look at the current version of DOC's policies and procedures relating to gender dysphoria. So let's take a look at trial Exhibit 2021. This -- that's been previously admitted?

And, doctor, if you would look at the first page. Can you identify for us what this appears to be.

A. So this is an official DOC policy under Chapter 807 -- this is 807.23, which is the treatment and management of gender dysphoria policies and procedures.

Q. Okay. And let's take a look at -- we're going to stay on page 1. Let's look under policy Roman Numeral V. It says it is the policy of DOC to provide essential mental health, medical, and psychiatric care to prisoners with gender dysphoria that decreases the symptoms associated with gender dysphoria that limit activities of daily living while incarcerated.

Is that the focus of this particular policy?

A. To clarify, the focus of this particular policy is on overall treatment and management of gender dysphoria. The policy statement here is that the intent or the policy of DOC is to provide essential care, whether that's the healthcare -- excuse me -- mental healthcare, medical care or psychiatric care to prisoners who have the condition of gender dysphoria.

Q. And is there a focus on symptoms when it comes to this

UNITED STATES DISTRICT COURT

**5-ER-0912**

852

particular section of the policy?

A. That's correct. Yes.

Q. And why would it be important to focus on the symptoms of gender dysphoria?

A. As I said, gender dysphoria is associated with very disturbing end points if those symptoms lead -- or excuse me -- the gender dysphoria itself is associated with very dire and harmful outcomes. And those symptoms are the things that indicate if a person moving towards one of those dire outcomes like suicide, like a worsening of risk of cardiovascular disease or something of that sort, and so our focus on symptoms is an indicator of whether or not the gender dysphoria -- or to the extent that the gender dysphoria is increasing the risk for a person, whether or not that is being adequately addressed.

Q. And in a DOC setting, is it DOC's desire to have inmates function at a high level to be able to perform programming, do those types of things?

A. Absolutely.

Q. Okay. Talk to us a little bit about that, the importance of that.

A. Well, I'll speak from a medical perspective. And that is if individuals -- in our case patients are housed within a correctional setting -- there's a recognition they're living in a confined, congregate setting, the idea is that if a person is going to be there whether it's three days or three weeks or a

UNITED STATES DISTRICT COURT

**5-ER-0913**

853

long period of time, it's important that the individual be able to function within this incarcerated setting. Part of health would be the ability to engage in the activities of daily living, to seek out personal needs and essentials, as well as participating in the life and function of the institution, participating in work -- to the extent that it's possible -- to be able to participate in programming that would prepare a person for a return back to life in the community.

And so the idea is of course that -- that part of a person's health is ability to participate in what would otherwise be the activities for any of us living in any neighborhood or any community.

Q. I want to ask you a little bit about the treatment options that are available to inmates at -- within DOC that have gender dysphoria. And let's turn to page 5. And I'd like to look under gender dysphoria treatment modalities. And let's --

MS. KERR: We're still on 2021.

MS. GROSS: We're still on 2021, page 5, gender dysphoria treatment modalities. Let's call out all of those A, B, C, D, E.

BY MR. GROSS:

Q. As a starting point, is mental health counseling and mental health services a part of the treatment plan for DOC?

A. Yes.

Q. What would that entail?

UNITED STATES DISTRICT COURT

**5-ER-0914**

A.  So mental health services are available to everyone who is incarcerated within the Department of Corrections.  Those can be either requested or referred.  And that's provided by the mental health team at each facility.

Q.  And under the right circumstances, will DOC provide hormone treatment for inmates suffering from gender dysphoria?

A.  Yes.

Q.  And, finally, if you take a look at paragraph E.  Under certain circumstances would actual surgical interventions be sanctioned or appropriate within DOC for folks suffering with gender dysphoria?

A.  Yes.

Q.  Does DOC adopt a conservative approach to medical care?

A.  Yes.

Q.  Tell us about that.

A.  So the idea when we use the term conservative care, we're recognizing that our goal is to take care of an individual with means that are least restrictive and least invasive.  It will meet -- that will meet the purpose.

And so in regards to treatment for gender dysphoria, you see that we're following what at the time early on was something that was at least consistent with what we were seeing nationally.  And that was taking a stepwise conservative approach to that treatment starting with the less invasive reversible options for treating gender dysphoria and then

UNITED STATES DISTRICT COURT

**5-ER-0915**

moving sequentially to those options that were more invasive, more likely to cause permanent changes, in some cases irreversible.

Q. Okay. At the time you left DOC, did you find these policies to be reasonable under the circumstances?

A. I did.

Q. And were the policies that were implemented by Alaska DOC, were they consistent with the policies that you saw in DOCs in other states?

A. They are.

Q. Now I would like to turn your attention a bit to some of the treatment that was provided specifically to Ms. Wagoner. And I want to ask you some questions specifically about some of the MAC decisions. And I'm going to start with Exhibit 2039. And 2039 was previously admitted.

This is a MAC memo. It looks like the date is going to be May 6th, 2019. If you could look at the first paragraph -- first page, second paragraph. It starts by saying your medical case has been referred to and evaluated by the Medical Advisory Committee. A review of your records reveals that you have a chronic condition resulting from a self-inflicted injury to your penis some years ago causing a four-centimeter hypospadias opening in your urethra along the underside of your penis.

Though the area has had ample time to heal, you report

ongoing pain, leakage, and bleeding.  Let me stop there.  So at this point is the MAC taking up the issue of Ms. Wagoner's penile injury?

A.  Yes, to be specific, this part of the response is stating what is known.

Q.  Okay.  And prior to this decision, what would have happened in -- what would the legwork look like in reaching this decision?

A.  I'm going to ask for clarification when you say reaching this decision.

Q.  The decision that's outlined in this memo.  What went into and led up to the creation of this memo?

A.  If I'm understanding the question correctly, this memo is a response that started -- in most cases a grievance which is a way in which an inmate who is requesting care, if that care has not been provided at the local level in a way that's satisfactory, the inmate can ask for an informal review or reconsideration.

If that is not satisfied, the inmate can submit what's called a grievance at a first level.  If the issue is not resolved at that first level, which is really at the facility, then any inmate can write a secondary level grievance.  It's my understanding that at the second level that the issue comes before the MAC Committee.  So what we're looking at is a response to that second level grievance.  We'd have to zoom out

UNITED STATES DISTRICT COURT

**5-ER-0917**

again to see what the actual request was.

Q. Okay.

A. That's my understanding.

Q. We'll keep going. It goes on to say recent examinations have failed to demonstrate the leakage or bleeding of which you complain. The DOC physician has explained to you at length about current treatment options. Per his consult with urology, there is no anatomical reason for leakage as there are two sphincters well above the legion that hold urine adequately.

The urologist also stated that the likelihood of any improvement with the repair of hypospadias was slim, and, in fact, has a very high likelihood of complication and or complete failure. You are, therefore, being treated appropriately for your ongoing urological issues.

Was that the conclusion of the MAC?

A. It is.

Q. And what was that conclusion based on? What type of information led to that particular decision?

A. So in order to investigate that complaint, the MAC Committee would have reviewed the medical records, both internal exams and trauma evaluations, as well as an outside urologist's evaluation.

Q. Let's turn to page 5. Same exhibit. And on this particular page, I think there's a reference to a Dr. Simmerville. Who is that?

UNITED STATES DISTRICT COURT

A. Dr. Simmerville is a urologist here in Alaska.

Q. Okay. And the reference to a urologist in that paragraph that I just read, would that have been Dr. Simmerville, to your understanding?

A. Yes.

Q. Okay. Now the first time that the MAC issued a decision or commented on surgical intervention was in 2022. And I want to show you that and ask you some questions about that. This is trial Exhibit 2041. This is a MAC memo dated November 14, 2022?

Does this look to be a document that was prepared by the MAC?

A. Yes.

Q. And is this document kept in the ordinary course of business with the DOC?

A. It is.

Q. Is this the type of document that would be used on a regular basis in the treatment and care of Ms. Wagoner?

A. Yes.

MR. GROSS: Your Honor, I move for admission of exhibit 2041.

THE COURT: 2041. Ms. Kerr.

MS. KERR: Sonja Kerr for the plaintiff. No objection.

THE COURT: Without objection, 2041 is admitted.

UNITED STATES DISTRICT COURT

**5-ER-0919**

BY MR. GROSS:

Q. Doctor, take a look at the second and third paragraphs. Let's start with the first part of that. It says your medical case has been referred to and evaluated by the Medical Advisory Committee. A review of your records show you were referred to a urologist on June 27, 2022 for an evaluation of a long-standing penile injury and urinary incontinence.

We'll stop there for a second. What is this particular memo dealing with?

A. This is in response to a request by the patient for the Department of Corrections to follow -- I understand if we look at the top of the main memorandum -- to follow the recommendations of the urologist.

Q. Okay. Let's keep going down and take a look at the next part of that paragraph. It says at that visit you requested a referral from the urologist to a center specializing in transgender surgical procedures. The urologist explained that a surgical orchiotomy and other urological procedure is not necessary for treating your penile injury or incontinence.

For transgender surgeries, you deferred evaluation to those with expertise in providing transgender care. On July 24th, 2022 you were referred to a physician with expertise in treating gender dysphoria. You are now receiving hormone therapy recommended by this physician. Surgical procedures have not been recommended. So, at this point in time, would

UNITED STATES DISTRICT COURT

**5-ER-0920**

you have agreed with this decision of the MAC?

A.  I do.

Q.  And at this point in time, is it your understanding that there was no one recommending any type of surgery?

A.  That's correct.

Q.  I'm going to show you now a surgery -- or a medical record from July of 2022.  Let's go trial Exhibit 2042.  This was previously admitted.  And I want to turn your attention to page 4.  And in particular I want to pull up the bottom there where it says addendum.

This section says addendum July 26th, 2022.  I received -- and this would be Dr. Lund talking.  I received a call today from Dr. Lawrence at the Department of Corrections wanting clarification.  He further explained constitutional issues regarding elective and necessary medical care and light of -- in light of incarcerated individual.  I explained that in my opinion lower surgery is an elective procedure which is not necessary at this time for physical health.

I did emphasize that I was not in a position nor do I have expertise to make a psychological recommendation regarding long-term health.  However, certainly from a physical standpoint this surgery would seem to be elective.

First off, do you remember this conversation?

A.  I do.

Q.  And when he's talking -- he specifically says lower

UNITED STATES DISTRICT COURT

861

surgery.  What is your understanding of what he's talking about there?

A.  It could mean one of two things.  When the patient was referred to Dr. Lund, the referral was asking for his expertise as a urologist on repair of the penile injuries or evaluation of complaints.  If I remember right, these would be the complaints that we referenced there about leakage or bleeding so we were asking for his opinion as a surgeon as to what the approach should be to address those issues.  And so when he's referring to lower surgery, he could be referring to that.

At that meeting, Ms. Wagoner had also requested from him a referral for surgery specific for gender dysphoria so gender-affirming type of surgeries.  And sometimes that term lower surgery is used in that context.  My understanding is -- and I don't want to speak for Dr. Lund but what he is referring to here is that -- that lower surgery just means a repair of the injuries of the -- of the penis and the genital as opposed to the gender-affirming surgery.

Q.  And when he refers to constitutional issues, do you remember talking to him about constitutional issues?

A.  I do.

Q.  What did you say?

A.  So this was not an uncommon call.  I have to call specialists pretty regularly -- or did -- to help explain some of what we did before, explain what essential healthcare to a

UNITED STATES DISTRICT COURT

**5-ER-0922**

specialist is. Oftentimes specialists will give recommendations that are very hard to implement within the Department of Corrections or the surgeon may or may not have available information that is available to us but is not available to them during an evaluation. So it was not uncommon for me to call a specialist to discuss cases when a referral was made.

When I made the call to Dr. Lund, one of the questions we had was whether or not his provision of -- if I remember right -- there was a -- there were a series of clinics in the lower 48 states that provide gender-affirming type of surgeries or evaluation for those surgeries and so I was calling him to ask if his provision of those clinics in that list of clinics was to be received as a referral or recommendation that the Department of Corrections send Ms. Wagoner to the lower 48 for those surgeries. And then that's where he explained to me that, no, that was part of a doctor patient conversation. He was trying to be accommodating at the time.

So then I asked and we spent quite a bit of time talking about the surgeries that would help with either repair or addressing issues. Anyway, the complaints Ms. Wagoner had specifically so we talked a lot about the definition of essential healthcare and whether or not the surgeries referred to outside would meet the definition of essential healthcare or not.

Q. What did he say about that?

A. So he -- that's the point at which he said, no, his provision -- and the end of conversation was he affirmed that giving us a list of those outside clinics was not to be taken as a referral. And his comment to me was that the gender-affirming surgeries in his mind would be elective.

He said the same thing though about the -- the repairs because of the discussion about whether or not the full repair of that hypospadias was necessary at the time versus surgery performed causing further problems.

Q. The next thing I want to show you is going to be another MAC memo. This one is going to be trial Exhibit 2038, which has been previously admitted. This is dated November 7, 2022. First page, second paragraph.

Starts by saying your medical case has been referred to and evaluated by the Medical Advisory Committee. A review of your records reveals you have been prescribed Meloxicam and Acetaminophen daily. You state that they don't work and will damage your liver.

I'm going to stop there. Is this a situation where the MAC is considering some pain management issues?

A. Yes. I believe the request was for provision of pain management.

Q. Okay. It goes on to say you have not come to the medication cart on a regular basis to take the prescribed

medication. I think that was -- I think this is supposed to say so we are unable to evaluate the effectiveness of these medications without appropriate dosing. Observations in person and on camera have not shown you to be in any obvious pain that would interfere with your activities of daily living.

The urologist exam of genitalia recorded unremarkable scrotum with bilateral benign to palpation testes. So a few questions about this provision. First off, when they're talking about the observation of Ms. Wagoner, what kind of tools are available to DOC to actually observe her?

A. We were able to observe anyone who is living within the incarcerated setting whether it's in the common areas -- this would be out in the yard, this would be within facilities and classrooms within the living MODs -- there are several areas, in fact, most areas in the facility are on camera so there's the ability to review camera footage and then we can talk to individuals so they can receive reports of how a patient is doing anywhere within the facility by receiving that information that is observed throughout the facility in different ways.

Q. In your medical practice, if someone is suffering from serious pain, especially pain in the groin area, would you typically be able to see that with regard to the way that the person walked or went up stairs or went across the yard, something like that?

A.  I would say that severe pain in the genitalia tends to affect a person's ability to perform any normal activities.

Q.  The MAC also uses the words activities of daily living.  I keep seeing that term pop up.  What's the significance of that term?

A.  There's actually two layers to that term from the medical perspective.  In the first layer are just the activities of being able to eat on your own, to toilet on your own, to take care of personal hygiene.

The second level, and the one that is most likely referred to here, are the activities required for successful and flourishing life within any community.  And so that would be the activities of being able to get up, to go to a job, be able to go to a cafeteria area, to interact with other people, and go through programming and so forth.

Q.  Finally there's some doctor talk here at the end where it says unremarkable scrotum with bilateral benign to palpation testes.  What does that mean in lay terms?

A.  So as part of the exam, the urologist would have palpated or pushed on the testes to test whether or not there was pain at the time and to determine if that pain was within the testicle or an epididymitis which is tissue that is above the testicle.

And so the statement unremarkable scrotum to exam with bilateral benign palpation means there was no pain at the time

UNITED STATES DISTRICT COURT

**5-ER-0926**

866

elicited by that -- performing that particular exam.

Q. I'm going to try to turn to trial Exhibit 2043. This is August 22nd, 2022. Does this appear to be that to MAC memo?

A. Yes.

Q. Does this appear to be an accurate copy of the MAC memo, the position on that date?

A. It is.

Q. Does this appear to be a document that is kept within the ordinary course of business with the DOC?

A. Yes.

Q. And is this a document that would be part of Ms. Wagoner's medical treatment?

A. Yes.

MR. GROSS: Move admission of Exhibit 2043.

THE COURT: 2043, Ms. Kerr.

MS. KERR: Sonja Kerr for the plaintiffs. No objection.

THE COURT: No objection. 2043 is admitted.

BY MR. GROSS:

Q. I'm going to start now at the third paragraph. This says the MAC discuss concerns regarding several aspects of the recommendation to initiate estrogen therapy including the degree of which hormone therapy is essential in this case. The evidence of short term risks associated with estrogen treatment, the lack of evidence for long-term benefit of

UNITED STATES DISTRICT COURT

**5-ER-0927**

867

cross-hormone therapy for preventing suicide, substantive use, sexually transmitted diseases, the sufficiency of hormone therapy where the patient has stated having a goal for a fixed outcome of transgender surgeries as opposed to a therapeutic goal of reduced dysmorphia and the increased risk of cardiovascular disease and blood clots with estrogen treatment. That's a mouthful. I want to break that down with you if I could.

What is meant by the degree of which hormone therapy is essential in this case. What are you referring to there?

A. This is an opportunity to drop into that meeting of individuals who are considering, you know, request for treatment of the gender dysphoria so to let you know, part of that discussion is focused on, as we discussed earlier, whether or not hormone therapy is -- it meets the definition of essential healthcare.

Q. Okay. It says evidence of short-term risk associated with estrogen treatment. Short-term risk, what are you talking about?

A. I seem to recall the two primary risks that were discussed at that time were a risk of emotional changes or swings with starting on a hormone therapy or blood clots.

Q. Okay. And then the big part here I think is where we're talking about the lack of evidence for long-term benefit of cross-hormone therapy and then you list three, I guess, risk

UNITED STATES DISTRICT COURT

**5-ER-0928**

868

factors.  There's preventing suicide, substance abuse, or sexually transmitted diseases.  I think you've spoken to this a little bit, but what's going through your mind regarding this information?

A.  If I can clarify, I don't think these -- of these as risk factors but the very conditions that make gender dysphoria a serious medical condition is suicide, substance abuse, or sexually transmitted diseases.  So here is where you start to feel the weight that is felt by the MAC Committee that they're having to make a very serious decision.  And that's the question about whether or not the addition of hormone therapy is going to reduce the risk long-term of suicide, of substance abuse, of a sexually transmitted disease as opposed to actually increasing that risk.

Q.  Okay.  And then it says the sufficiency of hormone therapy where the patient has stated having a goal -- a fixed outcome of transgender surgery as opposed to a therapeutic goal of reduced dysphoria.  What's the concern there?

A.  I think most would agree -- and we've known for a long time -- that treatment for gender dysphoria has to be individualized and it cannot be fixed on a particular outcome. What was considered by MAC at this time was a recognition that Ms. Wagoner's stated desire was for the gender-affirming surgeries.  And so there was question or discussion at MAC about whether or not the cross-sex hormone or the provision of

UNITED STATES DISTRICT COURT

**5-ER-0929**

cross-sex hormones was going to have a positive effect knowing that the patient actually had a fixed desire for a different end or different outcome.

Q. And then, finally, increased risk of cardiovascular disease. Was that considered?

A. Yes. And, again, the discussion there was a recognition that in the literature there is not a reduction in cardiovascular disease after treatment but rather in most studies an increased risk of blood clots and cardiovascular disease. So there was much discussion about whether or not the provision of the hormone therapy, again, was going to reduce long-term risks rather than providing something that would increase harm.

Q. Let's take a look at the last paragraph. It says the MAC acknowledges that Emalee Wagoner continues to express feelings of dysphoria, despite non hormone interventions. Cross-hormone therapy has been recommended by a psychiatric health practitioner. The treatment will be provided under the guidance of a consult with expertise in the management of cross-sex hormones. The MAC authorizes implementation of this treatment. Did you agree with that decision?

A. I did.

Q. And who was the doctor that was going to oversee this particular care?

A. So the thing to notice in this paragraph and the document

UNITED STATES DISTRICT COURT

**5-ER-0930**

870

is that there is a parallel agreement between a medical provider and a mental health clinician or, in this case, psychiatrist and that outside medical provider is Dr. Laura(sic) Samuelson who after we had received a recommendation from the Gender Dysphoria Management Committee to proceed with hormone therapy, we -- in recognizing that we did not have someone within the Department of Corrections who could provide the medical side of that care -- we each reached out and found Dr. Samuelson who agreed to provide that care so that's what you see referenced.

Q. And in a multi disciplinary approach, do you have both the medical side and the mental health agree before a surgery like this is authorized?

A. Yes.

Q. Or treatment whether it's hormone or surgery, you have to have both sides of the shop agree?

A. I would say what you see from the beginning when we were developing the process for treating gender dysphoria here in Alaska, we recognized early on that you have to have agreement and concordance between those who are providing the medical care and those providing the mental health care, and, as you say, that is a part of the multi disciplinary approach that is the patient's best interest.

Q. Let's go to the next document. This is a MAC memo dated October 23rd, 2023. It's going to be Exhibit 2045. This

UNITED STATES DISTRICT COURT

**5-ER-0931**

exhibit has been previously admitted. And I want to look at paragraph 4, if I could.

And this starts by saying the MAC reviewed the current guidelines and the evidence based literature regarding treatment of gender dysphoria. I'm going to stop right there. We talked about this a little bit before but you had previously looked at research. Did you continue to consult the research of the literature on this particular issue?

A. We did.

Q. And is that what you're referring to here?

A. We are. Yes. If we were to look at the date of this document, I am fairly sure that's several years after the first reviews that were done again in 2015 and '16.

Q. It goes on to say the MAC discussed concerns regarding several aspects of the recommended surgeries for Ms. Wagoner including the degree to which surgeries are essential under DOC policy and insufficient evidence for long-term benefit of gender altering surgery for providing suicide, substance abuse, sexually transmitted disease, or cardiovascular disease?

Now a couple of the experts talked about the fact that substance abuse and sexually transmitted diseases didn't seem to be necessary, it doesn't really apply in that situation. Can you talk to us about why you're listing those three things there again.

