No. 25-6813

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

EMALEE R. WAGONER,

Plaintiff-Appellee

v.

JENNIFER WINKELMAN, Commissioner of Alaska Department of Corrections,

Defendant-Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ALASKA

# BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT AND SUPPORTING REVERSAL

HARMEET K. DHILLON
Assistant Attorney General
JESUS A. OSETE
Principal Deputy Assistant Attorney General
R. JONAS GEISSLER
Deputy Assistant Attorney General
GREGORY DOLIN, M.D.
Senior Counsel
ANDREW G. BRANIFF
Attorney
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 598-0243

# TABLE OF CONTENTS


PAGE

INTEREST OF THE UNITED STATES ............................................................ 1

INTRODUCTION ............................................................................................ 1

STATEMENT OF THE ISSUES ...................................................................... 8

ARGUMENT .................................................................................................... 8

I. The Eighth Amendment does not require "Gender Affirming" surgery in these circumstances. ............................................................8

A. The Eighth Amendment does not require provision of elective and highly contested medical interventions .............8

B. WPATH guidelines are not evidence of universal medical consensus. ....................................................................14

II. *Edmo* does not require "Gender Affirming" surgery in this case.... ...18

A. Important factual differences between *Edmo* and the present case compel a different result here ...............................18

B. Trial Court's overly broad reading of *Edmo* has no logical stopping point. .............................................................22

III. In the alternative, *Edmo* was wrongly decided and should be overruled. .......................................................................................25

CONCLUSION ................................................................................................ 28

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**CASES:** **PAGE**


*Balla v. Idaho*, 29 F.4th 1019 (9th Cir. 2022) ........................................................26

*Carley v. Aranas*, 103 F.4th 653 (9th Cir. 2024)........................................... 8, 9, 11

*Clark v. Valetta*, 157 F.4th 201 (2d Cir. 2025)................................ 7, 15, 17, 28, 29

*Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) .................................... *passim*

*Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103 (D. Idaho 2018)..................19

*Eknes-Tucker v. Governor*, 114 F.4th 1241 (11th Cir. 2024).......................... 15, 16

*Estelle v. Gamble*, 429 U.S. 97 (1976) ................................................... 8, 9, 11, 29

*Farmer v. Brennan*, 511 U.S. 825 (1994) ..............................................................9

*Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019)........................................ 14, 15, 27

*Hallett v. Morgan*, 296 F.3d 732 (9th Cir. 2002)...............................................8, 14

*Hamby v. Hammond*, 821 F.3d 1085 (9th Cir. 2016) ............................................11

*Hoffer v. Secretary, Florida Dep't of Corr.*,
973 F.3d 1263 (11th Cir. 2020)................................................ 11, 12, 21, 26

*Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014)................................. 18, 19, 20, 22

*Lochner v. New York*, 198 U.S. 45 (1905)............................................................29

*Lange v. Houston Cnty.*, 152 F.4th 1245 (11th Cir. 2025) ....................................14

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003)......................................................7

*Norsworthy v. Espinoza*, 2025 WL 1684180 (E.D. Cal. June 16, 2025)................ 14

*Porretti v. Dzurenda*, 11 F.4th 1037 (9th Cir. 2021)........................... 11, 20, 21, 28

**CASES (continued):** **Page**

*Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018)............................................ 12, 13

*United States v. Skrmetti*, 605 U.S. 495 (2025) ................................ 5, 9, 16, 17, 18

*Wilson v. Seiter*, 501 U.S. 294 (1991) ......................................................................9

**CONSTITUTION:**

U.S. Const., Amend. 8 ............................................................................. *passim*

**STATUTES:**

18 U.S.C. 242 ...........................................................................................................4

28 U.S.C. 1291 .........................................................................................................2

**RULES:**

Fed. R. App. P. 29(a)(2)............................................................................................1

9th Cir. Local R. 29-2(a)...........................................................................................1

**MISCELLANEOUS:**

American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2022) .................................................. 3, 21, 22, 24

Andrew Jacobs, *Doctors' Group Endorses Restrictions on Gender-Related Surgery for Minors*, N.Y. Times (Feb. 4, 2026) ........................................................................ 17

Carol L. Alter, M.D., and Steven A. Epstein, Wilkins, Kaplan & Sadock's Comprehensive Textbook of Psychiatry, (10th ed. 2014).............................25

E. Coleman *et al.*, *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23 Int'l J. Transgender Health (2022) .....................................................5, 10

**MISCELLANEOUS (continued):** **PAGE**

Fed. Bureau of Prisons,
Program Statement 5260.01 (Feb. 19, 2026)....................................................3

H. Cass, Independent Review of Gender Identity Services
for Children and Young People:
Final Report 13 (Apr. 2024) ..........................................................................17

Joseph Goldstein, *The Transgender Cancer Patient and*
*What She Heard on Tape*, N.Y. Times (Dec. 1, 2025)....................................24

Joshua E. Lewis, *et al.*, *Examining Gender-Specific Mental Health Risks*
*after Gender-Affirming Surgery: A National Database Study*,
22 J. Sex. Med. 645 (2025)..............................................................................28

Kai Dallas, *et al.*, *Complications After Gender Affirming*
*Vaginoplasty in a Large Population-Based Cohort*,
206 J. Urology e541 (2021)...................................................................... 27, 28

S. Higgins & A. Wysong, *Cosmetic Surgery and Body*
*Dysmorphic Disorder—An Update*,
4 Int'l J. Women's Derm. 43 (2017) ...............................................................25

The CODA Collaborative, *A Randomized Trial Comparing*
*Antibiotics with Appendectomy for Appendicitis*,
338 N.E. J. Med. 1907 (2020) .........................................................................10

World Professional Association for
Transgender Health (WPATH) (8th ed. 2022).................................... 4, 15, 16

Zainab Yusufali Motiwala, *et al.*, *Postoperative Urogynecologic*
*Complications After Gender-Affirming Surgery:*
*A Narrative Review*, Int'l Urogynecology J. (2025) .......................................28

## INTEREST OF THE UNITED STATES

The United States has a substantial interest in this appeal, which involves the standard for evaluating constitutional rights of incarcerated trans-identifying individuals, as well as the obligations of state and federal correctional institutions with respect to such individuals. The United States is permitted to file this brief without the consent of the parties or leave of the Court. Fed. R. App. P. 29(a)(2); 9th Cir. Local R. 29-2(a).

