No. 25-6813

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

EMALEE R. WAGONER,
*Plaintiff-Appellee,*

v.

JENNIFER WINKELMAN, Commissioner of Alaska Department of Corrections,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Alaska, No. 3:18-cv-00211-MMS
The Honorable Matthew McCrary Scoble

# BRIEF OF AMICI CURIAE INDIANA, IDAHO, 21 OTHER STATES, AND THE ARIZONA LEGISLATURE IN SUPPORT OF APPELLANT AND REVERSAL

RAÚL LABRADOR
Attorney General of Idaho

MICHAEL A. ZARIAN
Solicitor General

Office of the Idaho
Attorney General
700 W. Jefferson Street
Suite 210
Boise, ID 83720
(208) 334-2400
Michael.Zarian@ag.idaho.gov

THEODORE E. ROKITA
Attorney General of Indiana

JAMES A. BARTA
Solicitor General

Office of the Indiana
Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
James.Barta@atg.in.gov

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

As governmental parties, *amici curiae* are not required to file a disclosure statement. Fed. R. App. P. 26.1(a); 9th Cir. R. 29-1(b).

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......... ii

TABLE OF AUTHORITIES .......... iv

INTERESTS OF AMICI CURIAE .......... 1

SUMMARY OF THE ARGUMENT .......... 2

ARGUMENT .......... 5

I. The Eighth Amendment Does Not Require States to Provide Sex-Change Surgeries to Prisoners .......... 5

A. The Eighth Amendment does not require States to provide risky, controversial surgeries to inmates .......... 5

B. Sex-change surgery is a risky procedure with uncertain benefits that States may regulate .......... 8

II. This Court's Decision in *Edmo* Does Not Require Affirmance .......... 15

III. Plaintiff's Request for a Court-Ordered Surgery Raises Problems That Extend Beyond the Eighth Amendment .......... 21

CONCLUSION .......... 24

ADDITIONAL SIGNATORIES .......... 26

CERTIFICATE OF COMPLIANCE .......... 28

CERTIFICATE OF SERVICE .......... 29

## TABLE OF AUTHORITIES

**CASES**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .......... 18

*Barr v. Pearson*,
909 F.3d 919 (8th Cir. 2018) .......... 8

*Brown v. Plata*,
563 U.S. 493 (2011) .......... 23

*Bucklew v. Precythe*,
587 U.S. 119 (2019) .......... 6

*Christian Legal Soc. v. Martinez*,
561 U.S. 661 (2010) .......... 18

*City of Grants Pass v. Johnson*,
603 U.S. 520 (2024) .......... 5

*Clark v. Valletta*,
157 F.4th 201 (2d Cir. 2025) .......... 9, 15

*Confederacion Hipica de Puerto Rico, Inc. v. Confederacion de Jinetes Puertorriquenos, Inc.*,
30 F.4th 306 (1st Cir. 2022) .......... 18

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... 19

*Edmo v. Corizon*,
935 F.3d 757 (9th Cir. 2019) .......... 3, 15, 16, 17, 19, 20

*Eknes-Tucker v. Governor of Ala.*,
114 F.4th 1241 (11th Cir. 2024) .......... 13

*Estelle v. Gamble*,
429 U.S. 97 (1976) .......... 2, 6

**CASES [CONT'D]**


*Furman v. Georgia*,
408 U.S. 238 (1972) ........................................ 6

*Gibson v. Collier*,
920 F.3d 212 (5th Cir. 2019) ........................................ 7, 8, 9

*Hamby v. Hammond*,
821 F.3d 1085 (9th Cir. 2016) ........................................ 2, 7, 8

*Hoffer v. Sec'y, Fla. Dep't of Corr.*,
973 F.3d 1263 (11th Cir. 2020) ........................................ 8

*Hudson v. McMillian*,
503 U.S. 1 (1992) ........................................ 6

*Ingraham v. Wright*,
430 U.S. 651 (1977) ........................................ 5

*Johnson v. Dominguez*,
5 F.4th 818 (7th Cir. 2021) ........................................ 8

*Johnson v. Doughty*,
433 F.3d 1001 (7th Cir. 2006) ........................................ 6

*K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*,
121 F.4th 604 (7th Cir. 2024) ........................................ 14

*Kosilek v. Spencer*,
774 F.3d 63 (1st Cir. 2014) ........................................ 7, 9

*Lewis v. Casey*,
518 U.S. 343 (1996) ........................................ 23

