**No. 25-6813**

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

EMALEE WAGONER,

*Plaintiff-Appellee*

v.

JENNIFER WINKELMAN,
COMMISSIONER ALASKA DEPARTMENT OF CORRECTIONS,

*Defendant- Appellant.*

---

On Appeal from the United States District Court for the District of Alaska
No. 3:18-cv-00211
Hon. Matthew M. Scoble

---

## APPELLEE'S ANSWERING BRIEF

---

Richard Saenz
Nephetari Smith*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall St., 19th Floor
New York City, NY 10005
(646) 307-7394

Sonja D. Kerr
Morgan J. Walker
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
(214) 219-8585

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
(202) 804-6245

Susan Orlansky
Doron Levine
ACLU OF ALASKA FOUNDATION
1057 W. Fireweed La., Suite 207
Anchorage, AK 99503
(907) 952-1668

*Counsel for Appellee*
*\*Admission pending*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................iv

INTRODUCTION ...........................................................................................1

JURISDICTIONAL STATEMENT .....................................................................3

STATEMENT OF ADDENDUM .......................................................................3

ISSUES PRESENTED......................................................................................3

STATEMENT OF THE CASE...........................................................................4

I.   MS. WAGONER SUFFERS FROM THE SERIOUS MEDICAL
     CONDITION OF GENDER DYSPHORIA....................................................4

II.  UNDER THE ACCEPTED STANDARDS OF CARE, GENDER-
     AFFIRMING GENITAL SURGERY CAN BE MEDICALLY
     NECESSARY TREATMENT FOR GENDER DYSPHORIA, INCLUDING
     FOR MS. WAGONER. .........................................................................6

III. FOR YEARS, DOC HAS ACTED WITH DELIBERATE INDIFFERENCE
     TO MS. WAGONER'S GENDER DYSPHORIA BY REPEATEDLY
     DENYING AND DELAYING ADEQUATE TREATMENT, CAUSING
     HER SERIOUS HARM..........................................................................9

     A. Attempts at Self-Surgery to Conform her Genitalia with her Gender
        Identity.......................................................................................10

     B. DOC's Denials of Adequate Treatment for Gender Dysphoria..............13

     C. DOC's Denial of Outside Mental Health Consultant's Recommendation
        for Therapy ................................................................................14

     D. DOC Issues its Gender Dysphoria Care Guides and Policy ...................15

     E. DOC's Continued Denial of Adequate Care Despite Ms. Wagoner's
        Worsening Condition.....................................................................16

i

F. Dr. Samuelson's Provision of Hormone Therapy and Further Recommendations for Necessary Surgery ................................17

G. MAC's Rejection of Treating Physician's Clinical Recommendations...18

IV. SINCE DOC'S OCTOBER 2023 DENIAL OF MEDICALLY NECESSARY SURGERY, MS. WAGONER'S SEVERE GENDER DYSPHORIA HAS PERSISTED. ................................19

V. PROCEDURAL HISTORY ................................20

SUMMARY OF THE ARGUMENT ................................22

STANDARD OF REVIEW ................................24

ARGUMENT ................................25

I. THE DISTRICT COURT PROPERLY FOUND THAT GENITAL SURGERY IS MEDICALLY NECESSARY CARE TO TREAT MS. WAGONER'S SEVERE GENDER DYSPHORIA.................................26

A. The Court's finding that surgical treatment is medically necessary for Ms. Wagoner is supported by the record.................................27

1. Treating Physician and Expert Witness Testimony ................27

a. Dr. Samuelson's Medical Opinion.................................27

b. Expert Opinions of Dr. Ettner and Dr. Gorton ........................ 29

2. The Court's finding that WPATH SOC is the prevailing standard of care for the treatment of gender dysphoria is supported by the record.................................32

a. Courts routinely apply WPATH SOC in the prison context. ...35

b. There is no competing body of medical standards for the proper treatment of gender dysphoria. ................................36

B. The Court's finding that surgical treatments are safe and effective was supported by research studies admitted into the record. .........................36

ii

C. The record shows that, even if present, Borderline Personality Disorder and Anti-social Personality Disorder are not a barrier to receiving gender-affirming surgery. ...................................................................39

II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT DOC ACTED WITH DELIBERATE INDIFFERENCE TO MS. WAGONER'S GENDER DYSPHORIA. ..................................................................42

A. The District Court's conclusion that DOC acted with deliberate indifference by rejecting the treating physician's treatment recommendations is amply supported by both applicable precedent and the record. .......................................................................42

III. THE DISTRICT COURT'S CONCLUSION THAT DOC ACTS WITH DELIBERATE INDIFFERENCE BY REFUSING TO PROVIDE MEDICALLY NECESSARY TREATMENT IN THE FACE OF HER ONGOING SEVERE GENDER DYSPHORIA IS AMPLY SUPPORTED BY BOTH APPLICABLE PRECEDENT AND THE RECORD ................49

IV. UNDER WELL-ESTABLISHED LAW, DOC'S DE FACTO BAN ON MEDICALLY NECESSARY CARE VIOLATES THE EIGHTH AMENDMENT. ............................................................................52

V. THE DISTRICT COURT ACTED WITHIN ITS AUTHORITY BY GRANTING A PERMANENT INJUNCTION. .........................................55

CONCLUSION ...............................................................................................61

STATEMENT OF RELATED CASES ....................................................................63

CERTIFICATE OF COMPLIANCE .......................................................................64

CERTIFICATE OF SERVICE ..............................................................................65

iii

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Trucking Ass'ns, Inc., v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009)............................................................57

*Anderson v. City of Bessemer, N.C.*,
  470 U.S. 564 (1985) ...........................................................................25

*Armstrong v. Schwarzenegger*,
  622 F.3d 1058 (9th Cir. 2010)............................................................61

*Arnett v. Webster*,
  658 F.3d 742 (7th Cir. 2011)..............................................................32

*Bernier v. Turbocam, Inc.*,
  814 F.Supp.3d 229 (D.N.H. 2026) .....................................................29

*Brown v. Plata*,
  563 U.S. 493 (2011) ...........................................................................60

*Chess v. Dovey*,
  790 F.3d 961 (9th Cir. 2015)..............................................................58

*Clement v. California DOC*,
  364 F.3d 1148 (9th Cir. 2004)............................................................61

*Colwell v. Bannister,*
  763 F.3d 1060 (9th Cir. 2014)............................................. 25, 43, 52

*Cordellione v. Comm'r, Indiana Dep't of Correction*,
  No. 3:23-CV-00135-RLY-CSW, 2024 WL 4333152
  (S.D. Ind. Sept. 17, 2024)................................................... 29, 35

*De'lonta v. Johnson*,
  708 F.3d 520 (4th Cir. 2013)..............................................................50

iv

*Doe v. Horne*,
   683 F. Supp. 3d 950 (D. Ariz. 2023)......................................................33

*eBay Inc. v. MercExch., LLC*,
   547 U.S. 388 (2006) .......................................................................55

*Edmo v. Corizon, Inc.*,
   935 F.3d 757 (9th Cir. 2019)................................................. *passim*

*Edmo v. Idaho Dep't of Correction*,
   358 F. Supp. 3d 1103 (D. Idaho 2018).............................................36

*Estelle v. Gamble*,
   429 U.S. 97 (1976) .....................................................................1, 54

*Farmer v. Brennan*,
   511 U.S. 825 (1994) .........................................................................1

*Fields v. Smith*,
   653 F.3d 550 (7th Cir. 2011).................................................. 53, 55, 58

*Fisher v. Federal Bureau of Prisons*,
   484 F. Supp. 3d 521 (N. D. Ohio 2020)............................................53

*Gant v. County of Los Angeles*,
   772 F.3d 608 (9th Cir. 2014)..........................................................42

*Gordon v. Schilling*,
   937 F.3d 348 (4th Cir. 2019)..........................................................48

*Hamby v. Hammond*,
   821 F.3d 1085 (9th Cir. 2016)............................................. 25, 43, 49

*Hamilton v. Endell*,
   981 F.2d 1062 (9th Cir. 1992).........................................................43

*Hecox v. Little*,
   104 F.4th 1061 (9th Cir. 2024).......................................................33

*Henderson v. Ghosh*,
   755 F.3d 559 (7th Cir. 2014)................................................................32

*Hernandez v. Cnty. of Monterey,*
   110 F. Supp. 3d 929 (N.D. Cal., 2015) ...............................................60

*Hicklin v. Precynthe*,
   No. 4:16-CV-01357-NCC, 2018 WL 806764
   (E.D. Mo. Feb. 9, 2018) ...................................................... 29, 35, 53

*Hundley v. Aranas*,
   No. 3:19-CV-00458-ART-CSD, 2025 WL 2382988
   (D. Nev. Aug. 15, 2025)......................................................................29

*Hunt v. Dental Dept.*,
   865 F.2d 198 (9th Cir. 1989)...............................................................43

*Iglesias v. Fed. Bureau of Prisons*,
   No. 19-CV-415-NJR, 2021 WL 6112790 (S.D. Ill. Dec. 27, 2021)............. 35, 54

*Independent Training and Apprenticeship Program v. California Dept. of Indus. Relations*,
   730 F.3d 1024 (9th Cir. 2013)..............................................................55

*Jett v. Penner*,
   439 F.3d 1091 (9th Cir. 2006)..............................................................25

*JJS v. Pliler*,
   No. 19-CV-02020 (VSB)(SN), 2022 WL 16578124 (S.D.N.Y. Aug. 3, 2022) ..35

*Keohane v. Fl. Dep't of Corr. Sec'y*,
   952 F.3d. 1257 (11th Cir. 2020)...........................................................53

*Kohler v. Presidio Int'l, Inc.*,
   782 F.3d 1064 (9th Cir. 2015)..............................................................24

*Kosilek v. Spencer*,
   774 F.3d 63 (1st Cir. 2014) .................................................................55

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
762 F.3d 867 (9th Cir. 2014) .................................................................24

*Lentini v. California Ctr. for the Arts, Escondido*,
370 F.3d 837 (9th Cir. 2004) .................................................................24

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) ...............................................................50

*Maryland v. Wilson*,
519 U.S. 408 (1997) ...............................................................................34

*Melendres v. Arpaio*,
695 F. 3d 990 (9th Cir. 2012) ................................................................57

*Monroe v. Baldwin*,
424 F. Supp. 3d 526 (S.D. Ill. 2019) .....................................................35

*Norsworthy v. Beard*,
87 F.Supp.3d 1164- (N.D. Cal. 2015) ......................................... *passim*

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*,
960 F.3d 603 (9th Cir. 2020) .................................................................24

*Peralta v. Dillard*,
744 F.3d 1076 (9th Cir. 2014) ...............................................................60

*Poe v. Labrador*,
709 F.Supp.3d 1169 (D. Idaho 2023) .....................................................33

*Pritchard v. Blue Cross Blue Shield of Illinois*,
No. 3:20-CV-06145-RJB, 2022 WL 17092846 (W.D. Wash. Nov. 21, 2022) ...29

*Robinson v. Labrador*,
747 F.Supp.3d 1331 (D. Idaho 2024) .....................................................53

*Rosati v. Igbinoso*,
791 F.3d 1037 (9th Cir. 2015) ......................................... 52, 53, 54

*Saucier v. Katz,*
    533 U.S. 194 (2001) ................................................................43

*Snow v. McDaniel,*
    681 F.3d 978 (9th Cir. 2012)............................................ 43, 44

*U.S. v. Skrmetti,*
    605 U.S. 495 (2025) ................................................................54

*United States v. DeCologero,*
    821 F.2d 39 (1st Cir. 1987) .....................................................32

*United States v. Raines,*
    362 U.S. 17 (1960) ..................................................................57

*United States v. Washington,*
    853 F.3d 946 (9th Cir. 2017)....................................................25

*Williams v. Kincaid,*
    45 F.4th 759 (4th Cir. 2022)....................................................35

*Wright v. Rushen,*
    642 F.2d 1129 (9th Cir.1981)...................................................60

*Zayre-Brown v. N. Carolina Dep't of Pub. Safety,* No.,
    3:22-CV-191-MOC-DCK, 2024 WL 410243, (W.D.N.C. Feb. 2, 2024)............35

## Statutes

18 U.S.C. §3626(a) ............................................ 22, 24, 55, 60

28 U.S.C. § 1983 ...............................................................20

## Regulations

Alaska Admin. Code tit. 7, § 105.130 .....................................33

**Other Authorities**

Anthony Almazan, et al., *Association Between Gender-Affirming 240 Surgeries and Mental Health Outcomes* (Apr. 28, 2021).......................................37