A. Again, the discussion of the MAC Committee was a

recognition at what makes gender dysphoria a serious medical condition is people die from each of these four different conditions. And so there's a recognition that whether it's substance use or sexually transmitted disease for a person to have those conditions that leads to their death is very serious. And if gender dysphoria is what is leading to those end points, it has to be taken seriously. So even if looking at -- well I would say looking at any one of the four different options for treatment, in this case, it was surgery, it's important to be asking the question will surgery reduce the risk of those dire end points.

Q. Okay. If you keep reading it says the potential for harms in physical and mental health if the recommended surgeries are expedited or approved. What harms are you referring to there?

A. There was much discussion at the MAC Committee or recognition that when individuals get surgery for -- surgery for anything within an incarcerated setting, recovery has to occur, you know, within the Department of Corrections. Usually within our infirmaries there is a period of recovery.

And there is an increased risk of -- either an increased risk, stress or depression, during the period of dealing with a very serious illness during that period of recovery. And then also just the physical recovery period so there's a recognition we had to consider before going forward there was the potential not just for benefit if surgery was

UNITED STATES DISTRICT COURT

873

provided, but serious concern for any harms associated with the surgery itself if it is to be expedited, meaning, yes, let's move forward quickly with this or --

Q. It goes on to say the lack of objective signs of deterioration and mental health over the last five years. What's that referring to?

A. So this is in the discussion where the MAC Committee was given information about the mental health going back five years from this particular discussion and really asking the question after going through the early stages of being treated with psychotherapy, going through, you know, the treatment of cross-sex hormone therapy, has there been a further deterioration in mental health. And there was a recognition or at least what was presented to the MAC is there had not been a deterioration of mental health over that period of time.

Q. Okay. Let's jump to the conclusion of this Exhibit 2045. Last paragraph says the MAC acknowledges Emalee Wagoner continues to express feeling of dysmorphia, despite cross-sex hormone interventions, and cognitive behavior therapies, however, there is insufficient evidence to affirm Ms. Wagoner's mental health and wellbeing will decline without surgery. The MAC does not authorize implementation of this recommendation.

Do you believe that was the correct decision?

A. I do.

Q. Do you understand at the time you made this decision Dr.

UNITED STATES DISTRICT COURT

**5-ER-0934**

Samuelson was recommending surgery?

A. Yes.

Q. Does that change your opinion?

A. No.

MR. GROSS: Your Honor, those are all of the questions I have.

THE COURT: All right. Thank you, Mr. Gross.

Ms. Kerr, cross-examination.

MS. KERR: I'm wondering if we could start in the morning, Your Honor. Mine's going to be pretty lengthy.

THE COURT: Okay. Let me -- let me check in with the defendants. How many more witnesses do you anticipate?

MR. GROSS: We've got one short witness and two experts.

THE COURT: I think we can pretty easily fill one day with one short witness and two experts so if we can make use of the next 25 minutes, Ms. Kerr. I certainly appreciate it's been a long day, and I appreciate that you don't want to start your cross examination only to have it interrupted. I'm sympathetic to that but we also need to make use of the time we have. So if you don't mind terribly, let's go ahead and get your cross started.

MR. SAENZ: Your Honor, if I may. This is Richard Saenz for the plaintiff.

Understanding that Ms. Wagoner has been transported

UNITED STATES DISTRICT COURT

5-ER-0935

every day -- which we extend our thanks -- if she has to leave at 4:15, it's fine if testimony continues after 4:15 but she can be escorted at 4:15, Your Honor.  Thank you.  Oh.  Ms. Wagoner is fine with staying until 4:30.

THE COURT:  Very good.  All right.  Ms. Kerr.

CROSS-EXAMINATION BY MS. KERR:

Q.  This is Sonja Kerr for the plaintiff.  Good afternoon, Dr. Lawrence.

A.  Good afternoon.

Q.  Would you remind me where you went to college?

A.  So I went to college at Harding University in Searcy, Arkansas.

Q.  Okay.  Is that a liberal arts college?

A.  It is.

Q.  And what was your undergraduate degree?

A.  It's in Bible and Theology.

Q.  And then you were a pastor for a while?

A.  I was a minister.  That is correct.  That's correct.

Q.  Are you still a licensed minister?

A.  My particular designation is not one of a licensed type. But I do continue to serve as a minister.

Q.  And what faith?

A.  It's -- I currently attend Anchorage Church of Christ so the faith would be the Christian faith.

Q.  Prior to becoming involved in this case, had you ever met a

876

transgender individual?

A. Yes.

Q. And prior to becoming involved in this case, had you ever treated -- medically treated a transgender individual?

A. Yes.

Q. Where?

A. Within the Department of Corrections.

Q. Okay. And did you recommend any type of surgery for that individual?

A. I did not.

Q. Have you ever recommended any type of surgery for a person who is transgender?

A. I have not.

Q. Would you turn to -- could we bring up Defendants' Exhibit 1040. Dr. Lawrence, do you recognize this email between yourself and Kristy Land?

A. I do.

Q. And who is Kristy Land?

A. Kristy Land was one of our health practitioners there within the Department of Corrections who worked at the Goose Creek Correctional Center.

Q. And do you have any -- do you have any reason to believe this is not a correct copy of this email between yourself and Ms. Land?

A. It appears to be correct.

UNITED STATES DISTRICT COURT

**5-ER-0937**

Q.  All right.

MS. KERR:  We would offer Plaintiff's Exhibit 1040.

THE COURT:  I show it as previously admitted.

MS. KERR:  Okay.

THE COURT:  Am I correct, madam deputy?

COURTROOM DEPUTY:  Yes, Your Honor.

MS. KERR:  All right.  Thank you.

BY MS. KERR:

Q.  Dr. Lawrence, what was the substance of this general -- substance of this email between yourself and Kristy Land?

A.  Looking at the date which is January 2018, what I recall of the situation is that there were many health practitioners and even mental health clinicians who were learning to follow a process that we had put together for the treatment of gender dysphoria.  This email -- reflects and you'll see in this Mrs. Land's discomfort with what she was being asked to do as a part of following that clinical care guide.

Q.  And that was because of her faith?

A.  I can't confirm or deny that it was directly related to her faith.  She -- she does mention personal ethics.

Q.  And as a minister, you would not want anyone to not follow their faith?

A.  I would broaden it beyond just as a minister.  Within the Department of Corrections, it was important for us that no mental or medical health clinician ever violate personal

ethics.  Because if they were willing to step over that line in order to follow a guideline, I couldn't be sure they wouldn't under the coercion of pressure from either inmates or from officers or others and so you're correct that that was important to us.

Q.  I'll keep going down to the next page if we could.  I think it's perhaps the next page.  Okay.  What is -- can you read this paragraph to yourself and then I have a question.

A.  So this is an email dated January 11th, 2018.  It's from Kristy Land to me regarding Emalee Wagoner.

Q.  And --

A.  I am --

Q.  Do you see about six lines down.  Can you read the part that says I do not pretend.

A.  I do not pretend to understand the struggle but gender transition is not something I personally stand behind or professionally feel is responsible.

Q.  And she goes on to say, does she not, I'm sitting here thinking and I just cannot come up with another issue that I could not separate my personal values from.  Do you see that?

A.  I do.

Q.  And so you honored her personal values in response to this email.  Right?

A.  If we look at my response --

Q.  Just answer my question, if you could.

UNITED STATES DISTRICT COURT

**5-ER-0939**

MR. GROSS:  Your Honor, he was answering her question.

THE COURT:  He was trying to.  Let's go ahead.

MS. KERR:  It's kind of a yes or no question.

THE COURT:  Let's hear his answer.  And if he's not answered your question, you can ask a follow-up question.

MS. KERR:  Okay.

THE COURT:  Go ahead and give your answer, sir.

THE WITNESS:  Would you be willing to repeat the question.

MS. KERR:  Can we have it read back.

THE COURT:  Madam Court Reporter, are you able to read that question back for us?

(Record read.)

THE COURT:  Can you answer that question.

THE WITNESS:  I cannot because I cannot speak to her personal values and the degree to which I honored or did not honor those by my response.

BY MS. KERR:

Q.  Well, she says does she not, I'm sitting here thinking and I cannot come up with another issue that I could not separate my personal values from.  And then your response to that if we go up a little is -- can you read this where it starts with the short answer.

A.  Yes.  These are great questions and important points.  The

UNITED STATES DISTRICT COURT

**5-ER-0940**

880

short answer which is true of any treatment, you will not be expected to write prescriptions for anything you're not professionally trained or prepared to prescribe, even if you've performed an initial exam on a patient with gender dysphoria.

The data is limited, but estrogen may temporarily reduce the symptoms of dysphoria in certain individuals with gender dysphoria. However, to date, we have not had any patients for whom this benefit would outweigh the cardiovascular risks. For this and many of the reasons you outlined, the treatment plan in DOC will be developed by a multi-disciplinary team. Treatment, if approved by the multi-disciplinary team, will be prescribed by someone with appropriate training and experience.

Q. And Ms. Land had been asked to conduct some type of evaluation of Ms. Wagoner. Right?

A. That's correct.

Q. And was your email to her, the one you just read, basically telling her she didn't have to do that?

A. No. That's not correct.

Q. Did she ever do one?

A. I don't recall if she is the one that performed this exam or not.

Q. Okay. What type of exam was she supposed to perform?

A. So our approach to treating gender dysphoria began with the -- as we saw earlier, in the mental health clinicians' exam

UNITED STATES DISTRICT COURT

**5-ER-0941**

881

and then there was an evaluation done not only by the psychiatrist but also a medical provider. The exam that was being requested here was for the medical provider to do an evaluation of the patient for any comorbid conditions or any risk factors for, specifically, cardiovascular disease.

Q. So she was supposed to conduct a physical exam. Correct?

A. Yes. A full evaluation that would include a physical exam.

Q. Okay. And since she did not want to do that, did someone perform the physical exam?

A. My understanding is yes.

Q. Who?

A. But I can't speak to who the -- that is an assumption based on decisions made afterwards would have required that someone who has performed that exam.

Q. Did you perform any physical exam of Ms. Wagoner at this time in 2018?

A. Not that I recall.

Q. Have you ever performed a physical exam of Ms. Wagoner?

A. Not that I recall.

Q. Have you ever met Ms. Wagoner?

A. Yes.

Q. And have you ever visited with Ms. Wagoner?

A. Yes.

Q. And were those opportunities to visit with Ms. Wagoner prior to 2019?

**5-ER-0942**

882

A. Yes.

Q. Can you bring up Plaintiff's Exhibit 1014 and page 63.

Dr. Lawrence, this is a journal that Ms. Wagoner kept and I'm just -- I'm not going to offer to admit it, Your Honor, but I just would like the witness to read it and then I have a question for him about the meeting he had with Ms. Wagoner. Go ahead.

A. This appears --

Q. I don't need you to read it out loud. Just read it to yourself.

A. Thank you.

Q. We'll scroll on to the next page when you're ready, Dr. Lawrence.

A. Thank you. I'm ready to scroll. Okay. Thank you.

Q. I think you need to go on to the next page.

A. Thank you.

Q. Okay. So my question, Dr. Lawrence, do you remember having this meeting with Ms. Wagoner?

A. I do.

Q. And it was you and Mr. Rutherford. Right?

A. Yes.

Q. You, Mr. Rutherford, and Ms. Wagoner?

A. Yes.

Q. And what was the purpose of the meeting?

A. If I recall, the meeting that we had with Ms. Wagoner was

UNITED STATES DISTRICT COURT

**5-ER-0943**

right after a Gender Dysphoria Management Committee meeting.

Q. Okay.

A. And the purpose was to basically share with her the decision of the meeting.

Q. And what was that decision at that time?

A. We're stretching back for all of the details.

Q. Well, that's where I was trying to find a document that could help you.

A. The -- basically what we were sharing with her sounds like -- from Ms. Wagoner's perspective -- is what we were talking about earlier is the stepwise approach to treating the gender dysphoria. What I recall about that meeting is it becoming quite contentious where there was -- it was not really the ability to share the information, what was discussed. It became quite accusatory but we did spend quite a bit of time together going through what was discussed by the committee and the decision.

I think the document probably reflects, at least topically, the types of things that we talked about. In terms of substance, it's helpful to hear what her perspective was. What I can't confirm is exactly what was said in terms of an outline of that discussion.

Q. After you left this meeting, did you write up or prepare any document regarding the meeting?

A. Not that I recall.

884

Q. Okay. Would you turn please to Plaintiff's Exhibit 1022. Look at 1022. Dr. Lawrence, do you recall seeing any document, Plaintiff's Exhibit 1022, which is a response from Adam Rutherford about grievance GCCC161272?

A. Would you be able to show me the date of this document. January 16th, 2017. I'm sorry was your question whether or not I recognize this document?

Q. Yeah. Have you seen it?

A. I believe I have. Yes.

Q. And were you part of creating it at all?

A. I was not.

Q. Did you -- when did you see it? When do you recall seeing it or getting it or?

A. The time that popped in my mind when you asked if I had seen this before was during this trial I think this has been presented.

Q. Okay. So when you went to the meeting that we just talked about with yourself and Mr. Rutherford --

A. Uh-huh.

Q. -- to the best of your knowledge, you didn't have this memo; you hadn't seen this memo?

A. I don't recall that. No.

Q. Okay.

          MS. KERR: Your Honor, this is a good stopping point.

          THE COURT: That's fine. You've gotten the most out

UNITED STATES DISTRICT COURT

**5-ER-0945**

of this time.

MR. GROSS:  I'm just trying to squeak out every bit we can get because it's going to be close whether we can finish tomorrow or not but that's fine.

THE COURT:  I appreciate that but we can go ahead and stop for today.

MS. KERR:  I will represent to the Court I will be very efficient tomorrow.

THE COURT:  All right.  I'm going to hold you to that.

MS. KERR:  I will.

THE COURT:  So any -- any housekeeping matters before we break from the plaintiffs?

MR. SAENZ:  No, Your Honor.

THE COURT:  Nope.  All right.  From the defendants?

MS. MICHALETZ:  I don't know if the Court has this capacity, Your Honor, but I'm -- I'll ask and you can deny. I'm wondering in order to maximize our time tomorrow, is it possible to start at 8:30 instead of 9:00?

THE COURT:  That implicates a number of stakeholders. Let me go around from our transport people.  Are you able to get Ms. Wagoner here no later than 8:30 tomorrow morning?

UNIDENTIFIED SPEAKER:  Yes.

THE COURT:  And, madam deputy, does that work for the clerk's office?

COURTROOM DEPUTY:  It should, Your Honor.

UNITED STATES DISTRICT COURT

**5-ER-0946**

THE COURT: All right. It's -- and I should ask the plaintiffs. Is that acceptable?

MS. KERR: It's fine.

MR. SAENZ: We agree.

MS. MICHALETZ: Your Honor, we do have another court reporter in the morning.

THE COURT: Stand by, everyone. All right. There are sort of a fairly complicated logical chain in getting Ms. Wagoner to Anchorage so that's what I was just advised so we're at the mercy of the people transporting her but to the best of everyone's ability, we will be here and ready to go by 8:30 tomorrow morning. All right. That's a good suggestion. I appreciate it.

We'll do the best we can to wring everything we can out of tomorrow. If we can finish tomorrow, that's great. I don't want to jinx us. I would encourage the parties to meet and confer regarding what happens if we can't finish. I have a full calendar on Monday, which I will clear, but the more notice the better because there's a lot of people's schedules who are impacted.

I also had to set some matters in other case over the lunch hour so we'll go over the lunch hour then I've got to stop because I got to take up other matters. So that's the plan for tomorrow.

All right. Thank you all very much. See you tomorrow

UNITED STATES DISTRICT COURT

**5-ER-0947**

morning 8:30.  We're adjourned.


     (Proceedings conclude at 4:25 p.m)

                    ---oOo---

                UNITED STATES DISTRICT COURT

888

# C E R T I F I C A T E

I, ANDREA K. BLUEDORN, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 15th day of May, 2025.

/s/ Andrea Bluedorn
_____
Andrea K. Bluedorn, RMR, CRR

UNITED STATES DISTRICT COURT

**5-ER-0949**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

_____

| | | |
|---|---|---|
| **Emalee Wagoner,** | ) | |
| | ) | No. 3:18-cv-00211-MMS |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Phoenix, Arizona |
| **Nancy Dahlstrom et al.,** | ) | May 16, 2025 |
| | ) | 8:33 a.m. |
| Defendants. | ) | |
| | ) | **(AMENDED)** |

**BEFORE:  THE HONORABLE MATTHEW M. SCOBLE, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**VIA HYBRID ZOOM VIDEOCONFERENCE**

**BENCH TRIAL – DAY 5**

**(A.M. SESSION)**

**(Pages 889-1021)**

Official Court Reporter:
**Andrea K. Bluedorn, RMR, CRR (By Zoom Videoconference)**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona 85003-2151
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**5-ER-0950**

**A P P E A R A N C E S**

For the Plaintiff:
    LAMBDA LEGAL DEFENSE AND EDUCATION FUND
    By:  **Richard Saenz, Esq.**
           **Morgan Walker, Esq.**
    120 Wall Street, 19th Floor
    New York, NY 10005-3919

For the Plaintiff:
    LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
    By:  **Sasha Buchert, Esq.**
    815 16th Street NW, Ste 4140
    Washington, DC 20006

For the Plaintiff:
    LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
    By:  **Sonja D. Kerr, Esq.**
    3500 Oak Lawn Avenue, Suite 500
    Dallas, Texas 75219

For the Defendants:
    BIRCH HORTON BITTNER & CHEROT
    By:  **Mara Michaletz, Esq.**
           **David Karl Gross, Esq.**
    510 L. Street, Suite 700
    Anchorage, Alaska 99501

UNITED STATES DISTRICT COURT

**I N D E X**

**WITNESSES:**                                                    **PAGE:**

Dr. Robert Lawrence
         Cross-Examination by Ms. Kerr              894
         Redirect Examination by Mr. Gross          913
         Recross Examination by Ms. Kerr            915

Mr. Adam Rutherford
         Direct Examination by Mr. Gross            917
         Cross-Examination by Ms. Kerr              935
         Redirect Examination by Mr. Gross          949
         Recross Examination by Ms. Kerr            950

Dr. Sara Boyd
         Direct Examination by Ms. Michaletz        952
         Cross-Examination by Ms. Buchert          1007


**EXHIBITS:**                                                     **PAGE:**

1052- Internal DOC emails about medical care from       909
May 9, 2017 and through January 2018 - August 2020,
(ERW 001270-ERW 001287), (ESI 00001, ESI 000031-ESI
000037, ESI 000512-ESI 000517; ESI 000519-ESI
000522)

2046- MAC Decision, dated January 16, 2017              928
(SOA002792)

2107                                                    966

UNITED STATES DISTRICT COURT

**5-ER-0952**

**P R O C E E D I N G S**

THE COURT:  All right.  Good morning, everyone.  We are back on the record.  The parties are present.  Ms. Wagoner is present.  Today is Friday.  Hopefully our last trial day.

Let's see, in no particular order, I'll just remind everybody to speak slowly for the court reporter.  For folks in the gallery, I'll remind you to keep your phones off and put away.  I think if we have any hope of finishing today, we're really going to need to be maximally efficient.

So I always try to give all litigants the opportunity to fully put their case on.  At this point, if we're going to finish evidence today, I may have to tighten the reins a little bit, so-to-speak.  So there may not be multiple rounds of cross and recross and rerecross and so forth so I'll ask everybody to be efficient.

If there is an objection to voice, if you have a basis for that objection, please say it when you say objection.  Objection without a basis doesn't mean anything.  I also understand that of course both sides are represented by teams of attorneys that -- I'm happy to see that.  I'm happy to see everybody working together and at times we need to collaborate.  Each time we pause for a couple minutes to collaborate to confer, those couple minute pauses add up.  If you need to speak with co-counsel, try to do it while your other team

member is moving things along on the record.

With that being said, any housekeeping before we recall Dr. Lawrence from the plaintiff?

MS. KERR: Sonja Kerr for the plaintiffs. I don't believe so.

MR. SAENZ: Good morning, Your Honor. Richard Saenz for the plaintiff. We would ask for a few minutes for rebuttal if necessary at the end in terms of timing.

THE COURT: All right. Thank you. For the parties' planning purposes, I have a hard stop at 5:00. I can go until 5:00. I can't go past 5:00. Any housekeeping from the defendants?

MR. GROSS: No, other than to understand who the rebuttal witness would be.

THE COURT: I'll let you at your morning break, I'll let you all -- you can meet and confer, and if there's issues, we'll talk about them on the record.

Dr. Lawrence, there you are, sir. Come up to the witness stand. I'll remind you you're still under oath.

And, Ms. Kerr, you were cross examining.

MS. KERR: Good morning. Sonja Kerr for the plaintiffs. Your Honor, just before we start with Dr. Lawrence, plaintiffs would offer Plaintiff's Exhibit 1073 and Plaintiff's Exhibit 1074. These are affidavits signed by Dr. Lawrence.

UNITED STATES DISTRICT COURT

**5-ER-0954**

MR. GROSS:  No objection.

THE COURT:  Previously admitted.

MS. KERR:  Thank you.

CROSS-EXAMINATION BY MS. KERR:

Q.  Dr. Lawrence, good morning.

A.  Good morning.

Q.  Can you tell me when an inmate receives medical care from an outside provider, who pays for that?

A.  So the cost of care for outside providers is paid for by the State of Alaska, the Department of Corrections.

Q.  And is that through Medicaid?

A.  In most cases, no.  There is one exception and that is for inmates that are hospitalized for greater than 24 hours.

Q.  So if an inmate has surgery, is that paid for by Medicaid?

A.  The answer to that is complex.  The direct answer would be no.  The caveat of course is that exception I just mentioned.

Q.  All right.  Did the Gender Dysphoria Committee exist before February 3rd, 2018?

A.  I don't recall the date that it was first established.  But my recollection is that that would have been pulled together sometime in 20 -- late 2017.