## INTRODUCTION

The Eighth Amendment's prohibition on cruel and unusual punishment does not require prison officials to provide inmates with elective and disputed medical interventions. But in this case, the district court held that a biologically male inmate—with a record of severe mental illness and self-mutilation (including for the express purpose of being moved to a women's facility), and who had responded favorably to less extreme treatment—had a constitutional right to taxpayer-funded "gender affirming" surgery. That expansive misapplication of the Eighth Amendment threatens dire consequences for prison officials and cries out for this Court's correction.

Plaintiff Emalee R. Wagoner (previously known as Emmanuel Cancel) is serving a sentence of 60 years' imprisonment (with 20 years suspended) under the supervision of the Alaska Department of Corrections (ADOC) following a guilty

plea to three counts of first-degree sexual abuse of a minor. Wagoner sexually abused Wagoner's biological daughter, Wagoner's stepchildren, and the daughter of a family friend over a period of approximately ten years. Before going to prison, and for the first few years of incarceration, Wagoner lived as a male. In 2016, while incarcerated, Wagoner began to "transition" from male to female. 1-ER-26.[1]

While in prison, Wagoner has engaged in self-harm. Specifically, on August 21, 2016, Wagoner used a razor blade to cut Wagoner's penis down the shaft with the goal of tucking it in to create a vagina. 1-ER-26. Wagoner then lied about the cause of the penile injury by claiming that it was an accident, before finally admitting that it was an attempt at "self-surgery." 1-ER-26. After this attempt at penile self-surgery, Wagoner wrote to Wagoner's female then-fiancée, admitting that the attempted self-surgery would permit both of them to live together in the ADOC facilities.[2] 1-ER-26-27.[3] Wagoner reinjured the penis in 2017, requiring hospitalization. 1-ER-27. Wagoner again lied about the cause of the injury,

[1] "__-ER-__" refers to the volume and page numbers in the Excerpts of Record filed with appellant's opening brief.

[2] While Wagoner's then-fiancée was not incarcerated, Wagoner's plan was apparently to be transferred to a women's facility where the fiancée could then also be housed once she committed an appropriate crime that would result in imprisonment.

[3]

claiming that it was an accident before finally admitting that it was another attempt at "self-surgery." 1-ER-27. Wagoner continues to commit acts of self-harm, including attempting to crush Wagoner's testicles in hopes of preventing testicles from continuing to produce testosterone.

Given this medical history, the parties have stipulated that Wagoner experiences gender dysphoria. 1-ER-46. Additionally, it is undisputed that Wagoner suffers from Borderline Personality Disorder. 1-ER-32-35.

ADOC has dealt with Wagoner's gender dysphoria in various ways.[4] For example, Wagoner has received women's deodorant and cosmetics, feminine hair accessories and styling instruments, and women's undergarments (1-ER-28), medical treatment for problems stemming from penile injuries (1-ER-28-29), and substantial mental health care (1-ER-29-30). Starting sometime in 2021, under the supervision of Dr. Rachel Samuelson—a physician ADOC retained to help address Wagoner's gender dysphoria—Wagoner also began receiving hormone therapy. 1-ER-30. Wagoner testified that after beginning hormone therapy, Wagoner felt a "nice calm" and "rather peaceful." 1-ER-30.

[4] The United States does not concede that hormonal, surgical, or "social transition" interventions are "medically necessary" in this or any other case. *See* Fed. Bureau of Prisons, Program Statement 5260.01 (Feb. 19, 2026). However, in this case the Court need not reach those issues to conclude that ADOC did not violate the Eighth Amendment.

In April 2023, Dr. Samuelson recommended that Wagoner be referred to a surgeon for evaluation for "gender affirming" surgery. 1-ER-31. ADOC's policies do not categorically prohibit providing such surgeries, but require individual assessments that consider relevant medical guidelines. 1-ER-23-24. ADOC has not adopted, but considers, as part of its individualized assessment, current guidelines for medical intervention for patients diagnosed with gender dysphoria published by the World Professional Association for Transgender Health (WPATH) (8th ed. 2022). 1-ER-15, 1-ER-23-24.

ADOC's Medical Advisory Committee considered the specifics of Wagoner's case, including a lack of sufficient evidence of a long-term benefits; a potential for harm in mental and physical health if the requested surgeries are expedited or approved; Wagoner's lack of objective signs of deterioration in mental health since beginning to receive hormones; and concerns that Wagoner would be non-compliant with long-term, post-surgical care requirements given Wagoner's past patterns of behavior. 1-ER-31. On the basis of these considerations, ADOC denied the referral. 1-ER-31.

Wagoner filed suit. Relying almost exclusively on *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) (per curiam), the district court held that ADOC's denial of Wagoner's request for "gender affirming" surgery violates the Eighth Amendment. But the trial court expressed its deep discomfort with *Edmo*. 1-ER-51-56.