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................ 19

*Preiser v. Rodriguez*,
411 U.S. 475 (1973) ........................................ 24

**CASES [CONT'D]**

*Roberts v. Spalding*,
783 F.2d 867 (9th Cir. 1986) .......... 22

*Sanchez v. Vild*,
891 F.2d 240 (9th Cir. 1989) .......... 18

*Spector v. United States*,
193 F.2d 1002 (9th Cir. 1952) .......... 21

*Toguchi v. Chung*,
391 F.3d 1051 (9th Cir. 2004) .......... 2, 4, 7, 22

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) .......... 18

*United States v. Skrmetti*,
605 U.S. 495 (2025) .......... 3, 9, 13, 14, 20, 21

*Wilson v. Seiter*,
501 U.S. 294 (1991) .......... 7

**STATUTES**

18 U.S.C. § 3626(a)(3) .......... 23

18 U.S.C. § 3626(g)(4) .......... 23

**OTHER AUTHORITIES**

Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments,* 10 Health Psych. Rsch., (2022) .......... 14

Bishop et al., *Pain and Dysfunction Reported After Gender-Affirming Surgery: A Scoping Review,* 103 PTJ: Physical Therapy & Rehab. J. 1 (2023) .......... 12

Bränström & Pachankis, *Letter to the Editor*, 177 Am. J. Psychiatry 769 (2020) .......... 10

**OTHER AUTHORITIES [CONT'D]**


Bränström et al., *Reduction in Mental Health Treatment Utilization Among Transgender Individuals after Gender Affirming Surgeries: A Total Population Study,* 177 Am. J. Psychiatry 727 Correction (2020) .......... 10

Dahlen et al., *International Clinical Practice Guidelines for Gender Minority/Trans People: Systematic Review and Quality Assessment,* 11 BMJ Open 1 (2021) .......... 12

Daniel Yetman, *Lobotomy Overview*, Healthline (Apr. 28, 2022), https://tinyurl.com/vdk6kmu4 .......... 20

Dhejne et al., *Long-Term Fol-low-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden,* 6 PLoS One 1 (2011) .......... 12, 13

Djordjevic et al., *Reversal Surgery in Regretful Male-to-Female Transsexuals after Sex Reassignment Surgery,* 13 J. Sex Med. 1000 (2016) .......... 12

Dunford et al., *Genital Reconstructive Surgery in Male to Female Transgender Patients: A Systematic Review of Primary Surgical Techniques, Complication Profiles, and Functional Outcomes from 1950 to Present Day,* Eur. Urol. Focus 1 (2020) .......... 10

*Find a Surgeon*, TransHealthCare, https://www.transhealthcare.org/find-surgeon/ .......... 22

*Gender Dysphoria and Gender Reassignment Surgery: National Coverage Analysis Decision Memo*, Centers for Medicare & Medicaid Services (Aug. 30, 2016), https://www.cms.gov/medicare-coverage-database/view/ncacal-decision-memo.aspx?proposed=N&NCA Id=282 .......... 9, 10

Lewis et al., *Examining Gender-Specific Mental Health Risks After Gender-Affirming Surgery: A National Database Study,* 22 J. Sexual Med. 645 (2025) .......... 11

**OTHER AUTHORITIES [CONT'D]**

Lindqvist et al., *Quality of Life Improves Early after Gender Reassignment Surgery,* 40 Eur. J. Plastic Surgery 223 (2017) .......... 11

Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners,* 50 Archives of Sexual Behav. 3353 (2021) .......... 12

*Provider Directory Search*, WPATH, https://tinyurl.com/4smfwcjp; .......... 22

Y. Zhang et al., *Quality of the World Professional Association for Transgender Health Guideline Standards of Care 8: An Appraisal Using the AGREE II Instrument,* Arch. Sex Behav., Feb. 2026, at 6, https://doi.org/10.1007/s10508-025-03399-6 .......... 14

## INTERESTS OF AMICI CURIAE

Across the country, medical professionals and policymakers are engaged in intense dialogue over how to address gender dysphoria. Plaintiff and the World Professional Association of Transgender Health (WPATH) advocate for treating discomfort with one's body by altering a person's physical appearance through invasive sex-change surgeries. Others urge a more measured approach, such as non-invasive psychotherapy. Whatever the wisdom of these competing approaches, the Constitution does not constrain States to take one side of the debate or the other. It leaves policy choices about best medical practices to politically accountable policymakers, who are best positioned to weigh the safety, efficacy, and ethics of different approaches.