Am. Med. Ass'n, *AMA Board Newsletter – March 2026*, https://cloud.e.ama-assn.org/newsletter?utm_source=SFMC&utm_medium= email&utm_term=3262026&utm_content=AMA_BoardNewsletter_Mar_03262 6&utm_campaign=MMX_Email_Newsletter_BoardChair&utm_uid=GENEM& utm_effort=GENEM#gender-affirming-care.......................................33

Am. Soc'y of Plastic Surgeons, *ASPS Statement Regarding Gender Surgery for Adolescents*, (Aug. 14, 2024), https://www.plasticsurgery.org/reconstructive-procedures/asps-statement-regarding-gender-surgery-for-adolescents ...............34

George R. Brown, *Autocastration and Autopenectomy as Surgical Self-Treatment in Incarcerated Persons with Gender Identity Disorder*, 12 Int'l J. Transgenderism 31 (2010) ....................................5

Cecilia Dhejne, et al., *Long-Term Follow-Up of Transsexual 228 Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden* (Feb. 2011) .................................... 37, 38, 39

Joshua Lewis, et al, *Examining Gender-Specific Mental 231 Health Risks After Gender-Affirming Surgery: a National Database Study*, (Jan. 25, 2025).................................... 37, 38, 39

World Health Org., *Handbook for Guideline Development* (2d ed. 2014) .............34

World Pro. Ass'n Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health (2022), https://wpath.org/publications/soc8/.............................7

ix

**INTRODUCTION**

The Eighth Amendment to the U.S. Constitution prohibits the Commissioner of the Alaska Department of Corrections[1] from acting with deliberate indifference to the serious medical needs of incarcerated people. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). For almost a decade, Ms. Emalee Wagoner ("Wagoner"), a transgender woman in DOC custody, has desperately sought medical treatment for the severe distress and pain caused by her gender dysphoria. In response, DOC has consistently denied and delayed her treatment despite knowing that without adequate care Wagoner's health and safety are imperiled. Instead, DOC requires that Wagoner's health deteriorate further before it will provide the treatment she needs now. In so doing, DOC violates Wagoner's rights under the Eighth Amendment because it disregards the excessive risk to her health or safety posed by denying treatment. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

After a five-day trial, the District Court properly applied U.S. Supreme Court and Ninth Circuit precedent in assessing Wagoner's Eighth Amendment claim and concluded that DOC acted with deliberate indifference to Wagoner's serious medical need in refusing to provide her medically necessary gender-affirming surgery. The

---

[1] Appellant is Jennfer Winkelman, the Commissioner of the Alaska Department of Corrections, (the "Commissioner," "Appellant" or "DOC") sued in her official capacity. The Commissioner "has the authority to enforce an order for relief in this case should the Court so award." Order on Stipulations, 1-SER-0049-50.

Court considered credible testimony from Wagoner, her treating physician, Dr. Rachel Samuelson ('Samuelson") of Anchorage Neighborhood Health Center ("ANHC"), and the parties' experts, and evidence of the relevant standards of care for the treatment of gender dysphoria and the safety and efficacy of gender-affirming surgery. The Court weighed the considerable evidence showing that hormone therapy has been insufficient and inadequate to treat Wagoner, who continues to suffer from severe gender dysphoria. The Court concluded that as a practical matter, despite the language of its policies, DOC has enforced a *de facto* ban on gender-affirming surgery, and in denying that care to Wagoner has subjected her to cruel and unusual punishment.

The record of Wagoner's specific medical needs and DOC's deliberate indifference amply supports the Court's findings and conclusions. On appeal, DOC responds to the Court's factual findings with post-hoc justifications for denying medically necessary treatment, including its new objections to the *Standards of Care for the Health of Transgender and Gender Diverse People* (hereafter "Standards of Care" or "SOC") promulgated by the World Professional Association for Transgender Health ("WPATH"). These belated efforts to validate DOC's refusal to provide necessary care do not change the record below or the Court's conclusions that gender-affirming genital surgery is medically necessary care for Wagoner, that DOC has acted with deliberate indifference to her gender dysphoria, and that DOC

2

continues to fail to provide adequate medical care despite her obvious and ongoing suffering.

The Court acted within its authority by ordering the Commissioner to provide Wagoner with a prompt referral to a qualified surgeon for an individualized evaluation and consultation for gender-affirming surgery and enjoining DOC from enforcing a *de facto* prohibition on gender-affirming surgery to remedy Wagoner's harm and the ongoing constitutional violations. The District Court's judgment should be affirmed.

## JURISDICTIONAL STATEMENT

Appellee agrees with Appellant's jurisdictional statement. Appellant Opening Brief 11.

## STATEMENT OF ADDENDUM

All relevant statutory and constitutional authorities appear in the Addendum to this brief.

## ISSUES PRESENTED

1. Whether the District Court was correct in finding that gender-affirming surgery is medically necessary treatment for Ms. Wagoner's severe and persistent gender dysphoria?

2. Whether the District Court properly concluded that DOC acted with deliberate indifference under the established Eighth Amendment frameworks in rejecting the

3

treating physician's clinical recommendations, applying medically unwarranted criteria, refusing to provide surgery despite Ms. Wagoner's ongoing dysphoria, and in enforcing a *de facto* policy of categorically denying gender-affirming surgery?

3. Whether the District Court properly exercised its discretion when it prospectively ordered DOC to provide Ms. Wagoner with adequate medical care and enjoined the enforcement of DOC Policy #807.23 to the extent it operates as a *de facto* ban on gender-affirming surgery?

STATEMENT OF THE CASE

## I. MS. WAGONER SUFFERS FROM THE SERIOUS MEDICAL CONDITION OF GENDER DYSPHORIA.

Gender dysphoria is a medical condition codified by the *Diagnostic and Statistical Manual of Mental Disorders* published by the American Psychiatric Association. Its diagnostic criteria are a marked incongruence between one's gender identity and assigned gender and associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. 2-ER-0110-11; 3-ER-0518; 6-ER-1348. It "is a serious medical condition but fortunately a treatable one" for which there is "a huge assemblage of literature which now indicates that there's a biological basis." 2-ER-0108-09. Some transgender people have gender dysphoria and some do not. 2-ER-0112. Some people with gender dysphoria experience severe dysphoria focused on the presence of genitalia inconsistent with their gender identity. 2-ER 0252. It is common for a person with

4

gender dysphoria to not seek care until later in life. 2-ER-0278.

Left untreated, gender dysphoria typically worsens with age due to hormone changes associated with aging. 2-ER-0109-10. Untreated gender dysphoria causes severe emotional symptoms which can lead to substance abuse, self-surgery, and even suicide. 3-ER-0522. Depression and anxiety are "almost ubiquitous with people who have gender dysphoria." 2-ER-0209. As forensic and clinical psychologist, Randi Ettner, Ph.D. ("Ettner"), expert witness for the plaintiff, testified that auto-castration and auto-penectomy are known risks for inadequately treated gender dysphoria for incarcerated people. 2-ER-131-33.[2] Robert Lawrence, M.D. ("Lawrence"), former DOC Chief Medical Officer, explained that gender dysphoria is a serious medical condition because it is associated with four different causes of death, the first which is suicide, and that treatment for gender dysphoria must be individualized. 5-ER-0905; 5-ER-0910.

Ms. Wagoner is a transgender woman who has been incarcerated at Goose Creek Correctional Center ("GCCC") since 2011 with a projected release in 2038. 1-ER-0012. The parties stipulated that Wagoner has gender dysphoria and that DOC confirmed that diagnosis. 2-SER-0436; *see also* 3-ER-0518; 6-ER-1348. Wagoner suffers from severe and persistent gender dysphoria. *See, e.g.*, 2-ER-

---

[2] Ettner citing to George R. Brown, *Autocastration and Autopenectomy as Surgical Self-Treatment in Incarcerated Persons with Gender Identity Disorder*, 12 Int'l J. Transgenderism 31 (2010).

0107 (Ettner opining "that she was suffering from a severe form of gender dysphoria, and that the treatment she had received to date was inadequate for the dysphoria she was experiencing"); 2-ER-0229-30 (Rachel Samuelson, M.D. testifying to "clear, persistent, and severe genital dysphoria"); 3-ER-0511 (Nick Gorton, M.D. ("Gorton"), expert for the plaintiff, testifying that Wagoner's gender dysphoria is "severe").

## II. UNDER THE ACCEPTED STANDARDS OF CARE, GENDER-AFFIRMING GENITAL SURGERY CAN BE MEDICALLY NECESSARY TREATMENT FOR GENDER DYSPHORIA, INCLUDING FOR MS. WAGONER.

Gender-affirming genital surgery is widely accepted as an effective treatment for gender dysphoria. 2-ER-0125. Gender-affirming genital surgery is not a cosmetic procedure. 2-ER-0139. It is a component of the complementary, and often sequential, treatment modalities for gender dysphoria recognized by WPATH SOC-8: social transition; hormone therapy; and, for some people, gender-affirming surgery. 2-ER-0112-13; 5-ER-0905-06 (referencing a stepwise order).

Abundant evidence since the 1970s shows that gender-affirming surgery is an effective medical treatment for some people with gender dysphoria. 2-ER-0118. In May 2014, given its safety and efficacy, the U.S. Department of Health and Human Services ended the categorical exclusion of coverage for gender-affirming surgery from Medicare. *Id*. Every major medical organization recognizes surgery as a treatment for gender dysphoria consistent with WPATH SOC. 2-ER-0125; *see also*

6

2-ER-0115. For a transgender woman with gender dysphoria, the most common surgical treatment procedure is a penile inversion vaginoplasty (3-ER-0522), which involves removal of the testicles (2-ER-0125-26) and creation of a functional urogenital perineum and vagina that appears congruent with the person's gender identity. 2-ER-0125-26. Penile inversion vaginoplasty is a safe procedure because it "doesn't involve invasion of another system." 2-ER-0125. One study found vaginoplasty to have complications only in five percent of cases, whereas breast reduction surgery in cisgender women has a complication rate of 43 percent. *Id*.

WPATH is composed of specialists in transgender healthcare, including mental health professionals, endocrinologists, and surgeons. 2-ER-0100-01. WPATH has promulgated standards of transgender healthcare since 1979 (*Id.*); the current version is version 8 (hereinafter, "SOC-8").[3] WPATH SOC is evidence-based. 2-ER-0117. Almost every major medical organization has cited as authoritative WPATH SOC, including the World Health Organization, the National Commission on Correctional Health ("NCCHC"), the American Medical Association ("AMA"), the American Psychiatric Association, the American Academy of Family Physicians, the National Association of Social Workers, the American Association of Public Health, and the American College of Obstetrics and

---

[3] World Pro. Ass'n Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1, S11 (2022), https://wpath.org/publications/soc8/

Gynecology. 2-ER-0115-16.

Thus, it is not surprising that Dr. Samuelson, and all four experts incorporate WPATH SOC into their decisions concerning treatment for gender dysphoria. While DOC's experts, Dr. Sara Boyd ("Boyd") (5-ER-1032-34) and Dr. Joseph Penn ("Penn") (6-ER-1116-21), questioned WPATH SOC's applicability in prisons, they did not reject its use and acceptance by providers, and neither provided an alternate standard of care either generally or for incarcerated people specifically. The experts all acknowledged that WPATH SOC-8 is the standard of care for gender-affirming genital surgery, and none denied that NCCHC endorses WPATH SOC. *See* 2-ER-0102-3; 3-ER-0517-20; 5-ER-1031-32, 5-ER-1074; 6-ER-1116-18, 6-ER-1139, 1145-47-. Indeed, Lawrence testified that DOC considered WPATH SOC in drafting its care guides and policy. 5-ER-0906-7.

Under WPATH SOC-8, surgery is typically indicated for people whose symptoms of gender dysphoria have not resolved through social transition and hormone therapy. 3-ER-0510-11; 3-ER-0519. All experts testified that gender-affirming surgery is sometimes medically necessary to treat gender dysphoria. 2-ER-0153, 2-ER-0240; 3-ER-0510-11, 3-ER-0517-20. DOC expert, Boyd agreed that gender-affirming surgeries can be an effective treatment for alleviating symptoms of gender dysphoria for some people (5-ER-1046-47, 5-ER-1052) and acknowledged the professional consensus that gender-affirming surgery can

"substantially alleviate" (5-ER-1079-80) or "effectively resolve" gender dysphoria for some people (5-ER-1046-47). DOC expert Penn also agreed that "some may progress or need surgery." 6-ER-1136-37. Indeed, DOC itself recognizes that surgical treatment can be medically necessary to treat gender dysphoria, though it restricts surgery to those who have not responded to nonsurgical intervention. 7-ER-1435; 5-ER-0967-68.