Q.  Do you agree with Mr. Mercer's testimony from yesterday that there would be notes from every Gender Dysphoria Committee meeting?

A.  No.

UNITED STATES DISTRICT COURT

**5-ER-0955**

Q. You do not recall seeing any notes from what the Gender Dysphoria Committee decided before you and Mr. Rutherford met with Ms. Wagoner as we talked about yesterday?

A. Just to clarify, you said notes from a Gender Dysphoria Management Committee.

Q. Right.

A. No.

Q. Okay. Other than the Gender Dysphoria Management Committee notes, were there any separate documents called treatment plans?

A. Yes. And what comes to mind as you're asking that question would be what is found within the medical record, and there are multiple different types of notes that are included in the broader medical record.

Q. Including progress notes, including documentation of medicine, etcetera?

A. Correct.

Q. Okay. But is there any specific document entitled individual treatment plan?

A. Not that I'm aware of.

Q. Okay. Would you look at this declaration from February of 2023. If you could turn to paragraph 72. I'll give you a moment to read that and then I have a question.

A. Yes.

Q. Okay. So you signed this affidavit in February of 2023.

You had already left DOC or not?

A. I had not.

Q. Okay. You left DOC in 2024 in May?

A. That's correct.

Q. Okay. So in February -- in February of 2023, when you signed this affidavit, you were still working for DOC?

A. Correct.

Q. And you were aware or not aware when you signed this affidavit that Dr. Samuelson was treating Ms. Wagoner?

A. I was aware. Yes.

Q. And you did or did not speak to Ms. -- to Dr. Samuelson about surgical needs before you signed this affidavit?

A. I -- I had spoken to Dr. Samuelson about surgical needs.

Q. Okay. And you were aware in April of 2023 that Dr. Samuelson had recommended surgery at that time?

A. I believe so. Yes.

Q. You did not amend this affidavit. Correct?

A. I did not.

Q. Okay. And the -- either yourself or the other decision makers rejected Dr. Samuelson's recommendation for surgery. Correct?

A. Not correct.

Q. You did not reject her recommendation?

A. No. That would mischaracterize the decision.

Q. Okay. Let me ask it this way. You said you left in May of

2024. Right?

A. Correct.

Q. You were aware that from approximately April of 2023 through the time you were still at DOC, May of 2024, Dr. Samuelson was repeatedly suggesting a referral for surgery. Right?

A. Correct.

Q. Did you talk to Dr. Samuelson about that during that time?

A. I did. Yes.

Q. And did you tell her what your opinion was?

A. I did not discuss with her my personal opinion of her recommendation. No.

Q. Okay. And from October of 2023 -- you recall we looked at documents yesterday from October of 2023?

A. Correct.

Q. When the MAC Committee said no surgery despite Dr. Samuelson's recommendation?

A. Correct.

Q. From October of 2023 until you left in May of 2024, you did not recommend surgery despite the recommendations from Dr. Samuelson?

A. To be clear, it is a MAC decision that led to not moving forward with Dr. Samuelson's recommendation.

Q. Let me ask it this way -- not trying to confuse you. So from October of 2023 to May of 2024, there was not another MAC

UNITED STATES DISTRICT COURT

**5-ER-0958**

898

meeting, right, on surgery?

A. We'd have to look at the dates. That's what I'm unclear in terms of where we are. There's a decision that's made by the MAC Committee that weighs Dr. Samuelson's recommendation.

Q. That was in 2023, sir, in October?

A. In October. Okay.

Q. So are you aware of any other MAC meeting that you attended, that you dealt with in which there was a decision made to not allow surgery?

A. The October '23 would be the proper date. I don't recall a specific meeting after that date revisiting that decision.

Q. Okay. Even though you were receiving the repeated requests from Dr. Samuelson for surgery -- let me say that again. Bad question. So you get the -- DOC gets the care notes from Dr. Samuelson. Right?

A. Correct.

Q. And Dr. Samuelson testified the other day that every time she saw Emalee after April of 2023, she was recommending surgery. Right?

A. Correct.

Q. Okay. So when you were continuing to get these recommendations from Dr. Samuelson after the MAC met in October of 2023, no one reconvened the MAC to discuss again Dr. Samuelson's repeated requests she be referred to a surgeon?

A. Well, to clarify the time that that request would come back

UNITED STATES DISTRICT COURT

**5-ER-0959**

to a MAC Committee would be after a Gender Dysphoria Committee at the facility in which that decision was again weighed. And when a discussion between -- or really with mental health discussing among themselves do they agree with the treating medical provider and even if there's disagreement there or if a decision needs to be made, if they cannot come to consensus and, at that time, the issue would then rise to the level of the consideration by the Medical Advisory Committee but that's what I don't recall after October '23 that that process occurred.

Q. So if the records don't reflect that the Gender Dysphoria Committee met to discuss, again, Dr. Samuelson's repeated requests that Ms. Wagoner be referred for surgical consult, you don't have any knowledge that the Gender Dysphoria Committee met. Correct?

A. Correct.

Q. Or that the MAC Committee met. Correct?

A. Correct. Well, can I clarify?

Q. On that -- on that issue?

A. On that issue.

Q. Okay. Thank you. Can we look at paragraph 72. It's -- can you just read the -- the second sentence there.

A. It's my opinion that DOC has provided Ms. Wagoner with the medically necessary care for her gender dysphoria. Her care will continue to be evaluated over time in order to measure her

UNITED STATES DISTRICT COURT

response to her ongoing mental health counseling and hormone therapy.

Ms. Wagoner's need for irreversible surgical intervention for gender dysphoria will be in the future if recommended by an attending medical provider at DOC or outside of DOC. That potential future evaluation should be multidisciplinary and include the input of mental health professionals and medical staff who can collectively address Ms. Wagoner's underlying mental health comorbidities, her underlying physical conditions, and perhaps her recent report of not wanting hormone therapy despite her past history of stating otherwise.

Q. Okay. And so, to your knowledge Dr. Lawrence, from October of 2023 until today, May of 2025, there has not been a reconsideration such as you recommended in this affidavit of February 2023?

A. I cannot confirm that.

Q. Okay. You can confirm it as far as May of 2024 when you left?

A. As of 2024, I can confirm that the -- the recommendations that Dr. Samuelson made were known to staff at DOC and that medical providers and mental health providers at DOC were aware of that recommendation. It would be speculating on my part to say in their treatment team meetings they were still visiting that recommendation from Dr. Samuelson, but I can't confirm or

deny that was discussed.

Q. But as the chief medical officer until May of 2024, you didn't reconvene or ask reconvening of the Gender Dysphoria Committee or the MAC Committee on that point after October of 2023. Correct?

A. I did not request a reconvening on that point. Yeah.

Q. Okay. And now let's talk a little bit about WPATH. You mentioned that yesterday in your testimony. Do you remember that?

A. Yes.

Q. And I think you said that WPATH was considered by DOC but not adopted?

A. That is correct.

Q. Okay. And that's in your declaration at paragraph 20 if we can turn to that. Okay. Can you read that into the record?

A. Sure. Paragraph 20. DOC has not formally adopted the WPATH guidelines as a policy or treatment guideline but has consulted the WPATH guidelines for direction when adopting and implementing its own policies and guidelines.

Q. Other than WPATH, were there any other guidelines you considered prior to your leaving DOC in May of 2024?

A. Yes.

Q. What ones?

A. So there's quite a list but the guidelines we turned to or look to would include the endocrine society has a set of

guidelines.

Q.  Okay.

A.  University of California San Francisco has a set of guidelines.  And then we also consulted with other Department of Corrections throughout other states to see what guidelines were developed in those states and also looked overseas at guidelines that were being put out by other countries.

Q.  Okay.  And with respect to the endocrine society and UCLA, agree or disagree those are generally consistent with WPATH?

A.  Generally consistent with, yes.

Q.  Okay.  All right.  And you would agree that there's no one who sat on the Gender Dysphoria Committee from 2017 until you left in 2024 that was an expert in gender dysphoria.  Correct?

A.  I cannot -- I cannot say that's correct.

Q.  You don't know?

A.  No.  It's just that to state that there was or were not experts would require discussing what we mean by expert and the spectrum of knowledge of each of the people that sat on those committees.

Q.  You were the only doctor on the team?

A.  No.  There was other doctors.

Q.  Okay.  Were any of those individuals trained in gender dysphoria, to your knowledge?

A.  I can't speak to their personal knowledge or experience with gender dysphoria.

UNITED STATES DISTRICT COURT

Q. Okay. And would you look at -- can we turn to Defendants' Exhibit 2047. Okay. So this is one of the Gender Dysphoria Committees that you were present at on February 8th, 2023?

A. It appears so, yes.

Q. Okay. And what knowledge do you have of Dr. Matthews' training?

A. Okay. So Dr. Matthews is our regional medical officer. He is a primary care physician who would have the training consistent with primary care.

Q. Okay. All right. And can we look at the next -- and you attended this meeting. Right?

A. Yes.

Q. Okay. And then would you go to the 2048.

The next meeting was in June of 2024 and you attended that one also?

A. Yes.

Q. And then 2049. You were not at this Gender Dysphoria Committee meeting in September of 2023. Correct?

A. My name is not listed.

Q. Okay. And then 2050. You were not at this meeting in March of 2024. Correct?

A. Correct.

Q. Okay. And then you left in May of 2024?

A. Correct.

Q. Okay. So the next meeting which is 2051, you did not

attend that because you had left?

A.  Correct.

Q.  Okay.  Do you agree that surgery by itself does not create cardiovascular risk for a person?

A.  You'd have to clarify, but, no.  I would disagree with that statement.

Q.  So you think any surgery creates a cardiovascular risk for any person?

A.  It is a consideration for increasing cardiac risk following surgery.  That's a consideration for anyone going into surgery is whether or not the surgery increases the risk of cardiovascular events.

Q.  So if anybody has any surgery, there's a cardiovascular visit?

A.  There is a need to consider whether or not the surgery is going to increase the risk for that individual.  Yes.

Q.  Okay.  And from 2016 until May of 2024, as the chief medical officer, you were the person who made final decisions about medical care in Ms. Wagoner's case.  Correct?

A.  Incorrect.

Q.  Who was the person who made final decisions about medical care?

A.  So final decisions about medical care would fall to the treating physicians and or health practitioners.

Q.  And who was Ms. Wagoner's treating physician at this time?

UNITED STATES DISTRICT COURT

**5-ER-0965**

A.  So it would be a team of individuals that were working at Goose Creek at the time that would include the regional medical officer and a team of health practitioners.

Q.  Who was the doctor?

A.  Give me the time span again because it may have been different physicians.

Q.  So you don't know, sitting here today, who her doctor was?

A.  I do, yes.

Q.  Who was it?

A.  So to answer clearly, over that span of time, 2016 to 2024, there would potentially have been three doctors.  But the two that definitely were treating regional doctor -- were Dr. Nemmo(ph) and then Dr. Matthews as you just mentioned.

Q.  Okay.  And you were not her treating physician?

A.  I was not.

Q.  Who replaced you as the chief medical officer?

A.  So the chief medical officer is now Dr. Tim Ballard.

Q.  B-A-L-L --

A.  A-R-D.  Correct.

Q.  Okay.  Thank you.  And do you now as the acting director of health and human -- rehab services supervise anyone at DOC?

A.  I do not.

Q.  And to whom does Tim Ballard report?

A.  So he would report to the director of health and rehabilitation services.

UNITED STATES DISTRICT COURT

**5-ER-0966**

Q. And that is?

A. And that is Mr. Welch.

Q. And Mr. Welch reports to the?

A. Commissioner.

Q. Of DOC?

A. Yes.

Q. Who is Jen Winkelman?

A. Jen Winkelman. Yes.

Q. Speaking of Jen Winkelman, she started in June of 2022. Do you recall that?

A. I do.

Q. And did you work with her with regard to the gender affirming -- or sorry -- gender dysphoria policies?

A. Not directly but through the director, I would have worked with a team that was working on those policies.

Q. Okay. And if we could turn quickly to Defendants' Exhibit 2021, which has been admitted. These are the -- this is policy 807.23, the treatment and management of gender dysphoria. Right?

A. Correct.

Q. And that is signed by Jen Winkelman as acting commissioner?

A. Correct.

Q. All right. In 2022. Right?

A. Correct.

Q. So from 2022 to the time you left, this was the operative

Q. policy?

A. Correct.

Q. Okay. And would you turn to page 5. And looking at section 5E. Can you just read that into the record?

A. Surgical interventions for prisoners with gender dysphoria shall be for therapeutic purposes that meet the criteria for essential healthcare when symptoms of gender dysphoria have not responded to nonsurgical interventions.

Q. Okay. So the policy that was in place before you left DOC was that you could only get surgery if other efforts, other types of treatments had failed?

A. It might state that differently but that's correct.

Q. Okay. So in order to get surgery, Ms. Wagoner would have to not succeed with HRT treatment?

A. Yes.

Q. Okay. Now could you look at Plaintiff's Exhibit 1052. And if we go to the next page. Okay. Do you recognize this as an August 5th, 2020 email sent from Christine Sawyer to you?

A. I do.

Q. And Christine Sawyer was the psychiatrist at the time?

A. Correct.

Q. And can you read into the record what she's asking you.

A. So this email -- that is, again, as you stated dated 2020. Hi, Bob. Third request. Please review. I have not ordered her Spironolactone as yet until I can provide informed consent.

UNITED STATES DISTRICT COURT

908

Your direction on this is appreciated. Another option would be that medical initiates and manages the Spironolactone for transgender male to female. Thanks so much, Chris.

Q. Okay. And then the email prior to that on July 13th, 2020. Can you read that into the record?

A. Hi, Bob. I have not received a response on this. Left a message at ACO when I sent it originally. What are your thoughts on this? Thanks.

Q. Okay. And that was July 13th, 2020?

A. Correct.

Q. Okay. And what is Spironolactone -- you pronounce it. I'm not sure I can. Spironolactone.

A. Thank you. The medication is called Spironolactone.

Q. Okay. And what is it?

A. Spironolactone is a medication that does several things but it's primarily used to treat hypertension as a positive effect when treating liver disease and then has a side effect as pertinent in this case to lowering testosterone levels.

Q. And if you lower testosterone levels, what happens?

A. Well, there's less testosterone in the body. So the effects that testosterone would otherwise have are not present -- or you would not experience.

Q. Okay. So is it a type of drug that can be used for hormone therapy for individuals who are transgender with gender dysphoria?

UNITED STATES DISTRICT COURT

**5-ER-0969**

A.  Yes.

Q.  Okay.  And tell the Court why you didn't approve or respond to Dr. Sawyer's suggestion of this in 2020?

A.  Well I can't confirm or deny that I responded.  My assumption would be that there is a response but it was not by email.  Typically, I would respond to this type of inquiry by either phone or if it's in the medical record, as a communication through the medical record, that's where we would find the communication.

Q.  After this communication, Dr. Sawyer did not administer the medication.  Right?

A.  I would be speculating to say yes.  Because I don't recall seeing Spironolactone on the medical record afterwards.

Q.  Okay.  And from the time of this email until Ms. Wagoner started to receive hormone therapy from Dr. Samuelson, she did not have hormone therapy.  Correct?

A.  That's correct.

Q.  Okay.

        MS. KERR:  We would offer Plaintiff's Exhibit 1052.

        THE COURT:  1052.  Mr. Gross.

        MR. GROSS:  No objection.

        THE COURT:  Without objection, 1052 is admitted.

BY MS. KERR:

Q.  Okay.  And would you agree that providing Ms. Wagoner HRT therapy under the direction of Dr. Samuelson has not caused any

UNITED STATES DISTRICT COURT

**5-ER-0970**

disruption to the security of the institution.  Right?

A.  Would you restate that question.  I --

Q.  A little mouthy.  Isn't it?

A.  A little bit.

Q.  You agree -- you know Ms. Wagoner has been getting HRT therapy.  Right?

A.  Yes.  Just to clarify the term HRT stands for hormone replacement therapy.

Q.  Okay.  I'm using the initials.

A.  The initials there -- yeah, now I know what you're speaking about.  We call that cross-sex hormone therapy.

Q.  Okay.  Cross-sex hormone therapy.  You know she's been receiving that from Dr. Samuelson.  Correct?

A.  Correct.  Yes.

Q.  And during the time that you were still employed by DOC, Ms. Wagoner's receipt of that did not cause any disruption to the security of the institution?

A.  Not that I'm aware of.

Q.  Okay.  And yesterday you said that under certain circumstances DOC would act -- would provide surgical interventions.  Do you remember that?

A.  I do.

Q.  But you are not really able to offer an opinion about whether Ms. Wagoner needs surgery right now since you have not seen her at all since 2019.  Correct?

UNITED STATES DISTRICT COURT

**5-ER-0971**

A.  Correct.

Q.  So basically does your opinion remain the same as it was in February of 2023?

A.  Could you clarify which opinion.

Q.  The opinion we just read about that it should be relooked at depending on what her providers say?

A.  Yes.  To be clear, my opinion is that the condition should be monitored, followed, evaluated repeatedly over time.

Q.  Okay.  So just so I'm clear, you spoke with Dr. Lund back in 2022, and as a result of your discussion with him, he had an addendum that he was not recommending surgery for medical reasons.  Right?

A.  Correct.  I believe his term was he stated that surgery was not essential at that time.

Q.  Okay.  But he said that as a doctor and not as any kind of mental health professional.  Right?

A.  Correct.

Q.  Okay.  Did you check with any mental health professional after you spoke to Dr. Lund about whether the surgery should go forward?

A.  I did not call a mental health professional after that conversation with Dr. Lund.

Q.  Okay.  Thank you.  And the next direct involvement you had was when Dr. Samuelson's recommendation was declined by the MAC Committee in October 23?

UNITED STATES DISTRICT COURT

**5-ER-0972**

912

A. That would be my communication with whom?

Q. With the MAC Committee?

A. Oh, yes, the MAC Committee met weekly.

Q. Okay. And you made a recommendation, didn't you, to not follow Dr. Samuelson's recommendation?

A. I think you're asking if I personally made that decision and that would be incorrect.

Q. Did you express an opinion at that meeting that you thought that surgery should go forward?

A. There were many opinions expressed at that meeting.

Q. I'm just asking for yours?

A. But I can't say that I came to a final statement that would answer your question directly.

Q. Did you agree with the MAC decision to not allow surgery after Dr. Samuelson recommended it in October of '23?

A. Yes.

Q. Okay. And you agreed with it but you didn't vote for it?

A. Well to be clear, when the MAC makes a decision that's published, it means there's consensus that has been gained. It does not mean that every part of that decision is completely agreed upon by everyone. But the consensus states that everyone that was at the MAC Committee came to a point that they said the Medical Advisory Committee could make that recommendation.

Q. And you were the only medical doctor at that meeting.

UNITED STATES DISTRICT COURT

**5-ER-0973**

Right?

A. No. That's incorrect.

Q. You were the chief medical officer at that meeting. Correct?

A. Correct.

Q. And there was no other chief medical officer?

A. There was a chief mental health and two regional medical officers.

Q. Okay. And Ms. Wagoner was not at that meeting?

A. No.

Q. Nor Dr. Samuelson?

A. No.

MS. KERR: I don't have anything else. Thank you, Your Honor.

THE COURT: All right. Thank you, Ms. Kerr.

Redirect, Mr. Gross.

REDIRECT EXAMINATION BY MR. GROSS:

Q. Very quickly. I think when we were talking yesterday, we talked about a multidisciplinary approach. Is that approach used when making this particular decision about surgery?

A. Yes.

Q. And tell the Court about the different prongs of that decision. Who is involved, what type of specialties are involved when making that decision?

A. At the most basic level, we're looking for a specialist

UNITED STATES DISTRICT COURT

**5-ER-0974**

914

that can serve the medical arm of that decision and speak to the medical risks involved in moving forward as well as the medical benefits and then the mental health arm to speak to the mental health benefits and risks of moving forward and we seek consensus between those two disciplines.

Q. And then with regard to this particular decision, what were the mental health folks indicating with regard to Ms. Wagoner's functionality?

A. So what I recall at those meetings is we were hearing that from a mental health perspective that the concerns were being well addressed and that function was adequately -- or the ability to participate in activities in the institution indicated mental health was being well covered.

Q. Okay. And was Dr. Samuelson's opinion and recommendation taken into account?

A. Absolutely. Yes.

Q. But why was then her recommendation not followed?

A. Well, the guidelines that we were following suggested that before we move forward with surgery, there had to be consensus between the mental health clinician and the treating provider or, in this case, treating medical provider. So we had one half of that equation which was a medical physician who stated in her opinion, that surgery should move forward. What we didn't have was consensus from the mental health professionals taking care of Ms. Wagoner that surgery was going to be

UNITED STATES DISTRICT COURT

**5-ER-0975**

beneficial more so than any harms.

MR. GROSS: All right. Those are all of the questions I have. Thank you.

THE COURT: All right. Ms. Kerr, very brief recross.

RECROSS EXAMINATION BY MS. KERR:

Q. Was the person at mental health -- the mental health representative Traci Tusha?

A. Depends on when -- what spectrum of time we're talking about.

Q. The meeting in October of '23.

A. Not that -- not that I recall. The -- I'd have to look at documents to see who the mental health professionals were. I think of it as a team not as one individual.

Q. Okay. Thank you. And you would agree that co-occurring mental health concerns unrelated to the person's gender dysphoria do not necessarily preclude surgery but those concerns need to be managed either prior to or concurrent with surgical treatment?

MR. GROSS: Objection. Beyond the scope of my redirect.

THE COURT: I think it is.

MS. KERR: Thank you.

THE COURT: All right. Other side need this witness held subject to recall?

MR. GROSS: No.

UNITED STATES DISTRICT COURT

**5-ER-0976**

916

THE COURT: Ms. Kerr, do you want this witness excused?

MS. KERR: Sure.