Specifically, the trial court noted that but for *Edmo*, it "would have placed much more weight on the inexperience of" Wagoner's experts (both of whom also served as experts in *Edmo*) in dealing with patients in prison. 1-ER-52. The court also observed that the World Professional Association for Transgender Health (WPATH) guidelines relied on by the *Edmo* Court are deficient because "WPATH appears to rest [its] conclusion[s] on self-referencing consensus rather than evidence-based research, which may help explain the group's confidence in the face of concededly inadequate evidence." 1-ER-53-54 (quoting *United States v. Skrmetti*, 605 U.S. 495, 544 (2025) (Thomas, J., concurring)). The court also observed that these guidelines are "entirely devoid of any recommendations" when it comes to "the unfortunate and unavoidable realities of custodial care." 1-ER-52.[5] Perhaps most importantly, the court recognized that "giving judicial imprimatur to what is fundamentally a medical question" subject to ongoing scientific debate is improper. 1-ER-53. The Court nevertheless ruled for Wagoner.

[5] The guidelines do have a separate section dedicated to "institutional environments," E. Coleman *et al.*, *Standards of Care for the Health of Transgender and Gender Diverse People*, 23 Int'l J. Transgender Health S106-S109 (8th ed. 2022), https://tinyurl.com/y8u6u5k3 (SOC-8); however, and as explained below, that section cites no scientific or medical studies. Furthermore, the guidelines do not address problems peculiar to custodial situations such as security, availability of surgical follow-up care, and the like.

That was error. To start, the Eighth Amendment is violated only when prison officials make medical choices that are "medically unacceptable." That high bar cannot be met when the appropriate course of treatment is disputed among medical experts. And such disagreement is rampant in the area of transgender medicine generally—to say nothing of the unique context of prisons. The WPATH guidelines relied upon by the trial court do not reflect medical consensus. Any suggestion that surgery was indisputably required in this case is beyond the pale—and would imply that prison officials must provide a wide range of dubious treatments to prisoners with taxpayer funds.

This Court's precedent does not require a different result. *Edmo* is all but limited to its facts. *See* 935 F.3d at 767 ("We also emphasize that the analysis here is individual to Edmo and rests on the record in this case. We do not endeavor to project whether individuals in other cases will meet the threshold to establish an Eighth Amendment violation."). What made a difference in that case was parties' failure to raise any prison security interests or to dispute that WPATH guidelines dictated the Eighth Amendment analysis, which resulted in a very different record than in this case. Here, the government provided evidence of important prison security concerns, and evidence that the WPATH guidelines (the applicability of which parties do dispute) do not dictate the analysis.

If *Edmo*'s reasoning somehow did require the district court's conclusion, this Court should nonetheless disregard *Edmo* given that the *Skrmetti* Court calls into questions its precedential value. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc) (holding "where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority, and should reject the prior circuit opinion as having been effectively overruled). In the seven years since *Edmo*, it has become even more clear that WPATH guidelines cannot be imported into the Eighth Amendment's Cruel and Unusual Punishment clause, as multiple courts and jurists have recognized. That all but eliminates *Edmo*'s precedential force. Ultimately, there is clearly no medical consensus that an inmate like Wagoner must be provided with "gender affirming" surgery with taxpayer funds. Indeed, the Second Circuit has recently characterized *Edmo* as "the Ninth Circuit's stray decision," and like "the other courts of appeals to address the issue . . . decline to follow [it]." *Clark v. Valletta*, 157 F.4th 201, 214 (2d Cir. 2025). Importantly, ten judges dissented from the denial of rehearing en banc:

> With its decision today, our court becomes the first federal court of appeals to mandate that a State pay for and provide sex-reassignment surgery to a prisoner under the Eighth Amendment. The three-judge panel's conclusion—that any alternative course of treatment would be "cruel and unusual punishment"—is as unjustified as it is unprecedented. To reach such a conclusion, the court creates a circuit

> split, substitutes the medical conclusions of federal judges for the clinical judgments of prisoners' treating physicians, redefines the familiar "deliberate indifference" standard, and, in the end, constitutionally enshrines precise and partisan treatment criteria in what is a new, rapidly changing, and highly controversial area of medical practice.

*Edmo v. Corizon, Inc.*, 949 F.3d 489, 490 (9th Cir. 2020) (O'Scannlain, J., respecting the denial of rehearing en banc). *See also ibid.* at 505 (Collins, J., dissenting from the denial of rehearing en banc); *ibid*. (Bumatay, J., dissenting from the denial of rehearing en banc).

## STATEMENT OF THE ISSUES

1. Whether the Eighth Amendment, as interpreted by this Court in *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) (per curiam), requires the provision of "gender affirming" surgeries to inmates diagnosed with gender dysphoria under the circumstances of this case; and

2. Whether *Edmo* should be overruled.

## ARGUMENT

### I. The Eighth Amendment does not require "Gender Affirming" surgery in these circumstances.

#### A. The Eighth Amendment does not require provision of elective and highly contested medical interventions.

The Eighth Amendment prohibits the denial of necessary medical treatment to prisoners. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). But it does not require the State to provide inmates with "best treatment and practice." *Carley v. Aranas*,

103 F.4th 653, 661 (9th Cir. 2024). Indeed, even negligence or medical malpractice alone does not rise to the level "cruel and unusual punishment." *See, e.g.*, *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002). Instead, the Eighth Amendment prohibits only "deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 104. Deliberate indifference requires a showing that the officials had subjective knowledge of a risk of serious harm yet acted with subjective recklessness. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). That subjective intent is necessary because "the Eighth Amendment . . . bans only cruel and unusual punishment." *Wilson v. Seiter*, 501 U.S. 294, 300 (1991) (emphasis omitted). Thus, "the plaintiff must show that the course of treatment the [doctors] chose was medically unacceptable under the circumstances and that the [defendants] chose this course in conscious disregard of an excessive risk to the plaintiff's health." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 786 (9th Cir. 2019) (per curiam) (citation omitted). It follows that "a difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Ibid.* (alteration and citation omitted).