Despite WPATH's insistence on surgeries, nothing in the Eighth Amendment's text or history allows prisoners to demand whatever medical interventions they desire. Nor does anything in its text or history require States to provide risky, controversial medical procedures of uncertain benefit to prisoners. And the Eighth Amendment certainly does not appoint federal courts to be the referees of robust, ongoing debates within the medical community. As sovereigns who have long

regulated medicine to protect public health and safety, amici States have an interest in protecting their authority, including for the prisoners in their care. They urge the Court to vacate the district court's injunction requiring Alaska to facilitate a prisoner's desired sex-change surgery.

## SUMMARY OF THE ARGUMENT

**I.** The Eighth Amendment prohibits prison officials from showing "deliberate indifference to serious medical needs of prisoners," but does not grant them a right of unqualified access to healthcare. *Estelle v. Gamble*, 429 U.S. 97, 102–05 (1976). Instead, "deliberate indifference" requires a prisoner to show that prison officials chose a "medically unacceptable" course of action in "conscious disregard of an excessive risk to the [prisoner's] health." *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016). This means a prisoner must show more than malpractice or gross negligence. Officials must have withheld the "minimal civilized measure of life's necessities." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). Mere disagreement between "a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate" is insufficient. *Hamby*, 821 F.3d at 1092.

As a matter of first principles, it therefore follows that the Eighth Amendment does not require prison officials to provide prisoners exhibiting gender dysphoria with risky, expensive, and much-debated sex-change surgeries. Gender dysphoria is the subject of "fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments" that "raise sincere concerns" with "profound" implications. *United States v. Skrmetti*, 605 U.S. 495, 525 (2025). And the scientific literature is replete with statements concerning the poor quality of data and lack of evidence supporting sex-change surgeries as interventions for gender dysphoria. WPATH's support for these surgeries reflects ideological and political motivations rather than science.

**II.** This Court's decision in *Edmo v. Corizon,* 935 F.3d 757 (9th Cir. 2019), does not require Alaska to provide sex-change surgeries to transgender-identifying prisoners. In *Edmo*, the parties *stipulated* that the Eighth Amendment required Idaho to provide a prisoner diagnosed with gender dysphoria whatever procedures WPATH would recommend. So *Edmo* establishes no more than that WPATH's Standards of Care supported the requested surgery. It did not resolve for all time whether the science around sex-change surgeries is so settled that no competent

medical practitioner would refuse to provide them. And certainly *Edmo* could not have anticipated more recent developments showing that WPATH's views represent but one side of an ongoing medical debate.

**III.** Although the district court did not go so far as to order Alaska to provide the prisoner in this case with a vaginoplasty, the prisoner's request for such an order highlights a larger problem. The surgery plaintiff seeks is not available in Alaska—or, for that matter, in 23 other States. To provide plaintiff with a vaginoplasty, Alaska would have to transfer one of its prisoners serving a lawful sentence for crimes committed against Alaska and its people to the custody of a State with no interest in the case.

Ordering a State to transfer a prisoner out of state would raise substantial legal issues. Under the Prison Litigation Reform Act (PLRA), a single district-court judge cannot order a State to transfer its prisoner out of state—a precaution that reflects the serious federalism concerns that surround federal intrusion into the state criminal justice system. More fundamentally, however, the fact that a surgery is not available to free citizens in half of the Nation reveals the surgery is not a "minimal civilized measure of life's necessities." *Toguchi*, 391 F.3d at 1057.

# ARGUMENT

## I. The Eighth Amendment Does Not Require States to Provide Sex-Change Surgeries to Prisoners

Despite "hesitation" about whether the Eighth Amendment requires States to provide transgender-identifying prisoners with sex-change surgeries, the district court ordered Alaska to evaluate a transgender-identifying prisoner for a vaginoplasty. 1-ER-48–51; *see* 1-ER-8. The court should have hesitated further. The Eighth Amendment does not require States to provide prisoners with controversial, risky interventions. And as the district court itself recognized, sex-change surgeries are a "salient topic of political controversy," and other circuits have held that WPATH is "merely one side in [this] sharply contested medical debate." 1-ER-53, 55. Its order should be reversed.