Samuelson, Ettner, and Gorton are the only doctors who are experienced in the treatment of gender dysphoria and who evaluated Wagoner. 1-ER-0030; 1-ER-0017, 2-ER-0090, 2-ER-0095, 2-ER-0128; 3-ER-0464-65,  3-ER-0498; 5-ER-1071 (Boyd did not evaluate Wagoner). Samuelson relied on her clinical experience and clinical guidelines including WPATH SOC in forming her treatment recommendations for Wagoner. 2-ER-0222-26. Both Ettner and Gorton applied their decades of clinical experience in gender-affirming care and WPATH SOC-8 surgical criteria in their assessments concluding that Wagoner met all surgical criteria under WPATH SOC-8 and SOC-7, that was previously in effect, and that gender-affirming surgery is medically necessary for her. *See generally* 2-ER-0089-154, 155-305; 3-ER-0495-616

**III. FOR YEARS, DOC HAS ACTED WITH DELIBERATE INDIFFERENCE TO MS. WAGONER'S GENDER DYSPHORIA BY REPEATEDLY DENYING AND DELAYING ADEQUATE TREATMENT, CAUSING HER SERIOUS HARM.**

### A. Attempts at Self-Surgery to Conform her Genitalia with her Gender Identity

After approximately five years in custody, in 2016, Wagoner began to live as a woman to the best of her ability while in a men's prison. 2-ER-0312. In response to her social transition, DOC providers said they had never seen anyone like her, they did not understand people like her, they did not have training in how to deal with her. They informed her that DOC is not a therapeutic environment, and hormone treatment was not necessary for her. 2-ER-0336; 7-ER-1574; 2-SER-0448 ("Alaska DOC does not offer a medical treatment for [gender dysphoria]."). Subsequently, Wagoner attempted self-surgery to her genitals with razor blades and other crude instruments and has continued to self-harm by crushing her testicles to the present. 2-ER-0321-22, 2-ER-0326, 2-ER-0331; 6-ER-1346; 7-ER-1415; 8-ER-1744, 8-ER-1747, 8-ER-1753; *See also* 2-ER-0107, 2-ER-0190-91.

On August 21, 2016, while experiencing severe gender dysphoria and desperate for treatment, Wagoner attempted to surgically construct a vagina on herself. 2-ER-0321-23; 8-ER-1744. She studied anatomy texts before the first self-surgery attempt (3-ER-0504) and then sliced through her phallus with a Bic disposable razor blade to conform her body to her gender identity. 2-ER-0321-23. She tried to stop the bleeding by rubbing garlic and salt into the wound. 2-ER-0322. Unable to stop hemorrhaging, Wagoner alerted DOC, which took her to the hospital. 3-ER-0369. Later, fearing punishment for "self-harm," Wagoner said that she had

10

"hit it on the edge of a table." 2-ER-0326. DOC punished Wagoner for engaging in self-harm. 2-SER-0450; 4-ER-0643-48, 4-ER-650, 4-ER-0788-94.

Again, in June 2017, shortly after requesting hormone therapy, Wagoner again attempted crude self-surgery, by shoving her finger into her organ, splitting it along the prior laceration and causing considerable bleeding. 2-ER-0284; 3-ER-0358; 7-ER-1415, 7-ER-1421. Her goal was to further extend the incision from the first self-surgery attempt. 3-ER-0504. She told ER staff that she tried to give herself "a sex change" in 2016. 7-ER-1415. DOC again punished Wagoner by putting her in solitary confinement. 3-ER-0358.

After enduring DOC's refusal to adequately treat her gender dysphoria, in September 2018, Wagoner filed suit alleging that DOC failed to implement appropriate policies for treatment for transgender people which has caused her severe stress, anxiety, and physical pain for almost two years due to her gender dysphoria. 8-ER-1774. Although DOC was on notice of the lawsuit, it continued to deny necessary treatment for her gender dysphoria and chronic genital pain.

Soon after initiating her lawsuit, on November 29, 2018, Wagoner again attempted to perform self-surgery. 8-ER-1753; 2-ER-0331. This was in addition to her efforts to crush and "strangulate" her testicles which she had begun to do in 2016 on a daily basis for nearly a decade. 2-ER-0331. She testified that she crushed her testicles the day before her testimony. *Id*. DOC is aware that Wagoner continues

11

harming her testicles and has been discussed at treatment team meetings. 5-ER-0874. Ettner distinguished the self-surgery attempts from the ongoing testicles crushing. 2-ER-0132. Ettner confirmed that Wagoner's constant inability to resolve the conflict between her genitals and her identity is so agonizing for her that she attempted to do a complicated surgery to rid herself of her hated male genitals. 2-ER-0123-24, 2-ER-0230.

Wagoner told Gorton that she attempted self-surgery out of her belief that DOC will continue to withhold surgery. 3-ER-0516. Wagoner also testified to frequently crushing her testicles with the goal of reducing endogenous testosterone. 2-ER-0331-32. As Ettner testified, Wagoner's "three attempts to perform a surgical procedure on herself" reflect a "desperate intention to access… a solution to a serious medical concern that was not being addressed." 2-ER-0107. "[S]urgical self-treatment," she explained, "is *a priori*[4] evidence of severe gender dysphoria. And we only see it in cases where treatment has not been adequate or appropriate." 2-ER-0107. Likewise, Gorton explained that self-surgery occurs out of desperation when patients suffering from severe gender dysphoria believe that they cannot access surgery. 2-ER-0515-17.

---

[4] "*A priori*" appears in the transcript as "a priority." 2-ER-0107.

12

**B. DOC's Denials of Adequate Treatment for Gender Dysphoria**

After her first attempt at self-surgery, Wagoner began using DOC's "requests for interviews" forms ("RFI"), and internal grievance system to request gender-affirming care. 6-ER-1178-81 (approval of RFI to be seen "by a professional for a proper diagnosis"). DOC's responses reflected the limited utility of such requests. For example, on November 15, 2016, DOC responded to Wagoner's request for mental health care by writing that a worker had "explained to the inmate that [the prison] is not a therapeutic environment and DOC does not allow or accommodate outside psychological services for these issues." 1-SER-0067. Ten days later, DOC responded to Wagoner's RFI for a qualified provider: "I am willing to help you work on acceptance of your situation or develop coping methods, however [mental health] does not address gender dysphoria issues, nor does medical as far as I know. ***Please let it go***." 6-ER-1177 (emphasis added).

After DOC explained that its "mental health" providers would not treat her gender dysphoria, Wagoner asked whether "medical" offered such care. 1-SER-0068. DOC responded, "Alaska DOC does not offer medical treatment for this. Continue to follow up and meet with mental health." *Id*.

13

### C. DOC's Denial of Outside Mental Health Consultant's Recommendation for Therapy

In May 2017, outside mental health provider Michael Reed evaluated Wagoner. 6-ER-1184-89; 3-SER-0658-63. Reed diagnosed Wagoner with gender dysphoria, noting that she had a "strong desire to be rid of her primary sex characteristics/organs, such as when she cut her own penis." 3-SER-0662. Reed's recommendations included twelve bi-monthly individual therapy sessions and that DOC consider allowing Wagoner to wear female undergarments and makeup that are allowed for female inmates to aid in her transition as a transgender woman. 3-SER-0662. Adam Rutherford ("Rutherford"), DOC Deputy Director of Health and Rehabilitation Services and former Chief Mental Health Officer, agreed that Wagoner had gender dysphoria but nonetheless denied the counseling recommendation. 3-ER-0440-41. These therapy sessions did not happen. *Id*.

DOC's deficiencies in mental health services for gender dysphoria have continued. Ray Mercer ("Mercer"), GCCC supervising mental health clinician, testified that DOC does not provide individual therapy to incarcerated people who need it; DOC relies instead on "the school of life" and workbooks, which he characterized as "bibliotherapy," "self-study" and "check ins" with clinicians as the "closest thing to an individual session in DOC." 5-ER-0856, 5-ER-0841. Wagoner tried using the workbooks but eventually stopped out of frustration. 5-ER-0845.

14

**D. DOC Issues its Gender Dysphoria Care Guides and Policy**

In July 2017, DOC issued a Gender Dysphoria Clinical Care Guide. ("Care Guide") 7-ER-1491. The 2017 Care Guide defines sex reassignment surgery but does not state criteria for when surgery is indicated. In March 2018 and later in September 2018, DOC revised the Care Guide. 7-ER-1479, 7-ER-1467. The 2018 Care Guides stressed that transgender adults with gender dysphoria are at an increased risk of suicide and that appropriate treatment including hormone therapy and surgery can help achieve treatment goals, but do not include a pathway to surgery. 7-ER-1466; 7-ER-1482; 7-ER-1486.

Four years after the start of litigation, on July 5, 2022, DOC issued a Gender Dysphoria treatment policy that established a new definition of "essential" healthcare. 7-ER-1432. It states: "Surgical interventions for prisoners with gender dysphoria shall be for therapeutic purposes that meet the criteria for essential health care when symptoms of gender dysphoria have not responded to non-surgical interventions." 7-ER-1435. DOC considered WPATH SOC in developing its policy but did not precisely adopt them. 5-ER-0906-07. Although DOC's policy purportedly authorizes gender-affirming surgery for gender dysphoria, it only permits surgery if the symptoms of gender dysphoria did not respond to nonsurgical interventions; in other words, for Wagoner to access surgical care, hormone therapy would have had to have no effect on her at all. 5-ER-0968. All treatments for gender

15

dysphoria must be approved by the Medical Advisory Committee ("MAC"), and the Gender Dysphoria Management Committee ("GDMC") established by MAC. 7-ER-1432; 7-ER-1434. DOC recognizes counseling, hormone therapy, and surgery as beneficial for treating gender dysphoria, but effectively forecloses surgery as a treatment by requiring that the patient not respond to hormone therapy.

### E. DOC's Continued Denial of Adequate Care Despite Ms. Wagoner's Worsening Condition

From 2016 until 2022, DOC refused to provide Wagoner with treatment specific to her gender dysphoria. In response to her chronic genital pain that resulted from her self-surgery attempts, DOC sent Wagoner to Dr. Greg Lund of Alaska Urology ("Lund"). Lund concluded that "[a] specific referral from a physician here is needed, and there has been no help from the Department of Corrections physicians in referral to a center specializing in transgender issues." 7-ER-1561. Lund wrote that "the patient would definitely benefit from referral to specialist in trans gender [sic] care" and suggested options for full-service transgender clinics. 7-ER-1564. In response, Lawrence informed Lund that there are "constitutional" issues involved with DOC providing care to incarcerated people; after this call, Lund amended his records to clarify that he is not qualified to assess the need for surgery as treatment for gender dysphoria. *Id*. Despite this, Lawrence did not consult with any qualified mental health provider concerning surgery. 5-ER-0972.

In the summer of 2020, Lawrence denied requests from DOC psychiatrist Dr.

16

Christine Sawyer to prescribe Wagoner with spironolactone, a medication that lowers a patient's testosterone level. 5-ER-0968-70; 2-SER-0513. Lawrence could not remember but agreed that he did not recall seeing Spironolactone on the medical record after the email exchange. 5-ER-0968-70.