THE COURT: Dr. Lawrence, thank you so much for your time. You can return to the gallery, or if you want to return to your regular duties, you're welcome to do that too.

All right. Mr. Gross.

MR. GROSS: We'd now like to call Adam Rutherford to the stand, please.

THE COURT: Mr. Rutherford. Sir, if you would please step up the witness stand. You'll remain standing and be sworn.

ADAM RUTHERFORD, after being first duly sworn, testified as follows:

THE WITNESS: I do.

COURTROOM DEPUTY: Please be seated. For the record, please state and spell your full name and if you want to put that lapel mic on first.

THE WITNESS: Adam Rutherford. A-D-A-M, R-U-T-H-E-R-F-O-R-D.

THE COURT: And, Mr. Rutherford, just for your information, we're using a remote court reporter for this trial. You can see her on the screen there. She's being a tremendous help to this court for making a good record for this trial. We can really help her out by speaking slowly and

UNITED STATES DISTRICT COURT

**5-ER-0977**

clearly. I know it can be difficult but just make a conscientious effort to speak as slowly as you think you reasonably can.

THE WITNESS: Yes, sir.

THE COURT: Thank you very much. Mr. Gross, you may inquire.

DIRECT EXAMINATION BY MR. GROSS:

Q. Good morning, Mr. Rutherford. I appreciate you coming in today. I want to start with a few questions about your background and experience. Let's start with your education background. Do you have a degree?

A. Yes, I do. I have a Bachelor's in Psychology from the University of Virginia and I have a Master's of Education with emphasis in Community Counseling from Lincoln Memorial University.

Q. And did you find an occasion to start working for someone in a correctional setting? Tell us about that.

A. Yeah. Actually started my career in corrections in Virginia in 1998 as a qualified mental health professional at a super max facility there in Virginia.

Q. What did you do after that?

A. After that, I transitioned to the private sector for a period of time where I was the clinical supervisor for a day treatment program for severe and persistent mentally ill folks. And then, at that time, we transitioned in terms of relocating

UNITED STATES DISTRICT COURT

918

to a different state and we relocated to Montana and there in Montana I was the program supervisor over at a reentry program focused on the last year of incarceration and connecting folks with services needed, everything from substance abuse to mental health treatment to work services, work programming to be successful upon reentry.

Q.  Okay.  Did you eventually find your way up to Alaska?

A.  Yes, sir.

Q.  And when you arrived here, what did you do for work?

A.  I actually was hired by South Central Foundation to be the clinical supervisor for their day treatment program for the severe and persistent mentally ill.

Q.  Okay.  When did you start working for Alaska DOC?

A.  Started in approximately 2007 working for the Alaska Department of Corrections and then started that -- their acute mental health unit as a mental health clinician on the acute mental health unit there for the treatment of men with severe and persistent mental illness that meet the requirements for hospitalization.

Q.  Okay.  And what did you do after that?

A.  I actually transitioned from a floor clinician to the lead clinician at that unit.  And then from there, transitioned to the valley working at the Palmer Correctional Facility and that too -- as the lead clinician there.  And then when Goose Creek opened up, I actually transitioned to Goose Creek to help open

UNITED STATES DISTRICT COURT

**5-ER-0979**

up the mental health services there at Goose Creek.

Q. Okay. Have you worked at Goose Creek ever since?

A. No. Actually in approximately 2008 or actually -- 2012. Sorry, 2012 I had the opportunity to apply to be the chief mental health officer for the Department of Corrections and was selected for that position. So from 2012 -- 2012 to 2022, I was the chief mental health officer for the Department of Corrections.

Q. What is your current title?

A. I'm currently the deputy director for health and rehabilitation services.

Q. And give the Court an idea of what that job entails. What are your day-to-day responsibilities.

A. Yeah, day-to-day I'm responsible for the oversight of all of the medical, mental health, substance abuse, behavioral health, reentry, vocation services within the department.

Q. Okay. So all told, how many years do you think that you've worked in the mental health field?

A. In some form, within corrections, approximately about 20 years of being involved in mental health services or health services within corrections. And then in the private sector about five years post Master's Degree.

Q. Does DOC have a policy of providing medical care to inmates?

A. Yes. We do. Yes, sir.

UNITED STATES DISTRICT COURT

**5-ER-0980**

Q. Does that also include mental health care?

A. Yes, sir, it does.

Q. And about what percentage of the inmate population comes into incarceration with some type of mental health related issue?

A. On any given day, about 65 percent of our population are considered what's called trust beneficiaries and those are folks that may suffer from a mental illness, cognitive impairment of some sort or struggle with some form of addiction.

Q. Okay. And what type of mental health issues do you see? What kind of mental health issues do you deal with?

A. We deal with a broad spectrum, anything from an adjustment disorder to someone that may struggle with a severe persistent mental illness.

Q. Okay. Does DOC also treat folks who have gender dysphoria?

A. Yes, sir. We do.

Q. Now in 2011 which is when I believe Ms. Wagoner was initially incarcerated, did DOC have a specific policy dealing with gender dysphoria in 2011?

A. No, sir. At that time, we did not.

Q. And what was the reason for that?

A. You know, really, gender dysphoria wasn't even a diagnosis at that point. And so there wasn't an identified need to have a policy.

UNITED STATES DISTRICT COURT

**5-ER-0981**

921

Q. At that time, were there a lot of inmates complaining about gender dysphoria?

A. Not at that time. I think there is a lot of stigma. I think through -- as culture has changed within our general society, we've had more individuals actually speak to their needs and have more insight into gender dysphoria and the needs associated with gender dysphoria.

Q. And as the years went by, did DOC try to be proactive in creating a policy that deals specifically with gender dysphoria?

A. Yes. As we identified folks, you know, we want to do our best to provide care to -- to the needs of our population and so we did put quite a bit of effort into developing a policy and developing services for folks that are struggling with gender dysphoria.

Q. Okay. Let's take a look at that policy. It's been previously admitted as trial Exhibit 2021. And show that up on the screen here in a second.

This is just the first page, but does this appear to be the policy that was implemented and put into effect by DOC?

A. Yes, sir. It does.

Q. What kind -- I think you already testified to this, but what kind of time and effort -- what kind of things did you and the folks at DOC do to help formulate this policy?

A. Yeah. You know, we actually looked at what were the

UNITED STATES DISTRICT COURT

**5-ER-0982**

standards that were out there currently for the treatment of gender dysphoria. We actually consulted with experts in the field of treatment of gender dysphoria. I was -- at that time, I was part of a national group of directors and mental health services for the Department of Corrections so we were actually having conversations and sharing policies and procedures about the management of gender dysphoria as well. And then also looking and seeing what the national commission of correctional healthcare was recommending as well in terms of care for individuals with gender dysphoria.

Q. Okay. Would you agree this is a bit of a moving target?

A. It has been. I think, you know, through the evolution of information that we're learning about gender dysphoria. Those standards I think even WPATH I heard referenced earlier has gone through eight different renditions of recommendations for treatment and management of gender dysphoria. So it's evolving as we learn more about the needs and treatment of gender dysphoria.

Q. Okay. Great. I would like to ask you specific questions about some of the policies in this particular exhibit. Let's stay on page 1. Let's go under policy -- let's look at Roman Numeral number V.

This says it is the policy of DOC to provide essential mental health, medical, and psychiatric care to prisoners with gender dysphoria that decreases the symptoms associated with

UNITED STATES DISTRICT COURT

**5-ER-0983**

923

gender dysphoria that limit activities of daily living while incarcerated. This seems like the focus here is on symptoms and why would that be?

A. You know, one of the things that I've really always been proud of and really has excited me as a mental health provider working for the Department of Corrections is that we get to focus on essential healthcare and that means focusing on helping folks manage the symptoms that they're reporting and addressing those needs really. And really what that focus would be is looking at how that diagnosis or the symptoms associated with the diagnosis are impairing that individual's ability to function within our system.

Q. Okay. Why is it important for an inmate to be able to function in that system?

A. We want folks to be able to receive rehab services. We want folks to be able to participate in activities -- someone being able to manage their symptoms also helps with the management of the safety and security of everybody within the facilities as well.

Q. And what tools does DOC have to help manage healthcare issues within the facility?

A. Healthcare issues, you know, we have a broad spectrum of services on the healthcare side and on the mental health care side as well. Ranging from work -- individual work with individuals to actually inpatient care within our system.

UNITED STATES DISTRICT COURT

**5-ER-0984**

924

Primarily our system focuses from a mental health perspective on psychiatric services, brief individual interventions, and then group interventions as well.

Q. Let's take a look at another section. Let's take a look at -- we're still on page 1, Roman Numeral Number VI. This says it is the policy of DOC to establish a multidisciplinary committee to oversee treatment planning for prisoners with gender dysphoria. Tell us what that's talking about.

A. One of the things that we recognized early on is that gender dysphoria actually crosses over between mental health services and medical services and so we wanted to ensure that everyone was at the table discussing the individual's needs so that we can provide the best care for the individuals that are struggling with gender dysphoria and really wanted to have that -- that multi-disciplinary approach so that we have insight from each of those disciplines on how to best move forward and proceed in terms of care with individuals that are struggling with gender dysphoria.

Q. Let's talk about some of the treatment options available for gender dysphoria. Go to page 5. We're going to take a look at the section called gender dysphoria treatment modalities. Let's start with A.

A says psychiatric and mental health services provided to prisoners with gender dysphoria shall focus on enabling prisoners to better adjust to institutional living and to

UNITED STATES DISTRICT COURT

5-ER-0985

improve their level of mental health function.  We sort of already talked about that but what is the objective of this particular modality.

A.  Really, again, it's focusing on impairments that limits an individual's ability to function within our system.  And the goal of services are to treat those symptoms so the individual can function within the Department of Corrections.

Q.  Let's take a look at paragraph B.  Cross-sex hormone treatment provided to prisoners with gender dysphoria shall be for therapeutic purposes that meet the criteria for essential healthcare.  What is that saying?

A.  Really what that's looking at is that an individual can receive hormone therapy if their symptoms and the impairment levels of their activities, daily living would benefit from the addition of hormone therapy.

Q.  Okay.  Finally, let's take a look at paragraph E.

Surgical interventions for prisoners with gender dysphoria shall be for therapeutic purposes that meet the criteria for essential healthcare when symptoms of gender dysphoria have not responded to nonsurgical intervention.  What is that saying?

A.  Really, it basically is allowing the department, if other treatment interventions aren't successful, to look at actually surgical interventions to assist with the management of symptoms relating to gender dysphoria.

Q. Do you believe DOC's policies when it comes to treatment of gender dysphoria are reasonable and appropriate?

A. Yes, sir.

Q. Do you believe that they align with what other DOCs throughout the country are doing?

A. Yes, sir. I do believe that.

Q. Let's turn and talk a little bit about the specific treatment for Ms. Wagoner. And let's talk about mental health counseling first. Was mental health counseling available to Ms. Wagoner to help deal with her gender dysphoria?

A. Yes, sir. Mental health counseling services were made available for Ms. Wagoner.

Q. Okay. I'd like to show you a memo that's dated January 16th, 2017. Trial Exhibit 2046. Is this a document that looks familiar to you, Mr. Rutherford?

A. Yes, sir. It's a memo actually to, at the time, Emmanuel Cancel, who is now known to us as Ms. Emalee Wagoner.

Q. And is this a memo you helped draft?

A. Yes.

Q. Is this a document that's kept in the ordinary course of business within DOC?

A. Yes, sir, it is.

Q. And is this a document that would be used to help in the treatment of Ms. Wagoner, at least, memorialized Ms. Wagoner --

A. Yeah. I think it captures -- it's a response to Ms.

UNITED STATES DISTRICT COURT

**5-ER-0987**

927

Wagoner's grievance of not receiving care. And it does document things that have occurred and then also documents movement forward as well based on the review of her concerns that were brought forward.

MR. GROSS: I'd like to move in to admission Exhibit 2046.

THE COURT: 2046, Ms. Kerr.

MS. KERR: We object simply on foundation. There's two dates on it, 2018 and 2017.

THE COURT: All right. Can you clarify that, Mr. Gross.

MR. GROSS: I can ask questions?

THE COURT: Yes.

BY MR. GROSS:

Q. I think if you look at the internal dates that you're talking about there -- I'll ask the witness. By looking at this particular document, can you determine whether the date at the top is the correct date or whether the received date at the bottom is the correct date? When was this memo drafted, to your understanding?

A. It would have been done the date of 2017.

MR. GROSS: All right. Thank you, Your Honor. I move to admit this exhibit.

THE COURT: All right. Ms. Kerr, anything further?

MS. KERR: I'm not going to stipulate to it.

UNITED STATES DISTRICT COURT

**5-ER-0988**

THE COURT: Any additional objections?

MS. KERR: I have an additional objection which I can ask the witness about or I can cover it in my cross.

THE COURT: The document is admitted. 2046 is admitted.

BY MR. GROSS:

Q. If we look at the full second paragraph. I just want to walk through this document with you. It starts by saying your grievance has been reviewed and investigated. A review of your chart indicated that on November 12th, 2016, you submitted a request to mental health requesting to speak with a mental health psychologist. On November 15, 2016, you were seen by mental health and informed that the DOC does not accommodate outside psychological services for these issues. I'm going to stop there. Explain what you mean by not being able to accommodate outside psychological services?

A. Yeah. The Department of Corrections has a policy that services related to mental health would be managed through our clinical care through our clinical staff and that no outside mental health services would be allowed unless it's related to -- particular to court related issues in terms of appeals or evaluations related to court issues.

Q. Okay. And, at this time, you weren't denying her mental health services, you were just saying that there's no outside mental health services available?

UNITED STATES DISTRICT COURT

**5-ER-0989**

A.   That is correct.

MS. KERR:  Objection.  Leading.

THE COURT:  Go ahead and rephrase the question.

BY MR. GROSS:

Q.   Did you have resources in-house to deal with gender dysphoria at this time?

A.   We had -- we had clinicians and psychiatric -- psychiatrists internally that were available to provide mental health services at this time.  Yes, sir.

Q.   And those folks were available if Ms. Wagoner wanted to see a mental health practitioner?

A.   That's correct.  Yes, sir.

Q.   I'll keep going.  On November 23rd, 2016, you submitted a request to mental health asking for treatment by a qualified mental health specialist so that they may start treating "my" serious medical needs.  At this time, you are informed that DOC does not address gender dysphoria issues.  On November 26th, 2016 you submitted a request to medical asking if medical offers treatment for gender dysphoria or gender identity disorder.

At this time, you were informed Alaska DOC does not offer treatment for this and to continue to follow up with mental health.  At that time, was there a -- was there a sort of -- I think we talked about this already but was there a policy involved in providing this type of treatment for gender

UNITED STATES DISTRICT COURT

**5-ER-0990**

dysphoria.

A. We didn't have a policy at that time related to the treatment of gender dysphoria. But this is referencing responses that Ms. Wagoner received from entry level staff in the facility stating that we don't provide care for gender dysphoria and so it was confirming that that's what she was told by our staff within the facilities. But, at the same time, we were providing individual counseling and psychiatric services for Ms. Wagoner.

Q. And I think you've already spoken to this but as time goes on, the policy evolves. Is that true?

A. That is correct. Actually, we actually developed a policy for the treatment and management of gender dysphoria.

Q. Soon after this, DOC reached out to an individual by the name of Mr. Reed -- at the time -- I think he's a doctor now. Do you remember that?

A. Yes, sir.

Q. Okay. And what was the point of doing that?

A. You know, at the time, we had asked Mr. Reed to evaluate Ms. Wagoner for any type of paraphilia that might be related to a sexual offense that she was charged with. We wanted to make sure that what she was presenting with wasn't a paraphilia versus a true symptom of potential gender dysphoria.

Q. Okay. And did Mr. Reed, at the time, have the qualifications to offer that kind of opinion?

UNITED STATES DISTRICT COURT

**5-ER-0991**

A. At that time, he was a sex offender treatment provider and could assess whether it was paraphilia or not.

Q. He did prepare a report. I'd like to show you this exhibit, 2084. This was previously admitted. This is Mr. Reed's May 17, 2017 report. And let's turn to page 5.

And, in particular, I would like to reference these bullet points where Mr. Reed is making some recommendations. It starts by saying Ms. Cancel should engage in biweekly individual therapy, 12 sessions, and plans to work through her emotional behavioral issues as well as her symptoms related to gender dysphoria. Was the plan to have Mr. Reed perform these sessions?

A. You know, at the time, we actually did discuss having Mr. Reed come in. We wanted to -- again, we were in the process of trying to figure out how we can best help individuals that are struggling with gender dysphoria. And, at the time, based on this assessment and recommendations, we did feel like Mr. Reed could potentially come in and help Ms. Wagoner.

Q. Okay. Did that ultimately happen?

A. Unfortunately, no, it did not happen. There were some challenges with Mr. Reed completing some of the needed clearance paperwork, and despite staff reaching out to Mr. Reed, we didn't receive a response to that.

Q. Okay. Looking at these recommendations, is there any discussion about gender-affirming surgery?

UNITED STATES DISTRICT COURT

**5-ER-0992**

A. You know, the final recommendation does say upon her release from incarceration it's recommended that she find the medical provider that would be willing to prescribe her antiandrogen medications to assist in her transition but there's no real recommendations related to any type of gender-affirming surgery.

Q. Is Ms. Wagoner currently receiving hormone therapy?

A. She is. Yes.

Q. Now, at some point, there is a Gender Dysphoria Review Committee that's set up that oversees the treatment of those folks with gender dysphoria. Is that fair to say?

A. That's correct. Yes, sir.

Q. And how did that evolve over time?

A. It came actually from us looking at how other systems were trying to assist individuals that were struggling with gender dysphoria. And then also through just wanting to make sure that there was a collaborative effort given that crossover of medical and mental health needs that arise from individuals who are struggling with gender dysphoria.

Q. Okay. I would like to show you one of these committee reports. This is going to be Exhibit 2048. This has been previously admitted. It's going to be dated June 15th, 2023. Will you look at the second page.

Under current mental health treatment and after it says current mental health symptoms reported it says, overall,

UNITED STATES DISTRICT COURT

933

Emalee appears to be managing her daily life skills with proper hygiene, maintaining an institutional job, attending programming. She had been given a dialectical behavior therapy skills chapter one but she did not bring to this meeting. Reports having support in the MOD from others and within her own peers. Other than reporting discomfort with her genitals that medical is addressing, inmate appears to be maintaining a healthy lifestyle.

I'm going to stop there and ask you about that. The dialectical behavior therapy workbook, what is that?

A. Dialectical behavior therapy was an intervention developed by Marsha Linehan that focuses on assisting individuals that have been diagnosed with borderline personality disorder. And basically what it's designed to do is with borderline personality disorder, folks develop a maladaptive coping skills. So Linehan's approach uses cognitive behavioral interventions to help individuals learn skills. And those skills are used to help regulate some of the symptoms that are associated with -- with the management of -- of borderline personality disorder.

Q. Okay. And based on this report, how does Ms. Wagoner's functionality appear to be doing?

A. Based on what's been reported here, it appears she's been -- she's able to function appropriately within our system.

Q. Okay. And at some point, was there a request for a

UNITED STATES DISTRICT COURT

**5-ER-0994**

934

vaginoplasty for Ms. Wagoner?

A. Yes. There has been a request for that. Yes.

Q. Okay. I'd like to show you Exhibit 2045. This is MAC memo dated October 23rd, 2023. It's been previously admitted. I want to show you the last paragraph of this document.

It says the MAC acknowledges that Emalee Wagoner continues to express feelings of dysmorphia despite cross-sex hormone intervention and cognitive behavioral therapies. However, there is insufficient evidence to affirm Ms. Wagoner's mental health and wellbeing will decline without surgery. The MAC does not authorize implementation of this recommendation. Do you agree with that conclusion?

A. I was part of the MAC that actually came to that conclusion. Yes, sir.

Q. And from a mental health standpoint, does this conclusion make sense?

A. You know, based on what was being reported by the chief mental health officer through the Gender Dysphoria Committee at the facilities, there were some ongoing concerns with cause of the complications associated with Ms. Wagoner's co-occurring diagnosis of borderline personality disorder.

Q. And, at this time, were you aware that a Dr. Samuelson had recommended surgery?

A. It was discussed in MAC there had been recommendations from Dr. Samuelson for the surgery. Yes, sir.

UNITED STATES DISTRICT COURT

**5-ER-0995**

935

Q. Did that change your opinion?

A. Based on the information that was presented in MAC at that time, it did not influence the MAC's decision in terms of what we felt was best for Ms. Wagoner at the time.

MR. GROSS: Those are all of the questions I have. Thank you.

THE COURT: All right. Ms. Kerr, cross-examination.

MS. KERR: This is Sonja Kerr for plaintiffs.

CROSS-EXAMINATION BY MS. KERR:

Q. Good morning, Mr. Rutherford.

A. Good morning.

MS. KERR: At this time, we'd like to offer Plaintiff's Exhibit 1072, which is the affidavit of Mr. Rutherford.

MR. GROSS: No objection.

THE COURT: Previously admitted.

BY MS. KERR:

Q. Mr. Rutherford, you were chief mental health officer from 2012 until January of '22?

A. That is correct. Yes.

Q. And to whom did you report?

A. At that time, it would have been director Laura Brooks.

Q. And to whom did Laura Brooks report?

A. She would have reported to deputy commissioner and there was a wide variety of deputy commissioners throughout that

UNITED STATES DISTRICT COURT

**5-ER-0996**

process so -- that she would have reported to.

Q. Okay. And from 2018 to 2022, who was the commissioner?

A. It would have been Nancy Dahlstrom at that time.

Q. And after Nancy Dahlstrom left in 2022, the commissioner was acting commissioner Jen Winkelman?

A. That's correct. Yes.

Q. And is Ms. Winkelman the commissioner now?

A. She is. Yes.

Q. Now you were named as a defendant in this case. Is that correct?

A. Yes, ma'am.

Q. And you were named defendant in this case before you changed jobs to your current position of director of health and rehabilitation?