A proper application of this exacting standard necessarily forecloses Wagoner's Eighth Amendment claim, which depends entirely on the WPATH guidelines. Given the debate surrounding appropriate care of trans-identifying individuals, *see United States v. Skrmetti*, 605 U.S. 495, 525 (2025) (noting the

"fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field" of transgender medicine), those WPATH guidelines do not reflect a "medical standard [that i]s so well established that the failure to prescribe the course of treatment [in accordance with these guidelines] could only be considered deliberate indifference within the meaning of the Eighth Amendment," *Carley*, 103 F.4th at 661.

Indeed, the WPATH guidelines themselves disclaim that they constitute a recommendation for any particular or specific course of intervention applicable to all or even a majority of individuals presenting with gender dysphoria. The introduction to the guidelines cautions that "[t]ransgender healthcare is a rapidly evolving interdisciplinary field," and that as a result the "guidelines are intended to be flexible" and "adaptable," permitting "individual health care professionals and programs [to] modify" them as appropriate. E. Coleman *et al.*, *Standards of Care for the Health of Transgender and Gender Diverse People*, 23 Int'l J. Transgender Health S3 (8th ed. 2022), https://tinyurl.com/y8u6u5k3 (SOC-8). In this sense, medical interventions for gender dysphoria are not similar to medical interventions for, say appendicitis, where clinical consensus has existed for decades and only two approaches are appropriate—surgical intervention or, in some uncomplicated cases, antibiotics. *See, e.g.*, The CODA Collaborative, *A Randomized Trial Comparing Antibiotics with Appendectomy for Appendicitis*, 338 New Eng. J. Med. 1907 (2020).

The lack of medical consensus when it comes to the necessity or even propriety of surgical interventions for trans-identifying individuals necessarily means that surgery is not a "medical *need[]*," *Estelle*, 429 U.S. at 104 (emphasis added), but, at most, a medical *option*. Declining to provide a particular medical option (especially when coupled with provision of other care, such as psychological and psychiatric treatment so as to reduce symptoms of dysphoria including depression, anxiety, suicidal ideation, etc.) is evidence not of "deliberate indifference to serious medical needs" of the inmate, *ibid.*, but merely "a difference of opinion between a physician and the prisoner," *Hamby v. Hammond*, 821 F.3d 1085, 1092 (2016). In addition, to the extent that appropriate medical intervention for gender dysphoria (or any other condition) is debatable even among experts, "mere disagreement of medical opinion between experts does not demonstrate deliberate indifference as a matter of law." *Porretti v. Dzurenda*, 11 F.4th 1037, 1048 (9th Cir. 2021).

The courts of appeals have applied this logic in a variety of contexts. The Eleventh Circuit's opinion in *Hoffer v. Secretary, Florida Department of Corrections*, 973 F.3d 1263 (11th Cir. 2020) (endorsed by this Court in *Carley*, 103 F.4th at 661-662) is instructive. There, an inmate alleged that Florida prison officials violated the Eighth Amendment because they refused to provide certain antiviral treatment for his Hepatitis C (HCV). At trial, experts credibly disagreed as to

whether all HCV-infected patients, or only those in whom the disease has most progressed, should be treated with the requested drugs. *Hoffer*, 973 F.3d at 1267-1268. Prison officials opined that while early-stage disease patients *can* benefit from treatment, they "don't need to be treated immediately," and could instead be monitored until the illness progressed to later stages. *Id.* at 1268. The plaintiff's expert, on the other hand, relying on "guidelines published by the American Association for the Study of Liver Diseases and the Infectious Diseases Society of America," opined that the requested treatment should be provided for all chronic HCV patients. *Ibid.* Faced with these facts, the Eleventh Circuit concluded that Florida was not "*refusing or denying* medical care to any HCV-positive inmate." *Id.* at 1272. Rather, it was "not . . . providing [early stage] inmates the particular course of treatment that they and their experts want." *Ibid*. Though Florida's decision differed from certain professional medical guidelines, it satisfied State's Eighth Amendment obligations.

Along the same lines, the Sixth Circuit has held that, even if an inmate could show that a liver transplant was necessary to treat a condition, refusal to provide one does not violate the Eight Amendment when the treating physician believed that the inmate would not be a good candidate. *Rhinehart v. Scutt*, 894 F.3d 721, 750 (6th Cir. 2018). Nor was it an Eighth Amendment violation to decline to provide a "TIPS [transjugular intrahepatic portosystemic shunt]" which is a "gold standard" for

treating patients with the conditions that the inmate in *Rhinehart* had. *Ibid.* (citation omitted). As the Court explained, "even if the [prisoner] had established that a [shunt] procedure was necessary to alleviate [his] pain, and that the pain medication he received was inadequate for doing so, [his] claim would still fail because no reasonable jury could find that [prison officials] acted with deliberate indifference when [they] denied" the shunt procedure. *Ibid.*

The same logic applies here. ADOC has provided extensive medical, psychiatric, and social care to Wagoner. 1-ER-28-30. That care was not "medically unacceptable under the circumstances," and ADOC did not choose it "in conscious disregard of an excessive risk to the plaintiff's health." *Edmo*, 935 F.3d at 786 (citation omitted). To the contrary, in considering Wagoner's request for "gender affirming" surgery, ADOC investigated and chose to consider multiple factors including: whether surgery was medically necessary, the likely long-term benefits of surgery, the potential for harm to Wagoner's mental and physical health, Wagoner's current mental health status, and capacity for compliance with post-surgical care. 1-ER-31.[6] That ADOC's decision may differ from the course of

[6] The last concern was amply supported by Wagoner's history. According to prison records, Wagoner was frequently uncooperative and non-compliant with the treatment plans. At various times, Wagoner declined to take medication for depression and anxiety, refused to use dialectic behavior therapy workbooks (which are considered to be the "gold standard" for treatment of borderline personality disorder (*see* 1-ER-34)), was non-cooperative during mental-health appointments,

action recommended by WPATH does not show that Wagoner's medical needs were deliberately ignored.