### A. The Eighth Amendment does not require States to provide risky, controversial surgeries to inmates

The Eighth Amendment bars only the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Rooted in the English Bill of Rights, this prohibition was adopted "to ensure that the new Nation would never resort" to "certain barbaric punishments like disemboweling, quartering, public dissection, and burning alive." *City of Grants Pass v. Johnson*, 603 U.S. 520, 542 (2024); *see Ingraham v.*

*Wright*, 430 U.S. 651, 664 (1977); *Furman v. Georgia*, 408 U.S. 238, 259 (1972) (Brennan, J., concurring). As early commentators explained, the Eighth Amendment rules out "the use of the rack or the stake," or "breaking on the wheel, flaying alive, rending asunder with horses, maiming, mutilating, and scourging to death." *Bucklew v. Precythe*, 587 U.S. 119, 131 (2019) (cleaned up). The Eighth Amendment was meant to bar "long disused (unusual) forms of punishment that intensified the sentence of death with a (cruel) superaddition of terror, pain, or disgrace." *Id.* at 133.

Although the Supreme Court has announced that the Eighth Amendment prevents prison officials from showing "deliberate indifference to serious medical needs of prisoners," the Court has made clear that this does not mean "that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 102–05. The Eighth Amendment does not give prisoners "unqualified access to health care," *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), nor does it permit prisoners to "demand specific care," *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). "A showing of medical malpractice or negligence is insufficient to

establish a constitutional deprivation under the Eighth Amendment." *Toguchi*, 391 F.3d at 1060.

Rather, to demonstrate deliberate indifference, a prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to the plaintiff's health." *Hamby*, 821 F.3d at 1092 (internal quotes omitted). This showing of intent is important because the Eighth Amendment does not displace policymakers' traditional authority to resolve debates that divide the medical community. *Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019); *see Kosilek v. Spencer*, 774 F.3d 63, 96 (1st Cir. 2014) ("[n]othing in the Constitution mechanically gives controlling weight to one set of professional judgments"). Rather, the Eighth Amendment "bans only cruel and unusual *punishment*." *Wilson v. Seiter*, 501 U.S. 294, 300 (1991). Punishments require "a deliberate act intended to chastise or deter." *Id.*

As a result, a prisoner cannot demand medical interventions without showing that prison officials have putatively deprived the prisoner of the "minimal civilized measure of life's necessities." *Toguchi*,

391 F.3d at 1057. A mere "difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Hamby*, 821 F.3d at 1092. Or as other courts have put the point, a "constitutional violation exists only if *no* minimally competent professional would have so responded under those circumstances." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021); *see Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1273 (11th Cir. 2020) ("[A] simple difference in medical opinion . . . fails to support a claim of cruel and unusual punishment."); *Gibson*, 920 F.3d at 220 ("There is no intentional or wanton deprivation of care if a genuine debate exists within the medical community about the necessity or efficacy of that care."); *Barr v. Pearson*, 909 F.3d 919, 921–22 (8th Cir. 2018) ("difference of opinion over matters of expert medical judgment" simply "fails to rise to the level of a constitutional violation").

### B. Sex-change surgery is a risky procedure with uncertain benefits that States may regulate

Whether gender dysphoria should be addressed with sex-change surgeries is precisely the sort of question that the Eight Amendment leaves to policymakers. Currently, there are "fierce scientific and policy

debates about the safety, efficacy, and propriety of medical treatments" for gender dysphoria that "raise sincere concerns" with "profound" implications. *Skrmetti*, 605 U.S. at 525; *see Clark v. Valletta*, 157 F.4th 201, 213 (2d Cir. 2025) (recognizing that the First, Fifth, Eighth, Tenth, and Eleventh Circuits have "rejected deliberate-indifference claims for denial of specific gender-dysphoria treatments"); *Gibson*, 920 F.3d at 220 ("robust and substantial good faith disagreement divid[es]" the medical community); *Kosilek*, 774 F.3d at 76 (noting testimony from Johns Hopkins physicians that there are "many people in the country who disagree with" WPATH's surgical recommendations). The ethics of cutting off or mutilating healthy tissue to address a psychological condition is questionable. *Cf. Skrmetti*, 605 U.S. at 540–43 (Thomas, J., concurring) (discussing ethical concerns related to sex change procedures for minors). And medical review after review demonstrates that sex-change surgeries carry real risks while providing no proven benefit.