### F. Dr. Samuelson's Provision of Hormone Therapy and Further Recommendations for Necessary Surgery

When Wagoner requested hormone therapy in 2016 she was told that DOC does not provide such care. 2-SER-0448. In Spring 2022, DOC retained Dr. Rachel Samuelson, a community-based physician, to provide Wagoner with gender-affirming care specifically because DOC's lack of qualified providers with experience in gender dysphoria treatment. 5-ER-0930-31. Lawrence testified that DOC recognized "that we did not have someone with the Department of Corrections who could provide the medical side of that are we reached out and found Dr. Samuelson who agreed to provide that care. . ." 5-ER-0931. Samuelson assessed Wagoner at the first visit and, relying on her clinical experience, WPATH SOC and other clinical guidelines, recommended hormone therapy. 2-ER-0223; 2-ER-0241. Six years after Wagoner first requested treatment, and four years after she sued, on August 22, 2022, MAC approved hormone therapy. 7-ER-1565. MAC's decision stated that the hormone therapy will be provided under the guidance of Samuelson who DOC recognized as "a consultant with expertise in the management of cross-sex hormones." *Id.*

17

Beginning in April 2023, eight months after Wagoner had begun hormone therapy, Samuelson made a series of clinical recommendations that Wagoner be assessed by a surgeon with experience in gender dysphoria. 2-ER-0229-33; 6-ER-1217. Her initial recommendation stated, "Due to the severe dysphoria, I am recommending that the patient undergo a gender-affirming bottoms [sic] surgery that includes orchiectomy and creation of a neovagina and may include other procedures as indicated." 6-ER-1310. Samuelson's medical opinion—consistent from April 2023 through her testimony at trial—is that hormone therapy is not adequate to address Wagoner's condition because she suffers from severe anatomical gender dysphoria. 2-ER-0229-33; 6-ER-1317. Samuelson testified that surgery is the only remaining treatment for Wagoner's genital dysphoria. 2-ER-0256; 2-ER-0229-33.

### G. MAC's Rejection of Treating Physician's Clinical Recommendations

In October 2023, MAC considered Samuelson's recommendation for surgery for the first and only time. 5-ER-0958-62; 7-ER-1566. MAC members, including Lawrence and Rutherford, did not have experience treating gender dysphoria and had neither assessed nor approved surgical care for anyone as treatment for gender dysphoria. 5-ER-0999. Lawrence could not confirm that the committee members had expertise in gender dysphoria. 5-ER-0963-64. Lawrence had never recommended surgery for a transgender person and did not recall performing a physical exam of Ms. Wagoner. 5-ER-0942. Mercer did not talk with Samuelson

18

about her recommendation to refer Wagoner to a surgeon. 5-ER-0867. In fact, there was no evidence that any MAC members provided any direct clinical care for gender dysphoria to anyone.

Rutherford knew that Samuelson had advised that gender-affirming surgery was necessary for Wagoner in 2023 but he had not spoken to her since. 5-ER-1000. Instead, MAC applied criteria not supported by medical standards of care in rejecting the recommendations. 5-ER-0912-18; 5-ER-0995; 7-ER-1566. On October 23, 2023, DOC rejected Samuelson's recommendations, thereby denying medically necessary surgery to Wagoner. 5-ER-0995. The Court found that MAC's denial was a rejection of gender-affirming surgery as an effective treatment, which the Court read as a categorical denial of gender-affirming surgery. 1-ER-0003. Lawrence testified that after this denial, neither MAC nor the GDMC considered surgical care for Wagoner again. 5-ER-0958-62.

## IV. SINCE DOC'S OCTOBER 2023 DENIAL OF MEDICALLY NECESSARY SURGERY, MS. WAGONER'S SEVERE GENDER DYSPHORIA HAS PERSISTED.

The Court found, "The credible evidence shows that, despite almost three years of hormone therapy, Wagoner continues to experience severe emotional and psychological symptoms of gender dysphoria." 1-ER-0046. And found that Wagoner "suffers from chronic pain due to her attempts at self-surgery."1-ER-0037. These findings are supported by the record and were not clear error. Wagoner's

complex regional pain syndrome "is a direct result of the attempts" at self-surgery (3-ER-0516) as are her "mangled" (2-ER-0333) and "mutilated" (6-ER-1302) genitals.

Despite MAC's refusal to approve Wagoner for surgery in 2023, Samuelson continued to send medical records recommending surgery. Samuelson treated Wagoner throughout 2024 and 2025; her last visit prior to trial was in February 2025. 2-ER-0231-32. After the February appointment, Samuelson wrote:

> I continue to recommend a gender affirming genital surgery for the patient as noted in the 10-28-24, 6-18-24, 1-25-24, and 4-11-23 chart notes. Patient continues to have significant genital dysphoria. Her genital disfigurement needs to be corrected due to pain, current UTI – urinary tract infections – and dysphoria. It really would be – it really would be counter productive to repair the penis and I continue to advocate for her to have gender-affirming bottom surgery that remedies her genital injury and affirms her female gender. Her physical and mental health would significantly benefit from not having disfigured genitals and have genitals that align with her gender.

6-ER-1217; 2-ER-0232-33.

Now, almost four years since MAC's denial of surgery, Wagoner continues to suffer due to inadequate treatment for her severe gender dysphoria.

## V. PROCEDURAL HISTORY

In September 2018, Wagoner filed a *pro se* complaint pursuant to 28 U.S.C. § 1983 and the Eighth Amendment to the U.S. Constitution, asking the District Court to order DOC to provide her with adequate medical care as treatment for her severe gender dysphoria. 8-ER-1781.

After lengthy delays, in May 2025, the Court held a five-day bench trial in which Wagoner was represented by counsel. *See* 8-ER-1822-26. Wagoner testified

20

and presented the testimony of her treating physician, Dr. Samuelson and two experts, Dr. Ettner and Dr. Gorton. DOC presented the testimony of two DOC security officers, one DOC mental health clinician, Ray Mercer; former DOC Chief Medical Office Dr. Lawrence; DOC Deputy Director for Health and Rehabilitation Services Adam Rutherford; and two experts, Dr. Boyd and Dr. Penn. 1-ER-0013.

In September 2025, the Court issued detailed findings of fact and conclusions of law and an Order (subsequently corrected per a consent motion (1-ER-0002-5)). Based on the record, the Court found that gender-affirming genital surgery is medically necessary for Wagoner. The Court found that Wagoner experiences distress from her gender dysphoria, emphasizing her history of self-surgery and her continued, nearly continuous self-harm by crushing her testicles. 1-ER-0026-27, 1-ER-37, 1-ER-46-47. The Court held that DOC's refusal to substantively consider Samuelson's recommendation that Wagoner be referred for surgery amounted to deliberate indifference; that DOC's decision to provide hormone therapy to Wagoner does not satisfy its obligations to her, when evidence shows that she continues to suffer from symptoms of severe and persistent gender dysphoria, for which gender-affirming surgery is a medically indicated treatment that DOC has refused to approve; and that DOC had enforced its *de facto* policy of not providing gender-affirming surgery as to Wagoner. 1-ER-0011-13, 1-ER-46-49.

The Court concluded that Wagoner satisfied all factors for a permanent

21

injunction and after considering the mandates of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a)(1)(A); the Court ordered the DOC Commissioner to refer Wagoner "to a qualified surgeon for evaluation and consultation for gender-affirming genital surgery," and to "take all actions reasonably necessary to provide Ms. Wagoner gender-affirming genital surgery." 1-ER-0002-5 And enjoined the enforcement of DOC July 2022 Policy #807.23 as to Section (V)(E). *Id.* DOC appealed.

## SUMMARY OF THE ARGUMENT

The District Court properly applied the standard for an Eighth Amendment claim and made the required factual findings based on a substantial record including credible testimony from Wagoner, her treating physician, and two experts who evaluated Wagoner. The record thoroughly supports the Court's finding that gender-affirming surgery is medically necessary treatment for Wagoner and the Court properly applied the established legal framework in determining that DOC was deliberately indifferent in refusing to provide that surgery despite Samuelson's multiple recommendations and the clear evidence of Wagoner's ongoing severe gender dysphoria. While the Court expressed some hesitancy with the accepted standards of care, the record amply supports its findings that gender-affirming surgery is medically necessary for Wagoner's gender dysphoria.

The Court properly concluded that DOC acted with deliberate indifference to

22

Wagoner's serious medical condition of gender dysphoria despite knowing of her ongoing suffering. The record shows that DOC rejected Samuelson's clinical recommendations and relied instead upon justifications that are unsupported by any medical standard of care. The record shows that DOC lacked any meaningful expertise on the treatment of gender dysphoria and without reference to any alternate medical standard of care denied surgery. Indeed, DOC hired Samuelson because of DOC's lack of expertise in treating gender dysphoria. MAC members were unqualified to assess or treat gender dysphoria, and none had ever before assessed for gender-affirming surgery. Instead, DOC chose to continue a course of treatment that was insufficient and inadequate for her severe gender dysphoria. DOC acknowledges that Wagoner's symptoms of gender dysphoria persist, but they deliberately chose to ignore Samuelson's medical opinions and multiple clinical recommendations that gender-affirming surgery is the only available treatment for Wagoner's severe gender dysphoria, causing her serious harm.

Additionally, the Court correctly found that DOC's application of its own policies imposed medically unsubstantiated criteria and effectively precluded Wagoner or any other person with gender dysphoria in DOC custody from ever accessing gender-affirming surgery, functioning as a *de facto* ban. On appeal, DOC now argues that it could enforce a categorical ban on gender-affirming care regardless of individualized need. This directly conflicts with Supreme Court and

23

Ninth Circuit precedent and is not supported by any of the experts' testimony.

Because DOC's refusal to provide Wagoner with adequate medical care including gender-affirming surgery violates her rights under the Eighth Amendment, the Court appropriately exercised its authority to enjoin DOC from further infringing those rights, ordering DOC to end the irreparable harm its denial of medically necessary care has caused Wagoner. The injunction meets all factors for a permanent injunction based on the establishment of actual success on her Eighth Amendment claim and complies with the mandates of the PLRA, 18 U.S.C. §3626(a).

For these reasons, the District Court's judgment should be affirmed.

## STANDARD OF REVIEW

Following a bench trial, the trial court's findings of fact are reviewed for clear error and its conclusions of law are reviewed *de novo*. *See Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 612 (9th Cir. 2020). The trial court's findings of fact must be accepted unless the reviewing court is left with a definite and firm conviction that a mistake has been made. *See Kohler v. Presidio Int'l, Inc.,* 782 F.3d 1064, 1068 (9th Cir. 2015); *Lentini v. California Ctr. for the Arts, Escondido,* 370 F.3d 837, 843 (9th Cir. 2004). "Clear error exists if the finding is 'illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'" *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir. 2014). "If the district court's account of the evidence is

24

plausible in light of the record viewed in its entirely, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 573-74 (1985). In assessing a permanent injunction this Court reviews "factual findings for clear error, legal conclusions *de novo*, and the scope of the injunction for abuse of discretion." *United States v. Washington*, 853 F.3d 946, 962 (9th Cir. 2017) (as amended).

## ARGUMENT

"To establish a claim of inadequate medical care, a prisoner must first show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (citation and internal quotation marks omitted).[5] This principle does not exclude gender dysphoria. *Id.* (recognizing that gender dysphoria is a sufficiently serious medical need to implicate the Eighth Amendment and collecting cases). The Eighth Amendment does not impose a higher standard for medical treatment for gender dysphoria than for other serious medical conditions. *Id.*; *Norsworthy v. Beard*, 87 F.Supp.3d 1164-1187 (N.D. Cal. 2015). Under this established framework, the Court properly held that

---

[5] *See Jett v. Penner*, 439 F.3d 1091 (9th Cir. 2006); *Colwell v. Bannister,* 763 F.3d 1060 (9th Cir. 2014); *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016).

DOC acted with deliberate indifference to Wagoner's serious medical need of gender dysphoria by denying her medically necessary gender-affirming genital surgery.

## I. THE DISTRICT COURT PROPERLY FOUND THAT GENITAL SURGERY IS MEDICALLY NECESSARY CARE TO TREAT MS. WAGONER'S SEVERE GENDER DYSPHORIA.

There is no dispute that Wagoner has been diagnosed with gender dysphoria and that gender-affirming surgery can be a medically necessary treatment for gender dysphoria. DOC's gender dysphoria policy agrees that surgical treatment can meet "the criteria for essential healthcare" for the treatment of gender dysphoria. 7-ER-1435. And all four experts opined that surgical treatment can be medically necessary to treat gender dysphoria. 2-ER-0153; 2-ER-0240; 3-ER-0510-11; 3-ER-0517-20; 5-ER-1046-47; 5-ER-1052; 5-ER-1079-80; 6-ER-1136-37; 7-ER-1435; 5-ER-0967-68. The Court's finding that it is medically necessary specifically for Wagoner is rooted in the record, as well as consistent with applicable jurisprudence. Based on the clinical experience and accepted medical standards of care employed by qualified doctors, the research studies admitted into the record, and the lack of barriers to obtaining surgery posed by any other health condition, the Court's finding that gender-affirming surgery is medically necessary for Wagoner was not clear error.