A. Yes, I believe so. Trying to recall when the initial suit was filed, but, yes, I believe so.

Q. Initial suit was filed in September of 2018?

A. Yes, sir -- yes, ma'am. Sorry.

Q. And your current position of director of health and rehabilitation, is that within the DOC or -- or are you above the DOC? How does that work?

A. It's within the DOC, but I'm actually the deputy director. Not the --

Q. Deputy director. Okay. And then do you report to Ms. Winkelman?

UNITED STATES DISTRICT COURT

**5-ER-0997**

937

A. No. Not -- I actually report to Director Travis Welch.

Q. And he reports to Winkelman?

A. He actually reports to a deputy commissioner Jake Wyckoff.

Q. And he reports to Winkelman?

A. Yes.

Q. There you go. And when did you last serve in MAC?

A. I'm still part of the MAC.

Q. Okay.

A. In my current position.

Q. In Alaska, are prisoners allowed to receive health services through Medicaid?

A. No. They can't -- we can't currently bill for Medicaid services while someone is incarcerated unless they're hospitalized for over a 24 hour period outside of the Department of Corrections with the exception of new legislation. Let me clear that -- there's still new things. There's the justice involved youth program that actually focuses on bringing services in to the Department of Corrections that allows individuals to -- community individuals to be on Medicaid to provide services to help assist with reentry, substance abuse, those services. But that's just recent.

Q. And so if Ms. Wagoner had surgery and was hospitalized for more than 24 hours, would her care be covered by Medicaid?

MR. GROSS: This is beyond the scope of my direct

UNITED STATES DISTRICT COURT

**5-ER-0998**

examination.

THE COURT:  It is.  Sustained.

BY MS. KERR:

Q.  Is the defendant's refusal to provide Ms. Wagoner surgery a financial one?

MR. GROSS:  Beyond the scope of my direct exam.

THE COURT:  Sustained.

BY MS. KERR:

Q.  Prior to Ms. Wagoner, you had never evaluated a person for the possibility of having gender dysphoria.  Correct?

A.  That's correct.  But I had treated individuals previously -- within the DSM, it was diagnosed as gender identity disorder -- so I had worked with individuals previously that had that diagnosis.

Q.  But you never have actually completed an assessment for someone who the -- for whom the question is whether they have gender dysphoria?

A.  That is correct.  Prior to -- prior to Ms. Wagoner.

Q.  Did you personally evaluate Ms. Wagoner for gender dysphoria?

A.  No. I did not.

Q.  Would you -- can we bring up Plaintiff's Exhibit 1072 and paragraph 50.  Would you read paragraph 50, please.

A.  It says I have no personal opposition to providing Ms. Wagoner hormone therapy or gender-affirming surgery if that is

UNITED STATES DISTRICT COURT

**5-ER-0999**

939

recommended by her attending medical providers and mental health providers and those providers believe that it -- the care is not contraindicated by Ms. Wagoner's other mental health conditions or physical conditions.

Q. Is that still your opinion?

A. It is. It is.

Q. You've never spoken with Dr. Samuelson?

A. Initially, there was a conversation when Dr. Lawrence and I first were reaching out to find someone that could assist us with providing services for Ms. Wagoner. But that, no -- no further conversations. No.

Q. The Department of Corrections -- the agency receives the medical records from Ms. Samuelson when Ms. Wagoner visits her. Right?

A. That is correct. Yes.

Q. So who reviews those?

A. It would be the primary treating physician and then at the -- if there were concerns or if there were conversations, it would be the Gender Dysphoria Committee as well that would have reviewed those.

Q. Okay. And from October of 2023 until 2022 when -- spring of 2022 -- I'm sorry. From October of 2023 until now, are you aware of any MAC decision reviewing all of Dr. Samuelson's recommendations?

A. Beyond that -- what we've already discussed in terms of the

UNITED STATES DISTRICT COURT

**5-ER-1000**

940

recommendation that MAC had, no, I'm not aware of any other -- other reviews that have been brought to MAC.

Q. Okay. So from October of 2023 until now, there's not been another MAC Review of Dr. Samuelson's repeated requests --

MR. GROSS: Asked and answered.

THE COURT: It is. Sustained.

BY MS. KERR:

Q. From October of 2023 until now, have you had any specific -- have you given any specific directions to mental health staff about the type of care Ms. Wagoner should receive from a mental health perspective?

A. No. I have not.

Q. Okay. You referred to -- you were asked about a 2016 response indicating that there was -- that the department did not provide care for gender dysphoria. Remember that?

A. Yes.

Q. And you said that was a comment by entry level staff. Is that right?

A. That is correct. Yes.

Q. So you -- did -- that comment was made by Mr. Rod Smith?

A. Yes.

Q. And he was a clinical counselor level 2. Right?

A. He was a mental health clinician 2. Yes.

Q. Level two?

A. Yes.

UNITED STATES DISTRICT COURT

**5-ER-1001**

941

Q. So he was not entry level?

A. A clinician -- at the time, a clinician 2 would have been our entry level staff at the facilities. Yes.

Q. Okay. Did you ever tell Mr. Smith he was wrong?

A. Yes. There was a conversation with his supervisor and really discussed what we were doing in terms of the focus was primarily, at that point, the symptoms that were secondarily, the symptoms that were being reported, the anxiety, the depression, those pieces.

Q. Okay. So turning back to your affidavit, at this time, isn't it true that Ms. Wagoner's attending medical providers do believe that gender-affirming gender therapy is not contraindicated?

A. That is a recommendation that came from Dr. Samuelson. That was considered by the MAC. Yes, ma'am.

Q. So once considered then never considered again?

A. It's actually -- I wouldn't say that it's never considered again. That's part of the Gender Dysphoria Committee's responsibility. It may not be brought to MAC if it's a nonissue, for example, if Ms. Wagoner has been presenting as stable and functioning within the facility, there may not be a need to escalate that in terms of an intervention for Ms. Wagoner.

Q. When is the last time you personally spoke with Ms. Wagoner?

UNITED STATES DISTRICT COURT

**5-ER-1002**

A. Gosh, it's -- it's been a while. I don't know exactly how long it's been.

Q. So let's look at Plaintiff's Exhibit 1014. Page 15 to 16. Can you make that a little bigger? There you go. How long were you in this meeting with Ms. Wagoner to which she refers in her journal January 10, 2017?

MR. GROSS: If we could allow him to read it. Is there a hard copy he can look at?

THE COURT: I don't know if anybody knows where the hard copy is. Sir, are you able to read that on the screen? It's not super legible.

THE WITNESS: I think I can read it here.

BY MS. KERR:

Q. Can you read the first couple of sentences there.

A. Met with the boss of Dr. Sawyer, Traci Tusha, Rod Smith. His name is Adam Rutherford -- not sure how to spell his last name. He stated he gave me a diagnosis of gender identity -- GID -- and is looking into a list of providers from outside medical. He also apologized about how long it took him to reply to me. He said he wasn't -- he was evaluating my case from time of conversation until now. He stated he ain't sure why his staff had let this go on so long and that their replies to my RFPs were --

Q. You can stop with the rest of that sentence which is not okay.

UNITED STATES DISTRICT COURT

**5-ER-1003**

A. Not okay.

Q. Okay. Right. So you were telling Ms. Wagoner that the response she got from Mr. Smith was not okay?

A. I don't recall the specifics of -- of having the specific conversation of that nature. I don't think -- that doesn't sound like anything I would say, honestly. I could see that me saying that she -- I don't -- I don't recall having the conversation, to be honest with you.

Q. Do you recall telling her you had ordered treatment of secondary elements of gender dysphoria and that you would have a psychologist -- she would have a psychologist appointment as soon as he could make it?

A. I wouldn't order anything of that nature. I think I testified earlier that we did seek an outside service provider to meet with Ms. Wagoner.

Q. Okay. Go further down. The second line to the end. There's a reference to triadic treatment. Do you see that, the second to last sentence at the become?

A. He stated upon my question of following DSM-4 or DSM-5 triadic treatment, he said, yes, we will be treating you by DSM-4 or DSM-5 triadic treatment.

Q. What's triadic treatment?

A. I'm not sure what triadic treatment would be there. I'm not sure what's that referring to.

Q. Okay. And can we turn to page 28 of Plaintiff's Exhibit

944

1014. There's a reference towards the bottom and it says I never receive answers from Adam Rutherford. Do you see that?

A. Yes.

Q. Do you know Traci Tusha?

A. She's a treating clinician.

Q. Did she frequently contact you about concerns for Ms. Wagoner?

A. There were conversations about Ms. Wagoner and her needs. Yes.

Q. Okay. And did you respond to those concerns through Ms. Tusha?

A. Yes, I did.

Q. Okay. Now would you look at Plaintiff's Exhibit 1014 page 63. Do you recall going to a meeting on February 13th, 2018 with Dr. Lawrence and Ms. Wagoner?

A. I do. Yes, I do remember meeting with Ms. Wagoner and Dr. Lawrence.

Q. Okay. Can you read that to yourself and I just want -- I just want to ask you about one question of it. Just read the first ten sentences.

A. Okay.

Q. Okay. There's a reference there to -- that Ms. Wagoner would be getting some workbooks and I think you talked a little bit about some therapy that is involved in using workbooks?

A. That's correct. There is a curriculum that we chose. It's

UNITED STATES DISTRICT COURT

**5-ER-1005**

queer and transgender -- the queer and transgender resilience workbook and then, in addition, the DBT, the dialectical behavior therapy workbooks as well.

Q. Was it your understanding that Ms. Wagoner was going to be getting both of those resources in 2018?

A. I can't remember the exact date that we put the queer and transgender resiliency program but the DBT skills were there. Yes.

Q. And were you ever aware Ms. Wagoner had been receiving the DBT over and over again for a number of years?

A. And that's some -- it should happen that way. When we're talking about borderline personality disorder, you know, we're talking about maladaptive coping skills over a large number of years. And Linehan's treatment often when you talk about skill and skill building can last a lifetime for those individuals because you're trying to replace those maladaptive coping skills so it's not uncommon for folks to continue to have to practice skills or be reminded to skills or if there's a fallback there to go back over those again.

Q. Do you agree or disagree that Ms. Wagoner was not identified with a borderline personality disorder until after she asked for help for gender dysphoria?

A. It's my understanding she was diagnosed with borderline personality disorder prior to that.

Q. So are you -- have you ever reviewed her entry assessment

into the DOC?

A. It's been a very long time so I couldn't speak to it. I don't recall.

Q. So if -- the entry assessment is supposed to determine if anyone has a mental health issue when they arrive at the facility. Right?

MR. GROSS: We're going beyond the scope of my direct exam.

THE COURT: It is. Sustained.

BY MS. KERR:

Q. You made reference to experts in the field that you consulted with. Do you recall who when you were talking about developing the gender dysphoria policies?

A. Gosh, I know we reached out to University of San Francisco, an expert there. There were several individuals in the State of Washington that we reached out to as well. But I apologize I don't recall their names. And, again, then the folks within -- the chief mental health officer, their director rolls throughout the United States as well.

Q. All right. Can we look at Defendants' Exhibit 2046. This is a memo that you wrote you indicated in January of 2017.

A. Okay.

Q. And if you'd go to the bottom right of the memo there's a mark. It says received January 18, 2017. Do you see that?

A. I do.

Q. Do you recall that there was a delay in this memo reaching Ms. Wagoner?

A. I don't. I'm sorry.

Q. Uh-huh. So it never came to your attention that there was a grievance filed because this memo never reached Ms. Wagoner for a year?

A. I don't recall that. No.

Q. Okay. How did you get this memo to Ms. Wagoner?

A. Basically we discussed the grievance in MAC. It's then forwarded to Director Brooks, she would have signed off on it, and then it's distributed through a distribution process.

Q. Who would have put stamped on there received January 18, 2018. That's not something Ms. Wagoner could do, is it?

A. No. She wouldn't be able to do that so I don't know who would have done that.

Q. Okay. So if Ms. Wagoner believed she didn't get this for a year, you don't know why?

A. I don't. I'm sorry.

Q. Did she ever discuss that with you?

A. Not that I'm aware. I don't recall having that discussion.

Q. Okay.

        MR. GROSS: I move for admission of Exhibit 2046.

        MS. KERR: It's already been admitted.

        MR. GROSS: No, it has not yet.

        MS. KERR: I have it as admitted.

UNITED STATES DISTRICT COURT

**5-ER-1008**

948

THE COURT: I show as admitted as well. Let's confirm with Madam Deputy. 2024 has been admitted.

BY MS. KERR:

Q. Okay. Could we look at Defendants' Exhibit 2048 and page 3. The top -- can you highlight current physical symptoms. Now I don't believe you were at this meeting but were you ever aware that Ms. Wagoner was reporting pain to her testicles, pain with her penis?

MR. GROSS: Beyond the scope of my direct exam.

MS. KERR: He questioned him about the same document.

MR. GROSS: About mental health though not about medical health.

THE COURT: Insofar as it's information subsumed within the same document, I'll allow it.

BY MS. KERR:

Q. So, Mr. Rutherford, were you aware of the current physical symptom complaints of pain to testicles and pain to penis?

A. Yes.

Q. And what, if anything, did the Gender Dysphoria Committee do to help Ms. Wagoner with that?

A. I can't speak to the direct actions of the Gender Dysphoria Committee but I do know she was receiving medical attention for these needs at the facility.

Q. So can we scroll down to where the treatment plan is. It's at the bottom. Okay. Can we -- can you tell me which of those

UNITED STATES DISTRICT COURT

**5-ER-1009**

949

items is to address the pain?

A. Those appear to be primarily related to the treatment of her dysphoria not her physical health which is the focus of that Gender Dysphoria Committee.

Q. Okay. Is pain both medical and mental health distress?

A. So, yes. Pain can manifest itself in psychological ways as well. Yes. That's correct.

Q. Okay. I don't have any other questions. Thank you, Mr. Rutherford.

THE COURT: All right. Thank you. Redirect.

REDIRECT EXAMINATION BY MR. GROSS:

Q. Let's go to 2048 which I think is the same document we've got on the screen there. And let's go to the second page. Third page. Okay.

Mr. Rutherford, we just looked at the top of this page where it talks about pain to testicles. Do you see that?

A. Yes.

Q. And right below that, let's highlight the current medications.

A. Estradiol, 10 milligrams, IM q two weeks, Atorvastatin 20 milligrams q hs, Tamsulosin 0.8 milligrams q hs, Montelukast 10 milligrams q PM, Bupropion 75 milligrams q day, Tylenol and Meloxicam.

Q. And are Tylenol and Meloxicam medications for pain management, if you know?

UNITED STATES DISTRICT COURT

**5-ER-1010**

950

A.  I can't speak to what that's being prescribed for, but often, those medications are used to treat pain, yes.

Q.  Okay.  Those are all of the questions I have.

THE COURT:  Ms. Kerr.

RECROSS EXAMINATION BY MS. KERR:

Q.  Mr. Rutherford, were you ever aware Ms. Wagoner filed not one but two or three grievances about not receiving the correct type of medication for pain management?

A.  I'm not -- I would not -- I'm not aware of those.  I'm not sure.  I don't recall any of those grievances.

Q.  Thank you.

THE COURT:  All right.  May this witness be excused?

MR. GROSS:  Yes.

THE COURT:  Mr. Rutherford, thank you so much for your time.  If you would like, you can have a seat back in the gallery, or if you'd like to return to your regular duties, you can certainly do that too.  Thank you very much.

All right.  Would now be an optimum time for our morning break?

MS. MICHALETZ:  Yes, Your Honor.  The next witness will be our expert witness, Sara Boyd so this would be great.

THE COURT:  All right.  Let's take 15 minutes.

(Proceedings reconvene at 10:34 a.m.)

THE COURT:  All right.  Good morning, everyone.  We're

UNITED STATES DISTRICT COURT

**5-ER-1011**

back on the record. The parties are present. Ms. Wagoner is present. Just a quick note we're going to take our lunch break at a little later today, about 12:15. I had to set some hearings after the lunch hour so I'll plan to come back and be on the record in this matter 1:15.

All right. And, Ms. Michaletz, you have a witness.

MS. MICHALETZ: Yes. Our next witness is our expert witness, Sara Boyd.

THE COURT: All right. Ms. Boyd, if you could come up to the witness stand.

SARAH BOYD, after being first duly sworn, testified as follows:

THE WITNESS: Yes.

COURTROOM DEPUTY: Please be seated. For the record, please state and spell your full name and be sure to put that lapel mic on first.

THE WITNESS: My name is Sara Elizabeth Boyd; S-A-R-A, E-L-I-Z-A-B-E-T-H, B-O-Y-D.

THE COURT: All right. Thank you, Dr. Boyd.

And just so you're aware, we are using a remote court reporter. That's actually her on the screen right there. She's been a tremendous assistance to this court by providing remote court reporting. We can be of assistance to her if we really focus on speaking slowly and clearly. We all tend to speak quickly when we have a lot of things to say. So I've

UNITED STATES DISTRICT COURT

**5-ER-1012**

been reminding everybody to make a nice, mindful effort in this trial to speak as slowly and clearly as they possibly can.

With that being said, Ms. Michaletz, you may inquire.

MS. MICHALETZ:  Thank you, Your Honor.

DIRECT EXAMINATION BY MS. MICHALETZ:

Q.  Good morning, Dr. Boyd.  I'll cut to the chase.  Have you been retained as an expert in this case?

A.  Yes.

Q.  By whom?

A.  Your firm.

Q.  The defendants' -- the defendants' firm, I suppose.  And what is your profession?

A.  I am a licensed clinical psychologist.

Q.  What does that mean?

A.  I'm a psychologist who specializes in the assessment and treatment of primarily psychological illness as opposed to healthy psychological functioning.

Q.  What is your formal education?

A.  I have a Bachelor's Degree in Psychology from the University of Illinois.  I have two Master's Degrees.  One is in counseling psychology, one is in clinical psychology.  Both of those are from the University of Kentucky.

I have a PHD in clinical psychology from the University of Kentucky.  I completed a postdoctoral fellowship in forensic psychology at the University of Virginia and I am

UNITED STATES DISTRICT COURT

**5-ER-1013**

board certified as a forensic psychologist with the American Board of Professional Psychology.

Q. Do you hold professional licenses?

A. Yes.

Q. What are they?

A. I am licensed as a clinical psychologist in Washington D.C., in West Virginia, and Virginia. I am also authorized with the interjurisdictional practice certificate through PSYPACT which is an agreement between multiple states -- Alaska is not one -- but it does permit interjurisdictional practice.

Q. Have you held any positions in supervision, leadership, or fellowship in your field?

A. Yes. So the fellowship I already mentioned at UVA was a one year postdoctoral fellowship so after I had my PHD. I also supervised graduate students in postdocs who are receiving training at the Institute of Law, Psychiatry, and Public Policy at UVA where I did my own postdoctoral fellowship and where I'm currently adjunct faculty for the clinic. And I develop and lead trainings for that institute.

Q. Are you qualified to diagnose and treat mental health disorders?

A. Yes.

Q. Can you describe what that training was and your qualifications to do so?

A. Sure. So I was trained in graduate school with respect to

UNITED STATES DISTRICT COURT

the assessment, diagnosis, and treatment of mental health conditions. And then, additionally, we do internships and externships over the course of our trainings so that's more of the hands-on kind of work. We're supervised at that point by somebody who is already licensed. And then I was independently licensed in 2014.

Q. Are you trained as a forensic psychologist?

A. Yes.

Q. And what does that entail, that training?

A. So there isn't really requirement in the United States. In most places, anybody who is a psychologist can hang a shingle out and say I'm a forensic psychologist. In Virginia, we do have some specific rules if you're going to be court appointed to act as a forensic psychologist.

One of those rules is you have to complete our training at the institute related to basic forensic principles and ethics and that kind of thing. But, generally speaking, forensic psychology is the application of psychological science to assist a trier of fact in answering a legal question or quasi legal question. So it's not a situation where a psychologist is offering legal opinions, a psychologist is offering psychological information to someone else who makes the legal determination.

Q. And what does board certification entail?

A. There are some, what we call, vanity boards where you pay

UNITED STATES DISTRICT COURT

your money and you get your certificate, and those are not very rigorous. The one that I have done is one of the two that are recognized by the American Psychological Association; the other being board certification in neuropsychology.

Forensic psychology board certification by the American Board of Professional Psychology entails, first of all, you have to have completed a qualifying postdoctoral internship or else you have to wait five years. I completed one in qualifying intern -- or postdoctoral fellowships. And then you have to pass an exam that shows that you have the foundational knowledge.

After you pass the exam, you have to submit work samples to the board. Those are reviewed by other individuals who are already board certified. If you pass that, then those work products are used to -- for the purpose of an oral defense. So you go to a meeting -- they may do it more on Zoom since Covid -- but when I was doing it, it was in person. And it was panel of three other board certified forensic psychologists who questioned me extensively about my work products.

At the end of that process, they made the determination that I had passed. Most of the time, the people who get to that point of the oral defense, somewhere between 40 to 60 percent of them pass. It varies round to round.

Q. Why does one need specialized training as a forensic

psychologist?

A. Because forensic psychology is different from other forms of psychology. For one thing, the -- it's usually either the court or an attorney that is a client, as opposed to the individual you're evaluating. That can be strange.

Our ethical obligations are different. Our documentation obligations are different. So for nonforensic psychologist, for example, you can get away with quite a lot more brief record keeping, for example. Whereas our ethics for forensic psychologists require, for example, that we do sufficient documentation to permit adequate judicial scrutiny and discovery by both sides.

So normally when we're taking our notes and doing assessments and all of that we're thinking about I need to maintain a level of documentation that will allow other people -- including people who are not psychologists -- to review my work and see if it was adequate. And for the purpose of some kind of a judicial or quasi-judicial proceeding.