### B. WPATH guidelines are not evidence of universal medical consensus.

Prison officials do not violate the Eighth Amendment merely because the treatment that they provide falls below an accepted standard of care. *Hallett*, 296 F.3d at 744. *A fortiori*, they do not run afoul of their constitutional obligations when they decline to provide elective, highly contested, medically debated, and ultimately dubious interventions. The WPATH guidelines certainly do not resolve this ongoing debate.

Publicly available evidence and recent litigation show that WPATH guidelines "reflect not consensus, but merely one side in a sharply contested medical

---

and occasionally even claimed not to want continued administration of hormones. *See* 6-ER-1350; 7-ER-1572, 7-ER-1574-1575, 7-ER-1577; 8-ER-1663, 8-ER-1693-1703.

That is especially true because post-surgical care in this context is highly complex. *See Lange v. Houston Cnty.*, 152 F.4th 1245, 1250 (11th Cir. 2025) (en banc) ("After the procedure, the patient must undergo an extensive regimen of post-surgery dilatation to prevent the closure of the neovagina.") (citation and internal quotations omitted); *Norsworthy v. Espinoza*, No. 1:20-cv-813, 2025 WL 1684180, at *11 (E.D. Cal. June 16, 2025) (noting that some "patients [must] dilate three times per day for the first three months after the creation of the neovagina"). As Wagoner's own expert recognized, failure to adhere to these protocols may create additional medical problems. *See* 2-ER-146, 2-ER-211.

debate over sex reassignment surgery." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019). *See also Skrmetti*, 605 U.S. at 525 (noting the "fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field" of transgender medicine); *Clark v. Valletta*, 157 F.4th 201, 216 (2d Cir. 2025) ("[T]here is considerable growing disagreement within the medical and scientific communities on how to best treat people with gender dysphoria.") (citation and internal quotations marks omitted).

Indeed, WPATH guidelines arrived at a purported consensus only by systematically excluding opposing viewpoints, omitting inconvenient research results, and censuring critics. WPATH only selected "advocate[s] for transitioning treatments" to be contributors to its guidelines. Alabama Amicus Merits Br. at 10-11, *Skrmetti*, *supra* (No. 23-477 Oct. 15, 2024) (citing to the record in the case and including a quote from Dr. Marci Bowers, a WPATH president, stating it was "important" for each author "to be an advocate for [transitioning] treatments before the guidelines were created") (brackets in original; citations omitted)). During the drafting process, WPATH revised its guidelines not in response to any new studies, but in response to political pressure and litigation strategies. *See id.* at 15-23 (detailing the pressure applied by then-Assistant Secretary for Health Admiral Rachel Levine on the authors of the guidelines, and subsequent changes to the guidelines); *see also Eknes-Tucker v. Governor*, 114 F.4th 1241, 1247, 1261 (11th

Cir. 2024) (Lagoa, J., concurring in denial of rehearing en banc) ("[R]ecent revelations indicate that WPATH's lodestar is ideology, not science."), *certs. dismissed*, 145 S. Ct. 838 and 145 S. Ct. 2290 (2025). WPATH also has hindered publication of studies that called its conclusions into question. *See* Alabama Amicus Merits Br. at 32-34, *Skrmetti*, *supra*. As Justice Thomas observed, the resulting WPATH guidelines are merely "self-referencing consensus rather than evidence-based research." *Skrmetti*, 605 U.S. at 526, 544 (Thomas, J., concurring).

Recent studies demonstrate that at least some of the claims made by WPATH are debatable at best and lacking any scientific basis at worst. For example, WPATH recommends that "staff and professionals charged with providing health care to [trans-identifying] individuals living in institutions recommend and support gender-affirming surgical treatments in accordance with SOC-8, when sought by the individual, without undue delay." SOC-8, at S106. But the citations in support of this recommendation consist entirely of court cases (including this Court's decision in *Edmo*) and do not provide a single citation to any medical or scientific study. *Id.* at S106-107.

Recent scientific scrutiny of WPATH guidelines further expose the lack of any "consensus." For example, under WPATH guidelines, "gender affirming" hormonal intervention and surgery should be recommended to minors meeting certain criteria. *See* SOC-8, at S48. However, "a report commissioned by England's

National Health Service (NHS England) characterized the evidence concerning the use of puberty blockers and hormones to treat transgender minors as 'remarkably weak,' concluding that there is 'no good evidence on the long-term outcomes of interventions to manage gender-related distress.'" *Skrmetti*, 605 U.S. at 524 (quoting H. Cass, Independent Review of Gender Identity Services for Children and Young People: Final Report 13 (Apr. 2024)). Despite the consensus supposedly reflected in WPATH guidelines, "[H]ealth authorities in a number of European countries have raised significant concerns regarding the potential harms associated with using puberty blockers and hormones to treat transgender minors." *Id.* at 505. Indeed, just in the past few months, the American Society of Plastic Surgeons rejected the propriety of "gender affirming" surgeries for minors and the American Medical Association has followed suit. *See* Andrew Jacobs, *Doctors' Group Endorses Restrictions on Gender-Related Surgery for Minors*, N.Y. Times (Feb. 4, 2026), https://tinyurl.com/yc3sz7d9. Both organizations pointed out that evidence supporting such interventions was "low quality" and "insufficient." *Ibid.*

Though these examples are about "gender affirming" interventions for minors rather than adults, they show that transgender medicine is far from settled science. And in any event, the same debate exists when it comes to adult transgender medicine. *See Skrmetti*, 605 U.S. at 524-525; *Clark*, 157 F.4th at 216 (noting that "medical experts disagree about how to treat gender dysphoria," and that "there is

considerable growing disagreement within the medical and scientific communities on how to best treat people with" this condition) (citation and internal quotations marks omitted).