Consider a few examples. In 2016, the Centers for Medicare and Medicaid Services reviewed studies considering the effectiveness of sex-change surgeries. *Gender Dysphoria and Gender Reassignment Surgery: National Coverage Analysis Decision Memo*, Centers for Medicare &

Medicaid Services (Aug. 30, 2016), https://www.cms.gov/medicare-coverage-database/view/ncacal-decision-memo.aspx?proposed=N&NCAId=282. Of the hundreds of sources reviewed and cited, only six provided useful information regarding surgery. The four best-designed of those six studies "did not demonstrate clinically significant changes or differences in psychometric test results after" surgery. *Id.* A few years later, authors who set out to prove that surgery provides mental-health benefits were forced to retract their study after a reanalysis of their data showed "no advantage of surgery." Bränström et al., *Reduction in Mental Health Treatment Utilization Among Transgender Individuals after Gender Affirming Surgeries: A Total Population Study*, 177 Am. J. Psychiatry 727, 734, Correction (2020). What is more, the authors then conceded that there is "a lack of sufficient knowledge to provide evidence-based treatment recommendations" for gender dysphoria. Bränström & Pachankis, *Letter to the Editor*, 177 Am. J. Psychiatry 769, 769 (2020).

Similar concessions are found throughout the literature concerning sex-change surgery. A meta-analysis of "all studies published on genital[] surgery from 1950" to 2020 concluded that the "evidence for [post-surgical] complications and functional outcomes is of low level." Dunford

et al., *Genital Reconstructive Surgery in Male to Female Transgender Patients: A Systematic Review of Primary Surgical Techniques, Complication Profiles, and Functional Outcomes from 1950 to Present Day*, Eur. Urol. Focus 1, 5–6 (2020). And a 2025 study concluded that sex-change surgery patients "are at significantly higher risk for adverse mental health outcomes, including depression, anxiety, suicidal ideation, and substance use disorder, compared to those who do not undergo gender-affirming surgery." Lewis et al., *Examining Gender-Specific Mental Health Risks After Gender-Affirming Surgery: A National Database Study*, 22 J. Sexual Med. 645, 650 (2025). "This trend persists even after controlling for confounding factors." *Id.*

Other studies have suggested that a patients' quality of life immediately after surgery improves—but then concede that, if the window is expanded to five years post-surgery, quality of life has returned to the preoperative level. Lindqvist et al., *Quality of Life Improves Early after Gender Reassignment Surgery*, 40 Eur. J. Plastic Surgery 223, 224–25 (2017). As one study summarizes, "[t]he quality of current guidelines" for addressing gender dysphoria is "unclear" because they "tend[] to lack methodological rigour and rely on patchier, lower-

quality primary research." Dahlen et al., *International Clinical Practice Guidelines for Gender Minority/Trans People: Systematic Review and Quality Assessment*, 11 BMJ Open 1, 2, 6 (2021).

Indeed, some studies indicate that those who undergo life-altering surgeries later regret their decision and suffer serious complications. *See, e.g.*, Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 Archives of Sexual Behav. 3353 (2021); Djordjevic et al., *Reversal Surgery in Regretful Male-to-Female Transsexuals after Sex Reassignment Surgery*, 13 J. Sex Med. 1000 (2016). One review reports that, in the few studies that actually collected information about post-surgery pain, patients reported incontinence, vaginal stenosis, vaginal prolapse, and pain. Bishop et al., *Pain and Dysfunction Reported After Gender-Affirming Surgery: A Scoping Review*, 103 PTJ: Physical Therapy & Rehab. J. 1, 6 (2023). And especially troubling is a 2011 study showing that postoperative trans-identifying patients remained suicidal after surgery at a much higher rate—19.1 times higher—than a control population. Dhejne et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery:*

*Cohort Study in Sweden*, 6 PLoS One 1, 6 (2011). That study "found substantially higher rates of overall mortality, death from cardiovascular disease and suicide, suicide attempts, and psychiatric hospitalizations in sex-reassigned transsexual individuals compared to a healthy control population." *Id.* at 7.

Of course, interest groups like WPATH promote surgeries to treat gender dysphoria. But "'WPATH's lodestar is ideology, not science.'" *Skrmetti*, 605 U.S. at 545 (Thomas, J., concurring) (quoting *Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1261 (11th Cir. 2024) (Lagoa, J., concurring in denial of rehearing en banc)). Indeed, a contributor to WPATH's 2022 Standards of Care "explain[ed] that '[o]ur concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits.'" *Id.* at 544. "Worse, recent reporting has exposed that WPATH changed its medical guidance to accommodate external political pressure." *Id.* at 546. Perhaps unsurprisingly, a recent assessment of WPATH's Standards concluded that those Standards had "significant shortcomings"—"lack of rigor of development, probably compromised editorial independence, and limited

applicability." Y. Zhang et al., *Quality of the World Professional Association for Transgender Health Guideline Standards of Care 8: An Appraisal Using the AGREE II Instrument*, Arch. Sex Behav., Feb. 2026, at 6, https://doi.org/10.1007/s10508-025-03399-6. And "when the experts appear to have compromised their credibility, it makes good sense [for States] to chart a different course." *Skrmetti*, 605 U.S. at 546 (Thomas, J., concurring).