### A. The Court's finding that surgical treatment is medically necessary for Ms. Wagoner is supported by the record.

Referrals for surgical treatment to treat gender dysphoria—as with other medical conditions—are made on an individualized basis. 5-ER-0909-10. Based on its review of the record and trial testimony, the Court made independent findings concerning Wagoner's particular medical needs and found that surgery is medically necessary for her. DOC did not provide any evidence of some other treatment that could cure or substantially alleviate Wagoner's ongoing distress from her severe gender dysphoria.

### 1. Treating Physician and Expert Witness Testimony

### a. Dr. Samuelson's Medical Opinion

Samuelson has prescribed and monitored hormone therapy to Wagoner since 2022. In April 2023, based on her clinical experience, she determined that surgery was needed to treat Wagoner's severe gender dysphoria. 2-ER-0231. Samuelson determined that hormone therapy is not adequate to address Wagoner's gender dysphoria because she suffers from severe dysphoria relating to her genitalia. 2-ER-0229-30; 6-ER-1202 (medical record: "[h]as severe genital dysphoria [a]ttempted creation of orchiectomy and neo vagina by herself that has resulted in genital disfigurement"). She has recommended at least five times since April 2023 that Wagoner needs gender-affirming surgery, and informed DOC that Wagoner's symptoms of gender dysphoria have not resolved. 2-ER-0231-33; 6-ER-1217. The

27

first recommendation stated: "Due to the severe dysphoria, I am recommending that the patient undergo a gender-affirming bottom surgery that includes orchiectomy and creation of a neovagina and may include other procedures as indicated." 2-ER-0231.

Samuelson testified that surgery is the only remaining treatment for Wagoner's genital dysphoria. 2-ER-0256. Samuelson's testimony was unrefuted. Her medical recommendations are based on her clinical experience and clinical guidelines, including WPATH SOC. 2-ER-0241. She relied on records and her individual repeated and regular clinical meetings and assessments of Wagoner from July 2022 until April 2023 and continuing through May 2025. While DOC raises concerns about Wagoner's compliance with treatments for other conditions (Appellant Opening Br. 18-19; 26; 44; 46 (citing district court at 1-ER-39)), Wagoner has been compliant with her hormone therapy since 2022. 2-ER-0339.

The Court found that DOC's refusal to act on Samuelson's recommendations was based on applying criteria not supported by medical standards of care. 7-ER-1566. Indeed, DOC did not tell Samuelson that MAC would review her clinical recommendation so that she could offer her input. She was also never informed why surgery was denied. 2-ER-0236. When MAC rejected Samuelson's recommendations, it subjectively knew that Wagoner's symptoms persisted. 7-ER-1566. Despite this knowledge, MAC chose to continue a course of treatment that

28

was ineffective and inadequate and Wagoner continues to suffer.

### b. Expert Opinions of Dr. Ettner and Dr. Gorton

The Court properly recognized Ettner, a forensic and clinical psychologist, as an expert in the treatment of gender dysphoria, including referral and assessment for gender-affirming surgical treatments. 2-ER-0104. The Court also recognized Gorton, a medical and emergency doctor, as an expert in the field of transgender health generally and treatment of gender dysphoria, including referral and assessment for gender-affirming surgical treatment. 3-ER-0466. Both experts have decades of experience in referring and assessing patients for gender-affirming surgical treatment and they are the only experts in this case who are qualified to opine on the assessment and treatment of gender dysphoria *including surgical interventions. Id.* Both Ettner and Gorton have previously referred and assessed hundreds of patients for surgical treatment to treat gender dysphoria.[6] The Court did not find DOC's experts to be qualified as experts on the "treatment and referral" for

---

[6] *See Edmo,* 935 F.3d at 776-777; *Norsworthy,* 87 F.Supp.3d at 1177-1178.; *Pritchard v. Blue Cross Blue Shield of Illinois,* No. 3:20-CV-06145-RJB, 2022 WL 17092846, at *3 (W.D. Wash. Nov. 21, 2022); *Cordellione v. Comm'r, Indiana Dep't of Correction,* No. 3:23-CV-00135-RLY-CSW, 2024 WL 4333152, at *5, 15 (S.D. Ind. Sept. 17, 2024) (finding Ettner's testimony and conclusions to be credible and persuasive); *Hundley v. Aranas,* No. 3:19-CV-00458-ART-CSD, 2025 WL 2382988, at *3, *7 (D. Nev. Aug. 15, 2025) (finding Gorton's extremely detailed observations and experience with 1500 transgender patients to affirm his credibility). *Hicklin v. Precynthe,* No. 4:16-CV-01357-NCC, 2018 WL 806764, at *2 (E.D. Mo. Feb. 9, 2018); *Bernier v. Turbocam, Inc.,* 814 F.Supp.3d 229, 234-236 (D.N.H. 2026) (considering Ettner's various academic honors and determining Ettner is a qualified expert on gender dysphoria).

29

gender-affirming surgery. Boyd was qualified on "informed consent" for gender-affirming surgery (1-ER-0021), and Penn's qualifications did not include surgery (1-ER-0022).

As discussed below, qualified providers in the treatment of gender dysphoria apply accepted medical standards of care, here, WPATH SOC-8 surgical criteria when assessing whether an individual referral is appropriate.[7] After evaluating Wagoner, Gorton concluded that Wagoner meets WPATH SOC-8 and SOC-7 surgical criteria. 3-ER-0517-21. Based on his clinical experience he determined that surgery is medically necessary and that Ms. Wagoner should be referred to a surgeon. 4-ER-0614-16. Gorton testified that based on his clinical experience the likelihood that Wagoner's gender dysphoria would significantly improve without surgery is "zero." 3-ER-523.

Ettner evaluated Wagoner and based on her clinical experience and WPATH SOC she determined that Wagoner meets the surgical criteria under WPATH SOC-8 and SOC-7. 2-ER-0130. She testified that Wagoner has been compliant with her

---

[7] Gorton testified that health care providers apply these surgical criteria from WPATH SOC-8: (1) Gender congruence that is marked and sustained; (2) whether the patient meets diagnostic criteria for gender incongruence prior to gender affirming surgical intervention; (3) whether the patient demonstrates capacity to consent for the specific gender affirming surgical intervention; (4) whether there are other possible causes of apparent gender incongruence have been identified and excluded; (5) whether there are mental health and physical conditions that could negatively impact the outcome of gender affirming surgical intervention have been assessed with risks and benefits discussed; and (6), whether the patient is stable on their gender affirming hormonal treatment regime. 3-ER-0517-20.

hormone care and there is no indication that she would not be compliant with post-surgical treatment. 2-ER-0148. Ettner testified, "The postsurgical care that Ms. Wagoner would require is far less intensive than the wound care she's currently doing." 2-ER-0148.

By contrast, neither of DOC's experts evaluated Wagoner to offer a "dueling" opinion. While the Court found DOC's experts credible, both conceded their limited to non-existent experience referring patients for surgical treatment. What's more, DOC's experts failed to offer any fully informed precise opinion opposing Wagoner's need for a surgical referral. Boyd testified that while she sometimes refers people for medical consultations she does not recommend "for or against specific medical procedures," has not referred anyone for surgical care, had never met Wagoner, and could not give an opinion about her readiness for surgery, but saw no reason to delay a referral to a surgeon. 5-ER-1069-70; 5-ER-1041; 6-ER-1087-88. Penn testified that he had only assessed one person for surgery but would not provide any details of this assessment, other than the patient was in custody and Penn found that the person was eligible for surgery. 6-ER-1094-98. Penn had not evaluated Wagoner and testified that he or someone would need to do a further evaluation of her about a personality disorder, and that it would not be within his "wheelhouse" to make recommendations, though he agreed with Boyd about an independent surgeon or surgical evaluation. 6-ER-1136-37; 6-ER-1141.

31

### 2. The Court's finding that WPATH SOC is the prevailing standard of care for the treatment of gender dysphoria is supported by the record.

Regardless of whether *Edmo* requires a particular finding regarding WPATH SOC, the record fully supports its applicability to the Court's finding that gender-affirming genital surgery is medically necessary for Wagoner. Courts routinely make decisions about the appropriate medical standard when considering an Eighth Amendment claim. *See, e.g. Henderson v. Ghosh*, 755 F.3d 559, 566 (7th Cir. 2014). To determine the appropriate standard of care, courts look to the community standards outside of the prison context, which is "highly relevant in determining what care is medically acceptable and unacceptable." *Edmo*, 935 F.3d at 786; *United States v. DeCologero*, 821 F.2d 39, 43 (1st Cir. 1987) (holding prison officials must provide treatment "at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards."); *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (noting that treatment decisions are constitutionally inadequate when they are "'far afield of accepted professional standards'"). DOC has failed to produce evidence showing there is a community standard of care outside of the prison context that would support their bases for denying treatment or that there is a different standard of care that should apply in

32

prisons.[8] On the other hand, WPATH SOC have long been the prevailing standard of care for the treatment of gender dysphoria, including for incarcerated people. All the experts in this case, the treating physician, and DOC have consulted WPATH SOC in determining treatment.

WPATH SOC reflect consensus in expert opinion among professionals based on both collective clinical experience and a large body of research.[9] WPATH SOC are accepted by ever major medical organization in the United States, including the World Health Organization, NCCHC, AMA, the American Psychiatric Association, among others. 2-ER-0115-16.

DOC insinuates there are "cracks"[10] within the widespread consensus among major medical health care organizations in the country that endorse WPATH SOC. Appellant Opening Br. 10. But DOC's characterization is simply inaccurate.

---

[8] For example, Alaska's Medicaid program covers gender-affirming surgical treatment for Alaskans in the community not in DOC. *See* Alaska Admin. Code tit. 7, § 105.130 (21) (requiring prior authorization for "surgical procedures to alter a recipient's body to conform to the recipient's gender identity.").

[9] *See Hecox v. Little*, 104 F.4th 1061, 1069 (9th Cir. 2024), *as amended* (June 14, 2024), *cert. granted*, 145 S. Ct. 2871, 222 L. Ed. 2d 1154 (2025); *Poe v. Labrador*, 709 F.Supp.3d 1169, 1181–82, 1193 (D. Idaho 2023); *Doe v. Horne*, 683 F. Supp. 3d 950, 957-958 (D. Ariz. 2023), *aff'd*, 115 F.4th 1083 (9th Cir. 2024).

[10] DOC's assertion that the AMA has changed its position with regard to surgical treatment, is wrong. Appellant Opening Br. 10. AMA recently clarified that "there has been no change in AMA policy with respect to access to and provision of gender-affirming care." *See* Am. Med. Ass'n, *AMA Board Newsletter – March 2026*, https://cloud.e.ama-assn.org/newsletter?utm_source=SFMC&utm_medium=email&utm_term=3262026&utm_content=AMA_BoardNewsletter_Mar_032626&utm_campaign=MMX_Email_Newsletter_BoardChair&utm_uid=GENEM&utm_effort=GENEM#gender-affirming-care.

No organization has unendorsed WPATH SOC, and while the American Society of Plastic Surgeon's ("ASPS") statement recommends delaying surgical care to *minors*, its position supports such care for those over 18 years of age, like Wagoner, and it further reaffirmed its commitment to obtain clinical data on behalf of *adults*.[11] Lastly, DOC's citations to various legal concurrences are meager fare for attacking a body of professional standards and they are not decisional law. *Maryland v. Wilson*, 519 U.S. 408, 413 (1997); Appellant Opening Br. 9.

DOC asserts—without a shred of evidence—that WPATH relies on the wide consensus among health organizations rather than evidence-based medicine. *Id*. at 10. But DOC's criticism boils down to a view that only research studies that are "high quality," *i.e.*, the result of a double-blind studies, should be construed as evidence-based medicine. *Id*. But, as the record reflects, "low quality" and "high quality" are medical terms of art. "Low" does not mean "weak" or "bad," or that clinicians should not rely upon it.[12] 2-ER-0117. For this same reason, many widely accepted treatments based on clinical research that do not include double blind studies. Indeed, only 10% of medical and surgical interventions have high levels of

---

[11] Am. Soc'y of Plastic Surgeons, *ASPS Statement Regarding Gender Surgery for Adolescents*, (Aug. 14, 2024), https://www.plasticsurgery.org/reconstructive-procedures/asps-statement-regarding-gender-surgery-for-adolescents.