Our role is also often different. When you're functioning as an expert, you're expected to be neutral and objective. So you're not supposed to be on anybody's side. So what I tell people, for example, when they hire me or I'm evaluating somebody whose attorney hired me, I say, look, no matter who hires me, I have to give my honest, objective opinion. Just because somebody has paid me, that doesn't mean

UNITED STATES DISTRICT COURT

**5-ER-1017**

I'm going to come to an opinion that's favorable to them and it's important they understand I'm not here to provide treatment to you.

So it's possible that after this time we spend together, I might come to an opinion that you perceive is unfavorable to you and it's important that you understand that. So we're trained not only to understand the difference in our role and our function, what's expected of us in our documentation, but also how to appropriately interface with the other parties involved so that they have a clear understanding, they aren't misled about what our role is and what the expectations of us will be.

Q. Do you have a Master's Degree or equivalent in clinical behavioral science?

A. Yes.

Q. Do you have competency using the DSM-5 and or the ICD for diagnostical purposes?

A. Yes.

Q. What is ICD?

A. International Classification of Diseases.

Q. What is the DSM?

A. Diagnostic and Statistical Manual.

Q. Do you have the ability to recognize and diagnoses co-existing mental health concerns and to distinguish these from gender dysphoria?

958

A.  Yes.

Q.  Do you have documented supervised training and competency and psychotherapy or counseling?

A.  Yes.

Q.  Do you have knowledge of gender nonconforming identities and expressions?

A.  Yes.

Q.  Do you have knowledge of the assessment and treatment of gender dysphoria?

A.  Yes.

Q.  Do you have continuing education in assessment and treatment of gender dysphoria?

A.  Yes.

Q.  Do you have training and experience related to informed consent specifically?

A.  Yes.

Q.  And what does informed consent mean in our discussion about forensic psychology here?

A.  Informed consent is a concept that's just broader than just forensic psychology but it can mean something different in our setting at times.  Informed consent has three primary components.

One is that the individual has to have the capacity to provide informed consent so that's really about their functioning.  Is their cognitive functioning intact, are they

UNITED STATES DISTRICT COURT

**5-ER-1019**

in touch with reality, can they process information. Can they not only consume information but communicate their wishes as well. So only one part of it is that capacity.

The second part of it is has the individual been provided with the relevant information that they need for the specific intervention or interventions that they're considering. So not only what those interventions are but what are the risks, what are the benefits, what are the costs, what are the alternatives. What will happen if they don't have the intervention. And so there has to be also individualized knowledge on the part of the person.

That's not necessarily the patient's responsibility. That can be the responsibility of the provider to ensure that the patient has that information. So usually it's a dialogue that's occurring in the context of informed consent.

The third component is that it has to be voluntarily. And usually we're taking that to mean that there's not a coercive element to the circumstance, that the person is able to provide consent without some sort of additional pressure that's coercive.

Now, there are times that informed consent is not required. There are certain types of emergency treatment where it wouldn't be reasonable to expect an incapacitated person to provide consent to lifesaving care or else have it withheld. Also, are times when somebody has been civilly committed where

informed consent may not be something that is actually required in order for them to receive some kind of service or participate in some kind of treatment.

I would say that for myself and most of the other forensic psychologists that I know, even in that situation, we would look for assent. So even if you can't legally say you want this, that doesn't mean I'm not going to explain to you what this process is, what it means, what the risks are to you and that kind of thing.

So informed consent in a forensic setting, for us, is usually going to -- especially for an evaluation like this, there's two parts to it. One is that if I'm evaluating the person, I have an obligation to ensure that when I meet with them they understand here is who I am, here is why I'm meeting with you, here are your options as far as, you know, you can refuse to participate, you can stop at any time, you can choose not to answer particular questions that I ask so I have to explain what the voluntariness aspect of it is for them, what the evaluation is likely to entail.

I often will get into here are two ways in which my outcome could be something you perceive as unfavorable or harmful to you even. And then I offer the person the opportunity to ask any questions they have. That can be a lengthy process at times, especially if the person has some kind of impairment.

UNITED STATES DISTRICT COURT

**5-ER-1021**

For me, I always double check their understanding by saying tell me in your own words what I just explained to you about each component. So sometimes there's a little bit of additional explanation, remediation of misunderstanding, that kind of thing that goes on. For this type of evaluation specifically with respect to an informed consent evaluation of gender affirming care, then I'm also looking at those three components I mentioned. Do they seem to have the capacity to offer informed consent if they have sufficient information.

Number two, do they have the individualized and sufficiently detailed information that they need to make a decision about the specific interventions that they're seeking or which may be offered to them. And then number three, is there some element of the circumstance that's coercive in some way for that person.

See when I use the word informed consent today, I just want to make sure I'm clear about that because it can be a little confusing whether I'm talking about the evaluation of informed consent or versus my obligation or another psychologist's obligation to obtain informed consent before proceeding with an evaluation.

Q. Thank you. Do you have a background in training regarding gender minority individuals -- transgender people and gender diverse individuals?

A. Yes.

UNITED STATES DISTRICT COURT

**5-ER-1022**

Q.  Can you describe that?

A.  So some of that came about -- some of the training that I had was in graduate school.  I was trained in gender development, had coursework on that topic.  I was also part of a graduate student advisory group for my own department's curriculum, specifically with respect to enhancing the didactic material and experience that we had related to gender minority individuals and sexual minority individuals as well.

Additionally, when I reached my postdoc, I was collaborating with James Sinopuloos(ph) who was the forensic psychiatry postdoc at the same time.  He is somebody who has expertise and is published extensively and done many evaluations of currently incarcerated transgender people.  And at that time, he was also doing rotations at the DC jail.

I also was conducting evaluations for the Virginia Department of Corrections.  I was basically like an independent contractor.  They had their own process, their own similar kind of like a MAC Committee, Gender Dysphoria Review Committee. But then once they had gotten part of the way through their process, they would contract with an outside person just to do an independent evaluation so I was doing that for them as well.

I also worked on project where we were looking at the use of advanced directives for transgender people so that trans folks who might be incapacitated might worry, well, what if I get in a car accident and I'm unconscious, I want to make sure

UNITED STATES DISTRICT COURT

**5-ER-1023**

if I'm treated, I get treatment that's gender-affirming, that my chart says the right things. Even things like there might be visitors I really don't want to be allowed to come see me. So we worked on projects relating to making advanced directives something that trans folks could use to protect themselves when they were incapacitated in some way.

I've continued to work on related projects and I do evaluations of currently incarcerated transgender people. Often now more so at the request of their defense attorneys. So I'll see somebody who is trans who is up for sentencing, for example, and I'll write a report about how I feel that prison is likely to affect that person or why a longer term of incarceration, for example, may not be beneficial or could be harmful to that person.

I also do evaluations of individuals who are transgender or gender nonconforming who are involved in civil cases. The case doesn't always revolve around them being transgender. I should be clear about that. Sometimes it's just incidental. But a lot of times, the attorneys who work on those cases will still look for a psychologist who has expertise in that area because they don't want the psychologist to introduce their client to behave in a way that's harmful to them out of ignorance or not pick up on an issue that might be relevant.

I also evaluate people who have been incarcerated for

UNITED STATES DISTRICT COURT

**5-ER-1024**

long periods of time who are up for resentencings. So in DC, for example, this is an incarceration redaction amendment act where people whose crimes occurred before they were 24 and served 10 to 15 years of a sentence already can basically ask the Court for reconsideration if they got life originally. So for those people, they may have spent decades -- in fact, many of the people I've seen have spent 25 to 30 years in prison already and I'll do evaluations of those folks including some people who are trans where we're looking at not only what is going to be the effect of continued incarceration, but, also, potentially was having untreated or unknown gender dysphoria before their crime relevant and creating a plan for that person to be able to transition out of prison into the community where they have housing that's safe for them or they're able to receive gender affirming care if that's what they need and were able to help prepare their social network to receive them in a way that's likely to be supportive so that they're more likely to be successful in the community and not likely to get in trouble again.

Q. Have you been qualified as an expert related to transgender individuals in court?

A. Yes. In State Court and in Federal Court.

Q. Are you licensed in Alaska?

A. No, I'm not.

Q. What would be required to practice psychology in Alaska?

965

A. Because Alaska is not part of PSYPACT, what would be required is for me to get a courtesy license. In some jurisdictions they call it a temporary license. But a courtesy license is time limited. I believe in Alaska it's 30 days per calendar year. You can only do it one time. So you can't keep coming back getting new courtesy licenses.

You pay a fee, fill out paperwork, they verify your license is in good standing in whatever jurisdiction you're already licensed in and that the requirements for licensure there are at least as stringent as Alaska's licensure requirements. Also, once you're approved for that, you're required to submit a report monthly that details what psychological practice activities you undertook in Alaska that month, how many hours you spent, and so forth.

Q. Would you do this for forensic work or evaluations only?

A. Not just for testimony, but if you're going to meet with somebody and evaluate them, then you would need to be licensed, even if it's just a forensic evaluation. So if I had been brought in to specifically evaluate Ms. Wagoner myself and meet with her, I would have gotten this courtesy license.

Q. What were you asked to do in this case?

A. I was asked to review the expert reports that had been submitted by Doctors Ettner and Gorton and provide information about what I felt like were the strengths and challenges of the procedures and conclusions that those experts used and came to.

UNITED STATES DISTRICT COURT

**5-ER-1026**

Q. All right. Your Honor, just a simple matter of housekeeping. I think we have Dr. Boyd's CV right here labelled as 2107. Can you pull that up, Ms. Milliken. And I put a copy up there for you but you can also see it on the screen, Dr. Boyd. Do you recognize this document.

A. Yes.

Q. What is it?

A. This is a copy of my curriculum vitae.

Q. And you provided that to us?

A. Yes.

MS. MICHALETZ: And, Your Honor, at this time I would move to admit Dr. Boyd's CV as Exhibit 2107.

THE COURT: Any objection?

MS. BUCHERT: No objection, Your Honor.

THE COURT: Without objection, 2107 is admitted.

BY MS. MICHALETZ:

Q. You mentioned you reviewed records in this case?

A. Yes.

Q. What records did you review?

A. The records that I reviewed are listed towards the end of my report. There's a table that's provided that identifies the records that I reviewed.

Q. Would it assist you to look at that table in answering the question?

A. Yes.

Q. There's a copy of your report up there with you. Take a look.

A. I see it.

Q. Okay. What records did you review in this case?

A. I reviewed copies of the Department of Corrections medical files, including some institutional materials, details of medical appointments. There was some institutional file materials. That often refers to things like placement, disciplinary history, that kind of thing, screenings that have been done by the facility.

There were also some -- I would consider them more like administrative documents that are like care guides and so those were included. I had the DOC gender dysphoria clinical care guides from -- I believe the earliest one was 2017 and I believe the most recent one I saw was 2020.

MS. BUCHERT: Apologies for interjecting but I would be grateful if counsel could publish the document.

MS. MICHALETZ: We can -- we can publish Dr. Boyd's report. Just the materials page I think is what we're focused on.

BY MS. MICHALETZ:

Q. Yes. Continue.

A. Okay. There were also recordings of calls. So these were audio recordings. There were several of them. I believe the table lists six calls. There were some complaints and

UNITED STATES DISTRICT COURT

**5-ER-1028**

grievances that had been filed by the plaintiff as well. I had documentation related to that.

I also had some policies related to PREA and housing and the ADA. There were pages from what were described as Ms. Wagoner's personal journal. I don't have a way of knowing if there are other personal journals but I listed the ones that I had. And then there were some records from an external care provider. I believe this is Dr. Samuelson's practice, the Anchorage Neighborhood Healthcare -- or Clinic records. And then there were some transcripts of depositions as well.

Q. Okay.

MS. MICHALETZ: Your Honor, at this point, we would move to have Dr. Boyd qualified as an expert in the field of clinical and forensic psychology generally and specifically regarding transgender health, the diagnosis, evaluation, and treatment of gender dysphoria including informed consent for gender affirming surgical treatment in and out of a correctional setting.

MS. BUCHERT: Your Honor, we would object to the qualification with regard to informed consent. But not the others.

THE COURT: So the only basis on which you don't believe she is qualified to opine as an expert is on informed consent.

MS. BUCHERT: Yes, Your Honor.

THE COURT: Okay. I think more than adequate foundation was laid as to how she goes about taking informed consent so I will overrule the objection and Dr. Boyd will be recognized -- pardon me -- as an expert witness in the fields that Ms. Michaletz enumerated.

MS. MICHALETZ: Thank you, Your Honor.

BY MS. MICHALETZ:

Q. Dr. Boyd, you reviewed the report of Dr. Ettner. Is that correct?

A. Yes.

Q. And Dr. Gorton?

A. Yes.

Q. And you've been with us in trial this week. Correct?

A. Yes.

Q. And you've listened to both of their testimonies. Is that correct?

A. Yes.

Q. What, if anything, do you agree with as to the opinions of Dr. Gorton and Dr. Ettner?

A. Well, I think we all agree that gender dysphoria is a real disorder, that it has a significant impact on the lives of people who have gender dysphoria and that treatment is important, that treatment needs to be individualized. And I think we both agree that specialized knowledge and training is also important to conduct an evaluation and give an opinion in

UNITED STATES DISTRICT COURT

**5-ER-1030**

a case like this.

You know, I think I would say too that the three of us are probably in agreement -- it appears based on my understanding -- that borderline personality disorder and, perhaps, personality disorders more generally, are not automatically a bar to somebody being able to provide informed consent or to benefit from an intervention. So I do think that there are things that I agree with the other experts.

Q. Are you familiar with WPATH?

A. Yes.

Q. And what are your opinions, if any, on the WPATH approach?

A. I'm not a member of WPATH. I don't know that I ever will be. I have historically had strong disagreement with some of the aspects of the WPATH approach, primarily through WPATH 7.

For example, there was this -- what they used to call real life experience, which was a requirement that the person live as their gender publicly, sometimes for two years. And that means presenting that way, using those pronouns, and it was sort of like a test drive was one way you would hear people talk about it. The way it was presented in the literature was very much of a like let's make sure this is something this person really wants to do or their identity is authentic.

Having grown up in a rural, very, very conservative part of Illinois, I know that's not survival for some people. I know that's not something that everybody is going to be able

to do. So a lot of the gatekeeping historically that I've seen WPATH do I felt was inappropriately encroaching on patient autonomy, and I felt that it ensconced psychiatrists, psychologists, and medical professionals in an inappropriate position of authority in terms of serving as sort of the final gatekeepers about whether someone is trans or not and what interventions they should have.

And even insofar as I don't think it's necessarily appropriate for a provider to say to somebody you should definitely have this surgical intervention. I think our role is more appropriately to support the individual in developing their own reality based comprehensive and balanced understanding of what their options are, what the risks are, how likely the interventions they want to seek will be successful, what that looks like in a reality based way. How much relief they're likely to get and when and what kinds of conditions or concerns they may have that will likely not be relieved by gender affirming interventions.

Q. What are your opinions, if any, on the WPATH approach as practically applied to incarcerated individuals?

A. I appreciate that WPATH has added these sections, these headings about institutional care. However, in my view, it's insufficiently specific.

For one thing they're lumping nursing homes and other kind of institutional facilities in with prisons, and those are

972

just radically different kinds of settings. Additionally, to my knowledge, the people who are responsible for drafting those sections don't have extensive personal experience in those kinds of setting. And I've worked in not only correctional type settings as an evaluating psychologist but also I've worked in other institutional settings.

I was a caregiver for people with developmental disabilities for many years, and I did that in nursing home staff facilities, I did it in group homes. I did it in kind of a wide span of settings. And I can tell you that that is a very different set of considerations than a prison or a jail or a psychiatric residential treatment facility.

And so, in my view, there should be more specificity in that section of placement by placement, and I think that the general policy that's described in that section is sort of, well, this -- all of the same things that apply in the community also apply in these settings. And the reality in my experience is that that's just not true and so that means we need to navigate those settings for what they are with more specific detail about things like accreditation for those kinds of settings, what kind of avenues may be available or constraint in those kinds of settings.

Because, as a practical matter, I would say that the majority of the time it is just not possible to pursue treatment in an institutional setting in the way that it is in

the community and we don't benefit from pretending like that's not true.

Q. Now you have not had opportunity to examine or interview Ms. Wagoner. Is that correct?

A. That is right. I have never met her, still haven't met her.

Q. Have you had a chance to review the scope of Dr. Ettner and Dr. Gorton's evaluation of Ms. Wagoner?

A. I have reviewed their reports. I have reviewed their -- the notes that Ettner took in the raw data for -- for psychological testing of Ms. Wagoner. I reviewed the rebuttal reports that they offered, and I have listened to their testimony.

Q. What is your impression of Dr. Ettner's screening measures of Ms. Wagoner?

A. I think they were inadequate.

Q. How so?

A. So the measures that were used that were the Beck measures, like Beck hopelessness, Beck depression, Beck anxiety, these are measures that I would give to somebody in my waiting room when I was still doing therapy and I would do it every other week because I would be tracking their symptoms and most of these measures cover a two week period. So I would use that really as a screening and to track symptoms over time. That way we could say things like, well, I'm treating you for

depression, you've opted for behavioral activation, but your Beck depression scores are staying the same or getting worse so maybe we need to recalibrate and consider another option for you.

So they're very brief. They're very much focused on depression and anxiety. They're not specific to gender dysphoria at all. And they only cover that two week period.

The trauma symptom inventory is something I routinely use. So let me be clear about that. I actually love the trauma symptom inventory. Sounds nerdy to say that but it's true. And the reason I like it is because it has good comprehensive coverage of trauma related symptoms and it has what are called embedded validity scales. Embedded validity scales are in the test itself but it measures how the person approaches the test not just what they said. So did they say yes to everything, did they say no to everything. Did they answer similar items consistently. These are all things that we look for to tell us how valid somebody's self report is. Those Beck inventories do not have any validity index. They certainly don't have an embedded validity index.

The trauma symptom inventory does have response level, an atypical response which is supposed to get at like an exaggerated symptom presentation. Those scales have been critiqued as not being sufficiently specific. So a lot of times we will coadminister another test with them, something

like the personality assessment inventory or the Minnesota Multiphasic Personality Inventory because those have more validity scales embedded in them.

So the problem with the measures that she used was they're too narrow, they're not specific to gender dysphoria, and they also don't encompass the co-occurring conditions that were relevant specifically for Ms. Wagoner. And by co-occurring conditions, I'm speaking specifically what was documented in the records like as far as an antisocial personality style and borderline personality features.

Q. So you mentioned a couple tests there and that answered my question, are there better tests that Dr. Ettner could have employed?

A. Yes. So Mr. Reed -- maybe now Dr. Reed, I don't know -- but Mr. Reed at the time wrote that report that we saw up a couple times because folks were interested in his conclusions with respect to the SCL90 was one of the tests that he used. The SCL90 is a very commonly used test. It's reasonably good broad spectrum, but it doesn't have validity scale so it has some limitations, and if you read his report what he says is these scales are really high, it doesn't fit with her presentation so I think she should do something like the personality assessment inventory because those have better validity scales and are more comprehensive.

And I agree with that perspective. That would have

UNITED STATES DISTRICT COURT

**5-ER-1036**

been appropriate.  If I would have been the one doing the evaluation, I would have elected for either the personality assessment inventory or the MMPI -- probably MMPI2 after doing a reading screen with her to make sure that, you know, dyslexia or literacy issues or something like that wouldn't be a barrier to her being able to complete it.

Q.  Just from a logic perspective, are these tests that one could give to an inmate who is incarcerated?  Is there anything -- a barrier to doing so?

A.  These are pen and paper questionnaires.  If somebody has literacy problems, there's audio recordings or you can read the items out loud.  There's no blocks.  I mean, if somebody has a vision problem, again, we can read it to the person.  The PAI and the MMPI are probably the two most commonly administered psychological tests in forensic psychology.  So very widely used, very commonly relied on, strong evidence base in terms of the research literature.  And the MMPI is one of the few measures that's actually been studied specifically for use with transgender individuals.

Q.  Do you have an opinion on whether Dr. Ettner's evaluation was sufficient for her stated objective for having undertaken the evaluation?

A.  No.

Q.  Do you have any opinion on about whether Dr. Gorton's evaluation was sufficient for his stated objective for having

UNITED STATES DISTRICT COURT

**5-ER-1037**

undertaken the evaluation?

A. I have a limited ability to comment on what Dr. Gorton did because Dr. Gorton is a medical doctor. So I don't have opinions about any of the medical opinions that Dr. Gorton offered because I'm not a medical doctor. I do think that Dr. Gorton does not appear to be experienced in forensic work and I think that it would have been better to select some measures that have these embedded validity skills. For example -- the other thing that is true when we use psychological tests of any kind and we're using them for a population that wasn't included in the standardization norms, we are supposed to offer caveats to that effect and say, look, I used this test, maybe it's the best I could do for whatever reason, but it's important for you, the consumer, to understand that there's a limitation here potentially because transgender people were not utilized in developing the Beck depression scales. Transgender people were not, to our knowledge, were not included in the samples used to develop the trauma symptom inventory and so we might still use a test that didn't include trans people, but our expectation ethically is that we'll be transparent about that.

Q. Do you believe that the evaluations of Dr. Ettner and Dr. Gorton appropriately took into consideration the possibility that gender dysphoria did not contribute to Ms. Wagoner's self injuries?

A. I guess I might put it differently in that I didn't think

UNITED STATES DISTRICT COURT

**5-ER-1038**

978

that either of them adequately accounted for the other factors that might also be contributing. So I think it's reasonable to say that it's likely that for Ms. Wagoner -- and this is a complicated situation -- that she has a number of things going on mental health wise and that it's not likely that a single disorder or a single treatment is going to be a solution for her.

Q. Okay. I didn't mean to interrupt you. I'm sorry.

Next question, does the evaluation of the benefit of surgery require an evaluation of a patient's benchmark physical and mental health status?