Because WPATH guidelines do not represent a genuine medical consensus, a state's failure to follow these guidelines is not medically unacceptable, let alone an Eighth Amendment violation.

## II. *Edmo* does not require "Gender Affirming" surgery in this case.

### A. Important factual differences between *Edmo* and the present case compel a different result here.

Despite the trial court's lack of comfort with this Court's decision in *Edmo* (*see* 1-ER-51-56), the court concluded that *Edmo* mandated judgment in favor of Wagoner. However, a close reading of *Edmo* confirms that Wagoner's Eighth Amendment claim fails.

In *Edmo*, this Court recognized that in addressing the medical needs of trans-identifying inmates, as in any other context, where "two courses or treatment . . . [a]re medically acceptable," it is "not [a court's] place to 'second guess medical judgments' or to require that [correctional institutions] adopt the more compassionate of two adequate options." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 797 (9th Cir. 2019) (per curiam) (quoting *Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014) (en banc)). Thus, this Court did not hold that the Eighth Amendment requires "gender affirming" surgeries for inmates suffering from gender dysphoria. Rather,

this Court held that on the unique facts and particular legal theories raised by parties to that case, Idaho had violated the Eighth Amendment when it refused to provide such surgery to a particular inmate. This Court "emphasize[d] that [its] analysis . . . is individual to Edmo and rest[ed] on the record in th[at] case." *Id.* at 767. This Court did "not endeavor to project whether individuals in other cases will meet the threshold to establish an Eighth Amendment violation." *Ibid*.

Two crucial factors set this case apart from *Edmo*. First, in *Edmo* there was no genuine disagreement among experts because it was "undisputed" that the "WPATH Standards of Care" were the "starting point in determining the appropriate treatment for gender dysphoric individuals." 935 F.3d at 787. The trial court in *Edmo* deemed the Idaho's experts' testimony "illogical and unpersuasive" insofar as those experts purported to apply "WPATH criteri[a]," and therefore permissibly discounted it. *Id.* at 789. Second, in *Edmo*, Idaho advanced no other reasons for denying the surgery to the plaintiff. *See id.* at 794 (noting that Idaho did not argue that security concerns affected its decision). Given that unique record, this Court required Idaho to provide the inmate with "gender affirming" surgery, but it "emphatically d[id] not speak to other cases." *Id*. at 803. In highlighting all these facts, this Court emphasized that its opinion "mirror[ed] the First Circuit's" in *Kosilek*, even though the First Circuit reached the opposite result. *Id.* at 794 ("[I]mportant factual differences between cases yield different outcomes.").

Wagoner's situation aligns with the facts of *Kosilek*, rather than the facts of *Edmo*. *First*, unlike in *Edmo*, where the trial judge "credited the testimony of Edmo's experts," but "gave 'virtually no weight' to the opinions of the State's experts," 935 F.3d at 787 (quoting *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1126 (D. Idaho 2018)), here the trial court found both Wagoner's and ADOC's experts to be credible. *See* 1-ER-17-22.[7] In fact, the trial court found that only one expert—supporting ADOC—had experience in transgender medicine within the correctional environment. Additionally, unlike in *Edmo*, prison officials here found that surgery was contra-indicated for Wagoner. 1-ER-31. By contrast, in *Edmo*, prison officials simply argued that they understood WPATH guidelines did not warrant surgery. Thus, unlike *Edmo* (but like *Kosilek*) this case presents a battle of the experts. *See Edmo*, 935 F.3d at 794 (explaining that in *Kosilek*, "credited expert testimony disagreed as to whether [gender affirming surgery] was medically necessary"). Simply put, *Edmo* found an Eighth Amendment violation *because* it found prison's experts not credible, whereas the trial court in this case found an Eighth Amendment violation *despite* fully crediting ADOC's experts. That was

[7] Although it deemed them credible, the trial court noted that neither of Wagoner's experts has any expertise in "treating inmates with gender dysphoria who are currently incarcerated," or any "formal training in prison operations or security." 1-ER-18 (regarding Dr. Randi Ettner). *See also* 1-ER-19 (similar critique regarding Dr. Ryan N. Gorton).

error because the fact of expert disagreement that is "medically acceptable under the circumstances" alone forecloses an Eighth Amendment challenge. *See Porretti v. Dzurenda*, 11 F.4th 1037, 1048 (9th Cir. 2021) (citation omitted).