To summarize, surgical interventions for gender dysphoria are fraught with serious risks and uncertain to deliver any benefits. Meanwhile, non-surgical interventions are available—for example, "[s]ocial support and psychotherapy" are "widely recognized approaches." *K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, 121 F.4th 604, 610–11 (7th Cir. 2024) (citing Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments*, 10 Health Psych. Rsch., at 4 (2022)). In this context, where the benefits of sex-change surgeries are uncertain and medical advocacy organizations like WPATH have obscured their true risk profile, the Eighth Amendment does not require States to provide controversial, unproven surgeries to prison inmates.

## II. This Court's Decision in *Edmo* Does Not Require Affirmance

The district court in this case agreed with most of the above. It agreed that there are "limitations" in the existing medical literature supporting sex-change surgeries, noting that "the field of transgender health is dynamic and unsettled." 1-ER-55–56. It acknowledged that WPATH overstates the strength of the evidence supporting its recommendations, which shows that there is at least "an element of advocacy to the organization." 1-ER-56. And it recognized that WPATH guidelines make no attempt to "wrestle with the unfortunate and unavoidable realit[y]" that medical decisions in correctional facilities "must consider factors unique to incarceration." 1-ER-52.

Still, the district court ruled for plaintiff because it believed its hands were tied by this Court's decision in *Edmo v. Corizon*, the only circuit-court opinion in the country that has read the Eighth Amendment to require a sex-change surgery for a prisoner. 935 F.3d 757, 803 (9th Cir. 2019); *see Clark*, 157 F.4th at 214 (referring to *Edmo* as a "stray decision"). But *Edmo* does not dictate the result in this case. As the Court said at the time, "the analysis [t]here [was] individual to Edmo and rest[ed] on the record in th[at] case." 935 F.3d at 767 ("We do not

endeavor to project whether individuals in other cases will meet the threshold to establish an Eight Amendment violation.").

In *Edmo*, the parties *agreed* that the WPATH Standards of Care should be the measure of whether the Idaho Department of Correction's course of treatment was "medically acceptable" under the Eighth Amendment. *E.g.*, Excerpts of Record Volume 3 at ER-391, *Edmo*, 935 F.3d 757 (No. 19-35017), Dkt. 12-3 (defendants' counsel telling the district court "[t]his is not a case where the defendants have denied or refused to recognize the WPATH, which we have referred to as standards."). That took the factual question of the accepted standard of care off the table for judicial resolution—the only question the Court was called on to decide was how the WPATH Standards applied in Edmo's case.

The *Edmo* Court emphasized the parties' agreement on this point repeatedly. In the opinion's introduction, the Court emphasized that "[b]oth sides and their medical experts agree . . . that the appropriate benchmark regarding treatment for gender dysphoria is the [WPATH] Standards of Care." *Edmo,* 935 F.3d at 767. In discussing the WPATH Standards, the Court noted again that the defendants had told the

district court that the WPATH Standards "provide the best guidance" and "are the best standards out there." *Id.* at 769. And after explaining that the WPATH Standards indicate that sex-change surgery is necessary in certain circumstances, the Court again emphasized that the defendants did "not dispute" that "[t]reatment can and should include [sex-change surgery] when medically necessary," only that surgery was "not medically necessary for Edmo." *Id.* at 771.

The Court's reasoning also relied extensively on the parties' agreement that the WPATH Standards governed the medical acceptability of the Edmo's treatment. The Court upheld the district court's decision to discredit the opinions of the defendants' experts and the medical judgment of the prison's treating physician on the ground that they "ran contrary" to the WPATH Standards. *Edmo*, 935 F.3d at 788–92. Twice, the Court reiterated that it was using the WPATH Standards as the baseline because the defendants did "not contest" that the WPATH Standards were the relevant benchmark. *Id.* at 788 n.16, 791; *see id.* at 795 (noting the fact once more).