[12] The "Grading of Recommendations, Assessment, Development, and Evaluations" ("GRADE") is a process that determines the statistical degree of certainty that a particular treatment will have. *See* World Health Org., *Handbook for Guideline Development* 130 (2d ed. 2014).

34

certainty by this metric. Tonsillectomy, rotator cuff surgery and arthroscopic knee injury all are treatments supported by a "low" quality of evidence, as are the use of aspirin and Vitamin D. 2-ER-0118.

Furthermore, it would be impossible to conduct a double-blind test because there are obvious physical effects and it would be unethical to condition treatment on participation in a research study. 2-ER-0117-18. This is not a medically acceptable reason to doubt the efficacy of surgery to treat gender dysphoria.

### a. Courts routinely apply WPATH SOC in the prison context.

The actual implications of *Edmo*'s recognition of WPATH SOC's applicability to the determination of whether surgery is medically necessary is its reflection of the widespread recognition by courts that WPATH SOC apply to treatment for incarcerated persons.[13] The "WPATH Standards of Care have been endorsed by the National Commission on Correctional health Care ("NCCHC") as applying to incarcerated persons," and "[t]here are no other competing, evidence-

---

[13] *Cordellione v. Comm'r, Indiana Dep't of Correction*, No. 3:23-CV-00135-RLY-CSW, 2024 WL 4333152, at *7-8, *15 (S.D. Ind. Sept. 17, 2024) ; *Zayre-Brown v. N. Carolina Dep't of Pub. Safety*, No. 3:22-CV-191-MOC-DCK, 2024 WL 410243, at *5-6, (W.D.N.C. Feb. 2, 2024); *Iglesias v. Fed. Bureau of Prisons*, No. 19-CV-415-NJR, 2021 WL 6112790, at *2-3 (S.D. Ill. Dec. 27, 2021), *modified*, 598 F. Supp. 3d 689 (S.D. Ill. 2022); *JJS v. Pliler*, No. 19-CV-02020 (VSB)(SN), 2022 WL 16578124, at *1, *16 (S.D.N.Y. Aug. 3, 2022), *report and recommendation adopted sub nom. Shelby v. Petrucci*, No. 19-CV-2020 (VSB), 2022 WL 16575766 (S.D.N.Y. Nov. 1, 2022); *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 530 (S.D. Ill. 2019) ("WPATH dictates medically-accepted Standards of Care for treating gender dysphoria."); *Hicklin*, 2018 WL 806764 at *3; *Norsworthy*, 87 F. Supp. 3d at 1186 (WPATH Standards of Care are the accepted standards of treatment for transgender patients); *Williams v. Kincaid*, 45 F.4th 759, 768 n.3 (4th Cir. 2022).

35

based standards that are accepted by any nationally or internationally recognized medical professional groups." *Edmo v. Idaho Dep't of Correction*, 358 F. Supp. 3d 1103, 1124-25 (D. Idaho 2018), *aff'd*, 935 F.3d 757 (9th Cir. 2019). This has not changed since *Edmo*. The National Commission on Correctional Health expressly endorses WPATH SOC and advises prison healthcare providers to follow them. 2-ER-0116. Indeed, Penn testified that NCCHC presentations on gender-affirming care have helped to inform him. 6-ER-1145-46.

### b. There is no competing body of medical standards for the proper treatment of gender dysphoria.

No competing body of medical standards of care exists for the treatment of gender dysphoria. At trial, DOC offered no alternate standard of care for the treatment of gender dysphoria that is accepted in the medical community. The Court found that DOC's approach is a *de facto* ban on surgical care. There was no evidence showing it is rooted in a substantive medical consensus or body of standards of care. DOC offered anecdotes and distractions, while providing zero evidence supporting the position that denying treatment for gender dysphoria is anything but disregarding a substantial risk of serious harm.

### B. The Court's finding that surgical treatments are safe and effective was supported by research studies admitted into the record.

Although the trial court raised questions about the research supporting the safety and efficacy of gender-affirming surgeries, all three of the clinical research

studies entered into the record support its finding of medical necessity, concluding that surgical treatment effectively treats gender dysphoria. 8-ER-1668; 8-ER-1676; 3-SER-0664.[14] For example, the Almazan study concludes there is "an association between gender-affirming surgery and improved mental health outcomes" that provides new evidence to support the provision of gender-affirming surgical care." 2-ER-0299; 3-SER-0664.

While the Lewis study noted an "observed increase in mental health issues" for people who had attained surgery, it also noted that "gender-affirming surgery remains essential in aligning transgender individuals' physical appearance with their gender identity, offering significant psychological benefits.". 8-ER-1681; 2-ER-0290. This makes sense. Gender-affirming surgery is meant to treat gender dysphoria, and not mental health generally. 2-ER-0282. As such patients who need surgery, who already have a higher risk of mental health issues, will continue to show symptoms of a mental health condition that was pre-existing before surgery. 4-ER-0592-93. Attaining surgery does not extract transgender persons from their

---

[14] The three research studies that were admitted into the record are Cecilia Dhejne, et al., *Long-Term Follow-Up of Transsexual 228 Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden* (Feb. 2011) (8-ER-1668) ("Dhejne study"); Joshua Lewis, et al, *Examining Gender-Specific Mental 231 Health Risks After Gender-Affirming Surgery: a National Database Study*, (Jan. 25, 2025) (8-ER-1676) ("Lewis study"); Anthony Almazan, et al., *Association Between Gender-Affirming 240 Surgeries and Mental Health Outcomes* (Apr. 28, 2021) (3-SER-0664) ("Almazan study").

37

social environments where they experience harassment, discrimination, and ostracism. Indeed, without surgery, the mental health of those who need it would be even worse, not better.

The same holds true for the Dhejne study, which has been erroneously cited to support the proposition that surgical treatment leads to negative outcomes. 8-ER-1668. The Dhejne study is clear that it does not "address whether sex reassignment is an effective treatment or not." (Id. at 2). Gorton testified, "The study simply concluded that even though surgery alleviates gender dysphoria, that improved care is needed following surgery to reduce the disparities that exist between transgender people who have undergone surgical treatment and cisgender people who have undergone surgical treatment." 3-ER-0558.

Both the Lewis and Dhejne studies do not compare transgender people who have undergone surgical treatment, on the one hand, with transgender people who seek but who have not undergone surgical treatment, on the other hand. 2-ER-0291 ("[I]f you have two groups and one has undergone surgery and you have another group that is gender dysphoric but hasn't undergone surgery, … that [latter] group has a milder form of gender dysphoria and that the [former] group that's undergone surgery and the determination to go through surgery, that they would have had a more intense or severe form of gender dysphoria and, therefore, more attendant mental health issues"). This distinction is important because the mental health issues

for the latter cohort, which would include Wagoner, would likely be much higher than either those who have undergone surgical treatment *or* who do not need surgery at all. 2-ER-0291. Indeed, the only study in the record that does compare transgender patients who have undergone surgery with transgender patients who seek surgical treatment was a survey of 27,000 people, and unsurprisingly, it concluded that those patients who underwent surgical treatment had improved outcomes. 2-ER-0292; 3-SER-0664.

The Dhejne study, like the Lewis study, concludes that "surgery and hormonal therapy alleviates gender dysphoria," but that more needs to be done to improve care after surgery. 8-ER-1674. Far from casting doubt on its necessity, these studies suggest that additional measures should be taken to protect the well-being of transgender patients after surgical treatment given the stark disparities they experience because of stigma and discrimination.

### C. The record shows that, even if present, Borderline Personality Disorder and Anti-social Personality Disorder are not a barrier to receiving gender-affirming surgery.

The Court concluded that the denial of treatment "focused only on the severity of Ms. Wagoner's dysphoria" and therefore that "her borderline personality disorder is not relevant to whether DOC was deliberately indifferent at that time." 1-ER-0048-49. MAC did not deny surgery because of uncontrolled or severe BPD, and

39

DOC's post-hoc justification for denying surgery does not retroactively erase its deliberate indifference.

The record shows that Wagoner was diagnosed with BPD sometime after her gender dysphoria diagnosis. 2-ER-0130. It is unclear exactly when she was diagnosed with BPD or what, if any, treatment DOC has provided for it. Gorton testified that he was puzzled by the diagnosis because there was nothing in the record that "announced" the diagnosis or explained how Wagoner met the criteria for a BPD diagnosis. The first reference to BPD was June 20, 2017, but one week later, there is a medical note by Dr. Sawyer indicating that Wagoner had no known psychiatric history and, that there was no evidence of psychosis, delusions, and she was alert, cooperative and fully oriented. 1-SER-0081.

Nothing in the record indicates there was ever a treatment plan related to the BPD diagnoses or that any psychotropic medications or provider follow-up was scheduled. The only evidence of treatment in the record is that she was given workbooks and the hope that she will manage her condition by learning in "the school of life." 5-ER-0856; *see also* 3-ER-0526-27. Boyd explained that dialectical behavioral therapy for treating BPD would be a yearlong program involving group and individual therapy where participants' homework is to work on their workbook and then they come back and discuss work on the skills in a group. 5-ER-1061. This was never offered to Wagoner.

40

Even if BPD and anti-social personality disorder are valid diagnoses for Wagoner, all four experts agreed that treatment for BPD can be concurrent to gender dysphoria treatment: Ettner testified that "those conditions do not obviate the need for surgery or candidacy for surgery" and she did not observe any indications that Wagoner has uncontrolled BPD or antisocial personality disorder. 2-ER-0130-31. Gorton recognized Wagoner will need extra support and extra care but neither BPD nor antisocial personality disorder are a complication for surgery. 3-ER-0527-28. DOC did not refute this.

Boyd also agrees that BPD treatment can be concurrent to treatment for gender dysphoria. 5-ER-1067. Boyd believes Wagoner "needs an integrated approach that includes both gender affirming interventions and treatment for borderline personality." 5-ER-1043. Boyd believes the self-surgeries attempts might have been "an amalgam of both gender dysphoria and borderline [personality disorder]." 5-ER-1059-60. Penn, despite never having examined her, described Wagoner as "she's actually doing really well from a borderline perspective" and "her symptoms are pretty well managed". 6-ER-1123-24.

The record shows that Wagoner's self-surgery and ongoing self-harm are caused by her severe gender dysphoria that is inadequately treated. Even if BPD is present, it is not a barrier to surgery. Regardless, DOC cannot retroactively justify its denial of gender-affirming care by its own failure to treat BPD.

41

## II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT DOC ACTED WITH DELIBERATE INDIFFERENCE TO MS. WAGONER'S GENDER DYSPHORIA.

The Court determined that Wagoner satisfied the subjective prong of her Eighth Amendment claim. DOC was fully aware that gender-affirming surgery can be medically necessary treatment for gender dysphoria and denying such could create a serious risk of harm to Wagoner. DOC had Wagoner's medical records, grievances, and requests for care since 2018 which documented her long history of psychological distress, severe gender dysphoria, her repeated attempts at self-surgery and continuous self-harm to her genitals. DOC was also informed of Wagoner's serious medical need by Samuelson, who made multiple clinical recommendations for surgery based on the known risks if her gender dysphoria continues to be inadequately treated.

Despite these serious risks, DOC denied Wagoner medically necessary care. Under well-established law, this constitutes deliberate indifference in violation of the Eighth Amendment. *Edmo*, 935 F.3d at 803; *Gant v. County of Los Angeles,* 772 F.3d 608, 618 (9th Cir. 2014).

### A. The District Court's conclusion that DOC acted with deliberate indifference by rejecting the treating physician's treatment recommendations is amply supported by both applicable precedent and the record.

"In deciding whether there has been deliberate indifference to an inmate's serious medical needs, we need not defer to the judgment of prison doctors or

42

administrators." *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1989). Typically, "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012). "But that is true only if the dueling opinions are medically acceptable under the circumstances." *Edmo*, 935 F.3d at 786. Ignoring the recommendations of treating specialists and instead relying upon the opinions of non-specialist and non-treating DOC employees can constitute deliberate indifference. *See Colwell*, 763 F.3d at 1069; *Hamby*, 821 F.3d at 1092; *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992), abrogated on other grounds as stated in *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043 (9th Cir. 2002), overruled on other grounds by *Saucier v. Katz*, 533 U.S. 194 (2001).