A. So if we're going to reference the WPATH standards, they specifically itemize what needs to be done. And there is an analysis that's recommended with respect to the person's sort of medical suitability for any given intervention. I would go further than that and say that -- which I think the WPATH standards imply, which is that it's not enough to say you're in medically good enough health to have a surgery, but rather, okay, given the way that your body is, given your age, other injuries, and also what it is you want it to look like and what you want it to do when this surgery is done, here is the likelihood that that's actually going to work out the way that you hoped and here are your options for trying to get there.

So, for example, some people don't want a vagina canal. They don't care about that. Or, for whatever reason,

UNITED STATES DISTRICT COURT

**5-ER-1039**

specifically don't want it, so they can have a zero depth vulvoplasty where they have the external appearance but there isn't an internal canal. A lot of times medical professionals used to assume everybody wanted to have a vagina. And they assumed, in part, because of heterocentric expectations that anybody who is going to want to be a woman is going to want to receive penetrative sex so they didn't spend time talking with people about what is it you want this body part to be able to do, how do you want it to function, how do you want it to look.

The professionals made the assumption they were best qualified to know that instead of really spending the time with their patient. And I think fundamentally is where -- a big piece of what we're missing for Ms. Wagoner is a more specific opinion about given the injury to the tissue that's already there, given the complex regional pain syndrome, given her wishes for functionality and appearance, given the term of incarceration that she's still got ahead of her and what recovery would look like in that setting, how does that fit together to shape what her options might look like and how she might go about making those choices. And that's the information that I'm not seeing. I'm not seeing it in Dr. Ettner's report. I'm not seeing it in Dr. Gorton's report, and I haven't heard that information in the testimony.

MS. BUCHERT: Your Honor, I would object to this line of questioning given it exceeds the scope of the expertise.

UNITED STATES DISTRICT COURT

Move to strike.

THE COURT: Do you have a response, Ms. Michaletz?

MS. MICHALETZ: Yes, Your Honor. Dr. Boyd was retained in this case to be a rebuttal expert. We just heard a week of testimony and it's the defendants' opportunity to rebut the testimony that was presented and she's qualified to do so so I think this falls squarely within, you know, our notice and her retention and her qualifications to do so.

THE COURT: I would tend to agree this seems to fall really squarely within her expertise so the objection is overruled. Go ahead.

MS. MICHALETZ: Thank you.

BY MS. MICHALETZ:

Q. So is it your opinion that the tests performed by Dr. Ettner and Dr. Gorton have not provided them enough information to make a sufficient benchmark determination of Ms. Wagoner's health?

A. So I was focused not so much on making the determination about readiness for surgery because I wouldn't give that opinion myself. The only opinions I've given are about whether or not the steps they undertook would be sufficient to provide information about whether or not she's able to provide informed consent at this time for the procedures that she's identified wanting -- procedure she's identified wanting.

Q. All right. Thank you.

UNITED STATES DISTRICT COURT

**5-ER-1041**

You listened to Dr. Ettner's testimony in court and you reviewed her report.  And I wrote some notes.  Dr. Ettner concluded that Wagoner had made three attempts to perform a surgical procedure on herself and surgical self treatment is a prior evidence of severe gender dysphoria and we only see it in cases where treatment has not been adequate or appropriate.  Do you agree with Dr. Ettner's characterization of Ms. Wagoner's injuries as surgical procedures.

A.  I don't think that all three -- well, I should put it this way.  The information that I've reviewed isn't conclusive in that regard as far as being able to say affirmatively these were all self surgery interventions.  Certainly some could be described as self injury as opposed to self surgery, and I think that's probably where Dr. Ettner and I can diverge.

Q.  What information, if anything, should Dr. Ettner have considered and ruled out?

A.  Are you speaking specifically with respect to the self surgery.

Q.  Yes.  Let's start there.

A.  Yeah.  So for the self surgery, you would look at a number of things.  One is you would consider what are the other possible contributors because a lot of things can be true at the same time.  For example, someone could have gender dysphoria and be very unhappy with their genitals and want to have genital reassignment or a gender affirming surgery, I

UNITED STATES DISTRICT COURT

**5-ER-1042**

should say.

At the same time, it might also be true that they have borderline features or severe trauma related features that cause them to impulsively self injure when they're acutely distressed. That's very common in borderline. And so that's a situation where it's not so neatly extricated to say, okay, this percentage of it is gender dysphoria and this percentage of it is borderline, and if we cure this one, it will all go away.

What the information that's available suggests to me is that what's most likely is that she needs an integrated approach that includes both gender affirming interventions and treatment for borderline personality as well as clarification about the contribution of borderline personality to those incidents. So one of the things you would look for is prior to those incidents, were there emotionally distressing events that she experienced just prior to that. In particular, were there emotionally distressing events that caused her to feel that she was being rejected or abandoned in some way since that's kind of a core trigger for borderline.

So if the behavior is consistent with borderline, what we would expect is a pairing of these events with emotional stressors preceding it. What we might also expect in some people with borderline is an effort to get something out of doing the behavior. So I'm doing this to get help. I'm doing

UNITED STATES DISTRICT COURT

**5-ER-1043**

this as a cry for help or I'm doing this to show people how distressed I am or how much they've hurt me.

And so it's not so tidy as to just say well that's all borderline or well that's all gender dysphoria. Because the gender dysphoria might shape the direction that the self injury goes in. People with borderline self injure in all kinds of ways. The classic one you hear about is cutting but I've had people who swallow razor blades or paper clips or who burned themselves, hit themselves in the head and have injured all different parts of their bodies so it's not -- I don't think it's fair to say that there's a particular kind of self injury on a particular part of the body that is dispositive of borderline being the contributor and it's what we call pathonomic for gender dysphoria. Meaning a pathonomic sign or sympton is something that is always there in every person that has it and never there in somebody who doesn't.

Q. Are there assumptions that Dr. Ettner makes about Ms. Wagoner's reported history that otherwise deserve independent inquiry to the extent that Dr. Ettner relies on that history?

A. Yes. So I noted this in my report specifically with the example of the story about that Ms. Wagoner recounted during an interview about being a young child, toddler age in the bathtub with the sister and the observation that the sister's genitals are different from her own.

So the way that Dr. Ettner reported it in her report

is that this happened. The way we're trained in -- when we're forensically trained is we're taught to say this person reported X, Y, and Z. That way we're not saying this is an objective fact, we're just saying this is the information that I have. Just like you might say a record reports such and such instead of saying this happened. So you make it clear where the information you're relying on is coming from.

And if you wanted to verify it, a lot of times what you'll do are collateral interviews. So when I interview for folks with issues related to gender dysphoria or just in general, almost every forensic evaluation that I do without exception includes collateral interviews. And that's because we know there are unique circumstances and lawsuits and in criminal cases where people have incentives to prevent information maybe not in the most forthright way. And so our obligation is to not necessarily be an investigator but we do try to corroborate as much as we can. So the way I do that is through collateral interviews.

For a story like that, what I might try to do is talk to a person about do you still have contact with your mother, is there anybody else that I could interview if you're not in touch with that person or they are deceased or something like that. Is there anybody else who might have remembered what you were like as a child or what you might have reported that's consistent with this during childhood. You know, collateral

UNITED STATES DISTRICT COURT

**5-ER-1045**

985

interviews are a source of that but records are as well.

So the -- Dr. Lund, for example, I think was the urologist who has seen Ms. Wagoner for -- I think Ms. Wagoner said since she was 18 or thereabouts. So that's another person who could have been interviewed as a collateral source, not just about her history of her feelings of her genitalia and what she might have asked for the past but also somebody who could talk about her medical decision making historically.

Q. Is there other information you believe Dr. Ettner should have but didn't take into consideration when she rendered her opinion?

A. I think that the -- the interview was not sufficiently detailed in terms of the documentation that I saw. I didn't see a discussion where doctor indicated here is her fund of knowledge specifically about the interventions -- the intervention that she is seeking, what her knowledge is of the alternatives, what her knowledge is of the risk, the benefit, the timeline, the postsurgical care. Here is her understanding of what her options will be if there's complications. Here is her understanding of what the avenues might be for her if she has this procedure and her gender dysphoria is not resolved, as Dr. Ettner put it. What if you still have gender dysphoria after you have this procedure, what will you do. There isn't any discussion of that that I saw memorialized.

Q. Let's go to something you just said. Do you believe gender

UNITED STATES DISTRICT COURT

**5-ER-1046**

dysphoria can be effectively resolved with surgery?

A.  For some people, yes.

Q.  Can you talk more about that.

A.  So I think it's a small percentage of people for whom you would be able to say it was fully resolved.  But I think it's possible.  Most of the people that I've met with, including people who have already undergone their surgical transition, you know, people do continue to have some lingering problems and that's because the injury that's done to trans people isn't just -- it's not coming from their own body a lot of time, it's coming from the way they're treated from other people.

It's coming from your family rejecting you, from your community rejecting you, from hearing things in the news about how you're not a real person.  From, you know, the -- you know, being treating disrespectfully by romantic partners sometimes is another thing that can happen.  And then also living with being a gender sexual minority individual, over the course of your life, there's very commonly victimization of that person that happens or they get in trouble and they end up in prison or something like that.  There's a lot to have to cope with that surgery does not fix for somebody.  And so that's why it doesn't surprise me when we see studies like the Dhejne study and others where they're saying people have these interventions and they still have mental health problems afterwards.

That doesn't necessarily mean it's not a good idea to

UNITED STATES DISTRICT COURT

give people treatment, but what it does mean is that we should be appropriately sort of sober about recognizing that it's not phantasia. And for some people they're going to need other things as well. And for some people, depending on their circumstance, gender dysphoria may be something that they deal with for the rest of their life even if they get all of the available interventions that they might want. And, for most people, getting everything they want isn't practical. For whatever reason, because of money, because of timing, you know whatever the issue might be.

So the fair thing, in my view, to do is to recognize it's highly individualized but it's not likely to be a cure in the sense of that you're not going to have mental health problems after this or that the behavioral problems that you've had are going to go away or that you're going to necessarily experience greater social acceptance.

Q. Turning to Dr. Gorton. And I know you're not rendering any opinions on his medical based testimony. But what, if anything, do you agree with what Dr. Gorton testified to aside from that?

A. So I did like that Dr. Gorton used a couple of scales, even though those measures have not been validated for use in a correctional setting or a forensic setting. It would have been helpful to hear from Dr. Gorton, okay, so she got these scores now, and if she has this surgery, this is how much I expect

UNITED STATES DISTRICT COURT

**5-ER-1048**

988

these scores to change. So there wasn't information really about that in a concrete way.

I do think that Dr. Gorton attended to -- appropriately to the complex regional pain syndrome issue and I think that Dr. Gorton's acknowledgment that this is information that's potentially important that we don't have -- and, furthermore, Ms. Wagoner does not have, is potentially really important to make that determination -- for her even to make that determination.

Because what we don't know is how would this surgery affect the pain associated with complex regional pain syndrome, are there other interventions that would need to be done first or after surgery related to managing that. If she has the surgery that she wants and then she has exacerbation of the complex regional pain syndrome what avenues are available to her to manage there.

If there's additional physical pain or ongoing physical pain at the level which she's described -- which I think I heard her rate it at like a six routinely out of ten -- then how is that going to affect her mental health living with that level of pain. That's not information that we really have at this point. And so I pointed that out in my initial report and I think Dr. Gorton appropriately acknowledged that in his testimony.

But I do think that that is a big question mark. And

it's not something that I can give opinions about because I'm not a medical doctor. I'm not somebody who specializes in that particular condition. All I can talk about is that this is a big question mark that be would important in a confirmed -- informed consent analysis.

Q. We heard some suggestion that the Department of Corrections should not be using suicidal ideation as a factor in evaluating the benefit of gender-affirming surgery to Ms. Wagoner. Do you agree with that?

A. No, I don't agree.

Q. Why?

A. If you look at the research literature, even that the other experts relied on extensively, and you look at the outcome measures those researchers used, it was suicidality. It was also suicide attempts and completed suicide. So it's clearly an important enough indicator that the researchers who study this are including it routinely as a core outcome measure.

It's also the case -- and I think this has been acknowledged by other people multiple times -- that trans folks have a very high rate of suicidality. The estimates are somewhere between 40 and 50 percent of trans people have experienced suicidality in their lifetime.

And that doesn't just matter because they might kill themselves. It matters because somebody who feels that way is in terrible pain. That is -- there's a reason why they want to

kill themselves is because they're in so much pain that they want to escape it. So treating suicidality is valuable even if we don't think the person is ultimately going to die. It's valuable that the researchers include it in their outcome measures so I do think it's appropriate.

It's also appropriate specifically for her because she has a history of suicide attempt and what we call parasuicidal behavior. Parasuicidal behavior is things like cutting or self injury, self surgery, things like that where you're not trying to kill yourself but you are injuring yourself. And so that is something that makes sense as something to assess, not just generally for trans folks seeking gender-affirming interventions, but even for Ms. Wagoner specifically.

Q. Did you -- did you observe material differences in the experts' opinions that you heard in this courtroom this week?

A. I believe I did.

Q. What were those?

A. For one thing, I did not hear Dr. Gorton say that the desired surgery would be curative for Ms. Wagoner with respect to gender dysphoria. I believe the term that Dr. Ettner used is resolve. And so I did not hear agreement necessarily there. Now, I do think that they shared the opinion that this intervention would likely to give her significant psychological benefit but it's sort of degree of benefit that I think there's a distinction between the two of them.

UNITED STATES DISTRICT COURT

Also, Dr. Gorton indicated that there were still some unknowns that would potentially be relevant to informed consent whereas Dr. Ettner seems to feel that it's fine to go ahead at this point.

Q. You referenced studies I think when we were just discussing Dr. Gorton's testimony -- and we discussed several of them over the course of the past week, and three of them have been admitted into evidence -- do many studies support that gender affirming surgeries mitigate gender dysphoria for some individuals?

A. Yes.

Q. And you agree with that?

A. Yes.

Q. Do you have issues with Dr. Ettner and Dr. Gorton relying on these studies in support of their opinions?

A. I don't have an issue with them relying on the studies, but I think if you zoom out for a second, some issues emerge. One is that a lot of these studies are relying on a lot of the same psychological tests that I have recommended but neither of them did. So those researchers that are looking at benefits from intervention are also doing testing like the MMPI or the personality assessment inventory. And they are looking at things like suicidality, and they are looking at things like life functioning.

They use quality of life scales to measure before and

after for these procedures. Dr. Gorton and Ettner were not using those measures. So it's hard to say you can generalize from that study when you're not doing the same procedures as they are. And also I think the fact that those researchers are utilizing those measures and frameworks underscores the significance of those particular ways of measuring gender dysphoria so that we can determine if an outcome is beneficial or not.

And so I do think that there has been testimony about the difficulty of assessing some of these things like the subjective distress. That came up, you know, how well do you really know somebody. Or is the sort of ability to get along in an institution indicative of an absence of distress. But I think when we look at the research literature that the experts are relying on in this case -- and appropriately relying on in this case -- what we find is an incongruence between methodology that the researchers are utilizing in the ways they measure the distress and outcomes and the methodology that Dr. Gorton and Ettner were using to make predictions about the likelihood she's going to have gender dysphoria resolved or significantly ameliorated through a single surgical intervention.

Q. I want to look back to -- the one thing we were talking about when we discussed Dr. Ettner's reporting of Ms. Wagoner's history. Is interviewing the only way to obtain corroborating

information of the person's self reporting?

A. No.

Q. And so what are some other factors that you can utilize when you're trying to corroborate a person's self reporting?

A. In a forensic evaluation, we certainly do interview the person. That's not nothing. And we look for convergence between different sources of information. So we don't want to only interview the person. And we want to look for agreement so we look for does the result of their interview conform to what we see in the records, does it fit with what other people are saying, is there a report consistent over time.

And I will offer the caveat that it is true that for some people it's very difficult to be honest about their symptoms, especially if they want to seek treatment. You have to walk this tight rope of sort of like I'm distressed enough that I need this treatment, but I'm not so distressed that somebody is going to say I'm too mentally ill to be able to have this intervention. So it is a challenging thing to figure out.

But you would do it by looking at agreement between those other sources. You would also look for observable information. I believe at least a couple of other experts talked about signs. You know, other people being able to see are you participating in social life, are you participating in your occupation or how are you spending your time. Are you

UNITED STATES DISTRICT COURT

5-ER-1054

observably distressed in terms of crying or, you know, that kind of behavior. Are you withdrawing socially. There are things like that that you can observe.

But also the psychological testing. So we use scales like the MMPI and PAI because they have these embedded validity scales and that tells us, you know, how accurately is this person reporting at least their symptoms. It doesn't tell us if they're like a liar or not, and that wouldn't be particularly helpful anyway but it does tell us about the validity of their symptom reports specifically.

Q. So I want to turn to informed consent. Why is it important?

A. Well it's required for us ethically, not just for psychologists, but for medical doctors as well. It's a foundation of ethical practice. If an intervention or an evaluation is delivered to somebody without informed consent that can actually be battery under some circumstances so we certainly just to protect yourself, you want to do informed consent.

But it also -- informed consent in this framework as an approach to supporting somebody in receiving gender-affirming care, it matters because it also validates their autonomy and dignity as a patient. It's not enough for a doctor to say I understand it and I think it's a good idea so that's enough, that's good enough. You know, that

inappropriately vests the medical authority with too much power.

What is an informed consent model is saying this should be a conversation between an individual and their providers where they can ask questions, they can get information that they need in a way that they can understand it, and that information is balanced for them. You also want to avoid a coercive situation where they feel like I have to say I want this or don't want that.

Q. Are there aspects of the approach that Doctors Ettner and Gorton took that compromises the principles of informed consent?

A. I think, in this case, it is disserving to me that we haven't seen further investigation and provision for Ms. Wagoner of information about the complex regional pain syndrome issue, of how that might interface with her outcomes. And, in particular, how the existing damage to her tissue might impact the likelihood that surgery is going to be successful either aesthetically or functionally and the likelihood she might have more pain or the same amount of pain. You know, I can't speak to that so that part is certainly missing and I'm concerned about it.

I also think that when you tell somebody, look, if you do this surgery, you'll be cured, that can be -- especially if that's not true, that's a problem. Because now the person who

has to live with that consequence believes, well, if I do this thing, even if there's risk, even if there's cost, even if there's pain, then I'll do it because I want to get this 100 percent probability cured that I've been told I'll receive.

So they're going to weigh that differently than somebody who has been given the approach of, well, you know, it might not cure it, but it will probably help to some degree and here is how we can figure out how much it would help, but you're likely still going to need X, Y, and Z. And in her case, I think the X, Y, Z, a lot of that would be focused on the support for the borderline personality issues.

Q. So I heard testimony from plaintiff's experts that they believe Ms. Wagoner is capable of providing informed consent for this surgery though. Can you discuss what informed consent means in a mental health context?

A. So from a mental health perspective, you know, we're not necessarily -- we're not in a position to always give the person all of that medical information. Right. I don't know everything about all of the risks that might be entailed from a procedure so it's not always going to be my role to directly provide that education.

What my role is when I'm evaluating somebody is to find out what their wishes are as far as an outcome and try to determine who else we can consult with, who can tell us what the options would be to give us good up-to-date information

UNITED STATES DISTRICT COURT

**5-ER-1057**

about it. And then I'll usually assess the person's capacity with respect to their comprehension of that information. And if they don't have good comprehension, that doesn't mean they shouldn't -- that's where it stops.

You know, I had people who had intellectual disabilities, for example, they had a low IQ and maybe were not literate. But, for me, that wasn't an issue to say, well, they shouldn't get gender-affirming care. It was a time when I went back to the facility and said you need to give this person information that is verbal. If you're going to give them information in writing, it needs to be at this reading level. They need to have multiple meetings with people to learn about what their options are. Here is the additional support and accomodation that they'll need to learn about what they need to do. So it's iterative for one thing. I would say there's a fair amount of back and forth with that process.

Q. And you haven't seen that that has happened in this particular case with Ms. Wagoner?

A. No. I have not seen that.

Q. So turning to, I guess, the -- your review of the rest of the records, what other personality disorders are referenced in the records?

A. Antisocial and borderline.

Q. And in your records, do you see telltale signs that are consistent with that diagnosis for Ms. Wagoner?

UNITED STATES DISTRICT COURT

**5-ER-1058**

A.  Antisocial in prison is like shooting fish in a barrel. It's like many, many, many people in prison have an antisocial history because it's just characterized by rule breaking behavior.  So if you're in prison, you probably broke some rules.  I'm not saying people in prison are bad people, just that there's a high base rate of antisocial in there.

So if somebody has got rule breaking behavior, period, that is often supportive of that.  Reduced empathy and compassion for other people.  You know, not being as bothered by things that most other people would find distressing.  You know, that can be part of antisocial as well.  But the kind of core of it is rule breaking behavior, seeing other people as kind of a means to an end.  Aggressive behavior, that kind of thing.

The borderline I think is pretty well supported. Actually in the call that we heard I believe it was yesterday there was some very, very classic borderline kind of hallmarks going on there with you're going to leave me and that kind of thing.  So there were issues I think that are evident with fear of abandonment and rejection, dysregulated anger, and that can also manifest as impulsive kind of self injury.

So I think that one way of looking at some of these incidents that occurred in 2017, 2018, 2019 is that they're kind of potentially in an amalgam of both gender dysphoria and borderline in that the distress is focused on -- the genitals

are kind of the focus of attention but the -- the getting overwhelmed by distress and then acting on it in a way that is actually not advancing your long-term objectives.  Right. That's more of the borderline piece.

Because the injuries that she's done to herself are potentially going to, you know, have the potential to cause problems for the surgical outcome.  So even for her own stated goals, you know, what would be beneficial for her is if she's able to inhibit those self injurious behaviors.  And it seems reasonable to me based on the records that what we see in those self injury incidents is a combination of both.