*Second*, Wagoner, unlike the plaintiff in *Edmo*, has demonstrated marked improvement in psychiatric symptoms as a result of hormonal therapy coupled with mental health treatment and provision of various feminine products. *See* 1-ER-30. This indicates that, even if hormone therapy did not alleviate all of Wagoner's psychological symptoms, the approach was not "so grossly incompetent [or] inadequate . . . as to shock the conscience." *Hoffer v. Secretary, Florida Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020) (citation omitted). Thus, as in *Kosilek*, "the prisoner's active treatment plan . . . had led to a significant stabilization in . . . mental state." *Edmo*, 935 F.3d at 794 (quoting *Kosilek*, 774 F.3d at 90). By contrast, in *Edmo*, the plaintiff was continually "depressed, embarrassed, [and] disgusted" by Edmo's own male genitalia. *Id.* at 772 (brackets in original). Moreover, it is possible that Wagoner's initial self-mutilation stemmed from plaintiff's expressed goal to be transferred to a female prison with easier access to Wagoner's then-fiancée. ADOC's physicians cited the possibility of manipulation and seeking secondary gain as some of the reasons why "gender affirming" surgery is not an appropriate next step for Wagoner. *See* 1-ER-24-25. Nothing like that was at issue in *Edmo*.

*Third*, unlike in *Edmo*, Wagoner has a confounding diagnosis of borderline personality disorder. 1-ER-32-35. It is undisputed that Wagoner's borderline personality disorder "remains active." 1-ER-32. As the trial court explained (citing the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed.) ("DSM-5")), this disorder is characterized by

> [F]rantic efforts to avoid real or imagined abandonment; a pattern of unstable and intense interpersonal relationships; identity disturbance: markedly and persistently *unstable self-image or sense of self*; impulsivity in at least two potentially self-damaging areas;recurrent suicidal behavior, gestures, or threats, or *self-mutilating behavior*; affective instability due to a marked reactivity of mood; chronic feelings of emptiness; inappropriate, intense anger or difficulty controlling anger;" and transient, stress-related paranoid ideation or severe dissociative symptoms.

1-ER-32-33 (quoting DSM-5) (emphasis added). Wagoner's self-mutilation, depression, and other symptoms, are thus explainable by borderline personality disorder and ADOC experts so testified. *See* 1-ER-33-34. The trial court credited ADOC expert Dr. Penn's testimony that "[t]reatment of an inmate who had gender dysphoria with co-occurring borderline personality disorder through workbooks would also be acceptable." 1-ER-34. The mere fact that Wagoner's experts believe that a different and more radical intervention is called for in this case does not mean that the Eighth Amendment requires that ADOC undertake such an intervention.

In sum, *Edmo* approved of *Kosilek* while highlighting its distinguishable facts. The facts here resemble those in *Kosilek*, not *Edmo*. The outcome should likewise follow *Kosilek*, not *Edmo*.

### B. Trial Court's overly broad reading of *Edmo* has no logical stopping point.

Were this Court to approve the trial court's broad (albeit reluctant) reading of *Edmo*, there could be serious consequences for Eighth Amendment jurisprudence more generally.

The DSM-5 defines gender dysphoria as, *inter alia*, "[a] strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender," and/or "[a] strong desire for the primary and/or secondary sex characteristics of the other gender." 1-ER-14 (quoting DSM-5). Primary sex characteristics are physical reproductive organs that are present at birth (*i.e.*, a penis or a vagina), whereas secondary sex characteristics include non-reproductive traits associated with a given sex (*e.g.*, breasts for women, facial hair and laryngeal prominence ("Adam's apple") for men). A person with gender dysphoria may be discomfited not only because of a presence of an undesired reproductive organ, but also as a result of any appearances that are more congruent with his or her immutable biological sex rather than self-identified gender.

Under the trial court's overly broad reading of *Edmo*, it may be an Eighth Amendment violation to refuse to provide such a person with all sorts of plastic

surgery. *See Edmo*, 935 F.3d at 770 (recognizing that "Standards of Care identify the following evidence-based treatment options for individuals with gender dysphoria . . . surgery to change primary and/or secondary sex characteristics (*e.g.*, breasts/chest, external and/or internal genitalia, facial features, body contouring)"). For example, in December 2025, the New York Times reported on a trans-identifying patient who, "to look more feminine . . . underwent a half-dozen procedures to feminize her face." Joseph Goldstein, *The Transgender Cancer Patient and What She Heard on Tape*, N.Y. Times (Dec. 1, 2025), https://tinyurl.com/y3dh35ux. As the New York Times describes it, "Her brow ridge was sanded down. Her orbital bone was shaved to give her eyes an upward tilt. Her square chin was softened. There were cheek implants. Changes to her nose, too." *Ibid.* And according to the patient, she "*needed* radical surgical intervention." *Ibid.* (emphasis added). If *Edmo* applies broadly as a matter of law regardless of the actual medical debate in this area, then inmates may demand an endless parade of elective

surgeries, regardless of whether there is significant debate as to whether such operations are medically necessary.[8]

The trial court's overly broad application of *Edmo* arguably cannot even be limited to inmates suffering from gender dysphoria. For example, DSM-5 defines body dysmorphic disorder as "[p]reoccupation with one or more perceived defects or flaws in physical appearance that are not observable or appear slight to others" and which cause "clinically significant distress or impairment in social, occupational or other areas of functioning." Carol L. Alter, M.D., and Steven A. Epstein, M.D., Wilkins, Kaplan & Sadock's Comprehensive Textbook of Psychiatry, Ch. 27.1 (10th ed. 2014). Traditionally, cosmetic surgery was viewed as contraindicated for patients with body dysmorphia, and the condition was addressed through psychiatric intervention. However, some recent studies suggest that cosmetic surgery may be part of appropriate intervention for this condition. *See* S. Higgins & A. Wysong, *Cosmetic Surgery and Body Dysmorphic Disorder—An Update*, 4 Int'l J. Women's Derm. 43 (2017). Under the trial court's expansive reading of *Edmo*, an inmate could potentially demand radical cosmetic procedures—*e.g.*, skin bleaching/dyeing, umbilicoplasty, and canthoplasty—absent any limiting principle. Inmates with all

[8] As discussed in more detail below, *see* Part III, *infra*, available data do not convincingly show that such surgeries help resolve the underlying psychiatric problem or the symptoms associated therewith.

sorts of medical conditions will be able to demand, on Eighth Amendment grounds, a wide range of elective treatments.[9] Such an outcome runs headlong into the principles that "medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hoffer*, 973 F.3d at 1271 (citation modified). And it confirms that *Edmo* should be limited to its facts.