The parties' agreement to use the WPATH Standards as the relevant benchmark means the Court never had to resolve whether they

should be the benchmark when *Edmo* was decided in 2019, much less today. "In our adversarial system of adjudication, we follow the principle of party presentation"—"the parties [] frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). When the parties stipulate or otherwise agree to facts, or even a characterization of facts, it has the "effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact"—the court simply adjudicates the dispute based on the assumed facts. *Christian Legal Soc. v. Martinez*, 561 U.S. 661, 677–78 (2010); *e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023) (relying on stipulations of parties, including that websites that petitioner creates are "original, customized creations[s]").

Because the Court was never asked to decide whether there was any "difference of medical opinion" regarding the WPATH Standards and their endorsement of the view that sex-change surgery is at least sometimes an appropriate treatment, *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989), it did not establish any precedent on that point. "A decision cannot create a precedent on an issue unless the issue was actually decided." *Confederacion Hipica de Puerto Rico, Inc. v.*

*Confederacion de Jinetes Puertorriquenos, Inc.*, 30 F.4th 306, 315 (1st Cir. 2022); s*ee District of Columbia v. Heller*, 554 U.S. 570, 625 n.25 (2008) (statement from prior case was not binding "where the point was not at issue and was not argued"); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 426 (2024) (Gorsuch, J., concurring) (courts "render a judgment based only on the factual record and legal arguments the parties at hand have chosen to develop").

Thus, *Edmo* did not hold, as the district court believed, that sex-change surgeries are a "medically necessary treatment" for some prisoners, the "denial of which could amount to an Eighth Amendment violation." 1-ER-42. Rather, *Edmo* held that—since the parties "agree[d]" that the WPATH Standards provide the "appropriate benchmark" for determining what is "medically necessary," *Edmo*, 935 F.3d at 767—then Edmo had to be provided with the surgery recommended by those Standards.

At times, *Edmo* made remarks suggesting that the Court concurred with the parties that WPATH reflected a medical consensus back in 2019 and should be used as the appropriate benchmark. However, these remarks were always made within the context of the Court's "fact-specific

analysis of the record," and the Court continued to recite that its conclusions were based on "the record [t]here"—which, again, contained little about whether WPATH standards were *actually* the appropriate benchmark because there had been no adversarial briefing or argument about the point in light of the parties' agreement. *Edmo*, 935 F.3d at 794–96. The Court even distinguished other circuits' discussions of the state of the medical literature on the ground that those decisions rested on distinct records. *Id.* at 794–97 (noting that the First Circuit followed "the record before it," and the Fifth Circuit faced a "sparser record").

*Edmo*'s record-specific analysis should therefore be cabined to that case. Factual issues in the medical context can change quickly—the person who pioneered the lobotomy received a Nobel Prize in 1949, but the procedure quickly fell out of use upon more widespread use and observation and has not been performed in the United States since 1967. Daniel Yetman, *Lobotomy Overview*, Healthline (Apr. 28, 2022), https://tinyurl.com/vdk6kmu4. And this is yet another area in which the medical debate has "rapidly evolv[ed]." *Skrmetti*, 605 U.S. at 532–40 (Thomas, J., concurring). Many of the studies cited in Section I of this brief were not published until after the parties developed the record in

*Edmo*. And it was not until "recent[ly]" that the public learned of internal documents showing that WPATH had manipulated its "Standards of Care" to support preferred outcomes. *See Skrmetti*, 605 U.S. at 544–46 (Thomas, J., concurring). The Court should not be bound to a 2019 decision resting on a factual stipulation by the parties when the medical debate has since moved on. *See Spector v. United States*, 193 F.2d 1002, 1006 (9th Cir. 1952) ("no principle of stare decisis or res judicata makes a finding of fact applicable to persons not parties to the action in which the finding is made").

## III. Plaintiff's Request for a Court-Ordered Surgery Raises Problems That Extend Beyond the Eighth Amendment

The district court's order requiring plaintiff's "prompt referral to a qualified surgeon for evaluation and consultation" for a sex-change surgery goes beyond what is required by the Eighth Amendment. 1-ER-8. But plaintiff's request for an injunction requiring Alaska to provide plaintiff with a vaginoplasty suffers from even greater problems. 1-ER-12–13. Such an order would require Alaska to transfer one of its prisoners across state lines, which the Eighth Amendment does not require, PLRA does not allow, and basic federalism principles counsel against.