The record establishes that DOC's repeated rejections of Samuelson's recommendations for surgery is not a difference of medical opinion between providers. DOC hired Samuelson because of her experience in gender dysphoria treatment and because DOC lacked the experience and qualified providers to provide such care. DOC acted with deliberate indifference to Wagoner's gender dysphoria when the MAC rejected Samuelson's clinical recommendations despite (a) having no expertise in treating gender dysphoria among the MAC and (b) applying criteria not supported by any medical standards of care but its own policy. *See Colwell*, 763

43

F.3d at 1069 (finding that the prison improperly ignored the recommendations of treating specialists in favor of non-specialist, non-treating medical opinions based on administrative policy).

Based on everything DOC knew about Wagoner's continued suffering and its repeated delays and denials of care, the Court properly concluded that the DOC's decision—made by DOC officials and staff without experience with gender-affirming surgery—to deny Samuelson's recommendations for surgery constituted deliberate indifference. *Snow*, 681 F.3d at 988.

> **1. The record supports the conclusion that DOC's refusing the treating physician's treatment recommendations in favor of DOC staff and officials without experience in treating gender dysphoria shows deliberate indifference.**

In 2022, Lawrence contacted Samuelson to "find someone that could assist [DOC] with providing" gender-affirming care to Wagoner. 5-ER-1000; 2-ER-0224-225. After starting Wagoner on hormone therapy, Samuelson repeatedly had clinical visits with Wagoner as recorded in her clinical notes. From April 20233 until February 2025, Samuelson's recommendations for surgery were made multiple times in writing to DOC. Her notes show that despite receiving benefit from the hormone therapy, Wagoner continued to suffer from severe gender dysphoria. Samuelson determined that gender-affirming surgery is the only available treatment for Wagoner's severe gender dysphoria. 2-ER-0229-33.

At trial, DOC witnesses could not confirm that MAC members were

experienced in the treatment of gender dysphoria. The record does not support that any DOC provider or MAC member had experience with the accepted standards of care for the treatment of gender dysphoria. 5-ER-0864. Lawrence, who was Chief Medical Officer when he was on MAC, could not answer whether any MAC members were experts in gender dysphoria, nor if they had training on gender dysphoria. 5-ER-0963-64. Lawrence admitted that he has never recommended any type of surgery for a transgender person. 5-ER-0937. Rutherford admitted he has never assessed anyone for gender dysphoria and had never evaluated Wagoner. 5-ER-0999. Mercer, who served on MAC and GDMC, conceded that he had no formal training on gender dysphoria. 5-ER-0864.Taken all together, the Court properly concluded that DOC acted with deliberate indifference when it denied the treating physician's clinical recommendations. In October 2023, when MAC considered Samuelson's clinical recommendations, no one from DOC contacted her to discuss her recommendations or its reasons for rejecting them. 2-ER-0236. In fact, Rutherford testified that Dr. Samuelson's recommendations "did not influence the MAC's decision in terms of what we felt was best" for Wagoner. 5-ER-0995-96.

**2. The record supports the conclusion that DOC's application of criteria unsupported by applicable standards of care constituted deliberate indifference.**

The Court determined that DOC, through MAC, applied criteria not supported by medical standards of care, as required by *Edmo*. 1-ER-0048. DOC did not provide

45

any evidence that it considered any accepted standards of care in its review and rejection of Samuelson's clinical recommendations.

From July 2022 onward, Samuelson explicitly detailed Wagoner's symptoms of *severe* gender dysphoria. 2-ER-0229-30. MAC concluded that surgery should be denied based on various alleged "concerns" including, insufficient evidence for the long-term benefit of "gender altering surgery" for preventing suicide, substance abuse, sexually transmitted diseases or cardiovascular disease. 7-ER-1566. MAC's decision was made by members who are not specialist or experts in the field of gender dysphoria and did not explain how MAC reached this conclusion.

Moreover, MAC's cited reasons for denying surgery show that DOC believes surgery is never an appropriate treatment for gender dysphoria. This was contradicted by the testimony of each expert and is belied by DOC's own policy which acknowledges that surgery can be an appropriate treatment, even as the policy provides no pathway for medically necessary surgery.

MAC alleges that Wagoner has demonstrated "patterns of behavior raising concern for compliance with post-surgical care." 7-ER-1566. This ignores the fact that Wagoner has been consistently compliant with her gender-affirming care. She has had no issues following her regiment hormone therapy and the record shows she is complying with the medical requirements for wound care to her genitals. 2-ER-0148. Ettner testified, "The postsurgical care that Ms. Wagoner would require is far

46

less intensive than the wound care she's currently doing. And she's complied with her hormones," she continued, "There's no indication that she wouldn't be compliant with care post-surgery, which consists of dilation for the first few weeks and postoperative consultation at two and six weeks and a follow up probably a year later." 2-ER-0148. Samuelson has also requested appropriate medical supplies for wound care to DOC noting, "Due to chronic healing genital mutilation, patient is at risk for urinary tract infections. She requires a way to clean her genitals." 6-ER-1217-18. DOC does not refute this. Instead, DOC points to examples not related to treatment for her gender dysphoria.

Despite MAC's determination that Wagoner's symptoms of gender dysphoria persisted and knowledge of her ongoing self-harm to her testicles, it stated that there was a lack of objective signs of deterioration in mental health over the last five years. MAC's decision states, "[s]ince receiving these interventions, Emalee Wagoner has *expressed no suicidal ideation and has displayed no actions of self-harm or self-mutilation*" or that "there is insufficient evidence to affirm that Ms. Wagoner's mental health and well-being will decline without surgery." 7-ER-1566.

MAC's refusal of surgery was thus based on its view that the risk of Wagoner dying by suicide was insufficiently high. 7-ER-1566. MAC irrationally insisted that Wagoner commit more self-harm and suicidality to get treatment. 7-ER-1566.

Such a dangerous standard is anomalous. Courts have held "it is inconsistent

47

with the Eighth Amendment . . . to withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's condition significantly deteriorates." *Gordon v. Schilling*, 937 F.3d 348, 359 (4th Cir. 2019). Such a policy is extremely dangerous because it invites suicidality, self-harm, and self-surgery by sending the message that the only way in which a desperate patient can obtain adequate medical care for gender dysphoria is to engage in highly self-injurious behaviors. Gorton testified that he is aware of no medical condition, that requires this level of further deterioration before providing adequate medical treatment. 3-ER-0535-36. He also clarified that the policy "doesn't make a lot of sense" given that most surgeons would require a certain period of stability before providing surgical treatment. 3-ER-0535.

DOC's July 2022 policy No. 807.23 purportedly provides for surgical interventions. 7-ER-1435. The policy states, "[s]urgical interventions for prisoners with gender dysphoria shall be for therapeutic purposes that meet the criteria for essential healthcare when symptoms of gender dysphoria have not responded to nonsurgical interventions." 5-ER-0967-68; 7-ER-1435. In other words, surgery would only be medically necessary if Wagoner's symptoms did not improve at all from hormone therapy. 5-ER-0894. Such a requirement is not supported by any medical standard of care, and DOC did not present any evidence in support. There are benefits to hormone therapy, which can cause some improvement to a patient

48

with gender dysphoria, but for someone who continues to experience severe distress and other symptoms, like Wagoner, surgery can be medically necessary. At trial, DOC's witnesses did not present any medical basis for its "essential health" definition and requirements.

The Policy's carve-out of any patient already receiving any benefit from some other treatment, compounded by a requirement that patients be actively engaged in suicidality and self-harm, along with DOC Care Guide's lack of a process to obtain surgical care, work as a ban on surgical care. DOC policy allows MAC to never approve surgery by ignoring the individualized needs of the patient regardless of medical necessity and interfering with and overruling a provider's medical judgment in violation of the Eighth Amendment.

**III.   THE DISTRICT COURT'S CONCLUSION THAT DOC ACTS WITH DELIBERATE INDIFFERENCE BY REFUSING TO PROVIDE MEDICALLY NECESSARY TREATMENT IN THE FACE OF HER ONGOING SEVERE GENDER DYSPHORIA IS AMPLY SUPPORTED BY BOTH APPLICABLE PRECEDENT AND THE RECORD.**

"To show deliberate indifference, the plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to the plaintiff's health." *Hamby*, 821 F.3d at 1092 (cleaned up). *Edmo,* 935 F.3d at 786. The Court found that Wagoner suffers from "severe and persistent gender dysphoria" and that "despite almost three years of hormone therapy, [she] continues

49

to experience severe emotional and psychological symptoms of gender dysphoria." 1-ER-0046. Wagoner continues "to suffer from gender dysphoria," and "to live in distress," as evidenced "not only by her attempts at self-surgery, but also by her continued, nearly continuous, self-harm by the crushing of her testicles." 1-ER-0047. These findings are supported by the record and not clear error.

"The provision of some medical treatment, even extensive treatment over a period of years, does not immunize officials from the Eighth Amendment's requirements." *Edmo*, 935 F.3d at 793; *see also Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (explaining that "[a] prisoner need not prove that he was completely denied medical care" to make out an Eighth Amendment claim); *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("[J]ust because [officials] have provided De'lonta with some treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with constitutionally adequate treatment."). DOC concedes that Wagoner's symptoms of gender dysphoria persists and that she continues crushing her testicles but nonetheless continues a course of treatment that is evidently insufficient to address her condition. 7-ER-1566. Mercer testified that Wagoner's continuous crushing has been discussed at treatment team meetings. 5-ER-0874-76. He conceded that Wagoner is distressed. 5-ER-0883. Shockingly, he testified that at the 2024 GDMC meeting the most recent reports of Wagoner's self-harm was from 2016. 5-ER-0875-76.

50

DOC's assertion that the Court's found that DOC "treated Wagoner comprehensively at every turn" is simply wrong.[15] Appellant Opening Br. 26-27. The Court made detailed findings that hormone therapy is not adequate treatment for her severe gender dysphoria and additional treatment is medically necessary, a determination supported by the unrefuted medical opinion of Samuelson. 2-ER-0256. Ettner also testified that at some point the benefits of hormone therapy remain the "new normal," but does not address the physical need for surgery. 2-ER-0124.

The record shows that DOC's continued denial of medically necessary care has caused a substantial risk of harm to Wagoner. As Ettner testified, "And the risk is predictable and dire …. Ms. Wagoner has demonstrated to us what the risk is. The risk is bodily damage that could ultimately lead to death." 2-ER-0151. She continued, "I believe that Ms. Wagoner understands that she is not capable of performing an inverted procedure, an inverted penile procedure on herself. She now understands that is impossible. And so she would either remove her genitals with laceration or via strangulation of the genitals." 2-ER-0153. "With laceration, there's

---

[15] It is highly concerning that Mercer, testified that he has only seen Wagoner for at most 20 minutes in over nine years. At trial, he vehemently argued against the diagnostic criteria, which under his understanding would create a higher standard for a diagnosis. 5-ER-0870; 5-ER-0879-83. And it was his opinion that Wagoner no longer had gender dysphoria, contrary to the experts' opinions and DOC. 5-ER-0873; 5-ER-846-47. This is not comprehensive treatment.

51

the risk of organ infection, sepsis, and excessive blood loss leading to death. With strangulation of the genitals, you would have a gangrenous organ that would have to be removed." 2-ER-0153-54. Wagoner testified that without receiving medically necessary surgery she would likely attempt to remove her genitals again to remove "myself from the torture of the – the male genitalia that I suffer from." 3-ER-0368.

**IV.    UNDER WELL-ESTABLISHED LAW, DOC'S *DE FACTO* BAN ON MEDICALLY NECESSARY CARE VIOLATES THE EIGHTH AMENDMENT.**

The Court's finding that DOC had a *de facto* ban on gender-affirming surgery is amply supported by the record and comports with controlling case law. The record shows that DOC's policy is not based on accepted medical standards of care did not include a process or criteria to approve gender-affirming surgery. MAC's denial of surgery was a "rejection of GCS as an effective treatment." 1-ER-0048. This Circuit has found such bans to violate the Eighth Amendment. See, e.g., *Colwell*, 763 F.3d at 1063 (the "blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy . . . is the paradigm of deliberate indifference"); *Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015) (holding plaintiff sufficiently alleged deliberate indifference where prison denied gender-affirming surgery because of a blanket policy).

On appeal, DOC argues that the Court erred by "concluding that *Edmo* prohibited States from concluding that irreversible and unproven sex-reassignment

52

surgeries were not an appropriate treatment for prisoners with gender dysphoria." Appellant Opening Br. 39. DOC now argues that a total ban on gender-affirming surgery does not run afoul of the Eighth Amendment. Appellant Opening Br. 29. DOC misstates the constitutional violation that the Court held and ignores the record that supports the Court's findings.