Q.  So for borderline personality disorder, can it appear in mild or severe forms?

A.  Yes.

Q.  And can it be managed?

A.  Yes.

Q.  What are some of the ways in which borderline personality can be managed?

A.  The classic one has already been mentioned which is dialectical behavior therapy, which I love, and I think everybody should get in fifth grade probably.  It's really, really good and it's skills based and it's great for people who don't necessarily want to do the traditional psychotherapy, tell me about your mother, tell me about your past kind of thing.  It's very much focused on what skills can I use to make

UNITED STATES DISTRICT COURT

**5-ER-1060**

my life better now.

And so the issue for doing DBT for somebody like Ms. Wagoner is she does have some self injurious behavior and usually the way we deal with that in DBT is in group, that's like a class, you're learning your skills, you get your homework, you report back on it, all that stuff. But you never talk about your self injurious behavior in group. And the reason for that is other people might get activated and think about maybe I should self injure or I should harm myself so usually we have all these walls up about that in the group. And how that gets dealt with is on an individual basis.

And DBT does include a workbook typically. A workbook for the person leading the group and a workbook for the participant and it usually takes about one year so the modules take six months to go through and you repeat them one time so it's one year in total that most people are doing DBT. They can go back and get boosters so-to-speak for it if they want to but that's what DBT looks like and that's the gold standard.

Q. You mentioned a workbook. Are the workbooks for DBT only in prisons or --

A. No. I would say the workbook is used for virtually everybody that does DBT. They don't always give you a physical workbook. They might give you printed handouts each week but they're from a workbook. There's DBT self-help workbooks. So when I talk to people who are going to prison and I don't think

UNITED STATES DISTRICT COURT

**5-ER-1061**

1001

they're going to be able to get DBT, then I'll often recommend one of those self help DBT workbooks for them so they can do it on their own.

In Federal prison, they have something called Stages, but even for those people, I'll often recommend they self study because of the requirements to get into that program.

Q. We heard testimony yesterday about Ms. Wagoner's activities of daily living. Why is that an important factor to evaluate when you're looking at everything concerning her mental health?

A. Activities of daily lives are a type of what we call adaptive functioning. And adaptive functioning is an individual's ability to basically take care of themselves and function at a level that's appropriate for them given their age and their culture. So what we expect of somebody when they're eight is going to be different from when they're 18 is going to be from when they're 80 years old so it's contextualized.

And activities of daily living tend to refer to sort of the most -- the lowest layer of that sort of pyramid which is usually things like are they dressing themselves, are they feeding themselves, are they showering when they're supposed to, things like that. When people become very mentally ill, a lot of times we see they're not able to do that. You know, people with schizophrenia, for example, will stop eating, stop sleeping, stop showering, get really disheveled, and that will be something that we look for as sort of a hallmark of them

UNITED STATES DISTRICT COURT

**5-ER-1062**

being deteriorated.

So activities of daily living are something that are often observable to other people, not just you doing the activities but even your appearance can tell somebody who is evaluating you a little bit about how sick you might. There are certainly people can be mentally ill and still be able to do their activities of daily living. The way we've heard testimony about activities of daily living in this case has gone a little bit outside of what I usually consider to be pure baseline activities of daily living in terms of getting into things like socializing, participating in programming, things like that. But that's still a part of adaptive functioning and it still makes sense to look at that, especially when you're doing that -- you know, that recognition that the person might have incentive to present in a particular way so we need to look at multiple sources of information. And one of those sources of information is not just what the person says but also what they do and activities of daily living are part of that.

Q. In this case, Ms. Wagoner's asking for injunctive relief for gender-affirming surgery, right, and do you believe that there has been sufficient information gathered as a result of these evaluations that will put Ms. Wagoner in a position to provide informed consent for vaginoplasty?

A. I've not seen information to date that reassures me that

UNITED STATES DISTRICT COURT

**5-ER-1063**

that's the case.

Q.  Why is that?

A.  Well, I've already talked some about it so I don't want to belabor it but most of it is this additional information that I think folks have already acknowledged is missing about, you know, more detailed information about her fund of knowledge about her options and the implications of these interventions. More detailed information about how, in my view, it's not likely that surgery will be truly curative or will fully resolve gender dysphoria so what might a more comprehensive, a detailed treatment plan look like so there's more information that's just missing at this point.

And it wasn't detailed in the expert reports and it wasn't detailed in the testimony and so my concern is at this point not so much that she lacks a capacity fundamentally, like I haven't seen information that she's psychotic or that she has severe intellectual disability or something like that, the piece that I really see that's missing truly is more documentation that she's been provided with this very specific individualized information about -- for her, given the outcome she's seeking, what are the risks, costs, and benefits and the likelihood she's going to get the outcome that she's wants.

Q.  And does your opinion also play into some of the other surgeries we've talked about with the other experts on the stand, for instance, voice feminization, and chest surgery,

UNITED STATES DISTRICT COURT

**5-ER-1064**

facial reconstruction. How does this play into the whole bigger picture on that?

A. So with the informed consent, the bar is kind of it varies a little bit. The more intrusive and risky a procedure is, the sort of more knowledge the person needs to have. And that's comparable to other areas where we look at consent. So like I do evaluations of consent to participate in sexual activity for people with disabilities. The level of knowledge they need to go make out with somebody is very different from engaging in unprotected penetrative sex.

So when you're looking at medical interventions, there's a similar kind of continuum where one intervention like gender-affirming hormone therapy, you know, it's not going to be as difficult probably for the person to be able to provide informed consent and they may not need as much information, depending on the individual. But as their particular medical circumstance becomes more complex and or the intervention they're seeking becomes more complex, then the knowledge that person needs to have and the information they need to be given has to be somewhat fulsome.

Q. What about Dr. Ettner's dismissal of the fact that further surgeries were medically necessary. Can she say that?

A. I didn't see information that would suggest that Dr. Ettner has a foundation of knowledge and that she did the legwork basically to say, you know, she's not going to benefit from --

UNITED STATES DISTRICT COURT

**5-ER-1065**

1005

or she's not going to get symptom relief for, say, facial reconstruction or interventions related to her voice or chest surgery or something like that. I don't think we're in a position to say now.

And I would say based on the information I've seen, it's entirely possible she could go through with -- whether it happen in prison or elsewhere -- having this bottom surgery and still have gender dysphoria and still need some of these other interventions. I would certainly feel extremely uncomfortable saying she doesn't need those things and those are not necessary for her because I don't think that we know that.

Q. What, if any, are the risks to Ms. Wagoner if the surgery goes through without sufficient information?

A. Well the thing that comes -- that I would be concerned about would be that there's been a lot of representations made that this will be -- that this will achieve resolution of gender dysphoria. And when somebody has been told this is your -- this is your only option and this is the thing that will cure you and then if it doesn't, either because it went really well but you still have gender dysphoria or you have a complication so aesthetically or functionally you don't get the thing you were hoping for, now the person is feeling really let down, really misled and they've not been told there's any other option for them.

So it's like I did the things that people told me to

UNITED STATES DISTRICT COURT

**5-ER-1066**

do and I'm still in pain, I'm still suffering, do I have no other options?  That can be a high-risk for suicide kind of situation because a person feels like what else is there for me, what other avenue do I have at this point because they relied on the judgment of medical professionals that told you -- them this is your only option and this will cure you.  So that's one concern I would have for her.

The other is that with the oversimplification, I think that means there's neglect of the significance of the borderline personality piece.  And the thing about that is it's so treatable, and you can treat it at the same time that you can -- that you can receive gender-affirming care.  There's no contradiction between that.  And, in fact, I think that would be a great plan for somebody, especially for her because I think it would reduce the likelihood she would do more of this impulsive self injury to her body, and that's probably a good thing for her getting the outcome ultimately that she wants.

But if we ignore that and say never mind about the borderline, that's inconvenient, or never mind about the borderline because we have this particular narrative that surgery is the only way, that means we're not going to get a plan for treating them.  And that means that the person is not going to get relief because I think hopefully everybody would agree that surgery is not the treatment for borderline.

Q.  I don't have any further questions at this point.

THE COURT:  All right.  Thank you so much.

Ms. Buchert, cross examination.

CROSS-EXAMINATION BY MS. BUCHERT:

Q.  This is Sasha Buchert on behalf of the plaintiff.  Good afternoon.

A.  Good afternoon.

Q.  I'd just like to open with asking you a few questions about you qualifications and experience.

THE COURT:  Ms. Buchert, please keep your voice up. I'm having trouble hearing you here, and I imagine the court reporter is too.

MS. BUCHERT:  Is this better?

THE COURT:  That is better.  Yes.  Right in the microphone.

BY MS. BUCHERT:

Q.  Dr. Boyd, you're not a surgeon.  Is that correct?

A.  That's right.

Q.  Okay.  And you are not part of a multi-disciplinary team that provides surgical care?

A.  That's right.

Q.  And did you have any formal treatment regarding gender-affirming surgical treatment?

A.  I had continuing education but not something that occurred while I was in graduate school.

Q.  Have you ever served on a multi-disciplinary team that

UNITED STATES DISTRICT COURT

**5-ER-1068**

1008

provides gender-affirming surgical treatment?

A. No.

Q. Have you ever evaluated and then written a referral letter for a patient to receive a vaginoplasty?

A. I cannot recall specifically vaginoplasty, and I normally wouldn't recommend a specific procedure because I'm not a medical doctor, but I have done therapy with individuals who are seeking medical interventions and I've written letters essentially saying that they didn't have a co-occurring mental illness that would be a barrier.

Q. As you sit here today, you can't remember if you've evaluated and then written a letter -- a referral letter for a patient to receive a vaginoplasty?

A. I don't think I would write a letter saying that somebody should receive a vaginoplasty. What I can't recall is how many people were -- who I was writing a letter for were themselves seeking that.

Q. Okay. So then the answer is no you've never evaluated and referred someone for a vaginoplasty?

A. Specific, yeah, the answer is no.

Q. Thank you. Have you ever referred anyone for surgery to treat gender dysphoria?

A. I've referred people for consultation with other experts. I don't recommend specific -- for or against specific medical procedures.

UNITED STATES DISTRICT COURT

**5-ER-1069**

1009

Q. Okay. So you haven't written a letter referring someone for surgical care to treat gender dysphoria.

A. I've only referred them for consultation, not for surgery.

Q. I would be grateful if you would just give me a yes or no.

A. Sure.

Q. Have you ever referred someone for surgical treatment to treat gender dysphoria?

A. No.

Q. Okay. Thank you. And you haven't treated anyone post -- you haven't treated any post gender-affirming surgery for treatment. Is that right?

A. I've done psychotherapy with individuals afterwards. It wasn't related to their surgery though.

Q. Okay. Thank you. Have you written any peer reviewed articles regarding gender affirming surgery?

A. No peer reviewed articles. No.

Q. Okay. And you haven't written any peer reviewed articles addressing gender-affirming care generally?

A. No.

Q. Going to repeat some of the questions from the direct. But were you -- you've never met with Ms. Wagoner. Is that right?

A. That's right.

Q. And when were you contacted by the defendants to serve as an expert in this case?

A. I believe it was late January of this year.

UNITED STATES DISTRICT COURT

1010

Q.  Did you ask to evaluate Ms. Wagoner in person?

MS. MICHALETZ:  Objection, Your Honor.

THE COURT:  What's the objection?

MS. MICHALETZ:  Getting into attorney client -- or just work product discussions.  I don't know that that's entirely relevant but -- I think it's more of a cautionary objection.  I'll withdraw it.

THE COURT:  So I take your point.  I don't think that particular question is objectionable but it's sort -- it is getting close to a potential attorney work product question so that objection is overruled.  Just be mindful, Ms. Buchert, of not encroaching on questions that may implicate attorney work product.

Doctor, do you need to hear that question again?

THE WITNESS:  Yeah, that would be helpful.

THE COURT:  Ms. Buchert, if you recall the question, go ahead and repeat it.  If not, we can have Madam Court Reporter read it back.

BY MS. BUCHERT:

Q.  Okay.  Did you ever ask to evaluate Ms. Wagoner?

A.  I have not asked to evaluate Ms. Wagoner.

Q.  Thank you.  Have you met with any of her medical providers?

A.  I have not.

Q.  Based on your review of the medical records, approximately how many years has Ms. Wagoner been seeking surgical treatment?

UNITED STATES DISTRICT COURT

**5-ER-1071**

1011

A.  I believe that it's been at least since 2016 or 2017.

Q.  And I want to ask a few questions about your informed consent framework.  Is this informed consent model particular to your practice, or is this an accepted informed consent model that's accepted by other providers?

A.  The informed consent model is discussed actually in the new WPATH standards of care.  It wasn't in 7 but it's in 8.  And it's also discussed in plenty of other places as an approach.  It's essentially offered as an alternative to the kind of gatekeeping evaluations that other evaluators utilize.

Q.  Yeah.  I'm sorry.  What's the distinction between informed risk as it's stated in the WPATH and your definition of informed consent?

A.  So the informed consent approach to evaluation is a section within the WPATH standards of care.  It's -- it does get confusing because we're using the same words but the informed consent, like for surgery or whatever, is slightly differentiated from the informed consent evaluation process.

        So the idea is basically that the -- the medical folks used to come to us and want a letter that said this person is fine to do surgery, they're competent, they don't have a co-occurring mental disorder and we were supposed to write that letter, give it to the doctors, that's how it would work.  Sometimes they would want a full psychological evaluation if the person had something co-occurring like bipolar or something

like that.

But some of us are deeply uncomfortable with that idea that we are the ones who are supposed to say whether somebody should have surgery or not since it's both a medical decision and also something that, for people like me, we view inappropriately encroaches on their autonomy as a patient so it's a -- both a philosophically different approach but also as a practical matter, a different approach because when we do these informed consent evaluations, we don't say you should have surgery, you should not have surgery. We're only looking at what is the person's understanding of their options, are they able to give that opinion, do they have enough information.

Q. Yeah. I guess my question is, you know, some of the criteria that you've outlined, you know, with regard to, you know, what a proper evaluation should look like, you know, I'm asking where that language comes from in the WPATH standards of care?

A. Well, so the proper evaluation is not going to be so much just from WPATH. A lot of that is coming from forensic evaluation more generally. So when I'm talking about things like using collateral resources and doing interviews with other people, using testing that's validated or offering caveats if it's not, that is all coming from forensic psychological practice and not necessarily things that are specifically

directed within WPATH standards of care or another comparable guidance document.

Q. Okay. And so the informed consent framework that you're talking about today is drawn from the forensic psychology practice and from other sources, or where does -- where does that come from?

A. So the -- the broader framework is forensic psychology. The philosophical orientation and the purpose of the evaluation is something that I was doing actually before WPATH standards of care 8 came out. But now that it's come out, it's very much congruent with the approach that I take.

Q. The -- your testimony is the WPATH standards of care 8 is consistent with the approach that you're taking with your informed consent process including pulling in these factors from the -- from forensic psychology?

A. So it doesn't address -- it's not a very lengthy section of the WPATH so it's not super detailed. There isn't anything I've done that's incongruent with what's in WPATH. But as far as details of step one, step two, and who do you talk to and all that, that comes from a more general forensic psychology framework.

Q. Okay. I -- the question is I guess is there's a difference between what's in the WPATH and what you're talking about today when you're talking about informed consent because you're drawing in factors that come from forensic psychology. Would

UNITED STATES DISTRICT COURT

**5-ER-1074**

1014

that be accurate to say?

A.  Well, I don't think they're contradictory but because the WPATH is not very detailed, that's really where the issue lies is it's not in contradiction to it but where do you get that elaboration from that framework.  From me, as a psychologist, that comes from forensic psychology.  For forensic psychiatrist, it might come in a different framework, although I expect a forensic psychiatrist would also do collateral sources, would also consider caveats with testing, things like that.

Q.  Okay.  Thank you.  Is there any peer reviewed research of informed consent in the model that you're using?

A.  There is.  There's somebody who's been writing about for some time now for about I think eleven years or so.  Routh is one person who has written -- I think it's spelled R-O-U-T-H.  And so there are other people that have been publishing about this for some time, it just wasn't acknowledged in the standards of care until the standards of care 8 came out.

Q.  Is it fair to say that -- that care should be patient centered?

A.  Yes.

Q.  Okay.  And you would agree that a patient needs to be able to obtain the information that is relevant so they can provide informed consent?

A.  Yes.

UNITED STATES DISTRICT COURT

**5-ER-1075**

1015

Q. And do you know if the Department of Corrections has sent Ms. Wagoner to someone that can help her obtain that information?

A. I can't speak to whether or not that's happened or not because I don't think I have sufficient information to answer that question confidently.

Q. Either way?

A. Yeah.

Q. Yeah. And do you know from your review of the records whether they've been informed, you know, that she's been recommended to -- referred for surgery by other providers?

A. My recollection is that at least Dr. Samuelson at a minimum has recommended that that kind of consultation be undertaken and that she be provided with the opportunity to speak to a surgeon.

Q. And Ms. Wagoner has been seeking the treatment for a number of years. Is that right?

A. Yes.

Q. Okay. But you don't know whether -- based on your review of records, you have no knowledge whether the Department of Corrections has applied the informed consent model that you're referring to today?

A. So all I can say is that, in my view, nobody has demonstrated that she has been provided with the information that she would need to make that individual decision.

UNITED STATES DISTRICT COURT

**5-ER-1076**

1016

Q.  Thank you.  Who would be the appropriate person for the Department of Corrections to refer Ms. Wagoner to get the information with regard to the risks and benefits and the other informed consent considerations that you've talked about today in obtaining a gender-affirming genital surgery to treat her gender dysphoria?

A.  That's a great question.  And at the end of my report, I actually did have some recommendations about that.  One was that my view was that an independent forensic psychologist could do some of this additional legwork that I recommended with respect to assessment and some additional information gathering.

I think as far as making sure that person isn't sort of playing a game of telephone and maybe inadvertently giving Ms. Wagoner incorrect information, you would ideally also have the opportunity for consultation with a urologist and also probably a surgeon and potentially somebody who has a background in the complex regional pain issue since that's a thing that was brought up by Dr. Gorton and hasn't been -- you know, even Dr. Gorton doesn't seem to have done all the legwork that's needed to document that so there might be a need for an expert to do that consultation potentially even in concert with Ms. Wagoner so that the information she's getting is accurate and it's comprehensive.  Because of the complexity of her presentation with the injury that's already been done, that's

UNITED STATES DISTRICT COURT

**5-ER-1077**

why I think it would need to be more than just a surgeon.

Q. Okay. And to your knowledge, has the Department of Corrections referred to her any of those providers that you just identified?

A. Not to my -- well, the urologist they've done consultation with. And I think fairly nuanced consultation, but, again, I think there's additional legwork that could be done like having the independent forensic psychologist do an interview with that doctor about her history of treatment with Dr. Lund and how potentially consultation with another surgeon who does the type of surgery she wants for gender-affirming purposes how that would interface with some of concerns about treating urological issues and pain issues.

Q. Okay. And so they haven't referred her to a surgeon at this time?

A. To my knowledge, no.

Q. Is it -- in your professional opinion, do you think it would be appropriate to refer her to a surgeon now?

A. Well, I don't see -- I don't know that -- it would be complicated. Right. So I would not have a problem at all with her being referred for consultation with somebody. They might not be the surgeon who does it. Right. They might not be somebody who is able to do it. But just someone to be an information source and they will say here is what this will look like, here are your options given -- you know, I would

UNITED STATES DISTRICT COURT

**5-ER-1078**

1018

have reviewed your chart, I know the damage done to your tissues.

Also, ideally, that person would be able to tell us here is the period of time that you might need to refrain from further damaging your tissue in order to be suitable for surgery. There's lots of questions that I think that person could answer. They wouldn't have to be a surgeon who would actually be the one to perform a procedure like that. They would need to have that background to, at a minimum, be a consultant I think for that process.

Q. Yeah. And do you have any thoughts about why the Department of Corrections hasn't followed those recommendations?

MS. MICHALETZ: Objection, Your Honor. I think this does go outside of the scope of what her expertise is.

THE COURT: Yes. To absence and foundation about what she might know about Alaska Department of Corrections policies and how those policies are implemented, I think it is an objectionable question. Sustained.

MS. BUCHERT: Thank you, Your Honor.

BY MS. BUCHERT:

Q. Would it be fair to say that gender-affirming surgical treatment can alleviate gender distress relating to someone's genitals?

A. It can. Yes.

1019

Q.  And could you elaborate on that?

A.  Well, I mean, I think we heard several times it has to be highly individualized.  I think also the increment of benefit that somebody is going to get is highly individualized and it may not depend on the timing as well.  So -- but I think that I would say that there is a professional consensus that, at least for some people, surgical intervention is something that can substantially alleviate their gender dysphoria.

Q.  Yeah.  And apologies but this is a more specific question about whether it can alleviate gender dysphoria related to someone's genitals or body part?

A.  So my answer to that would be it's possible, yes.

Q.  Okay.

THE COURT:  Ms. Buchert, if you got one more question or --

MS. BUCHERT:  This would be a perfect time to break.

THE COURT:  All right.  So we will be in recess until 12:15.  One of the hearings I need to take up over the lunch hour will likely be a sealed hearing.  So if the parties come and find that doors are locked, it's not that we're kicking you out, we're just in a sealed hearing for the moment but hopefully we'll get back on the record in this matter at 1:15.

Thank you very much.  Doctor, while we're on a break, you're not to discuss your testimony with other side.

All right.  Thank you all very much.  We're in recess

UNITED STATES DISTRICT COURT

1020

until 1:15.


(Proceedings conclude at 12:15)

---oOo---

UNITED STATES DISTRICT COURT

**5-ER-1081**

1021

## C E R T I F I C A T E

I, ANDREA K. BLUEDORN, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 16th day of May, 2025.

_/s/ Andrea Bluedorn_
Andrea K. Bluedorn, RMR, CRR

UNITED STATES DISTRICT COURT

**5-ER-1082**