## III. In the alternative, *Edmo* was wrongly decided and should be overruled.

If *Edmo* actually controls the outcome in this case, this Court should overrule it.[10] *Edmo* relied on a supposed consensus in the field of transgender medicine, as expressed by the WPATH guidelines, which both sides conceded were the proper standard. More recent developments have shown that this reliance was unwarranted, such that *Edmo* cannot stand.

---

[9] Under the trial court's broad reading of *Edmo*, for example, it may be an Eighth Amendment violation to deny a facelift to an aging inmate if such inmate's mental distress is severe enough. In the same vein, prison officials may be required to provide inmates with artificial insemination if their mental suffering stemming from an inability to procreate cannot be fully treated by mental health professionals. The absurdity of these propositions is a strong indicator that the trial court read *Edmo* far too broadly.

[10] The United States recognizes that a panel of this Court is "bound by the law of [the] circuit, and only an en banc court or the U.S. Supreme Court can overrule a prior panel decision." *Balla v. Idaho*, 29 F.4th 1019, 1028 (9th Cir. 2022). Accordingly, if the Court were to conclude that *Edmo* requires affirmance, the Court should take the matter en banc to overrule *Edmo*.

Just a few months before *Edmo* was decided, the Fifth Circuit held that "there is no consensus in the medical community about the necessity and efficacy of [gender affirming] surgery as a treatment for gender dysphoria," and that the "on-going medical debate doom[ed] [the inmate]'s claim." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019). The *Edmo* Court rejected this view concluding that the Fifth Circuit "relied on an incorrect, or at best outdated, premise: that there is no medical consensus that "gender affirming" surgery is a necessary or even effective treatment for gender dysphoria." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 795 (9th Cir. 2019) (per curiam) (citation modified). But the Fifth Circuit's characterization of "gender affirming" surgeries and WPATH guidelines has stood the test of time. *See Clark v. Valletta*, 157 F.4th 201, 216 (2d Cir. 2025) ("[T]here is considerable *growing disagreement* within the medical and scientific communities on how to best treat people with gender dysphoria.") (citation and internal quotations marks omitted; emphasis added).

Recent studies undermine *Edmo*'s assertion that "gender affirming" surgery is "safe" and "effective." *See Edmo*, 935 F.3d at 794. For example, a 2021 study in the Journal of Urology reported that more than a quarter of patients who have undergone vaginoplasty had complications, with half of this group requiring additional surgical intervention. *See* Kai Dallas, *et al.*, *Complications After Gender Affirming Vaginoplasty in a Large Population-Based Cohort*, 206 J. Urology e541

(2021), https://doi.org/10.1097/JU.0000000000002032.08; *see also* Zainab Yusufali Motiwala, *et al.*, *Postoperative Urogynecologic Complications After Gender-Affirming Surgery: A Narrative Review*, Int'l Urogynecology J. (2025), https://doi.org/10.1007/s00192-025-06405-6 (finding that "[u]rogynecology complications after ["gender affirming" surgery] are prevalent and significantly impact quality of life, contributing to dysphoria and distress"). A 2025 study showed that individuals who had surgical intervention for gender dysphoria showed a *higher* prevalence of depression and anxiety as compared to those without surgery. According to that study, "[f]eminizing individuals demonstrated particularly high risk for depression . . . and substance use disorders." Joshua E. Lewis, *et al.*, *Examining Gender-Specific Mental Health Risks after Gender-Affirming Surgery: A National Database Study*, 22 J. Sexual Med. 645 (2025), https://doi.org/10.1093/jsxmed/qdaf026. In other words, according to this study, surgery, far from being curative, makes matters *worse* for trans-identifying individuals.

It is because of the uncertainty and ongoing debate over the data that the guidance of various professional organizations, both in the United States and abroad, has shifted over the past half-decade. In light of the new studies casting significant doubt on WPATH guidelines, and the "considerable growing disagreement within the medical and scientific communities on how to best treat people with gender

dysphoria," *Clark*, 157 F.4th at 216 (citation omitted), *Edmo*'s conclusions are ripe to be reconsidered.

## CONCLUSION

The Constitution prohibits state officials from exhibiting "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). However, no Eighth Amendment claim can be maintained when state officials choose a particular course of treatment among several options, even if such a course of treatment is a subject of disagreement between various experts. *See Porretti v. Dzurenda*, 11 F.4th 1037, 1048 (9th Cir. 2021). Because, to paraphrase Justice Oliver Wendell Holmes, "the [Constitution] does not enact" WPATH's Standards of Care guidelines, *Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting), the mere fact that Alaska prison officials declined to follow them is insufficient for Plaintiff to prevail.

Accordingly, the judgment below should be reversed.

HARMEET K. DHILLON
Assistant Attorney General

JESUS A. OSETE
Principal Deputy Assistant Attorney General

R. JONAS GEISSLER
Deputy Assistant Attorney General

/s/ Gregory Dolin
GREGORY DOLIN, M.D.
Senior Counsel

ANDREW G. BRANIFF
Attorney
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 598-0243

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** No. 25-6813

I am the attorney or self-represented party.

**This brief contains** 6,554 **words,** including [ ] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated [ ].
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Gregory Dolin **Date** 03/25/26

*(use "s/[typed name]" to sign electronically-filed documents)*