As Alaska explained to the district court, there are not, in fact, "*any* surgeons licensed in Alaska who provide vaginoplasty for gender-affirming care." 2-ER-253 (emphasis added). Nor is Alaska unusual in this regard—23 other States lack licensed practitioners that perform vaginoplasties to address gender dysphoria.[1] This means that the surgery plaintiff seeks is unavailable to *prisoners or free citizens in almost half of Nation*. Such widespread unavailability reinforces that the surgery is not among the "minimal civilized measure of life's necessities" required by the Eighth Amendment. *Toguchi*, 391 F.3d at 1057; *see Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir. 1986) (prisoners do not have a "right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution").

Another consequence of how few surgeons provide what plaintiff seeks is that no court can grant plaintiff an injunction requiring a State

---

[1] As of March 16, 2026, WPATH's Provider Directory and TransHealthCare's Find a Surgeon directory do not show any surgeons performing vaginoplasties in Alaska, Alabama, Arkansas, Connecticut, Delaware, Georgia, Iowa, Idaho, Kentucky, Louisianna, Maine, Missouri, Mississippi, Montana, North Dakota, New Mexico, Oklahoma, Rhode Island, South Carolina, South Dakota, Tennessee, Vermont, West Virginia, or Wyoming. *See Provider Directory Search*, WPATH, https://tinyurl.com/4smfwcjp; *Find a Surgeon*, TransHealthCare, https://www.transhealthcare.org/find-surgeon/.

to provide an out-of-state vaginoplasty. To provide the surgery here, Alaska would have to transfer plaintiff across state lines. Under the PLRA, however, a "prisoner release order" can be issued only by a three-judge panel, and then only upon the panel's finding that crowding is the cause of the constitutional violation that a prior order for less intrusive relief did not remedy. 18 U.S.C. § 3626(a)(3). A "prisoner release order" is "any order" that "has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." § 3626(g)(4). This includes out-of-state "transfer" orders. *Brown v. Plata*, 563 U.S. 493, 527 (2011). Thus, a court cannot lawfully order States to provide a surgery that would require an out-of-state transfer.

This important limit on the authority of federal courts reflects that federal orders requiring state prisoners to be transferred across state lines raise serious federalism concerns. "Principles of federalism and separation of powers impose stringent limitations on the equitable power of federal courts" to take control of prisons. *Lewis v. Casey*, 518 U.S. 343, 385 (1996) (Thomas, J., concurring). This is because "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that

is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491–492 (1973). It would be a serious intrusion on the federal structure for a federal court to require Alaska to transfer one of its prisoners, who is lawfully incarcerated for a crime committed against Alaska and its people, to the custody of a State with no interest in the execution of a sentence imposed by Alaksa for the violation of its laws.

## CONCLUSION

The district court should be reversed.

Respectfully submitted,

RAÚL R. LABRADOR
Attorney General

MICHAEL A. ZARIAN
Solicitor General

JADEN STEEVES
David H. Leroy Fellow

Office of the Idaho
Attorney General
700 W. Jefferson St.
Boise, ID 83720
Tel: (208) 334-2400
Michael.Zarian@ag.idaho.gov

THEODORE E. ROKITA
Attorney General

/s/ James A. Barta
JAMES A. BARTA
Solicitor General
*Counsel of Record*

JOHN P. LOWREY
Deputy Solicitor General

LAUREN R. LABAUMBARD
Deputy Attorney General

Office of the Indiana
Attorney General
IGC South, Fifth Floor
302 W. Washington Street

*Counsel for Amici States*

Indianapolis, IN 46204
Tel: (317) 232-0709
Fax: (317) 232-7979
James.Barta@atg.in.gov

*Counsel for Amici States*

## ADDITIONAL SIGNATORIES

STEVE MARSHALL
Attorney General
State of Alabama

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRISTOPHER M. Carr
Attorney General
State of Georgia

BRENNA Bird
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

Liz MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE L. HANAWAY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

DAVID A. YOST
Attorney General
State of Ohio

GENTNER F. DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General and Reporter
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

Keith G. Kautz
Attorney General
State of Wyoming

STEVE MONTENEGRO
Speaker of the Arizona
House of Representatives

WARREN PETERSEN
President of the
Arizona Legislature

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because it contains 4,561 words, excluding the parts of the brief exempted by Rule 32(f).

2. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook typeface.

/s/ James A. Barta
James A. Barta

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

March 25, 2026

/s/ James A. Barta
James A. Barta