Ninth Circuit caselaw, including *Edmo*, and the majority of courts to consider the issue have found that such categorical or *de facto* bans on gender-affirming care violate the Eighth Amendment because they do not account for the individual medical needs of the incarcerated person. *See Rosati*, 791 F.3d at 1039–40; *Fields v. Smith*, 653 F.3d 550, 556–58 (7th Cir. 2011) (affirming permanent injunction enjoining statute that banned hormone therapy and gender-affirming surgery because "[a]lthough Act 105 permits DOC to provide plaintiffs with some treatment, the evidence at trial indicated that plaintiffs could not be effectively treated without hormones"); *Keohane v. Fl. Dep't of Corr. Sec'y*, 952 F.3d. 1257, 1266–67 (11th Cir. 2020); *Nosworthy*, 87 F.Supp.3d at 1191; *Robinson v. Labrador*, 747 F.Supp.3d 1331, 1340-43 (D. Idaho 2024) (granting preliminary injunction against statute that bans hormone therapy for transgender inmates); *Hicklin*, 2018 WL 806764 at *11 (granting preliminary injunction to transgender plaintiff who was denied medically necessary hormone therapy based solely on a blanket policy banning initiation of hormone therapy in violation of the Eighth Amendment); *Fisher v. Federal Bureau*

53

*of Prisons*, 484 F. Supp. 3d 521, 543 (N. D. Ohio 2020); *Iglesias*, 2021 WL 6112790 at *18–19, *27. DOC is asking this Court to carve out a different analysis for the treatment for gender dysphoria that is not based on individualized need. There is simply no transgender exception to established Eighth Amendment requirements of individualized assessments of an incarcerated person's serious medical need. *Estelle*, 429 U.S. at 104 n.10 (holding that officials' failure to "exercise of professional judgment," to determine what treatment is medically necessary at the time for a particular person can constitute an Eighth Amendment violation); *Rosati*, 791 F.3d at 1039–40.

DOC's reliance on the U.S. Supreme Court's decision in *U.S. v. Skrmetti*, 605 U.S. 495 (2025), is wholly inapplicable. Appellant Opening Br. 38. *Skrmetti* has no bearing on this Court's assessment of Wagoner's Eighth Amendment claim. In *Skrmetti*, the Supreme Court rejected an Equal Protection challenge to a state statute regulating the practice of medicine for minors with gender dysphoria under rational basis review. The Supreme Court determined that the Tennessee law classified based on age and medical condition and the state's justifications for barring hormone therapy for minors related specifically to its implications for minors. *Skrmetti*, 605 U.S. at 511. *Skrmetti* did not address the provision of gender-affirming medical care for adults at all and certainly did not apply the constitutional frameworks applicable to incarcerated adults to whom the state owes an affirmative constitutional duty to

54

provide adequate medical care. While the Equal Protection Clause may only subject governmental line drawing based on medical condition to rational basis review, the Eighth Amendment does not permit DOC to categorically bar treatments for a particular medical condition. *Edmo*, 935 F.3d at 796-797; *see also, e.g., Kosilek v. Spencer*, 774 F.3d 63, 91 (1st Cir. 2014) ("a de facto ban against SRS as a medical treatment for any incarcerated individual . . .. would conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs"); *Fields*, 653 F.3d at 556, 559; *Norsworthy*, 87 F.Supp.3d at 1191. This Court should reject DOC's invitation to apply "*Skrmetti's* logic" to the Eighth Amendment context, especially with a trial record showing that gender-affirming surgery is medically necessary treatment for Wagoner's gender dysphoria and that she continues to suffer from DOC's failure to provide it.

## V. THE DISTRICT COURT ACTED WITHIN ITS AUTHORITY BY GRANTING A PERMANENT INJUNCTION.

The trial court's injunction meets all relevant factors for a permanent injunction. *See, Independent Training and Apprenticeship Program v. California Dept. of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013); *eBay Inc. v. MercExch., LLC*, 547 U.S. 388, 391 (2006). And the injunction complies with the mandates of the PLRA because it is narrowly tailored to address the harms and is specific to the factual findings concerning Wagoner's medical needs and constitutional violations. The scope of the injunction is the least intrusive way to

55

provide Wagoner with adequate medical care and to stop DOC's *de facto* ban on gender-affirming surgery, as applied to Wagoner. *See Edmo*, 935 F.3d at 783 (finding that district court made the necessary need-narrowness-intrusiveness findings in issuing an injunction ordering that gender-affirming surgery be provided); *Norsworth*y, 87 F. Supp. 3d at 1194-1195. DOC cannot overcome the high bar of abuse of discretion review.

The relief ordered is specific to Wagoner's needs and based on the findings that surgery is medically necessary for her and that there is no adequate alternative treatment for her, which are supported by detailed findings concerning her medical history and DOC's failure to provide adequate care. The Court explicitly and correctly held that DOC's actions and policies constituted deliberate indifference to Wagoner's serious medical need that violated the Eighth Amendment. Thus, Wagoner has established actual success. There are no legal remedies available to cure the tangible and constitutional harms to her. The first two factors supporting an injunction are plainly met.

So, too, are the remaining factors. The Court found that unless Wagoner is provided adequate medical care including medically necessary gender-affirming surgery, she will remain at serious risk of irreparable harm caused by DOC. *See, e.g., Edmo,* 935 F.3d at 797-98, 800 ("[i]t is no leap to conclude that Edmo's severe, ongoing psychological distress and the high risk of self-castration and suicide she

56

faces absent surgery constitute irreparable harm."); *Norsworthy*, 87 F. Supp. 3d at 1192 (finding irreparable injury where plaintiff testified that "she suffers continued and 'excruciating' 'psychological and emotional pain' as a result of her gender dysphoria"). In the Ninth Circuit, "the deprivation of constitutional rights unquestionably constitutes irreparable injury," *Melendres v. Arpaio*, 695 F. 3d 990, 1002 (9th Cir. 2012), because "constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Am. Trucking Ass'ns, Inc., v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009). The balancing of equities and public interest weigh in favor of the permanent injunction. And "it is always in the public interest to prevent the violation of a party's constitutional rights." *See*, *Melendres*, 695 F.3d at 1002 (citations and internal quotations omitted)); *see also*, *United States v. Raines*, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all constitutional guarantees."). DOC did not identify any benefit to the public in continuing to deny medically necessary care.

DOC offers last-ditch considerations in an attempt to alter the balancing of the equities but cannot point to record evidence to support any of them. First, DOC's arguments concerning the security concerns of housing someone "more feminized in a male prison" and housing a biological male "in a female facility" are undermined by the record. Appellant Opening Br. 49-50 (quoting 6-ER-1118). Since 2016,

57

Wagoner has lived as a woman in men's prison and has undergone changes to her secondary sex characteristics since receiving hormone therapy. No DOC employees testified that Wagoner is a threat to DOC despite her living as a woman at GCCC. In fact, Lawrence testified that Wagoner's hormone treatment did not disrupt institution's security. 5-ER-0970-71. DOC did not explain how surgery would create a significant security threat to outweigh its DOC's constitutional obligation to provide adequate care. *See Fields,* 653 F.3d at 558 (holding that the district court did not abuse its discretion in concluding that defendants' evidence failed to establish any security benefits associated with a ban on hormone therapy.) DOC points to security concerns mentioned by Penn, but he conceded that he "is not a security expert." 6-ER-1133-34. In fact, DOC's counsel objected to further questioning of Penn on these issues because "[h]e's not an expert in custodial or safety or security." 6-ER-1132-35.

Second, DOC wrongly suggests that *Farmer* (Appellant Opening Br. 49) gives it a rubber-stamp to deny medically necessary care without presenting evidence explaining how this person is a security risk. This flatly misstates DOC's burden. In *Chess v. Dovey*, 790 F.3d 961, 972, 974 (9th Cir. 2015), the Ninth Circuit held that a jury in an Eighth Amendment medical care case should not receive the deference instruction to a department's security-based policy unless one party's presentation of the case plausibly draws a connection between the security-based

policy or practice and the medical care decision at issue. Here, DOC has not presented any evidence explaining how providing surgery would create a greater security risk. In fact, DOC claims that its policy would permit surgery.

Third, DOC's argument concerning housing of someone who has received gender-affirming surgery (Appellant Opening Br. 49-50) is mere conjecture since DOC has never provided gender-affirming surgery to anyone in its care. DOC argues that recorded phone calls from September 2016 in which Wagoner discussed a potential self-surgery with her ex-partner, show "secondary gains" for surgery. Appellant Opening Br. 15, 41; 3-ER-0407-08. DOC interpreted this call as Wagoner devising a plan to engage in self-harm to her genitalia to be moved to a women's facility. 4-ER-0642-51; 4-ER-0729; 4-ER-0785; 4-ER-0791-94. A statement that she wanted to be with females does not by itself suggest a secondary gain. 8-ER-1657. The record lacks other references to such a relationship being a "secondary gain" for surgery. 3-ER-0407-08. DOC did not present any evidence other than the 2016 calls to support this. DOC's other "secondary gain" argument concerning "trafficking or trading or black market" medications (6-ER-1121), simply does not apply to surgical care.

Finally, DOC did not provide any evidence about financial or logistical burdens it would incur related to providing surgery. Regardless, "costs cannot be permitted to stand in the way of eliminating conditions below Eighth Amendment

standards." *Wright v. Rushen*, 642 F.2d 1129, 1134 (9th Cir.1981); *see also Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (holding that a case seeking prospective relief cannot be dismissed simply because there is a shortage of resources.); *Hernandez v. Cnty. of Monterey,* 110 F. Supp. 3d 929, 957 (N.D. Cal., 2015) (balance of equities favored inmates given Ninth Circuit law holding "that the interest in protecting individuals from physical harm outweighs monetary costs to government entities"). DOC did not present any evidence to support that it could not transport Wagoner for treatment or have a provider come to Alaska or that it had actually considered the logistics involved when it decided to deny care to Wagoner. As the Court found in issuing its Order, "there is no evidence that granting this relief will have any adverse impact on public safety or the operation of the criminal justice system." 1-ER-0004.

The Court made required findings under the PLRA. In *Brown v. Plata*, 563 U.S. 493, 531 (2011), the Supreme Court held that "the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court" and that "collateral effects" beyond the plaintiff do not invalidate an otherwise proper remedy. *Id*. at 531-32. The scope of the permanent injunction enjoining the enforcement of a *de facto* ban on surgery is appropriate to address the constitutional violation. The PLRA requires that relief "correct[] the violations of prisoners' rights with the minimal impact possible on defendants'

60

discretion over their policies and procedures." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1071 (9th Cir. 2010); *see also Clement v. California DOC*, 364 F.3d 1148, 1152-1153 (9th Cir. 2004) (upholding injunction addressing unconstitutional system-wide policy). DOC's effective ban on providing gender-affirming surgery is unconstitutional and enjoining that section of its policy is the least intrusive way to remedy the constitutional violation.

## CONCLUSION

For years, DOC has acted with deliberate indifference to Ms. Wagoner's severe and persistent gender dysphoria in violation of the Eighth Amendment. For her, gender-affirming surgery is medically necessary and despite DOC's knowledge of her suffering and the necessary treatment it has refused to provide adequate care.

For the foregoing reasons, the judgment below should be AFFIRMED.

Dated: June 17, 2026

Respectfully submitted,

/s/ *Richard Saenz*

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
(202) 804-6245

Richard Saenz
Nephetari Smith*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall St., 19th Floor
New York City, NY 10005
(646) 307-7394

Susan Orlansky
Doron Levine
ACLU OF ALASKA FOUNDATION
1057 W. Fireweed La., Suite 207
Anchorage, AK 99503
(907) 952-1668

Sonja D. Kerr
Morgan J. Walker
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
(214) 219-8585

*Counsel for Appellee*
**Admission pending*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, I hereby certify that I am unaware of any

related cases currently pending in this court.

/s/ *Richard Saenz*
Richard Saenz

63

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**  **25-6813**

I am the attorney or self-represented party.

**This brief contains  13784 words,** including 0 words manually counted in

any visual images, and excluding the items exempted by FRAP 32(f). The brief's

type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** */s/ Richard Saenz*_____ **Date** June 17, 2026

64

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on June 17, 2026 and that service will be accomplished by the appellate ACMS system on all registered participants.

/s/ *Richard Saenz*
Richard Saenz